SARAH R. NICHOLS (SBN 233099)
NICHOLS LAW, P.C.
75 Broadway., Ste 202
San Francisco California 94111
Telephone: (415) 710-9116
Facsimile: (415) 276-1999
Email: sarah@nicholslawyer.com

DAVID S. RATNER (SBN 316267)
SHELLEY A. MOLINEAUX (SBN 277884)
RATNER MOLINEAUX, LLP
1990 N. California Blvd., Suite 20
Walnut Creek, CA 94596
Tel: (925) 239-0899
Fax: (925) 801-3818
david@ratnermolineaux.com
shelley@ratnermolineaux.com

Attorneys for Plaintiffs

MARY ELIZABETH KNOX;
RACHEL PIERSIG; ALISON
CHANDLER; MARY BLUMBERG;
JILL HENDERSON

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| MARY ELIZABETH KNOX; RACHEL PIERSIG; ALISON CHANDLER; MARY BLUMBERG; JILL HENDERSON,<br><br>                                              Plaintiffs,<br><br>v.<br><br>THE COUNTY OF CONTRA COSTA; THE CONTRA COSTA COUNTY DISTRICT ATTORNEY'S OFFICE; and does 1 through 10, inclusive;<br><br>                                              Defendants. | **Case No.: 3:20-cv-01449**<br><br>*SECOND* **AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

PLAINTIFFS MARY ELIZABETH KNOX; RACHEL PIERSIG; ALISON CHANDLER; MARY BLUMBERG and JILL HENDERSON complain and allege as follows:

## I.   INTRODUCTION

1.      Plaintiffs Mary Elizabeth Knox ("Knox"), Rachel Piersig ("Piersig"), Alison Chandler ("Chandler"), Mary Blumberg ("Blumberg") and Jill Henderson ("Henderson") (collectively "Plaintiffs") bring this Complaint alleging that Contra Costa County District Attorney's Office ("DA's office") has engaged in, and continues to engage in, ongoing gender and age discrimination.  Plaintiffs are currently employed as Deputy District Attorneys in the County of Contra Costa. Plaintiffs seek lost wages, emotional distress damages, equitable and injunctive relief, as well as attorney's fees and costs.

2.      Diana Becton is the elected District Attorney of Contra Costa County. Ms. Becton has served as District Attorney since her appointment by the Contra Costa County Board of Supervisors in September 2017 and her election in June 2018. In this position, as head of the Contra Costa County District Attorney's Office, Ms. Becton is Plaintiffs' supervisor.

3.      After Plaintiffs protested Ms. Becton's gender and age discrimination, Ms. Becton retaliated against each Plaintiff, further exasperating the gender and age discrimination within the District Attorney's Office.

## II.   JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over Plaintiffs' complaint pursuant to 28 U.S.C. sections 1331 and 1343. This Court has jurisdiction over Plaintiffs' state law claims pursuant to the Court's power of pendant jurisdiction over related state law claims.

5.      Venue is proper in the U.S. District Court for the Northern District of California pursuant to 28 U.S.C. section 1391, in that the events giving rise to Plaintiffs' complaint occurred within Contra Costa County, Defendants are located in Contra Costa County, and Plaintiffs are citizens and residents of Contra Costa County, California, all of which are within this judicial district.

## III.   PARTIES

6.      Plaintiff Mary Elizabeth Knox has been employed as a prosecutor in the Contra Costa County District Attorney's office for over thirty-four years, from December 1985 to the present.

7.     Plaintiff Rachel Piersig has been employed as a prosecutor in the Contra Costa County District Attorney's office for over twenty years, from February 1999 to the present.

8.     Plaintiff Alison Chandler has been employed as a prosecutor in the Contra Costa County District Attorney's office for over fifteen years, from December 2004 to the present.

9.     Plaintiff Mary Blumberg has been employed as a prosecutor in the Contra Costa County District Attorney's office for over thirteen years, from December 2006 to the present.

10.     Plaintiff Jill Henderson has been employed as a prosecutor in the Contra Costa County District Attorney's office for over twenty-two years, from February 1998 to the present.

11.     Defendant County of Contra Costa and Defendant Contra Costa County District Attorney's Office are governmental entities located in Contra Costa County, California.

12.     Plaintiffs do not know the true names and capacities of defendants sued as Does I through 10. Plaintiffs will amend the complaint to show the true names of each such defendant when their identities have been ascertained. Each of the Doe defendants encouraged, participated, ratified and approved the conduct complained of herein. Each Doe defendant was at all relevant times the agent, employee, or representative of the named Defendants and/or the other Doe defendants, and was acting within the course and scope of such relationship.

## IV.     EXHAUSTION OF ADMINISTRATIVE REMEDIES

13.     On September 4, 2019, Ms. Knox filed a complaint with the California Department of Fair Employment and Housing. She received a right to sue notice on September 4, 2019.

14.     On August 23, 2019, Ms. Piersig filed a complaint with the California Department of Fair Employment and Housing. She received a right to sue notice on August 23, 2019.

15.     On September 11, 2019, Ms. Chandler filed a complaint with the California Department of Fair Employment and Housing. She received a right to sue notice on September 11, 2019.

16.     On November 21, 2019, Ms. Blumberg filed a complaint with the California Department of Fair Employment and Housing. She received a right to sue notice on November 21, 2019.

17.     On May 14, 2020, Ms. Henderson filed a complaint with the California Department of Fair Employment and Housing. She received a right to sue notice on May 14, 2020.

## V.      PLAINTIFFS

18.      Each Plaintiff is a seasoned, career prosecutor with a history of accomplishments in the District Attorney's office. Over the years, the DA's office rewarded Plaintiffs' individual accomplishments with promotions, special assignments, and committee assignments. All of that changed when Ms. Becton assumed the role of district attorney. Each Plaintiffs' career highlights are detailed below.

### A.  Plaintiff Mary Elizabeth Knox

19.      Mary Elizabeth Knox has been employed as a Prosecutor in Contra Costa County for thirty-four (34) years, working for four District Attorneys, each with different management styles and objectives.

20.      Ms. Knox's career has been impressive and exemplifies her dedication to the DA's office and to the citizens of Contra Costa County. She was promoted to executive management as a Senior Deputy District Attorney in July 2013 and served for five years with excellent reviews until she was unceremoniously demoted without warning in October 2018 by Ms. Becton.

21.      Prior to her promotion to Senior Deputy District Attorney in 2013, Ms. Knox was the Homicide Unit Supervisor and had spent approximately six years in the Homicide and Gang Homicide Units.  She has been assigned to every criminal unit in the office and has tried approximately thirty (30) misdemeanor trials and ninety (90) felony trials.  Her work has resulted in multiple murder convictions, the conviction of notorious sex traffickers and the conviction of "legal counsel" for the local Aryan Brotherhood who represented himself and cross-examined his eighth rape victim.  She has been recognized locally, regionally and state-wide for her excellent legal skills, leadership ability and ethics.

22.      Ms. Knox was the creator of the Community Violence Reduction Unit ("CVRU"), which functions as the prosecutorial arm of the District Attorney/FBI Safe Streets Task Force, handling wiretap investigations and gang-related gun violence and homicides.

23.      To address an epidemic of gang-related shootings on Hwy 80 and Hwy 4, Ms. Knox organized nine state and local law enforcement agencies into the Allied Freeway Shooting Agencies.

24.     Ms. Knox successfully obtained $3.5 million in funding from the California State Transportation Agency for the Freeway Security Network, a system of integrated ShotSpotter, pan-tilt zoom cameras and license plate readers, to overcome the investigative challenges of the freeway shootings.

25.     In addition to conceiving of, creating, and supervising the CVRU, Ms. Knox supervised the Juvenile Unit and the Drug Unit, developed and oversaw the annual week-long New Prosecutor training and MCLE training, was the District Attorney representative on the steering committee of the Youth Justice Initiative grant, and managed the remodeling of the office at 900 Ward Street. As a Senior Deputy District Attorney, Ms. Knox's management responsibilities included input on hiring decisions regarding the contract and permanent attorneys, transfers of the attorneys, evaluations of the attorneys and clerical staff, the organization of management training and input on office-wide policy and procedure.  In addition to these responsibilities, Ms. Knox continued to take homicides, gang homicides and human trafficking cases to jury trial.

26.     Ms. Knox has a long history of supervisory experience.  As the Misdemeanor Team Supervisor in Richmond in the early 1990s, she directly supervised five attorneys.  While she was the Misdemeanor Team Supervisor at 10 Douglas, Ms. Knox directly supervised eleven attorneys. As the Homicide Unit Supervisor, she supervised four attorneys. As the Senior DDA over the Juvenile and Drug Units, she supervised a Unit Supervisor with five attorneys under her and directly supervised four attorneys in the Juvenile Unit.  As the Senior DDA over CVRU, she supervised seven attorneys, an asset forfeiture law clerk and an accountant.

**B.     Plaintiff Rachel Piersig**

27.     Ms. Piersig is employed as a prosecutor of Contra Costa County. In her more than 20 years with the DA's Office she has personified what it means to work for the County by serving its most vulnerable and she has been recognized for her close relationships and strong advocacy for vulnerable victims.  Ms. Piersig has worked and tried cases in almost every unit in the office.   In 2011, she was promoted to supervise the Domestic Violence and Elder Abuse Units.  She headed the Domestic Violence Unit for four (4) years transforming into an effective and powerful unit with better trainings,

support for victims and procedures ensuring better conviction rates. During this same time period, she headed the Elder Abuse Unit, mending elder agency relationships that predecessors had broken and building the prestige of the Unit. After this remarkable leadership, she spent three years in the Homicide Unit, trying more than double the cases typical for that timeframe. She has proven effective in her leadership style and advocacy, devoted in her commitment to her cases, and is a trusted colleague and supervisor.

28.     Despite her qualifications and experience, Ms. Becton put Ms. Piersig in a role beneath her experience and skill set. She has been overlooked for promotions that have gone to younger less qualified males. Ms. Piersig is 48 years old.

29.     Since October 2018, Ms. Piersig has supervised the felony preliminary hearing team as a Felony Expeditor. Ms. Piersig's responsibilities include evaluating and making plea offers on felony cases, training inexperienced attorneys in felony cases so they can move to the trial team, and supervising the felony preliminary hearings. Although, this is a supervisory role, it is considered an entry Level supervisory role and beneath Ms. Piersig's prior experience and success. In this role, she is not given the opportunity to utilize her experience and skill set. Instead, less experienced male attorneys are being promoted into the desirable roles in the office.  The rate of advancement for males is significantly faster than it is for equally or more qualified female prosecutors.

30.     Prior to her transfer into the Felony Expeditor position, Ms. Piersig was in the Homicide Unit for over three years. Her performance in the Unit was exemplary.  Typically, attorneys try only three to six cases in a three-year period in the Homicide Unit; Ms. Piersig tried nine.

31.     Prior to her successful time in the Homicide Unit, Ms. Piersig was the Unit Supervisor for the Felony Domestic Violence Unit for over four years.  As the Unit Supervisor, she made filing determinations for felony domestic violence cases submitted to the office, trained and supervised attorneys at varying levels of experience, oversaw the litigation of all cases, implemented group and individual goals to encourage collaboration within the office, was ultimately responsible for all case dispositions, sat on advisory boards and made budgetary decisions for the Family Justice Center. She also handled her own caseload of complex domestic violence cases.

32.     When Ms. Piersig took over the Domestic Violence Unit, it was severely understaffed, poorly managed, and an undesirable unit in which to work. She restructured the unit, designing new standards and procedures. By the end of her four years leading the Unit, it was a desirable assignment with attorneys requesting to be transferred to the unit as they knew they would get the support, leadership, and training needed to be successful.

33.     Ms. Piersig's work restructuring the Domestic Violence Unit included creating a system that allowed the unit to determine the success rate of defendants on probation.  The new system enabled the office to track new offenses committed and admitted by offenders on probation which assisted the attorneys in prosecuting new cases.

34.     Ms. Piersig established guidelines for the Domestic Violence Unit that required that all filed cases have corroborating evidence so that the case could be proven without the necessity of the victim's testimony at trial, which lessened the unfair burden on victims to prove the case.  She trained all county police on these new standards, as well as all county misdemeanor and domestic violence filers, in order to ensure standardization across the office.  As a result, the domestic violence felony conviction rate increased.

35.     Other accomplishments in the Domestic Violence Unit included implementing a domestic violence offender database available to the entire DA's office, partnering with the Children's Interview Center to work with children exposed to domestic violence situations and partnering with the county probation office in order to keep track of probation violations.  This meant that the DA's office could determine whether a sentence for a probation violation would be sufficient and achieve a just result, without the need and expense of filing a new criminal charge against the offender.

36.     During this time of incredible accomplishment in the Domestic Violence Unit, from 2011 to 2015, Ms. Piersig was astonishingly also the supervisor of the Elder Abuse Unit.  This unit was also severely understaffed when Ms. Piersig began leading it, with just one part-time attorney position assigned to the Unit.  Ms. Piersig was able to increase that to a full-time position, allowing the attorney to take two significant Elder Abuse cases to trial within a year and obtain convictions in both.  This reestablished necessary relationships between the DA's office and elder partner agencies.

*SECOND* AMENDED COMPLAINT

7

37.     Ms. Piersig has been assigned to over a dozen different Units and has tried nearly sixty criminal trials, including twenty-five (25) misdemeanor trials and thirty-four (34) felony trials.  She has conducted well over five hundred (500) preliminary hearings.  Her work has resulted in multiple violent felony convictions, including murder, gang cases, domestic violence, sexual assault, and elder abuse. She has also secured guilty verdicts for drug felonies and complex financial cases, such as welfare fraud. She has been recognized for her excellent legal skills, leadership ability and ethics.

38.     After Ms. Piersig's impressive time as supervisor of the Domestic Violence and Elder Abuse Unit, Ms. Piersig was assigned to the Homicide Unit in September 2015. Chris Walpole was assigned to the Homicide Unit in May 2016 and Derek Butts became the Homicide Supervisor at the same time. Alison Chandler was assigned to the Homicide Unit in September 2016. For the next two years, these four attorneys comprised the Homicide team.

39.     Despite being the senior member of the homicide team and uniquely qualified for certain homicide cases, especially domestic violence related cases given her experience in the Domestic Violence Unit, Ms. Piersig was often passed over for these cases. Instead, the cases were assigned to a junior member of the homicide team, Mr. Walpole. While Ms. Piersig had more relevant experience for these challenging and impactful cases, they were given to Mr. Walpole to raise his status, presence, and prestige in the office.

40.     While Mr. Walpole was assigned prominent cases to raise his status, presence, and prestige, Ms. Piersig was often assigned problematic cases. Some examples of these cases are:

    i.  A case in which Ms. Piersig was tasked with getting a voluntary manslaughter at trial. Even though the case could have been settled for a plea of voluntary manslaughter, she was forbidden from accepting a plea and told it must go to trial. After a hung jury came back, Ms. Piersig again reiterated that this case should not have been tried. Her supervisor responded that she was, "the only one who complains," characterizing legitimate prosecutorial concerns expressed by Ms. Piersig as whining, a gendered insult.

    ii. Ms. Piersig had ethical concerns prosecuting another case in which she believed a key witness was lying. Ms. Piersig voiced concerns that a conviction would be based upon

perjured testimony.  During a meeting with her superiors, she was mocked as not being tough enough and for not having done a tour in the gang unit where witnesses lied out of fear.  Ms. Piersig pointed out that the case in question was not a gang case, and it would be unethical to base a conviction on perjured testimony.  Ultimately, the Assistant District Attorney agreed and offered a plea deal to the defendants.

iii.  In a murder case, there were issues with identifying the defendant as the gun shooter making it a very risky case to try.  Ms. Piersig was not allowed to offer a plea deal. She brought this specific issue to the attention of Ms. Johnson. Ms. Johnson seemed to agree with Ms. Piersig but ultimately insisted that Ms. Piersig try the case. The jury acquitted the defendant after only 45 minutes of deliberation.

**C.    Plaintiff Alison Chandler**

41.    Ms. Chandler is employed as a Prosecutor in Contra Costa County.  In her over fifteen (15) years with the DA's Office she has proven that she is dedicated to her role and invested in the County. She has been a member of the Felony Trial Team, Juvenile Prosecution Unit (2 times), Domestic Violence Unit, Special Operations, Sexual Assault Unit, Felony Filer (2 times), and the Homicide Unit.  She has prosecuted all types of cases including large financial fraud, gang crimes, homicide, sexual assault, child abuse and domestic violence.

42.     Prior to her transfer into her current position, Felony Filer in Richmond, Ms. Chandler was in the Homicide Unit for almost three years. Her performance in the Unit was excellent. She handled complex cases in sexual assault and insurance fraud. Two of her cases led to published decisions, one that is used statewide to charge and convict sexual predators. She put in place policies in the office still used today. Ms. Chandler worked passionately to build a strong, professional working relationship between the DA's office and the US Attorney's Office to assist with prosecuting child exploitation.

43.    Ms. Chandler took over fifteen sexual assault cases to jury verdict, many of which resulted in life sentences for the most violent offenders.  She received justice for the most vulnerable victims and quickly became known for her skill and passion in the area of sexual assault.

44.     When Ms. Chandler was in the Special Operations Unit from December 2009 through July 2012, she took on the unglamorous task of grant writing and secured over $2.1 million in grant money for the District Attorney's office. With Ms. Chandler's efforts to expand the Insurance Fraud Unit, the DA's office was awarded the 2012 Organized Auto Insurance Fraud, a competitive three-year grant that allowed the office to hire multiple investigators in Special Operations and grow its financial crimes investigation and prosecution.  Only ten counties may participate in this award and up until Ms. Chandler applied on behalf of Contra Costa County, only ten counties had ever applied.  Ms. Chandler's application was the first time Contra Costa County had applied for the grant.  Her application made the grant competitive and she was successful.  The County still benefits from the award of this grant and Ms. Chandler's efforts.  This achievement is evidence of Ms. Chandler's tenacity, ability to collaborate and lead through innovation. Ms. Chandler also worked on other grants that were awarded for the first time to the Contra Costa County District Attorney's Office while she was in the insurance fraud unit. Her grant templates are used as frameworks for attorneys in the units today.

45.     Ms. Chandler worked to expand the Auto Insurance Fraud Unit by beginning the process to create an Auto Theft Task Force. She wrote the Contra Costa County "CoCoRATT" agreement and met with agencies across Contra Costa County to obtain support and commitment for the Task Force.

46.     At the same time, Ms. Chandler worked with CONFIRE a multi-agency Fire, Rescue and Emergency Medical Services Dispatch Center to investigate and prosecute arson cases.  Ms. Chandler became an expert in arson investigation and prosecution and used this knowledge to strengthen the DA's relationship with the Fire Department.  Ms. Chandler published an article on Arson Prosecution for prosecutors to use across the state of California. Additionally, she taught arson investigation and prosecution around the state.

47.     Ms. Chandler has traveled over the state and regularly trains on topics including the investigation and prosecution of complex, large-scale insurance fraud rings.  She has trained at the National Sexual Assault Conference on Victim Centered Prosecution and she is the attorney coordinator for the Detective Symposiums in Contra Costa County.  In addition to her work in the DA's Office, Ms. Chandler is a professor at JFK School of Law where she taught Evidence for three years, currently

teaches Trial Advocacy and the Moot Court Program, and is assisting in the development of online curriculum for the law school as a subject matter expert.  Ms. Chandler also has taught for close to ten (10) years at the Contra Costa County Sheriff's Office Law Enforcement Training Center.

48.     Ms. Chandler is published in the California Sexual Assault Training Manual for prosecutors published by the California District Attorneys Association.  She also sits on the California Office of Emergency Services Sexual Assault Advisory Committee to the Governor.

49.     During her tenure with the DA's Office, Ms. Chandler has consistently proven herself to be a team player, willing to go above and beyond her stated duties and sought out opportunities to gain valuable supervisory experience. She filled in as the Richmond Misdemeanor Team Leader position for an extended period. She expedited in the Pittsburg office on numerous occasions when asked. She assisted in supervising in misdemeanors at 10 Douglas when asked to fill in, and willingly assisted supervisors in her Units with tasks when they were away.  While Ms. Chandler worked in the Insurance Fraud Unit, she volunteered her time to the sexual assault unit to gain experience in a gang rape case involving seven co-defendants.  While assigned to Special Operations, in the Auto Insurance Fraud Unit, Ms. Chandler also ran the Unit.  She was responsible for filing, disposition, and grant writing for the Unit.  This Unit now has a supervisor and multiple attorneys because she successfully wrote a supplemental grant that created a second position in the Unit.  Her efforts provided funding to hire multiple investigators and paralegals.  Although not given the role, title, or prestige of supervisor, she was doing the work of a supervisor and she was responsible for making all the offers on cases.  Ms. Chandler has proven herself capable, willing, and able to take on a supervisory role in the office, yet she is consistently passed over for important roles with those roles going to younger, less qualified and less experienced males.

D.     **Plaintiff Mary Blumberg**

50.     Mary Blumberg has been employed as a prosecutor for thirteen (13) years with the DA's Office.  She currently works countless hours in the homicide unit, and has contributed to the mission of the DA's Office with her heart, passion, and commitment as a supervisor of the misdemeanor team, in the Sexual Assault Unit, supervising the Real Estate Fraud Unit, in Auto Insurance Fraud Unit and as a

trial lawyer.  She mentors both through a formal mentorship program and informally through providing advice, guidance and assistance to new attorneys and colleagues in general.

51.     Mary Blumberg is one of a very small group of prosecutors who has tried sixteen sexual assault jury trials, many of which resulted in verdicts of life and life without possibility of parole.  She has specialized in Child Victim Crimes and managed a Child Abuse Grant protecting the most vulnerable victims.  For the past seven years, Ms. Blumberg has taught at the Advanced Sexual Assault School for Detectives statewide; she is published in the California District Attorney's Office Training Guide for Child Victim Crimes and Sexual Assault; she mentors young attorneys in sexual assault cases, and serves as a resource to the County Child Interview Center.

52.     Mary Blumberg shined in the Special Operations Unit while working in Auto Insurance Fraud and Real Estate Fraud.  As a supervisor, Ms. Blumberg transformed the Real Estate Unit with her commitment and focus on the victims.  She collected over three quarters of a million dollars in paid restitution for victims of real estate fraud.  She lectured at countywide real-estate forums aimed at ensuring citizens, brokers and title companies understood the trends in real estate crimes, and she trained other attorneys statewide at the California District Attorney's Association's (CDAA) annual fraud symposium.  Under Ms. Blumberg, the Unit was expanded from one investigator to three investigators and a paralegal.  With additional resources, the Unit investigated and prosecuted more complicated cases, including an extremely complex $11 million embezzlement case.  Ms. Blumberg prosecuted complex, multiple defendant insurance fraud rings that staged collisions and endangered countless citizens on the roads of Contra Costa County.  She was one of the first prosecutors in Contra Costa to begin undercover investigations in collaboration with statewide agencies and other counties to eradicate consumer fraud in auto body shops.

53.     Mary Blumberg worked as the Misdemeanor Team Leader in Central Eastern Operations for one year with the largest staff of young lawyers.  As part of her duties, she mentored young lawyers, attended policy meetings regularly, assisted in hiring decisions, and wrote formative evaluations for these lawyers.  Ms. Blumberg provided an energetic, supportive environment for young lawyers,

nurtured their growth and earned a strong reputation as a leader and a successful manager. The attorneys continue to ask her for advice.

54.    Mary Blumberg has taught for over ten years at Community Academies across the county, where Ms. Blumberg developed a bilingual presentation for Spanish speaking participants. Ms. Blumberg developed a Community Academy curriculum for the District Attorney's Office that is the framework for the course taught currently. Ms. Blumberg is a certified instructor for the Law Enforcement Training Center, and teaches prospective officers at the Police Academy. She actively participates in training and mentoring of law students that attend the "Prosecutor Academy," a one week "camp" for future prosecutors. She also privately mentors countless attorneys in the office daily when they seek advice.

### E.    Plaintiff Jill Henderson

55.    In her more than twenty-two (22) years with the DA's Office, Jill Henderson has proven herself to be a fierce litigator, handling more than 100 trials ranging from misdemeanor petty theft to gang murders, with a 99% success rate. Her meticulous preparation, keen grasp of legal issues and superb oral advocacy skills make her a valuable attorney and respected advisor.

56.    Ms. Henderson has been the supervisor of Elder Abuse Unit Supervisor since 2014. The litigation she has engaged in while in the Elder Abuse Unit is unprecedented. She conducted the first duty of care murder trial, first dementia rape and first duty of care homicide trials in the county. She is a recognized expert in elder abuse prosecution statewide and has conducted over 20 public speaking engagements on the topic. Other district attorneys from all over the state consult with Ms. Henderson on elder abuse prosecution methods. Prior to 2014, she spent three years in the Homicide Unit and prevailed in every trial. She has worked in nearly every unit in the DA's office. Ms. Henderson has worked tirelessly to improve methods for victim restitution, earning recognition by the victim witness advocates for her work. She also developed a special community prosecution program in collaboration with the Concord Police Department and the California Department of Justice to address issues in the Monument Boulevard corridor in the City of Concord, by collaborating with residents to tackle low level, chronic quality of life crime.

57.     An email from Ms. Becton herself in 2018 stated, "Jill completed a tour in the homicide unit where she successfully prosecuted murders and gang murders, including special circumstances cases.  Jill continues to serve Contra Costa County as the Elder Abuse Prosecutor and Unit Supervisor where she engages in novel and aggressive prosecution to hold those accountable who abuse and neglect our elders and dependents.  She has shared her expertise by conducting trainings with partnership agencies, representing the District Attorney's office on the multidisciplinary team, and engaging in community outreach to educate the public on how best to protect out most vulnerable citizens.  She is also the resident expert on Mental Health trial issues.  Thank you, Jill for your high quality of work performed during your 20-year career!"

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Gender Discrimination in Violation of FEHA, Cal. Gov't Code §12940.

(All PLAINTIFFS against all DEFENDANTS and DOES 1-20)

58.     Plaintiffs repeat and reincorporate herein all preceding paragraphs of this Complaint as though set forth full herein.

59.     Plaintiffs were and are employees of Defendants within the meaning of the Fair Employment and Housing Act, California Government Code section 12940 et seq.

60.     Defendants Contra Costa County and Office of the District Attorney of Contra Costa County are employers within the meaning of the Fair Employment and Housing Act, Government Code Sections 12926 and 12940.

61.     The Contra Costa District Attorney's Office has a long and pervasive culture of systemic gender discrimination.  Here are a few examples of the systemic discrimination:

   i.   Women have historically been passed over for promotion in favor of less qualified men.

   ii.   Females had to typically gain "more experience" before being given high profile assignments like being assigned to the Homicide Unit.

   iii.   Females typically had to work 12-14 years prior to being assigned to the Homicide Unit whereas males were considered and assigned typically at the 8-10 year mark.

*SECOND* AMENDED COMPLAINT

14

iv.  The culture encouraged and allowed openly disparaging comments against women and sexualized conversations in the lunchroom.  The sexualized conversations were well documented in several news articles after a young female DA alleged that she was sexually assaulted by an older male attorney.

62.  In 2012, a lawsuit was brought against the DA's office alleging gender discrimination. The County settled this lawsuit and the District Attorney's office implemented changes to rectify these wrongs.

63.  When Ms. Becton became District Attorney, she was formally made aware of this gender discrimination history.  A group of senior female prosecutors from the office met with Ms. Becton and shared with her the history of gender discrimination and she pledged she would fix the problems.

64.  Instead of building on gains made by the women in the office, Ms. Becton has reversed progress for women and has engaged in a pattern and course of gender and age discrimination by systematically demoting and failing to advance, promote and assign supervisory roles to qualified and accomplished prosecutors who are women, particularly if those women have significant prosecutorial experience and tenure.  It is as if she is seeking to prove she will not make it better for the women who have worked tirelessly for the County for decades.

65.  Under Ms. Becton, women in the DA's office have been stripped of the opportunity for career-advancing unit and supervisory assignments, case and specialty assignments, particularly in assignments to committees, training and leadership roles.

66.  Ms. Becton has promoted and assigned supervisory roles to significantly less qualified and less experienced men in contravention to Ms. Becton's promise to remedy the bias and discrimination against women in the office.

67.  Under Ms. Becton's administration, hard-fought gains which had been made by female prosecutors for representation in management have been obliterated.

68.  Since 2017, Defendants, under DA Becton's leadership, have reversed gains made by women in the office.

*SECOND* AMENDED COMPLAINT

15

69.     Defendants have established an environment where women need to gain more experience than men to get high profile assignments, including needing to work for up to six years more than men to be assigned to the homicide unit.

70.     In multiple instances, male prosecutors with less tenure and experience than female prosecutors have been selected for career-advancing assignments and given supervisory positions and dictatorships.

71.     Stacey Grassini, a male, was promoted to a Level 5 executive management position without any prior supervisory assignments within the office. Plaintiffs are more qualified.

72.     Chris Walpole, an attorney with very limited junior supervisory experience, was promoted without process to Level 5 executive management to supervise the largest vertical prosecution unit in the office, the Sexual Assault, Domestic Violence and Elder Abuse Unit.  Chris Walpole was again promoted to "Acting Assistant District Attorney" to supervise Homicide, Gangs, CVRU, Sexual Assault, Domestic Violence, Special Operations and Elder Abuse (over 75% of the office.)  Nancy Georgiou, the most senior Level 5 and the only remaining female Level 5, had formerly supervised the significant Sexual Assault, Domestic Violence and Elder Abuse Unit yet the supervisory responsibilities for the unit were assigned to a male attorney with less supervisory and sexual assault experience and despite her experience in these fields, Ms. Georgiou was moved to oversee the smallest prosecution unit. Plaintiffs are also more qualified than the male promoted.

73.     Simon O'Connell, an attorney with less than six months of junior management experience, was promoted to a Level 5 executive management position instead of a number of female applicants for the position (including three of the Plaintiffs) with multiple years of executive management and unit supervisory experience.

74.     Caleb Webster, with only five years of experience as an attorney was promoted to the position of Misdemeanor Team Leader replacing one of the more qualified Plaintiffs.

75.     Male Level 3 attorneys were moved to supervise Level 4 female attorneys and subsequently promoted.

76.     Symbolically, junior male attorneys and investigators were given larger window offices while more qualified female attorneys were forced to take smaller offices without windows.

77.     Newly promoted Level 5 manager, Chris Walpole was selected to fill the role of Acting Assistant District Attorney instead of the more experienced, and most senior Level 5, who happens to be a woman.

78.     Under Ms. Becton's administration, less experienced male prosecutors are now supervising higher ranking, advanced level female prosecutors.  Notably, no less experienced female prosecutors are supervising higher ranking, advanced level male prosecutors.  Also, the only senior-supervising female prosecutor supervises the smallest DA branch office in Richmond supervising only two advanced-level attorneys. Even where female prosecutors hold a supervisory position, often they are supervisory in name only as the female prosecutor does not actually have anyone beneath her to supervise. Male prosecutors with less tenure and experience than female prosecutors have also been selected by Ms. Becton for career-advancing assignments and given supervisory positions and directorships.

79.     Under Ms. Becton's administration, female prosecutors with significant prosecutorial experience have been excluded from committee membership and training positions which they previously held.  Ms. Becton's exclusion of the senior female prosecutors from these positions of significance within the office has sent the very clear message to prosecutors within the office, and to law enforcement in general, that the senior female prosecutors are not valued by Ms. Becton.

80.     The promotion process in Ms. Becton's administration for male prosecutors has been discriminatorily different than the promotion process for female prosecutors.  The change has been dramatic.  Junior male prosecutors are systemically promoted sooner than their more experienced female counterparts, resulting in higher pay that compounds with every year of employment.  Male prosecutors now have direct supervision of at least 75% of the prosecuting attorneys.

//

//

//

*SECOND* AMENDED COMPLAINT

17

i. **Plaintiff Mary Elizabeth Knox**

    i. DA Becton overrode the approval of two supervisors for Plaintiff Knox to take over a homicide case for a colleague on leave, and a less qualified male attorney was put on the case.

    ii. DA Becton transferred Plaintiff Knox from Ms. Knox's position as supervisor of the Community Violence Reduction Unit (the unit Ms. Knox created) to Felony Filing, a position usually filled by attorneys with twenty years less experience than Ms. Knox, in a satellite office with limited contact to other attorneys.

    iii. Since the filing of Plaintiffs' original complaint, after two and a half years in the felony filer position, DA Becton transferred Ms. Knox to the Elder Abuse unit in a non-supervisory role, another position typically held by attorneys with less than fifteen years of experience.

    iv. At the same time as Ms. Knox's most recent transfer, DA Becton transferred Satish Jallepalli, a male attorney with significantly less years in the office than Ms. Knox, to the CVRU, a position and unit Ms. Knox has stated she would like, and is, qualified for.

    v. Tellingly, the attorney moved into Ms. Knox's felony filer role is a fourteen-year attorney, supporting Ms. Knox's claim that the role she was performing for the last two and a half years is traditionally done by an attorney with less than fifteen years' experience.

    vi. A male attorney (Jason Peck) who had no prior experience as a unit supervisor or misdemeanor team supervisor replaced Plaintiff Knox as supervisor of the CVRU.

    vii. DA Becton passed over Ms. Knox for a Level 5 Senior Deputy District Attorney position in May 2019. Instead, DA Becton promoted Simon O'Connell, a male attorney with less than six months of junior management experience, and Stacey Grassini, a male attorney with no experience supervising attorneys, to Level 5, Senior Management, roles.

viii.   DA Becton assigns Ms. Knox rolls beneath her level of experience, expertise, and skill, which has the effect of killing the career that Ms. Knox has spent decades building. In direct contrast, DA Becton assigns younger, male attorneys, such as Simon O'Connell, Stacey Grassini, Chris Walpole, and Jason Peck, to name just a few, to roles beyond their individual levels of experience giving them an opportunity to rise to the challenge and stretch their professional growth and accomplishments. DA Becton does not give the same opportunity to the women in the office.

ix.   Defendants and Ms. Becton's discriminatory actions towards Ms. Knox as detailed above have humiliated Ms. Knox and caused her to be depressed, disheartened, embarrassed, and extremely upset as she watches the 35-year career she has built dissipate due to Defendants and Ms. Becton's actions.

ii.   **Plaintiff Rachel Piersig**

i.   The DA's office consistently denied Plaintiff Piersig opportunities for growth, and promotion, overlooking Ms. Piersig's accomplishments and contributions and placed Ms. Piersig in a role beneath her experience and skill set.

ii.   Plaintiff Piersig was passed over for a Level 5 promotion in 2018 and again passed over for a Level 5 Senior Deputy District Attorney position in May 2019.

iii.   In her performance review, Ms. Piersig was accused of being "too mean" to police officers - a charge that Ms. Piersig has never heard leveled at any male prosecutor. This language is gendered, not leveled at males, and exemplifies the bias Ms. Piersig has had to endure.

iv.   In June 2018, both Ms. Piersig and Ms. Chandler went to Ms. Johnson to voice their frustration and concerns regarding their treatment and management within the Homicide Unit. Specifically, they both raised the times when they voiced issues or concerns on their cases and their experience and concerns were ignored, demeaned and discounted. Ms. Johnson indicated that "things would change for the better soon" but nothing favorable occurred.

v.   Instead, the female Homicide Unit members were "given" "mental health breaks" while the male attorney Chris Walpole continued to receive the better assignments, was promoted and given a pay raise associated with a Level 5.

vi.   In October 2018, Ms. Piersig was transferred from the Homicide Unit to her current position as a Felony Expeditor, a position typically reserved for prosecutors with less experience.  Ms. Johnson told Ms. Piersig that the transfer "would be good for her mental health."  Mr. Walpole was promoted to a Level 5 and currently supervises the Family Violence Division, the Elder Abuse Unit, the Domestic Violence Unit, and the Human Trafficking Unit.  He was later promoted again to "Acting Assistant District Attorney."  The other complaining party, Ms. Chandler, was moved to the felony filer position in Richmond as "a mental health break."  This "time out" response exemplifies the discriminatory practice within the DA's office; women who complain about disparate treatment are moved to positions to give them "mental health breaks." This treatment has a disparate impact on female prosecutors, contributing to pauses in their career and a slower rise through the ranks of the DA's office. Mr. Butts still supervises the Homicide Unit.

vii.   Ms. Piersig has extensive supervisory experience.  As the supervising attorney of the Domestic Violence and Elder Abuse Units for over four years, she directly supervised fourteen attorneys at various times, of various levels of experience, from brand-new felony attorneys to far more senior prosecutors.  Since October 2018, Ms. Piersig has supervised the entire Preliminary Hearing unit, teaching less-experienced attorneys the fundamentals of felony prosecution to prepare them for felony trials.  She now directly supervises 3 attorneys.

viii.   While supervising the preliminary hearing team, Ms. Piersig's authority was repeatedly usurped by a junior male supervisor, Simon O'Connell.  Without speaking to Ms. Piersig, Mr. O'Connell would assign trials to Ms. Piersig's team.  Mr. O'Connell had no supervisory authority over Ms. Piersig's team.  One week, Mr.

O'Connell assigned trials to the attorneys on Ms. Piersig's team leaving her without any attorneys to handle the preliminary hearings for the week.  Ms. Piersig had to repeatedly ask Mr. O'Connell to not assign work to her team without speaking to her. He persisted and told attorneys they were transferred off her team and told another attorney that she was now assigned to Ms. Piersig's team.  All these actions were outside of Mr. O'Connell's authority.

ix.   During this time a junior female attorney was assigned a very serious felony case. Mr. O'Connell inserted himself and contacted Mr. Cabral and stated that the case should not be assigned to the young female attorney because, without any evidence, Mr. O'Connell was concerned that the defendant would "become focused" on the young attorney.  Ms. Piersig was informed that that the case would be reassigned to a male attorney.  The male attorney selected was not as talented as the young female. Ms. Piersig pointed out that this was unfair and was denying a female attorney an opportunity based solely on her gender, and while, ultimately, the case remained with that attorney, Ms. Piersig was seen to be complaining on behalf of other female prosecutors and Mr. O'Connell was promoted to a Level 5 by Ms. Becton.

x.   As a supervisor, Ms. Piersig regularly trained new attorneys. Ms. Piersig held formal trainings on domestic violence for the new attorneys. She also held trainings for attorneys on opening statements, and all aspects of trial, voir dire through closing statements.  She trained Contra Costa County Sheriff Dispatchers regarding elder abuse issues and provided training to all county law enforcement on procedures for handling domestic violence situations.  Ms. Piersig has contributed immensely to the Contra Costa District Attorney's Office through these internal trainings and external trainings that build bridges and are preventative measures used to reduce violence. Since Ms. Becton's election, Ms. Piersig has not been asked to participate in any trainings.

xi.  Mr. Walpole was suddenly promoted by Ms. Becton to a Level 5 position in or around the end of 2018.  Mr. Walpole was promoted without an application process and hurdled ahead of many qualified female prosecutors with far more experience including Ms. Piersig.  Historically, in order to be considered for a Level 5 promotion, attorneys had prosecuted in nearly every unit in the office and had significant supervisory experience.  Ms. Piersig has been with the DA's Office four years longer than Mr. Walpole.  She also has significantly more supervisory experience, including her four years supervising the Domestic Violence and Elder Abuse Units. In contrast, before his sudden promotion to Level 5, Mr. Walpole had only a year of junior level supervisory experience, back in 2012.  That position was limited to supervising three attorneys in court while the attorneys file and negotiate the misdemeanor cases themselves.  Supervising misdemeanors is considered an entry level supervisory position and does not invoke the level of responsibilities and duties that heading the Felony Domestic Violence Unit does, as Ms. Piersig did successfully for four years. Nevertheless, these qualifications and experience were overlooked and ignored on account of Ms. Piersig's gender.  Mr. Walpole's gender trumped Ms. Piersig's experience.

xii.  In April 2019, Ms. Becton announced that promotions into vacant Senior Deputy District Attorney positions would be made following applications and interviews. Ms. Piersig submitted her application highlighting her extensive experience and accomplishments in the office.  This included her successful and effective leadership of the Domestic Violence and Elder Abuse Units and the several initiatives she had put in place to increase efficiencies and conviction rates in those units, detailed above.

xiii.  Ms. Piersig's interview was scheduled at 1:00 p.m. on a Tuesday, Ms. Piersig's heaviest court day.  When Ms. Piersig arrived at the interview, she was surprised to find that Ms. Becton, the sole decision maker on advanced level promotions, was not

in attendance. The interview lasted barely 20 minutes and contained odd questions such as Ms. Piersig's thoughts on the chain of command in the office. The interview questions were very generic and did not have anything to do with the Level 5 position which entails supervising multiple teams of attorneys.  The interview, and whole process, on its face was a sham put in place to support decisions that had already been made regarding the promotions and to placate those that complained about Mr. Walpole's sudden promotion.

xiv.   In an email from Ms. Becton on May 15, 2019, it was announced that Stacey Grassini, a male, and Simon O'Connell, a male, were promoted to the Senior Deputy District Attorney positions. Ms. Piersig, and many other well qualified female attorneys, were passed over in favor of younger or less qualified males.

xv.   Ms. Piersig has more than six years of additional experience compared to Simon O'Connell who was promoted. At the time of his promotion, Mr. O'Connell had just six months of experience as a supervisor, as the felony trial team leader.  This position supervises less experienced attorneys, is really an assistant supervisory role without independence and is limited to assigning trials, making offers, and supervising the subordinate attorney, which is significantly less supervisory experience than Ms. Piersig holds.  Ms. Piersig also has an additional six months of experience as the felony expeditor, has worked in more units in the office and prosecuted more homicides than Mr. O'Connell.

xvi.   Ms. Piersig has prosecuted more trials and has significantly more supervisory experience than Stacy Grassini.  In fact, prior to his promotion to the Level 5 position, Mr. Grassini had never held a supervisory role in the office.  He had not tried a case in ten years and, on information and belief, has never prosecuted a homicide.

xvii.   When Ms. Becton took office in June 2018, two males and three females occupied the advanced level Attorney 5 positions. Now, there is only one female at that level, and she supervises only two attorneys in the smallest DA branch office in Richmond.  The

DA's office is in turmoil and is losing experienced prosecutors at an unprecedented rated. Since January 2019, fifteen prosecutors have resigned their position with the County.

xviii. Shortly after the promotions of Mr. O'Connell and Mr. Grassini, in June 2019, Ms. Becton doubled down on her discrimination and announced that Mr. Walpole, a Senior DA with less than eight months of experience in his new position as a Level 5 (to which he was promoted without any process bypassing many more qualified females), would be designated the Acting Assistant District Attorney.

xix. Defendants and Ms. Becton's discriminatory actions towards Ms. Piersig as detailed above have humiliated Ms. Piersig and caused her to be miserable, unhappy, embarrassed, and anxious as her career grows stagnate due to Defendants and Ms. Becton's actions.

iii. **Plaintiff Allison Chandler**

    i. In Spring of 2019, Plaintiff Chandler was promised a supervisory role in Felony Filer while still having to manage her homicide trial caseload, but ultimately was not given the supervisory role.

    ii. Since 2019, Plaintiff Chandler has been forced to do one and a half times the work by taking on "non-negotiable" extra responsibilities in Felony Filer by Filing Domestic Violence Misdemeanors. She was even stripped of a capital murder case assignment to do Filing Domestic Violence Misdemeanors.

    iii. Ms. Chandler has been told she is "too emotional" and "excitable" and "her temperament" is problematic. These are all gendered terms only leveled at females and used against them to prove that they are not equipped to supervise. Men are passionate and zealous; women are emotional and excitable. One is considered an asset: the other, a liability.

    iv. Ms. Chandler has consistently sought out opportunities for growth and advancement in her career. She has explicitly requested supervisory roles from her superiors.

Despite career success, her willingness to take on extra work and roles in addition to her assigned role, Ms. Chandler is consistently passed over for supervisory roles she is qualified for, with those roles going to less qualified, more junior males. The effect of this has been a stagnation in her career growth and inability to arc her career ascension at the same rate as her male counterparts and as a result Ms. Becton has failed to provide Ms. Chandler with equal employment opportunities based on her gender.  Despite her qualifications and experience, Ms. Chandler has been put in a role beneath her experience and skill set. She has been overlooked for supervisory positions that she is immensely qualified for and those have gone to younger, less qualified males.

v.   In June 2018, prior to their individual transfers, both Ms. Piersig and Ms. Chandler went to Ms. Johnson to voice their frustration and concerns regarding their treatment and management within the Homicide Unit. Specifically, they both raised the times when they voiced issues or concerns on their cases and their experience and concerns were ignored, demeaned and discounted. Ms. Johnson indicated that "things would change for the better soon" but nothing favorable occurred.

vi.   Instead, in retaliation, the female Homicide Unit members were "given" a "mental health break" while the male attorneys continued to receive the better assignments and were promoted.  Mr. Walpole was promoted to a "Level 5" and currently supervises the Family Violence Division, the Elder Abuse Unit, the Domestic Violence Unit, and the Human Trafficking Unit, and also has been promoted to "acting Assistant District Attorney." Ms. Chandler, was moved to her current felony filer position in Richmond as "a mental health break."  She was removed from emails and committees, and members of executive management started to ignore her.  This "time out" response exemplifies the discriminatory practice within the DA's office, and it effects women in the office by sending a message that the senior women will be ignored.  Junior women have ceased seeking guidance from senior women and are

being redirected to junior male attorneys endorsed by management.  Women who complain about disparate treatment are moved to positions to give them "mental health breaks" and effectively pushed aside.  Their reputations in the office are forever tainted.  This treatment has a disparate impact on female prosecutors, contributing to pauses in their career and a slower rise through the ranks of the DA's office.  Ms. Becton is aware of this because senior women have told her.  Despite this, she participates in the disparate treatment and does nothing to stop it.

vii.    In March 2019, Ms. Chandler was informed she would be rotated to Richmond to be the Felony Filer and share in the Felony Expeditor duties, a supervisory position. Ms. Chandler was told she would be assisting Steve Bolen, the then head of the Richmond office with the expeditor duties. Ms. Chandler had previously completed Felony Filer rotation in Martinez, and the role was beneath her experience and skill set. However, she was willing to take on the role since it came with the promise of a shared supervisory role, Felony Expeditor.  Ms. Chandler had requested a supervisory role. She was also informed that in addition to her Felony Filer and shared Expeditor role, Ms. Chandler was to continue prosecuting her over a dozen murder cases "until a prosecutor could replace her in homicide."

viii.   At the end of March 2019, Ms. Chandler was cleaning out her office planning to begin her new role in Richmond upon her return from a scheduled vacation when her supervisor, Derek Butts, questioned why she was cleaning out her office. Ms. Chandler informed him she was rotating to Richmond to be Felony Filer and share the Expeditor role. Mr. Butts showed her an email from Ms. Johnson informing him that Ms. Chandler was simply "filling in for a moment in Richmond as Felony Filer and 'still in homicide.'" There was no mention of the promised supervisory role.  Ms. Chandler left for her vacation with half her belongings in Richmond and the rest in Martinez, unsure of her role or even what office to return to after her vacation.

ix.   While on vacation, Chris Walpole, called Ms. Chandler and asked her to "help out" the office by being the Felony Filer in Richmond.  She agreed to do it for one week because she was expected to continue carrying and managing a very heavy homicide caseload. Since Ms. Becton was elected, there has been a significant number of employee departures, so more was being required of the remaining attorneys. Ms. Chandler fulfilled her commitment and completed the week and returned to homicide as she was instructed.

x.   In April 2019, Ms. Becton announced that promotions into vacant Senior Deputy District Attorney positions would be made following applications and interviews. Attorneys with one year of experience in a Level 4 position were eligible to apply. Although, Ms. Chandler was qualified for the position, she wanted to gain fundamental supervisory experience before taking on an executive management role as she understood this was historically a requirement.  She also understood there were many more senior qualified and experienced contenders like Mary Knox and Rachel Piersig who were applying for the role. Regardless, Ms. Chandler went through the process of putting together a resume similar to the application with the intent of highlighting her experience and contributions so Ms. Becton would understand her qualifications and move her into a supervisory role.  This is another example of Ms. Chandler being proactive.  She gave her completed application to Ms. Becton, asking that it be put in her file and informing Ms. Becton that she wanted a supervisory role with the goal of one day heading the Sexual Assault Unit. Becton asked Ms. Chandler if being Felony Filer and Expeditor as previously planned in Richmond would be a supervisory role that she would be interested in. Ms. Chandler said yes.

xi.   Ms. Chandler also sent her resume to Ms. Johnson asking her to review it prior to finalizing transfers. Ms. Chandler also let Ms. Johnson know that she wanted to be a supervisor.  Sometime later, Ms. Johnson approached Ms. Chandler to inform her that she was being transferred to a non-supervisory role as Felony Filer in Richmond and

that she would not be Felony Expeditor.  This was a step back in Ms. Chandler's career trajectory as she had already held this role prior to being on the Homicide team and it was not a supervisory role which she had explicitly requested.

xii.  Ms. Johnson told Ms. Chandler that she wanted to speak to her "woman to woman," that although Ms. Chandler had exceptional trial skills and "checked all the boxes" typically required to be moved into a supervisory role, Ms. Becton was looking for other intangible attributes, reputation in the office, as in, "what others think of you and how well you get along with others." Basically, Ms. Becton was conducting a popularity contest and not basing decisions on experience and abilities. Ms. Becton had provided many junior level male prosecutors opportunities to manage.  Even with their many mistakes and problems, Ms. Becton continued to allow them to stay in their position.  Ms. Chandler has not had any negative evaluations nor is anything in her personnel file that would support Ms. Becton's decision to deny her a supervisory role.

xiii.  In June 2019, a younger lesser qualified and less experienced male (twelve years her junior with five years of experience) was promoted into the position of Misdemeanor Team Leader in Richmond, a supervisory position in the office in which Ms. Chandler currently works. Ms. Chandler had requested this role when she was told she needed supervisory experience in order to move to the Sexual Assault Unit. Even though the role was beneath her experience level, she was willing to do it to get the experience.  It was given to a less experienced male.

xiv.  In the meantime, Stacey Grassini and Jason Peck were promoted to supervisory roles, and Stacey Grassini was given a Level 5 role without any supervisory experience. The reasons used for blocking Ms. Chandler's career advancement did not apply for less experienced males.

xv.  DA Becton assigns younger, male attorneys, such as Simon O'Connell, Stacey Grassini, Chris Walpole, and Jason Peck, to name just a few, to roles beyond their

individual levels of experience giving them an opportunity to rise to the challenge and stretch their professional growth and accomplishments. Meanwhile, Ms. Chandler has to "prove" herself over and over again, and yet Ms. Becton still denies Ms. Chandler the opportunities that less qualified males are given.

    xvi.   Ms. Chandler has been told she is "too emotional" and "excitable" and "her temperament" is problematic. These are all gendered terms only leveled at females and used against them to prove that they are not equipped to supervise. Men are passionate and zealous; women are emotional and excitable. One is considered an asset: the other, a liability.

    xvii.   Defendants and Ms. Becton's discriminatory actions towards Ms. Chandler as detailed above have humiliated Ms. Chandler and caused her to be miserable, unhappy, feel hopeless, and anxious as her career fails to progress due to Defendants and Ms. Becton's discriminatory treatment.

### iv.  **Plaintiff Mary Blumberg**

    i.   Plaintiff Blumberg was stripped of the supervisory role of Central and Eastern Operation(s) Misdemeanors Trial Team, which traditionally is a two-year period, roughly one year prematurely. She was also forced to the Homicide Unit without consultation.

    ii.   Plaintiff Blumberg experienced consistent denials of opportunities for growth, promotion, and overlooked accomplishments and contributions.

    iii.   Despite all her accomplishments, Ms. Blumberg has been discriminated against by Diana Becton based on gender.  In September 2017, Ms. Blumberg was assigned to supervise the Central and Eastern Operation(s) Misdemeanor Trial Team. This was a good career move for her as it would build her supervisory experience as she would be supervising twelve to fourteen new attorneys. Supervising misdemeanor trial attorneys is usually a two-year assignment. However, in October 2018, without any discussion, Ms. Blumberg was unceremoniously removed from the supervisor

position despite telling her then supervisor many times that she wanted to remain supervising misdemeanors for the traditional two-year period.

iv.   In October 2018, merely a year into her assignment, Ms. Blumberg was unexpectedly transferred from her supervisory position to the Homicide Unit. She was told the morning the transfer memorandum was sent that she was being moved. This move was unusual for two reasons: (1) it was done without input from Ms. Blumberg and (2) the two males who were assigned at the same time as her to the Homicide Unit had known about their move for weeks and one was also aware that Ms. Blumberg would be moved. Given the emotionally taxing and demanding mental and physical load of the Homicide Unit, and the significant investment of time it requires, attorneys are historically consulted before being moved to the Homicide Unit. The office has a vested interest in ensuring that the attorneys rotated to the Homicide Unit are ready, mentally and emotionally, and prepared for the impact the time commitment will have on their family and personal life. However, Ms. Blumberg was not allowed to consider this. She was never consulted. Unlike Ms. Blumberg, the male prosecutors who were moved to the Homicide Unit were granted weeks of advanced notice of the upcoming transfer and could mentally prepare for the new assignment.

v.   The stressful move to the Homicide Unit has had a significant impact on Ms. Blumberg's health and her family.  Her children are young and go days without seeing their mother.  Recently, a trial demanded she work 90 plus hour weeks for several weeks, causing her to downplay several health symptoms that ultimately landed her in the hospital with emergency surgery. Ms. Blumberg spent a month recovering from surgery but continued to be stressed given other homicide cases were scheduled for trial in her absence.  She asked for assistance to manage her caseload in her absence, and Plaintiff Mary Knox offered to try the double homicide case during

Ms. Blumberg's recovery. True to form, Ms. Becton ignored Ms. Knox and assigned the double homicide trial to a junior male prosecutor.

vi.  Upon return to work, Ms. Blumberg's repeatedly requested accommodations, and was met with silence and laughter. After asking for a stand-up desk, the Office Manager told Ms. Blumberg to "just stack" books on her desk.  Ms. Blumberg was only accommodated after a sympathetic colleague offered to disassemble her own standing desk and reassemble it in Ms. Blumberg's office. Shortly thereafter, she filed a DFEH complaint, and in retaliation, the executive management began to harass her for a doctor's note in order for her to return to work.  Her attorneys were forced to intervene.  Other similarly situated prosecutors have not been required to provide a doctor's note and even her supervisor thought the request for a doctor's note was unusual.

vii.  At the same time Ms. Becton assigned Ms. Blumberg to the Homicide Unit, Ms. Blumberg was removed from the Recruitment and Retention Committee. She emailed the Assistant Deputy District Attorney in charge of the recruitment and retention committee, asking for an explanation, and has never received an explanation.

viii.  At the end of 2018, a junior attorney, became the first male to request to work one of the part-time positions. At the time that he made the request, there was only one experienced prosecutor working part-time, a female attorney. This means that there should have been three spots still available, one part-time and job-share position. His request could easily have been accommodated without affecting the female's position. Instead, though Ms. Becton granted his request, as was appropriate, and at the same time demanded that the female attorney return to full-time status, which was not appropriate. Given the availability of multiple part-time positions, both attorneys should have been allowed to remain in their part-time positions. This was odd because no request for part-time has ever been denied, and Ms. Becton has spoken at length about how she was going to make the office better for women.

*SECOND* AMENDED COMPLAINT

ix. However, consistent with Ms. Becton's policy and practice, a female was asked to sacrifice, presumably "for the good of the office," ignoring her own personal and career goals. Ms. Becton had no interest in accommodating the female's desire to balance the needs of her family with her desire to continue long-term employment. This is a consistent theme with Ms. Becton. Ms. Becton replaced a longer tenured female attorney with a junior male attorney. The female attorney was ordered to return to full-time employment by March 2019. As a result, a seasoned, talented prosecutor moved to another County. She accepted a part-time position with the Alameda County DA's Office. Ms. Becton's actions violated the office policy and directly caused a qualified career prosecutor to leave county employment to meet family needs. This is yet another example of Ms. Becton pushing out, silencing, and punishing female prosecutors.

x. In June of 2019 for personal reasons, Ms. Blumberg considered asking for a part-time position but was hesitant given what had occurred with last female part-time attorney. She asked an Assistant District Attorney the procedure for requesting a part-time position. He said he did not know and needed to research the issue. After obtaining some information, he asked Ms. Blumberg if her request for part-time was based upon a medical issue. This surprised Ms. Blumberg, as obtaining a part-time position had never been based on a medical need. Moreover, this Assistant District Attorney indicated that if it was not medical, she needed to list all of her reasons for requesting the position as it is a discretionary decision made by the DA. According to his information, Ms. Blumberg would need to elaborate on her reasons for her request, including if it was medical. Ms. Blumberg pointed out that never in the history of the office was an attorney required to make such a showing. Ms. Blumberg further explained that she should be allowed to work part-time if she desired regardless of whether it was due to a medical need or not. He basically shrugged his shoulders and said, "good luck getting this approved." Given the recent message Ms.

Becton had sent by effectively forcing an experienced female attorney to return to full-time employment or resign, and seeking private medical information, Ms. Blumberg never requested the part-time position.

xi.  The treatment of the last female part-time attorney and the perceived unwillingness of Ms. Becton to allow female prosecutors to utilize the part time positions has had a chilling effect on women asking for these positions. Female prosecutors fear they will be further marginalized and discriminated against if they request a part-time position. Ms. Becton's policies and practices have a demonstrable disparate impact on females in the office.

xii.  Defendants and Ms. Becton's discriminatory actions towards Ms. Blumberg as detailed above have humiliated Ms. Blumberg and caused her to be miserable, worried, nervous, and anxious as her like situated male colleagues leapfrog over her in career advancement as a result of Defendants and Ms. Becton's discriminatory treatment.

v.  **Plaintiff Jill Henderson**

i.  Plaintiff Henderson experienced a reduction of her supervision role and her unit was cut.

ii.  However, Plaintiff Henderson was given additional responsibilities and also became the head of the DV Unit without a promotion or compensation.

iii.  Mr. Walpole, a younger and less qualified male, is now Ms. Henderson's direct supervisor and has never done a rotation in the Elder Abuse or Domestic Violence Units he now manages.  He undermines Ms. Henderson's authority by inserting himself into daily supervisory issues often without notifying Ms. Henderson.  When working through the conflict, Mr. Walpole told Ms. Henderson that he thought she was "smart" in a condescending manner for a younger man. When Ms. Henderson complained to Ms. Johnson, no action was taken.

iv. When Ms. Becton announced that promotions into vacant Senior Deputy District Attorney positions would be made following applications and interviews in April 2019, Ms. Henderson submitted her application highlighting her extensive experience and accomplishments in the office. This included her successful and effective leadership of the Elder Abuse Unit. During the interview, Ms. Henderson specifically noted that she wanted to be a role model for women in the office and the women were under-represented in management. She also separately complained about the lack of representation of women in leadership to Ms. Becton, Ms. Johnson, and Mr. Cabral, and they all acknowledged the need.

v. Sometime after the interview, Ms. Becton called Ms. Henderson into her office and informed her that someone else was getting the Senior Deputy position. When Ms. Henderson inquired about the second LLevel 5 position in special operations, Ms. Becton told Ms. Henderson that she had no hope of being promoted in the future despite the fact that she, Ms. Becton, believed Ms. Henderson to be "great." Ms. Henderson asked what she could do to be eligible to improve and Ms. Becton said, "nothing."

vi. The interview and whole process on its face was a sham put in place to support decisions that had already been made regarding the promotions. This sham process had been put in place after employees had protested when Chris Walpole was promoted without any process. Indeed, Ms. Becton, the ultimate decision maker, failed to attend many of the female interviews of senior female candidates.

vii. In an email from Ms. Becton on May 15, 2019, it was announced that Stacey Grassini, a male, and Simon O'Connell, a male, were promoted to the Senior Deputy District Attorney positions. Ms. Henderson, and many other well qualified female attorneys, were passed over in favor of these younger and less qualified males. Mr. O'Connell, for example, has eight years less experience than Ms. Henderson.

viii.    In addition to her traditional prosecutorial experience, Ms. Henderson has demonstrated a dedicated passion to proactively helping communities reduce crime. She developed a community prosecution program that was so popular, the City of Concord paid her full salary and benefits for four years. Ms. Henderson brainstormed novel techniques to address poverty-based crimes with incarceration as a last resort. When Ms. Becton was appointed the DA, Ms. Henderson shared her excitement and willingness to institute such programs. Ms. Becton declined her offer. When Ms. Becton formed a variety of committees to improve various office functions, Ms. Henderson asked Ms. Becton where she could be the most useful. Ms. Becton declined to use Ms. Henderson as a resource on any committee. Shortly after Ms. Becton's appointment Ms. Henderson shared her concerns about diversity in the office and wanted to discuss new methods of recruiting. Ms. Becton did not consult with Ms. Henderson over any of her ideas or rectify any of her concerns. Ms. Henderson specifically stated that she had recommended several qualified candidates with diverse backgrounds that she had interviewed and were rejected.

ix.    Ms. Henderson's role may be supervisory on paper, but she has been stripped of actual authority, respect and the opportunity to lead the department.  Instead, lesser qualified and less experienced male attorneys are being given this power and are not reprimanded for breaching long standing protocols showing respect to the employee's supervisor. For example, men are permitted to use subordinates without letting female supervisors know.

x.    In addition, after being involved in in-house trainings for years, Ms. Henderson has been excluded from the ability to lead trainings and was told that the DA wanted younger attorneys to do the training.

xi.    The power in the office is being redistributed to the younger males in the office at an alarmingly fast rate, while equally or more qualified female prosecutors are being stripped of their roles, their presence, and their voice in the office.  Ms. Henderson

went to Ms. Becton with her complaints over a course of more than a year, believing Ms. Becton would take action, but Ms. Henderson only experienced worse treatment as a result in retaliation after making her complaints.

    xii.   Defendants and Ms. Becton's discriminatory actions towards Ms. Henderson as detailed above have humiliated Ms. Henderson and caused her to be embarrassed, mortified, and extremely anxious for which she has sought therapy sessions to cope.

81.  Further, Ms. Becton has hired and protected men with a history of demeaning women.  The following are some examples:

    i.   Ms. Becton assigned a male to the Felony Expeditor position in the Richmond branch office.  In that position, he was the senior supervisor of junior female DAs despite numerous complaints about his sexist behavior.  In the past he sent videos to junior DAs under his supervision entitled "Jizz in my pants." He sent an email calling a female Deputy Attorney General a "pussy" and told junior female DAs that he would assign them cases that would cause them to "cream in their panties."  He told a woman that she was "swinging with the biggest dick on the fourth floor" and asked a nursing mother to not lift anything because it may make her "leak breast milk."  He told a pregnant attorney that she should order a mocha Frappuccino at Starbucks because it would help with "lubrication" in delivery.  Despite all of this and more, Ms. Becton assigned him to supervise women, and allowed him to continue as a supervisor as the Richmond Expeditor while deeming more senior women without such complaints unsuitable for managerial roles.

    ii.   Ms. Becton hired Roy Smalley as an Investigator Assistant.  Mr. Smalley was accused in a civil lawsuit of requiring one of his female employees at a group home in Solano County to have sex with him as a condition of her employment.  Mr. Smalley's hiring is alleged to have occurred outside of Contra Costa County's HR regulations and without a completed background check.  Following news reports of the hiring, Mr. Smalley abruptly quit his employment with the DA's Office.

iii.   Ms. Becton hired Larry Wallace who resigned from his last position over allegations of gender harassment.  The claims settled for $400,000. The settlement became public, and was widely reported, following an investigation by the Sacramento Bee.  Ms. Becton admitted that she was aware of the allegations and settlement when she hired Wallace.

82.   The empowerment and endorsement of these men shows Ms. Becton is not interested in ensuring a workplace free of discrimination for women.

83.   Defendants' actions, as described above constitute gender discrimination, in violation of the Fair Employment and Housing act, California Government Code Section 12940.

84.   Defendants' consistently denied Plaintiffs' opportunities for growth, promotion, and overlooked their accomplishments and contributions, constituting disparate treatment in that it was based on the fact that Plaintiffs are experienced women as alleged herein.

85.   As a proximate result of Defendants' actions, Plaintiffs have suffered and continue to suffer severe embarrassment, humiliation, and mental anguish, all to their damage in an amount according to proof.

## SECOND CAUSE OF ACTION

### Age Discrimination in Violation of FEHA, Cal. Gov't Code §12940

(PLAINTIFFS Knox, Piersig, Chandler and Henderson Against all DEFENDANTS and DOES 1-20)

86.   Plaintiffs Knox, Piersig, Chandler and Henderson repeat and reincorporate herein all preceding paragraphs of this Complaint as though set forth in full herein.

87.   Plaintiffs Knox, Piersig, Chandler and Henderson allege that they were discriminated against due to their age, over forty (40) years old. Given that the discrimination is continuing and ongoing, Plaintiffs Knox, Piersig, Chandler and Henderson were each over forty (40) at the time they were subjected to discrimination based on their age.

88.   Defendants are therefore strictly liable for the unlawful and discriminatory conduct pursuant to California Government Code §12900, et seq., and §§12940 and 12941, in particular.

89.   Plaintiffs Knox, Piersig, Chandler and Henderson allege that Defendants and other agents and employees of Defendants, had and has a history of discriminating against females, over the age of

forty, which history was known to Defendants. Despite such knowledge, Defendants callously chose to ignore the rights of their employees to be free from discrimination in favor of its own interests.

90.     Plaintiffs allege that much younger employees lacking the experience, expertise, and historical knowledge attributable to Plaintiffs Knox, Piersig, Chandler and Henderson filled roles and positions that should have gone to Plaintiffs.

91.     Defendants' consistently denied Plaintiffs opportunities for growth, promotion, and overlooked their accomplishments and contributions, constituting disparate treatment in that it was based on the fact that Plaintiffs are women over the age of forty as alleged hereinabove.

92.     Under Ms. Becton's administration, less experienced male prosecutors are now supervising higher ranking, advanced level female prosecutors. Notably, no less experienced female prosecutors are supervising higher ranking, advanced level male prosecutors. Also, the only senior-supervising female prosecutor supervises the smallest DA branch office in Richmond supervising only two advanced-level attorneys. Even where female prosecutors hold a supervisory position, often they are supervisory in name only as the female prosecutor does not actually have anyone beneath her to supervise. Male prosecutors with less tenure and experience than female prosecutors have also been selected by Ms. Becton for career-advancing assignments and given supervisory positions and directorships.

93.     Under Ms. Becton's administration, female prosecutors with significant prosecutorial experience have been excluded from committee membership and training positions which they previously held. Ms. Becton's exclusion of the senior female prosecutors from these positions of significance within the office has sent the very clear message to prosecutors within the office, and to law enforcement in general, that the senior female prosecutors are not valued by Ms. Becton.

     vi.  **Plaintiff Mary Elizabeth Knox**

         i.  At the time she was subjected to Defendants' adverse actions, Plaintiff Knox was over the age of forty.)

        ii.  Defendants continued to subject Plaintiff Knox to a demeaning assignment for over a year, despite the office tradition to limit an assignment to Felony Filing to one year

and notwithstanding Plaintiff Knox's requests to DA Becton to be reassigned to a position commensurate with her experience.

iii. Since the filing of Plaintiffs' original complaint, after two and a half years in the felony filer position, DA Becton transferred Ms. Knox to the Elder Abuse unit in a non-supervisory role, another position typically held by attorney's with less than fifteen years of experience.

iv. At the same time as Ms. Knox's most recent transfer, DA Becton transferred Satish Jallepalli, a younger, male attorney with significantly less years in the office than Ms. Knox, to the CVRU, a position and unit Ms. Knox has stated she would like, and is, qualified for.

v. DA Becton demoted Plaintiff Knox from her position in executive management as a Senior Deputy District Attorney. In her place, DA Becton promoted three younger, male attorneys to Senior Deputy District Attorney, Simon O'Connell, Stacey Grassini, and Chris Walpole.

vi. In addition, DA Becton replaced Ms. Knox as head of CVRU with a younger male, Jason Peck.

vii. Defendants and Ms. Becton's discriminatory actions towards Ms. Knox as detailed above have humiliated Ms. Knox and caused her to be depressed, disheartened, and extremely upset as she watches the 35-year career she has built dissipate.

vii. **Plaintiff Rachel Piersig**

i. At the time she was subjected to Defendants' adverse actions, Plaintiff Piersig was over the age of forty.

ii. Junior male prosecutors are systematically promoted sooner than their more experienced female counterparts; male prosecutors now have direct supervision of at least 75% of the prosecuting attorneys.

iii. Despite, applying for, and being qualified for, the Senior Deputy District Attorney position, DA Becton failed to promote Ms. Piersig. In her place, DA Becton

promoted three younger, male attorneys to Senior Deputy District Attorney, Simon O'Connell, Stacey Grassini, and Chris Walpole.

iv.   Defendants and Ms. Becton's discriminatory actions towards Ms. Piersig as detailed above have humiliated Ms. Piersig and caused her to be miserable, unhappy, embarrassed, and anxious as her career grows stagnate due to Defendants and Ms. Becton's actions.

viii.   **Plaintiff Allison Chandler**

i.   At the time she was subjected to Defendants' adverse actions, Plaintiff Chandler was over the age of forty.

ii.   DA Becton has engaged in a pattern and course of age discrimination by systematically demoting and failing to advance, promote and assign supervisory roles to qualified and accomplished female prosecutors, particularly those with prosecutorial experience and tenure.

iii.   DA Becton assigns younger, male attorneys, such as Simon O'Connell, Stacey Grassini, Chris Walpole, and Jason Peck, to name just a few, to roles beyond their individual levels of experience giving them an opportunity to rise to the challenge and stretch their professional growth and accomplishments. Meanwhile, Ms. Chandler has to "prove" herself over and over again, and yet DA Becton still denies Ms. Chandler the opportunities that less qualified males are given.

iv.   Ms. Chandler has consistently sought out opportunities for growth and advancement in her career. She has explicitly requested supervisory roles from her superiors. Despite career success, her willingness to take on extra work and roles in addition to her assigned role, Ms. Chandler is consistently passed over for supervisory roles she is qualified for, with those roles going to less qualified, more junior males. The effect of this has been a stagnation in her career growth and inability to arc her career ascension at the same rate as her male counterparts and as a result Ms. Becton has failed to provide Ms. Chandler with equal employment opportunities based on her

gender.  Despite her qualifications and experience, Ms. Chandler has been put in a role beneath her experience and skill set. She has been overlooked for supervisory positions that she is immensely qualified for and those have gone to younger, less qualified males.

v.   In June 2019, a younger lesser qualified and less experienced male (12 years her junior with five years of experience) was promoted into the position of Misdemeanor Team Leader in Richmond, a supervisory position in the office in which Ms. Chandler currently works. Ms. Chandler had requested this role when she was told she needed supervisory experience in order to move to the Sexual Assault Unit. Even though the role was beneath her experience level, she was willing to do it to get the experience.  It was given to a less experienced male.

vi.   Defendants and Ms. Becton's discriminatory actions towards Ms. Chandler as detailed above have humiliated Ms. Chandler and caused her to be miserable, unhappy, feel hopeless, and anxious as her career fails to progress due to Defendants and Ms. Becton's discriminatory treatment.

ix.  **Plaintiff Jill Henderson**

i.   At the time she was subjected to Defendants' adverse actions, Plaintiff Henderson was over the age of forty.

ii.   After being involved in in-house trainings for years, Ms. Henderson has been excluded from the ability to lead trainings and was told that DA Becton wanted younger attorneys to do the training. The DA's assistant stated that the DA wanted to see more "fresh faces."

iii.   Mr. Walpole, a younger and less qualified male, is now Ms. Henderson's direct supervisor and has never done a rotation in the Elder Abuse or Domestic Violence Units he now manages.  He undermines Ms. Henderson's authority by inserting himself into daily supervisory issues often without notifying Ms. Henderson.  When working through the conflict, Mr. Walpole told Ms. Henderson that he thought she

was "smart" in a condescending manner for a younger man. When Ms. Henderson complained to Ms. Johnson, no action was taken.

iv.   When Ms. Becton announced that promotions into vacant Senior Deputy District Attorney positions would be made following applications and interviews in April 2019, Ms. Henderson submitted her application highlighting her extensive experience and accomplishments in the office.  This included her successful and effective leadership of the Elder Abuse Unit. During the interview, Ms. Henderson specifically noted that she wanted to be a role model for women in the office and the women were under-represented in management. She also separately complained about the lack of representation of women in leadership to Ms. Becton, Ms. Johnson, and Mr. Cabral, and they all acknowledged the need.

v.   Sometime after the interview, Ms. Becton called Ms. Henderson into her office and informed her that someone else was getting the Senior Deputy position.  When Ms. Henderson inquired about the second Level 5 position in special operations, Ms. Becton told Ms. Henderson that she had no hope of being promoted in the future despite the fact that she, Ms. Becton, believed Ms. Henderson to be "great."  Ms. Henderson asked what she could do to be eligible to improve and Ms. Becton said, "nothing."

vi.   The interview and whole process on its face was a sham put in place to support decisions that had already been made regarding the promotions.  This sham process had been put in place after employees had protested when Chris Walpole was promoted without any process.  Indeed, Ms. Becton, the ultimate decision maker, failed to attend many of the female interviews of senior female candidates.

vii.   In an email from Ms. Becton on May 15, 2019, it was announced that Stacey Grassini, a male, and Simon O'Connell, a male, were promoted to the Senior Deputy District Attorney positions.  Ms. Henderson, and many other well qualified female

attorneys, were passed over in favor of these younger and less qualified males.  Mr.

O'Connell, for example, has eight years less experience than Ms. Henderson.

viii.   Ms. Henderson's role may be supervisory on paper, but she has been stripped of

actual authority, respect and the opportunity to lead the department.  Instead, lesser

qualified and less experienced male attorneys are being given this power and are not

reprimanded for breaching long standing protocols showing respect to the employee's

supervisor. For example, men are permitted to use subordinates without letting female

supervisors know.

ix.   The power in the office is being redistributed to the younger males in the office at an

alarmingly fast rate, while equally or more qualified female prosecutors are being

stripped of their roles, their presence, and their voice in the office.  Ms. Henderson

went to Ms. Becton with her complaints over a course of more than a year, believing

Ms. Becton would take action, but Ms. Henderson only experienced worse treatment

as a result in retaliation after making her complaints.

x.   Defendants and Ms. Becton's discriminatory actions towards Ms. Henderson as

detailed above have humiliated Ms. Henderson and caused her to be embarrassed,

mortified, and extremely anxious for which she has sought therapy sessions to cope.

94.     Defendants' policy, practice, routine and pervasive discrimination against Plaintiffs and

women over the age of forty causes individuals who are similarly situated as Plaintiffs to be

demonstrably disadvantaged by depriving said individuals from continuing gainful employment with

Defendants, despite superior qualifications and job performance.  Furthermore, Defendants' policy and

practice is not justified by any business necessity and in fact is harmful to its stated purpose to protect

the citizens of Contra Costa County.

95.     As a proximate result of Defendants' actions, Plaintiffs have suffered and continue to

suffer severe embarrassment, humiliation, and mental anguish, all to their damage in an amount

according to proof.

### THIRD CAUSE OF ACTION

*SECOND* AMENDED COMPLAINT

**Failure to Take Preventive Action in Violation of FEHA, Cal. Gov't Code Section 12900, 12940(k) et seq.**

(All PLAINTIFFS against all DEFENDANTS and DOES 1-20)

96.     Plaintiffs reincorporate herein all preceding paragraphs of this complaint as though fully set out below.

97.     Defendants have a culture of disparaging women with demeaning, sexualized comments.

98.     Since 2017, Defendants have reversed gains made by women in the office.

99.     Defendants have established an environment where women need to gain more experience than men to get high profile assignments, including needing to work for up to 6 years more than men to be assigned to the homicide unit.

100.     In multiple instances, male prosecutors with less tenure and experience than female prosecutors have been selected for career-advancing assignments and given supervisory positions and dictatorships.

101.     Stacey Grassini, a male, was promoted to a Level 5 executive management position without any prior supervisory assignments within the office. Plaintiffs are more qualified.

102.     Chris Walpole, an attorney with very limited junior supervisory experience, was promoted without process to Level 5 executive management to supervise the largest vertical prosecution unit in the office, the Sexual Assault, Domestic Violence and Elder Abuse Unit.  Chris Walpole was again promoted to "Acting Assistant District Attorney" to supervise Homicide, Gangs, CVRU, Sexual Assault, Domestic Violence, Special Operations and Elder Abuse (over 75% of the office.)  Nancy Georgiou, the most senior Level 5 and the only remaining female Level 5, had formerly supervised the significant Sexual Assault, Domestic Violence and Elder Abuse Unit yet the supervisory responsibilities for the unit were assigned to a male attorney with less supervisory and sexual assault experience and despite her experience in these fields, Ms. Georgiou was moved to oversee the smallest prosecution unit. Plaintiffs are also more qualified than the male promoted.

103.     Simon O'Connell, an attorney with less than six months of junior management experience, was promoted to a Level 5 executive management position instead of a number of female

*SECOND* AMENDED COMPLAINT

applicants for the position (including three of the Plaintiffs) with multiple years of executive management and unit supervisory experience.

104.    Caleb Webster, with only five years of experience as an attorney was promoted to the position of Misdemeanor Team Leader replacing one of the more qualified Plaintiffs.

105.    Male Level 3 attorneys were moved to supervise Level 4 female attorneys and subsequently promoted.

106.    Symbolically, junior male attorneys and investigators were given larger window offices while more qualified female attorneys were forced to take smaller offices without windows.

107.    Newly promoted Level 5 manager, Chris Walpole was selected to fill the role of Acting Assistant District Attorney instead of the more experienced, and most senior Level 5, who happens to be a woman.

108.    Under Ms. Becton's administration, less experienced male prosecutors are now supervising higher ranking, advanced level female prosecutors.  Notably, no less experienced female prosecutors are supervising higher ranking, advanced level male prosecutors.  Also, the only senior-supervising female prosecutor supervises the smallest DA branch office in Richmond supervising only two advanced-level attorneys. Even where female prosecutors hold a supervisory position, often they are supervisory in name only as the female prosecutor does not actually have anyone beneath her to supervise. Male prosecutors with less tenure and experience than female prosecutors have also been selected by Ms. Becton for career-advancing assignments and given supervisory positions and directorships.

109.    Under Ms. Becton's administration, female prosecutors with significant prosecutorial experience have been excluded from committee membership and training positions which they previously held.  Ms. Becton's exclusion of the senior female prosecutors from these positions of significance within the office has sent the very clear message to prosecutors within the office, and to law enforcement in general, that the senior female prosecutors are not valued by Ms. Becton.

110.    The promotion process in Ms. Becton's administration for male prosecutors has been discriminatorily different than the promotion process for female prosecutors.  The change has been

Case 3:20-cv-01449-JCS   Document 45   Filed 03/22/21   Page 46 of 120

dramatic.  Junior male prosecutors are systemically promoted sooner than their more experienced female counterparts, resulting in higher pay that compounds with every year of employment.  Male prosecutors now have direct supervision of at least 75% of the prosecuting attorneys.

    x.  **Plaintiff Mary Elizabeth Knox**

      i.  DA Becton overrode the approval of two supervisors for Plaintiff Knox to take over a homicide case for a colleague on leave, and a less qualified male attorney was put on the case.

      ii.  DA Becton transferred Plaintiff Knox from Ms. Knox's position as supervisor of the Community Violence Reduction Unit (the unit Ms. Knox created) to Felony Filing, a position usually filled by attorneys with twenty years less experience than Ms. Knox, in a satellite office with limited contact to other attorneys.

      iii.  Since the filing of Plaintiffs' original complaint, after two and a half years in the felony filer position, DA Becton transferred Ms. Knox to the Elder Abuse unit in a non-supervisory role, another position typically held by attorney's with less than fifteen years of experience.

      iv.  At the same time as Ms. Knox's most recent transfer, DA Becton transferred Satish Jallepalli, a male attorney with significantly less years in the office than Ms. Knox, to the CVRU. A position and unit Ms. Knox has stated she would like, and is, qualified for.

      v.  Tellingly, the attorney moved into Ms. Knox's felony filer role is a fourteen-year attorney, supporting Ms. Knox's claim that the role she was performing for the last two and a half years is traditionally done by an attorney with less than fifteen years' experience.

      vi.  A male attorney (Jason Peck) who had no prior experience as a unit supervisor or misdemeanor team supervisor replaced Plaintiff Knox as supervisor of the CVRU.

      vii.  DA Becton passed over Ms. Knox for a Level 5 Senior Deputy District Attorney position in May 2019. Instead, DA Becton promoted Simon O'Connell, a male

*SECOND* AMENDED COMPLAINT

46

attorney with less than six months of junior management experience, and Stacey Grassini, a male attorney with no experience supervising attorneys, to Level 5, Senior Management, roles.

viii.   DA Becton assigns Ms. Knox rolls beneath her Level of experience, expertise, and skill, which has the effect of killing the career that Ms. Knox has spent decades building. In direct contrast, DA Becton assigns younger, male attorneys, such as Simon O'Connell, Stacey Grassini, Chris Walpole, and Jason Peck, to name just a few, to roles beyond their individual levels of experience giving them an opportunity to rise to the challenge and stretch their professional growth and accomplishments. DA Becton does not give the same opportunity to the women in the office.

ix.   Defendants and Ms. Becton's discriminatory actions towards Ms. Knox as detailed above have humiliated Ms. Knox and caused her to be depressed, disheartened, and extremely upset as she watches the 35-year career she has built dissipate.

xi.   **Plaintiff Rachel Piersig**

i.   The DA's office consistently denied Plaintiff Piersig opportunities for growth, and promotion, overlooking Ms. Piersig's accomplishments and contributions and placed Ms. Piersig in a role beneath her experience and skill set.

ii.   Plaintiff Piersig was passed over for a LLevel 5 promotion in 2018 and again passed over for a Level 5 Senior Deputy District Attorney position in May 2019.

iii.   In her performance review, Ms. Piersig was accused of being "too mean" to police officers - a charge that Ms. Piersig has never heard leveled at any male prosecutor. This language is gendered, not leveled at males, and exemplifies the bias Ms. Piersig has had to endure.

iv.   In June 2018, both Ms. Piersig and Ms. Chandler went to Ms. Johnson to voice their frustration and concerns regarding their treatment and management within the Homicide Unit. Specifically, they both raised the times when they voiced issues or concerns on their cases and their experience and concerns were ignored, demeaned

*SECOND* AMENDED COMPLAINT

and discounted. Ms. Johnson indicated that "things would change for the better soon" but nothing favorable occurred.

v.   Instead, the female Homicide Unit members were "given" "mental health breaks" while the male attorney Chris Walpole continued to receive the better assignments, was promoted and given a pay raise associated with a Level 5.

vi.   In October 2018, Ms. Piersig was transferred from the Homicide Unit to her current position as a Felony Expeditor, a position typically reserved for prosecutors with less experience.  Ms. Johnson told Ms. Piersig that the transfer "would be good for her mental health."  Mr. Walpole was promoted to a Level 5 and currently supervises the Family Violence Division, the Elder Abuse Unit, the Domestic Violence Unit, and the Human Trafficking Unit.  He was later promoted again to "Acting Assistant District Attorney."  The other complaining party, Ms. Chandler, was moved to the felony filer position in Richmond as "a mental health break."  This "time out" response exemplifies the discriminatory practice within the DA's office; women who complain about disparate treatment are moved to positions to give them "mental health breaks." This treatment has a disparate impact on female prosecutors, contributing to pauses in their career and a slower rise through the ranks of the DA's office. Mr. Butts still supervises the Homicide Unit.

vii.   Ms. Piersig has extensive supervisory experience.  As the supervising attorney of the Domestic Violence and Elder Abuse Units for over four years, she directly supervised fourteen attorneys at various times, of various levels of experience, from brand-new felony attorneys to far more senior prosecutors.  Since October 2018, Ms. Piersig has supervised the entire Preliminary Hearing unit, teaching less-experienced attorneys the fundamentals of felony prosecution to prepare them for felony trials.  She now directly supervises 3 attorneys.

viii.   While supervising the preliminary hearing team, Ms. Piersig's authority was repeatedly usurped by a junior male supervisor, Simon O'Connell.  Without speaking

to Ms. Piersig, Mr. O'Connell would assign trials to Ms. Piersig's team.  Mr. O'Connell had no supervisory authority over Ms. Piersig's team.  One week, Mr. O'Connell assigned trials to the attorneys on Ms. Piersig's team leaving her without any attorneys to handle the preliminary hearings for the week.  Ms. Piersig had to repeatedly ask Mr. O'Connell to not assign work to her team without speaking to her. He persisted and told attorneys they were transferred off her team and told another attorney that she was now assigned to Ms. Piersig's team.  All these actions were outside of Mr. O'Connell's authority.

ix.  During this time a junior female attorney was assigned a very serious felony case. Mr. O'Connell inserted himself and contacted Mr. Cabral and stated that the case should not be assigned to the young female attorney because, without any evidence, Mr. O'Connell was concerned that the defendant would "become focused" on the young attorney.  Ms. Piersig was informed that that the case would be reassigned to a male attorney.  The male attorney selected was not as talented as the young female. Ms. Piersig pointed out that this was unfair and was denying a female attorney an opportunity based solely on her gender, and while, ultimately, the case remained with that attorney, Ms. Piersig was seen to be complaining on behalf of other female prosecutors and Mr. O'Connell was promoted to a Level 5 by Ms. Becton.

x.  As a supervisor, Ms. Piersig regularly trained new attorneys. Ms. Piersig held formal trainings on domestic violence for the new attorneys. She also held trainings for attorneys on opening statements, and all aspects of trial, voir dire through closing statements.  She trained Contra Costa County Sheriff Dispatchers regarding elder abuse issues and provided training to all county law enforcement on procedures for handling domestic violence situations.  Ms. Piersig has contributed immensely to the Contra Costa District Attorney's Office through these internal trainings and external trainings that build bridges and are preventative measures used to reduce violence.

Since Ms. Becton's election, Ms. Piersig has not been asked to participate in any trainings.

xi.    Mr. Walpole was suddenly promoted by Becton to a Level 5 position in or around the end of 2018.  Mr. Walpole was promoted without an application process and hurdled ahead of many qualified female prosecutors with far more experience including Ms. Piersig.  Historically, in order to be considered for a Level 5 promotion, attorneys had prosecuted in nearly every unit in the office and had significant supervisory experience.  Ms. Piersig has been with the DA's Office four years longer than Mr. Walpole.  She also has significantly more supervisory experience, including her four years supervising the Domestic Violence and Elder Abuse Units. In contrast, before his sudden promotion to Level 5, Mr. Walpole had only a year of junior level supervisory experience, back in 2012.  That position was limited to supervising three attorneys in court while the attorneys file and negotiate the misdemeanor cases themselves.  Supervising misdemeanors is considered an entry level supervisory position and does not invoke the level of responsibilities and duties that heading the Felony Domestic Violence Unit does, as Ms. Piersig did successfully for four years.  Nevertheless, these qualifications and experience were overlooked and ignored on account of Ms. Piersig's gender.  Mr. Walpole's gender trumped Ms. Piersig's experience.

xii.   In April 2019, Ms. Becton announced that promotions into vacant Senior Deputy District Attorney positions would be made following applications and interviews. Ms. Piersig submitted her application highlighting her extensive experience and accomplishments in the office.  This included her successful and effective leadership of the Domestic Violence and Elder Abuse Units and the several initiatives she had put in place to increase efficiencies and conviction rates in those units, detailed above.

xiii.   Ms. Piersig's interview was scheduled at 1:00 p.m. on a Tuesday, Ms. Piersig's heaviest court day.  When Ms. Piersig arrived at the interview, she was surprised to find that Ms. Becton, the sole decision maker on advanced level promotions, was not in attendance. The interview lasted barely 20 minutes and contained odd questions such as Ms. Piersig's thoughts on the chain of command in the office. The interview questions were very generic and did not have anything to do with the Level 5 position which entails supervising multiple teams of attorneys.  The interview, and whole process, on its face was a sham put in place to support decisions that had already been made regarding the promotions and to placate those that complained about Mr. Walpole's sudden promotion.

xiv.   In an email from Ms. Becton on May 15, 2019, it was announced that Stacey Grassini, a male, and Simon O'Connell, a male, were promoted to the Senior Deputy District Attorney positions. Ms. Piersig, and many other well qualified female attorneys, were passed over in favor of younger or less qualified males.

xv.   Ms. Piersig has more than six years of additional experience compared to Simon O'Connell who was promoted. At the time of his promotion, Mr. O'Connell had just six months of experience as a supervisor, as the felony trial team leader.  This position supervises less experienced attorneys, is really an assistant supervisory role without independence and is limited to assigning trials, making offers, and supervising the subordinate attorney, which is significantly less supervisory experience than Ms. Piersig holds.  Ms. Piersig also has an additional six months of experience as the felony expeditor, has worked in more units in the office and prosecuted more homicides than Mr. O'Connell.

xvi.   Ms. Piersig has prosecuted more trials and has significantly more supervisory experience than Stacy Grassini.  In fact, prior to his promotion to the Level 5 position, Mr. Grassini had never held a supervisory role in the office.  He had not tried a case in ten years and, on information and belief, has never prosecuted a homicide.

*SECOND* AMENDED COMPLAINT

51

xvii. When Ms. Becton took office in June 2018, two males and three females occupied the advanced level Attorney 5 positions. Now, there is only one female at that level, and she supervises only two attorneys in the smallest DA branch office in Richmond.  The DA's office is in turmoil and is losing experienced prosecutors at an unprecedented rated.  Since January 2019, fifteen prosecutors have resigned their position with the County.

xviii. Shortly after the promotions of Mr. O'Connell and Mr. Grassini, in June 2019, Ms. Becton doubled down on her discrimination and announced that Mr. Walpole, a Senior DA with less than eight  months of experience in his new position as a Level 5 (to which he was promoted without any process bypassing many more qualified females), would be designated the Acting Assistant District Attorney.

xix.  Defendants and Ms. Becton's discriminatory actions towards Ms. Piersig as detailed above have humiliated Ms. Piersig and caused her to be miserable, unhappy, embarrassed, and anxious as her career grows stagnate due to Defendants and Ms. Becton's actions.

xii. **Plaintiff Allison Chandler**

i. In Spring of 2019, Plaintiff Chandler was promised a supervisory role in Felony Filer while still having to manage her homicide trial caseload, but ultimately was not given the supervisory role.

ii. Since 2019, Plaintiff Chandler has been forced to do one and a half times the work by taking on "non-negotiable" extra responsibilities in Felony Filer by Filing Domestic Violence Misdemeanors. She was even stripped of a capital murder case assignment to do Filing Domestic Violence Misdemeanors.

iii. Ms. Chandler has been told she is "too emotional" and "excitable" and "her temperament" is problematic. These are all gendered terms only leveled at females and used against them to prove that they are not equipped to supervise. Men are

passionate and zealous; women are emotional and excitable. One is considered an asset: the other, a liability.

iv. Ms. Chandler has consistently sought out opportunities for growth and advancement in her career. She has explicitly requested supervisory roles from her superiors. Despite career success, her willingness to take on extra work and roles in addition to her assigned role, Ms. Chandler is consistently passed over for supervisory roles she is qualified for, with those roles going to less qualified, more junior males. The effect of this has been a stagnation in her career growth and inability to arc her career ascension at the same rate as her male counterparts and as a result Ms. Becton has failed to provide Ms. Chandler with equal employment opportunities based on her gender.  Despite her qualifications and experience, Ms. Chandler has been put in a role beneath her experience and skill set. She has been overlooked for supervisory positions that she is immensely qualified for and those have gone to younger, less qualified males.

v. In June 2018, prior to their individual transfers, both Ms. Piersig and Ms. Chandler went to Ms. Johnson to voice their frustration and concerns regarding their treatment and management within the Homicide Unit. Specifically, they both raised the times when they voiced issues or concerns on their cases and their experience and concerns were ignored, demeaned and discounted. Ms. Johnson indicated that "things would change for the better soon" but nothing favorable occurred.

vi. Instead, in retaliation, the female Homicide Unit members were "given" a "mental health break" while the male attorneys continued to receive the better assignments and were promoted.  Mr. Walpole was promoted to a "Level 5" and currently supervises the Family Violence Division, the Elder Abuse Unit, the Domestic Violence Unit, and the Human Trafficking Unit, and also has been promoted to "acting Assistant District Attorney." Ms. Chandler, was moved to her current felony filer position in Richmond as "a mental health break."  She was removed from emails

and committees, and members of executive management started to ignore her.  This "time out" response exemplifies the discriminatory practice within the DA's office, and it effects women in the office by sending a message that the senior women will be ignored.  Junior women have ceased seeking guidance from senior women and are being redirected to junior male attorneys endorsed by management.  Women who complain about disparate treatment are moved to positions to give them "mental health breaks" and effectively pushed aside.  Their reputations in the office are forever tainted.  This treatment has a disparate impact on female prosecutors, contributing to pauses in their career and a slower rise through the ranks of the DA's office.  Ms. Becton is aware of this because senior women have told her.  Despite this, she participates in the disparate treatment and does nothing to stop it.

   vii.  In March 2019, Ms. Chandler was informed she would be rotated to Richmond to be the Felony Filer and share in the Felony Expeditor duties, a supervisory position. Ms. Chandler was told she would be assisting Steve Bolen, the then head of the Richmond office with the expeditor duties. Ms. Chandler had previously completed Felony Filer rotation in Martinez, and the role was beneath her experience and skill set. However, she was willing to take on the role since it came with the promise of a shared supervisory role, Felony Expeditor.  Ms. Chandler had requested a supervisory role. She was also informed that in addition to her Felony Filer and shared Expeditor role, Ms. Chandler was to continue prosecuting her over a dozen murder cases "until a prosecutor could replace her in homicide."

   viii.  At the end of March 2019, Ms. Chandler was cleaning out her office planning to begin her new role in Richmond upon her return from a scheduled vacation when her supervisor, Derek Butts, questioned why she was cleaning out her office. Ms. Chandler informed him she was rotating to Richmond to be Felony Filer and share the Expeditor role. Mr. Butts showed her an email from Ms. Johnson informing him that Ms. Chandler was simply "filling in for a moment in Richmond as Felony Filer and

'still in homicide.'" There was no mention of the promised supervisory role.  Ms. Chandler left for her vacation with half her belongings in Richmond and the rest in Martinez, unsure of her role or even what office to return to after her vacation.

ix.  While on vacation, Chris Walpole, called Ms. Chandler and asked her to "help out" the office by being the Felony Filer in Richmond.  She agreed to do it for one week because she was expected to continue carrying and managing a very heavy homicide caseload. Since Becton was elected, there has been a significant number of employee departures, so more was being required of the remaining attorneys. Ms. Chandler fulfilled her commitment and completed the week and returned to homicide as she was instructed.

x.  In April 2019, Ms. Becton announced that promotions into vacant Senior Deputy District Attorney positions would be made following applications and interviews. Attorneys with one year of experience in a Level 4 position were eligible to apply. Although, Ms. Chandler was qualified for the position, she wanted to gain fundamental supervisory experience before taking on an executive management role as she understood this was historically a requirement.  She also understood there were many more senior qualified and experienced contenders like Mary Knox and Rachel Piersig who were applying for the role. Regardless, Ms. Chandler went through the process of putting together a resume similar to the application with the intent of highlighting her experience and contributions so Ms. Becton would understand her qualifications and move her into a supervisory role.  This is another example of Ms. Chandler being proactive.  She gave her completed application to Ms. Becton, asking that it be put in her file and informing Ms. Becton that she wanted a supervisory role with the goal of one day heading the Sexual Assault Unit. Becton asked Ms. Chandler if being Felony Filer and Expeditor as previously planned in Richmond would be a supervisory role that she would be interested in. Ms. Chandler said yes.

xi.  Ms. Chandler also sent her resume to Ms. Johnson asking her to review it prior to finalizing transfers. Ms. Chandler also let Ms. Johnson know that she wanted to be a supervisor.  Sometime later, Ms. Johnson approached Ms. Chandler to inform her that she was being transferred to a non-supervisory role as Felony Filer in Richmond and that she would not be Felony Expeditor.  This was a step back in Ms. Chandler's career trajectory as she had already held this role prior to being on the Homicide team and it was not a supervisory role which she had explicitly requested.

xii.  Ms. Johnson told Ms. Chandler that she wanted to speak to her "woman to woman," that although Ms. Chandler had exceptional trial skills and "checked all the boxes" typically required to be moved into a supervisory role, Ms. Becton was looking for other intangible attributes, reputation in the office, as in, "what others think of you and how well you get along with others." Basically, Ms. Becton was conducting a popularity contest and not basing decisions on experience and abilities. Ms. Becton had provided many junior Level male prosecutors opportunities to manage.  Even with their many mistakes and problems, Ms. Becton continued to allow them to stay in their position.  Ms. Chandler has not had any negative evaluations nor is anything in her personnel file that would support Ms. Becton's decision to deny her a supervisory role.

xiii.  In June 2019, a younger lesser qualified and less experienced male (twelve years her junior with five years of experience) was promoted into the position of Misdemeanor Team Leader in Richmond, a supervisory position in the office in which Ms. Chandler currently works. Ms. Chandler had requested this role when she was told she needed supervisory experience in order to move to the Sexual Assault Unit. Even though the role was beneath her experience level, she was willing to do it to get the experience.  It was given to a less experienced male.

xiv.  In the meantime, Stacey Grassini and Jason Peck were promoted to supervisory roles, and Stacey Grassini was given a Level 5 role without any supervisory experience.

The reasons used for blocking Ms. Chandler's career advancement did not apply for less experienced males.

xv.   DA Becton assigns younger, male attorneys, such as Simon O'Connell, Stacey Grassini, Chris Walpole, and Jason Peck, to name just a few, to roles beyond their individual levels of experience giving them an opportunity to rise to the challenge and stretch their professional growth and accomplishments. Meanwhile, Ms. Chandler has to "prove" herself over and over again, and yet DA Becton still denies Ms. Chandler the opportunities that less qualified males are given.

xvi.   Ms. Chandler has been told she is "too emotional" and "excitable" and "her temperament" is problematic. These are all gendered terms only leveled at females and used against them to prove that they are not equipped to supervise. Men are passionate and zealous; women are emotional and excitable. One is considered an asset: the other, a liability.

xvii.   Defendants and Ms. Becton's discriminatory actions towards Ms. Chandler as detailed above have humiliated Ms. Chandler and caused her to be miserable, unhappy, feel hopeless, and anxious as her career fails to progress due to Defendants and Ms. Becton's discriminatory treatment.

xiii.   **Plaintiff Mary Blumberg**

i.   Plaintiff Blumberg was stripped of the supervisory role of Central and Eastern Operation(s) Misdemeanors Trial Team, which traditionally is a two-year period, roughly one year prematurely. She was also forced to the Homicide Unit without consultation.

ii.   Plaintiff Blumberg experienced consistent denials of opportunities for growth, promotion, and overlooked accomplishments and contributions.

iii.   Despite all her accomplishments, Ms. Blumberg has been discriminated against by Diana Becton based on gender.  In September 2017, Ms. Blumberg was assigned to supervise the Central and Eastern Operation(s) Misdemeanor Trial Team. This was a

good career move for her as it would build her supervisory experience as she would be supervising twelve to fourteen new attorneys. Supervising misdemeanor trial attorneys is usually a two-year assignment. However, in October 2018, without any discussion, Ms. Blumberg was unceremoniously removed from the supervisor position despite telling her then supervisor, many times that she wanted to remain supervising misdemeanors for the traditional two-year period.

iv.  In October 2018, merely a year into her assignment, Ms. Blumberg was unexpectedly transferred from her supervisory position to the Homicide Unit. She was told the morning the transfer memorandum was sent that she was being moved. This move was unusual for two reasons: (1) it was done without input from Ms. Blumberg and (2) the two males who were assigned at the same time as her to Homicide Unit had known about their move for weeks and one was also aware that Ms. Blumberg would be moved. Given the emotionally taxing and demanding mental and physical load of the Homicide Unit, and the significant investment of time it requires, attorneys are historically consulted before being moved to the Homicide Unit. The office has a vested interest in ensuring that the attorneys rotated to the Homicide Unit are ready, mentally and emotionally, and prepared for the impact the time commitment will have on their family and personal life. However, Ms. Blumberg was not allowed to consider this. She was never consulted. Unlike Ms. Blumberg, the male prosecutors who were moved to the Homicide Unit were granted weeks of advanced notice of the upcoming transfer and could mentally prepare for the new assignment.

v.  The stressful move to the Homicide Unit has had a significant impact on Ms. Blumberg's health and her family.  Her children are young and go days without seeing their mother.  Recently, a trial demanded she work 90 plus hour weeks for several weeks, causing her to downplay several health symptoms that ultimately landed her in the hospital with emergency surgery. Ms. Blumberg spent a month recovering from surgery but continued to be stressed given other homicide cases were

scheduled for trial in her absence.  She asked for assistance to manage her caseload in her absence, and Plaintiff Mary Knox offered to try the double homicide case during Ms. Blumberg's recovery. True to form, Becton ignored Mary Knox and assigned the double homicide trial to a junior male prosecutor.

vi.   Upon return to work, Ms. Blumberg's repeatedly requested accommodations, and was met with silence and laughter. After asking for a stand-up desk, the Office Manager told Ms. Blumberg to "just stack" books on her desk.  Ms. Blumberg was only accommodated after a sympathetic colleague offered to disassemble her own standing desk and reassemble it in Ms. Blumberg's office. Shortly thereafter, she filed a DFEH complaint, and in retaliation, the executive management began to harass her for a doctor's note in order for her to return to work.  Her attorneys were forced to intervene.  Other similarly situated prosecutors have not been required to provide a doctor's note and even her supervisor thought the request for a doctor's note was unusual.

vii.  At the same time Ms. Becton assigned Ms. Blumberg to the Homicide Unit, Ms. Blumberg was removed from the Recruitment and Retention Committee. She emailed the Assistant Deputy District Attorney in charge of the recruitment and retention committee, asking for an explanation, and has never received an explanation.

viii. At the end of 2018, a junior attorney, became the first male to request to work one of the part-time positions. At the time that he made the request, there was only one experienced prosecutor working part-time, a female attorney. This means that there should have been three spots still available, one part-time and job-share position. His request could easily have been accommodated without affecting the female's position. Instead, though Ms. Becton granted his request, as was appropriate, and at the same time demanded that the female attorney return to full-time status, which was not appropriate. Given the availability of multiple part-time positions, both attorneys should have been allowed to remain in their part-time positions. This was odd

1    because no request for part-time has ever been denied, and Ms. Becton has spoken at

2    length about how she was going to make the office better for women.

3  ix.  However, consistent with Ms. Becton's policy and practice, a female was asked to

4    sacrifice, presumably "for the good of the office," ignoring her own personal and

5    career goals.  Ms. Becton had no interest in accommodating the female's desire to

6    balance the needs of her family with her desire to continue long-term employment.

7    This is a consistent theme with Ms. Becton. Ms. Becton replaced a longer tenured

8    female attorney with a junior male attorney.  The female attorney was ordered to

9    return to full-time employment by March 2019. As a result, a seasoned, talented

10   prosecutor moved to another County.  She accepted a part-time position with the

11   Alameda County DA's Office. Ms. Becton's actions violated the office policy and

12   directly caused a qualified career prosecutor to leave county employment to meet

13   family needs.  This is yet another example of Ms. Becton pushing out, silencing, and

14   punishing female prosecutors.

15  x.  In June of 2019 for personal reasons, Ms. Blumberg considered asking for a part-

16   time position but was hesitant given what had occurred with last female part-time

17   attorney. She asked an Assistant District Attorney the procedure for requesting a part-

18   time position. He said he did not know and needed to research the issue. After

19   obtaining some information, he asked Ms. Blumberg if her request for part-time was

20   based upon a medical issue.  This surprised Ms. Blumberg, as obtaining a part-time

21   position had never been based on a medical need.  Moreover, this Assistant District

22   Attorney indicated that if it was not medical, she needed to list all of her reasons for

23   requesting the position as it is a discretionary decision made by the DA. According to

24   his information, Ms. Blumberg would need to elaborate on her reasons for her

25   request, including if it was medical. Ms. Blumberg pointed out that never in the

26   history of the office was an attorney required to make such a showing.  Ms. Blumberg

27   further explained that she should be allowed to work part-time if she desired

28

regardless of whether it was due to a medical need or not. He basically shrugged his shoulders and said, "good luck getting this approved." Given the recent message Ms. Becton had sent by effectively forcing an experienced female attorney to return to full-time employment or resign, and seeking private medical information, Ms. Blumberg never requested the part-time position.

xi. The treatment of the last female part-time attorney and the perceived unwillingness of Ms. Becton to allow female prosecutors to utilize the part time positions has had a chilling effect on women asking for these positions. Female prosecutors fear they will be further marginalized and discriminated against if they request a part-time position. Ms. Becton's policies and practices have a demonstrable disparate impact on females in the office.

xii. Defendants and Ms. Becton's discriminatory actions towards Ms. Blumberg as detailed above have humiliated Ms. Blumberg and caused her to be miserable, worried, nervous, and anxious as her like situated male colleagues leapfrog over her in career advancement as a result of Defendants and Ms. Becton's discriminatory treatment.

xiv. **Plaintiff Jill Henderson**

i. Plaintiff Henderson experienced a reduction of her supervision role and her unit was cut.

ii. However, Plaintiff Henderson was given additional responsibilities and also became the head of the DV Unit without a promotion or compensation.

iii. Mr. Walpole, a younger and less qualified male, is now Ms. Henderson's direct supervisor and has never done a rotation in the Elder Abuse or Domestic Violence Units he now manages.  He undermines Ms. Henderson's authority by inserting himself into daily supervisory issues often without notifying Ms. Henderson.  When working through the conflict, Mr. Walpole told Ms. Henderson that he thought she

was "smart" in a condescending manner for a younger man. When Ms. Henderson complained to Ms. Johnson, no action was taken.

iv.  When Ms. Becton announced that promotions into vacant Senior Deputy District Attorney positions would be made following applications and interviews in April 2019, Ms. Henderson submitted her application highlighting her extensive experience and accomplishments in the office.  This included her successful and effective leadership of the Elder Abuse Unit. During the interview, Ms. Henderson specifically noted that she wanted to be a role model for women in the office and the women were under-represented in management. She also separately complained about the lack of representation of women in leadership to Ms. Becton, Ms. Johnson, and Mr. Cabral, and they all acknowledged the need.

v.  Sometime after the interview, Ms. Becton called Ms. Henderson into her office and informed her that someone else was getting the Senior Deputy position.  When Ms. Henderson inquired about the second Level 5 position in special operations, Ms. Becton told Ms. Henderson that she had no hope of being promoted in the future despite the fact that she, Becton, believed Ms. Henderson to be "great."  Ms. Henderson asked what she could do to be eligible to improve and Ms. Becton said, "nothing."

vi.  The interview and whole process on its face was a sham put in place to support decisions that had already been made regarding the promotions.  This sham process had been put in place after employees had protested when Chris Walpole was promoted without any process.  Indeed, Ms. Becton, the ultimate decision maker, failed to attend many of the female interviews of senior female candidates.

vii.  In an email from Ms. Becton on May 15, 2019, it was announced that Stacey Grassini, a male, and Simon O'Connell, a male, were promoted to the Senior Deputy District Attorney positions.  Ms. Henderson, and many other well qualified female

attorneys, were passed over in favor of these younger and less qualified males.  Mr.

O'Connell, for example, has eight years less experience than Ms. Henderson.

viii.   In addition to her traditional prosecutorial experience, Ms. Henderson has

demonstrated a dedicated passion to proactively helping communities reduce crime.

She developed a community prosecution program that was so popular, the City of

Concord paid her full salary and benefits for four years. Ms. Henderson brainstormed

novel techniques to address poverty-based crimes with incarceration as a last resort.

When Ms. Becton was appointed the DA, Ms. Henderson shared her excitement and

willingness to institute such programs. Ms. Becton declined her offer. When Ms.

Becton formed a variety of committees to improve various office functions, Ms.

Henderson asked Ms. Becton where she could be the most useful. Ms. Becton

declined to use Ms. Henderson as a resource on any committee. Shortly after Ms.

Becton's appointment Ms. Henderson shared her concerns about diversity in the

office and wanted to discuss new methods of recruiting. Ms. Becton did not consult

with Ms. Henderson over any of her ideas or rectify any of her concerns. Ms.

Henderson specifically stated that she had recommended several qualified candidates

with diverse backgrounds that she had interviewed and were rejected.

ix.   Ms. Henderson's role may be supervisory on paper, but she has been stripped of

actual authority, respect and the opportunity to lead the department.  Instead, lesser

qualified and less experienced male attorneys are being given this power and are not

reprimanded for breaching long standing protocols showing respect to the employee's

supervisor. For example, men are permitted to use subordinates without letting female

supervisors know.

x.   In addition, after being involved in in-house trainings for years, Ms. Henderson has

been excluded from the ability to lead trainings and was told that the DA wanted

younger attorneys to do the training.

xi.   The power in the office is being redistributed to the younger males in the office at an alarmingly fast rate, while equally or more qualified female prosecutors are being stripped of their roles, their presence, and their voice in the office.  Ms. Henderson went to Ms. Becton with her complaints over a course of more than a year, believing Ms. Becton would take action, but Ms. Henderson only experienced worse treatment as a result in retaliation after making her complaints.

xii.   Defendants and Ms. Becton's discriminatory actions towards Ms. Henderson as detailed above have humiliated Ms. Henderson and caused her to be embarrassed, mortified, and extremely anxious for which she has sought therapy sessions to cope.

111.   Further, Defendants and Ms. Becton has hired and protected men with a history of demeaning women.  The following are some examples:

iv.   Ms. Becton assigned a male to the Felony Expeditor position in the Richmond branch office.  In that position, he was the senior supervisor of junior female DAs despite numerous complaints about his sexist behavior.  In the past he sent videos to junior DAs under his supervision entitled "Jizz in my pants." He sent an email calling a female Deputy Attorney General a "pussy" and told junior female DAs that he would assign them cases that would cause them to "cream in their panties."  He told a woman that she was "swinging with the biggest dick on the fourth floor" and asked a nursing mother to not lift anything because it may make her "leak breast milk."  He told a pregnant attorney that she should order a mocha Frappuccino at Starbucks because it would help with "lubrication" in delivery.  Despite all of this and more, Ms. Becton assigned him to supervise women, and allowed him to continue as a supervisor as the Richmond Expeditor while deeming more senior women without such complaints unsuitable for managerial roles.

v.   Ms. Becton hired Roy Smalley as an Investigator Assistant.  Mr. Smalley was accused in a civil lawsuit of requiring one of his female employees at a group home in Solano County to have sex with him as a condition of her employment.  Mr. Smalley's hiring is

alleged to have occurred outside of Contra Costa County's HR regulations and without a completed background check. Following news reports of the hiring, Mr. Smalley abruptly quit his employment with the DA's Office.

vi.   Ms. Becton hired Larry Wallace who resigned from his last position over allegations of gender harassment. The claims settled for $400,000. The settlement became public, and was widely reported, following an investigation by the Sacramento Bee. Ms. Becton admitted that she was aware of the allegations and settlement when she hired Wallace.

112.   The empowerment and endorsement of these men shows Ms. Becton is not interested in ensuring a workplace free of discrimination for women.

113.   The above-described actions of Defendants constitute failure to take all steps reasonably necessary to prevent discrimination and retaliation from occurring, in violation of California Government Code section 12940(k).

114.   As a proximate result of Defendants' actions, Plaintiffs have suffered and continue to suffer severe embarrassment, humiliation, and mental anguish, all to their damage in an amount according to proof.

## FOURTH CAUSE OF ACTION

### Retaliation in Violation Of FEHA, Cal. Gov't Code §12940(h)

(All PLAINTIFFS against all DEFENDANTS and DOES 1-20)

115.   Plaintiffs reincorporate herein all preceding paragraphs of this complaint as though fully set out below.

116.   At all relevant times, the California Fair Employment & Housing Act, sections 12940, et seq., was in full force and effect, and binding on Defendants.

117.   FEHA makes it an unlawful employment practice for an employer to retaliate against an employee who has opposed a forbidden practice or filed a complaint against an employer or supervisor. CGC §12940(h).

118.   Defendants retaliated against Plaintiffs because they complained about improper conduct and unlawful acts by persons, as described above and filed charges alleging such unlawful conduct with the Department of Fair Employment & Housing.

xv.   **Plaintiff Mary Elizabeth Knox**

i.   Since her demotion, and in contrast to Ms. Becton's treatment of the male prosecutors who supported Paul Graves in the election, Ms. Knox has been stripped of all management and training responsibilities and has been physically isolated from day-to-day contact with the vast majority of prosecutors in the office. As a female, Ms. Knox is the only supporter of Mr. Graves' campaign who has been so publicly retaliated against by Ms. Becton.

ii.   This retaliation is unlike anything Ms. Knox has ever experienced. She was a very visible supporter of former DA Mark Peterson's opponent, Dan O'Malley, in a prior election. Post-election, Peterson retaliated and moved Ms. Knox from the Homicide Unit to the Richmond office to handle preliminary hearings. However, after a few months, Ms. Knox was moved back to the Homicide Unit, promoted to Homicide Unit supervisor, promoted into executive management as a Senior Deputy District Attorney and her ideas and opinions, such as creating the CVRU and developing the Freeway Security Network, were respected and valued by Mark Peterson.

iii.   Ms. Knox was one of many of Graves' supporters in the DA's office, yet she is the only supporter who Ms. Becton has targeted, demoted, and banished even though Ms. Knox has never disobeyed a policy or procedure put in place by Ms. Becton. Ms. Becton has lashed out at Ms. Knox because of her gender and age, stripping her of her many years of successful and important prosecutorial work.

iv.   The only other DA to experience such a public demotion and banishment was Ms. Becton's actual political opponent, Paul Graves. To add insult to injury, in an interview with the Mercury News in late 2018, Ms. Becton stated publicly that the

demotion of Mr. Graves and Ms. Knox gave "some attorneys in our office new opportunities for growth and development." This is in keeping with a later statement made by Ms. Becton's assistant, Venus Johnson, that the DA wants to see more "fresh faces." In contrast, young white males who supported Paul Graves have been forgiven by the DA and moved into the roles that older females are more qualified for.

    v.    In April 2019, Ms. Knox participated in the promotion process to be returned to her former position as a Level 5.  Despite five years of experience as a Level 5, Ms. Knox was not promoted. Stacey Grassini (male) and Simon O'Connell, who had decades less prosecutorial experience and no assigned supervisory experience, were promoted to the Level 5 positions.

    vi.    Despite an office tradition that limited an assignment to Felony Filing to one year, Ms. Knox continues in that position notwithstanding requests to Ms. Becton to be reassigned to a position commensurate with her experience. These complaints by Plaintiffs were protected activity under California law.

    vii.    When Ms. Becton was appointed the District Attorney of Contra Costa County in September 2017, upon the mid-term resignation of former DA, Mark Peterson, Ms. Becton recognized Ms. Knox's skills and experience in numerous ways.  Shortly after her appointment, Ms. Becton approached Ms. Knox and asked about her interest in serving as Ms. Becton's Chief Deputy, the number two position of authority in the office. Ms. Knox told Ms. Becton that she would support her in every way to ensure her success and the success of the mission of the District Attorney's Office. At this time, Ms. Becton had not yet announced her intent to run for election in 2018, yet, in the interest of full disclosure, Ms. Knox told Ms. Becton that she had already pledged her support to Senior Deputy District Attorney Paul Graves in the upcoming election.

*SECOND* AMENDED COMPLAINT

viii. A month later, in October 2017, Ms. Becton authorized Ms. Knox to continue in her role as an expert witness in federal court regarding 4th Amendment Search and Seizure issues, commenting that this recognition of Ms. Knox's expertise brought distinction to the District Attorney's Office.

ix. In the Spring of 2018, prior to the election, Ms. Becton asked Ms. Knox to accept the assignment of a death penalty prosecution that involved the murder and sexual assault of a fourteen-year-old in 1980. The defendant in that case had prior and subsequent convictions for sadistic sexual assaults. Becton told Ms. Knox that no attorney in the office was more qualified to try the case than her.  Ms. Becton approved Ms. Knox's request to attend the Capitol Litigation Symposium in May 2018.

x. At Ms. Knox's request, Ms. Becton moved the Gang Unit into the Community Violence Reduction Unit under Ms. Knox's supervision.

xi. After the election, on October 5, 2018, Ms. Becton told Ms. Knox that Ms. Becton was transferring her from her position as supervisor of the Community Violence Reduction Unit (the unit Ms. Knox created) to Felony Filing, a position usually filled by attorneys with twenty years less experience than Ms. Knox in a satellite office with limited contact to other attorneys. This transfer was far beneath Ms. Knox's skill set and experience. Ms. Becton did not inform Ms. Knox that she was being demoted from her position in executive management as a Senior Deputy District Attorney, a position that is held by the employee and not specific to a job assignment.  Ms. Knox learned that she had been demoted when she received her next paycheck and her pay decreased.  Ms. Becton replaced Ms. Knox as supervisor of the CVRU with Jason Peck, who had no prior experience as a unit supervisor or as a misdemeanor team supervisor.

xii. Defendants and Ms. Becton's discriminatory and retaliatory actions towards Ms. Knox as detailed above have humiliated Ms. Knox and caused her to be depressed,

disheartened, and extremely upset as she watches the 35-year career she has built dissipate.

**b.  Plaintiff Rachel Piersig**

i.   In June 2018, both Ms. Piersig and Ms. Chandler went to Ms. Johnson to voice their frustration and concerns regarding their treatment and management within the Homicide Unit. Specifically, they both raised the times when they voiced issues or concerns on their cases and their experience and concerns were ignored, demeaned and discounted. Ms. Johnson indicated that "things would change for the better soon" but nothing favorable occurred.

ii.   Instead, the female Homicide Unit members were "given" "mental health breaks" while the male attorney Chris Walpole continued to receive the better assignments, was promoted and given a pay raise associated with a Level 5.

iii.   In October 2018, Ms. Piersig was transferred from the Homicide Unit to her current position as a Felony Expeditor, a position typically reserved for prosecutors with less experience.  Ms. Johnson told Ms. Piersig that the transfer "would be good for her mental health."  Mr. Walpole was promoted to a Level 5 and currently supervises the Family Violence Division, the Elder Abuse Unit, the Domestic Violence Unit, and the Human Trafficking Unit.  He was later promoted again to "Acting Assistant District Attorney."  The other complaining party, Ms. Chandler, was moved to the felony filer position in Richmond as "a mental health break."  This "time out" response exemplifies the discriminatory practice within the DA's office; women who complain about disparate treatment are moved to positions to give them "mental health breaks." This treatment has a disparate impact on female prosecutors, contributing to pauses in their career and a slower rise through the ranks of the DA's office. Mr. Butts still supervises the Homicide Unit.

iv.   After filing the Complaint in this case, Ms. Piersig has received a retaliatory performance review from her supervisor.  Ms. Piersig lodged a formal complaint internally in April 2020.  When she inquired about the status of her complaint in June 2020, she was told there were no updates and it had "been referred to Jason Chan."  There has been no response since.  In comparison, since that time, a male has filed an informal complaint and Chris Walpole has had repeated meetings to address the male attorney's concerns.

v.   Ms. Piersig has been assigned to over a dozen criminal units in the office, tried nearly 60 jury trials, and supervised two felony units.  Her experience, management skills and knowledge far surpass those of all three men (Walpole, Grassini, and O'Connell) recently promoted.  Her credentials, qualifications and achievements surpass the men who were promoted ahead of her. The Defendants discriminated against her because she is a woman over 40 years old and have retaliated against her because of her complaints.

vi.   Defendants and Ms. Becton's discriminatory and retaliatory actions towards Ms. Piersig as detailed above have humiliated Ms. Piersig and caused her to be miserable, unhappy, embarrassed, and anxious as her career grows stagnate due to Defendants and Ms. Becton's actions.

**c.   Plaintiff Allison Chandler**

i.   In June 2018, prior to their individual transfers, both Ms. Piersig and Ms. Chandler went to Ms. Johnson to voice their frustration and concerns regarding their treatment and management within the Homicide Unit. Specifically, they both raised the times when they voiced issues or concerns on their cases and their experience and concerns were ignored, demeaned and discounted. Ms. Johnson indicated that "things would change for the better soon" but nothing favorable occurred.

ii.   Instead, in retaliation, the female Homicide Unit members were "given" a "mental

health break" while the male attorneys continued to receive the better assignments and were promoted. Mr. Walpole was promoted to a "Level 5" and currently supervises the Family Violence Division, the Elder Abuse Unit, the Domestic Violence Unit, and the Human Trafficking Unit, and also has been promoted to "acting Assistant District Attorney." Ms. Chandler, was moved to her current felony filer position in Richmond as "a mental health break." She was removed from emails and committees, and members of executive management started to ignore her. This "time out" response exemplifies the discriminatory practice within the DA's office, and it effects women in the office by sending a message that the senior women will be ignored. Junior women have ceased seeking guidance from senior women and are being redirected to junior male attorneys endorsed by management. Women who complain about disparate treatment are moved to positions to give them "mental health breaks" and effectively pushed aside. Their reputations in the office are forever tainted. This treatment has a disparate impact on female prosecutors, contributing to pauses in their career and a slower rise through the ranks of the DA's office. Ms. Becton is aware of this because senior women have told her. Despite this, she participates in the disparate treatment and does nothing to stop it.

iii.  When Ms. Chandler was rotated to Richmond Felony Filer, police agency detectives began to ask Ms. Chandler, "What did you do?" The move suggested to outsiders that she had been demoted. This was very upsetting and has impacted her reputation with detectives in the law enforcement community. The failure to promote Ms. Chandler will have a lasting effect on her ability to rebuild her reputation within the law enforcement community, and it will further set her

behind junior male prosecutors in the office.

 iv. After the transfer memorandum was distributed in 2019, Ms. Chandler was informed she would be given additional responsibilities but still not any supervisory duties.  Ms. Chandler was told that not only would she be doing the non-supervisory position of Felony Filer, but she was also expected to take on Filing Domestic Violence Misdemeanors, historically a separate role from Felony Filer, and the non-supervisory part of the misdemeanor team leader job in Richmond. She was told these additional duties were "not negotiable." For the past seven years, a male has held the position of Felony Filer in Richmond and was never asked to absorb filing Domestic Violence Misdemeanors as well. Ms. Chandler was forced to do one and half times the work, for the same pay, neither of which is a supervisory position.

 v. Ms. Chandler pushed back on the expectation that she take on the filing of Domestic Violence Misdemeanors. She reminded her supervisors that she would be taking a handful of homicide cases with her to Richmond, one of which was a capital murder case, a very prestigious and once in a lifetime opportunity for prosecutors. Ms. Chandler was committed to seeing these cases to their end. Having these cases, in addition to her Felony Filer position would make also filing Domestic Violence Misdemeanors nearly impossible. Instead of filling the Domestic Violence Misdemeanor role, Ms. Chandler was stripped of her capital murder case.  Not only was Ms. Chandler expected to take on another job in addition to her own, but to add insult to injury, in order to give her the time to do it, she was further maltreated by having a prestigious and important case taken from her docket. Similar to the other Plaintiffs, Ms. Chandler has been

discriminated against based upon her gender and age and retaliated against for

protesting her treatment.

vi. Defendants and Ms. Becton's discriminatory and retaliatory actions towards Ms.

Chandler as detailed above have humiliated Ms. Chandler and caused her to be

miserable, unhappy, feel hopeless, and anxious as her career fails to progress due

to Defendants and Ms. Becton's discriminatory treatment.

**d. Plaintiff Mary Blumberg**

i. At the same time Ms. Becton assigned Ms. Blumberg to the Homicide Unit, Ms.

Blumberg was removed from the Recruitment and Retention Committee. She

emailed the Assistant Deputy District Attorney in charge of the recruitment and

retention committee, asking for an explanation, and has never received an

explanation.

ii. Ms. Johnson has said that Ms. Becton prefers younger, newer attorneys to do the

training and recruitment as they can relate more to law students. However, this

"younger attorney" attitude only applies to the females with experience; male

prosecutors have been left in their training and recruitment roles while all of the

experienced female prosecutors have been pushed out. For example, a male,

Assistant Deputy District Attorney, with 18 years more experience than Ms.

Blumberg, still heads the recruitment and retention committee. He and a male

Senior Deputy District Attorney, one-year Ms. Blumberg's senior, along with Ms.

Johnson and a junior female attorney, (who has only six years in the office)

conducted the new hire interviews.  The recently appointed male, Director of

Recruitment, one year behind Ms. Blumberg, is also in charge of recruitment and

retention. This is another example of experienced female prosecutors losing

visibility and influence in the office but not the male prosecutors.

iii. Ms. Blumberg's move from her role as the Misdemeanor Supervisor to the Homicide Unit appears to have been done to curtail her access and visibility to new hires and trainings as it coincided with her removal from the recruitment and retention committee.

iv. Ms. Blumberg's move from her role as the Misdemeanor Supervisor to the Homicide Unit appears to have been done to curtail her access and visibility to new hires and trainings as it coincided with her removal from the recruitment and retention committee.

v. This sort of punitive shifting of women's roles has also been seen in relation to part-time roles. Traditionally, the DA's office offered two part-time positions and one job share position to people to work less than full time. This allowed for up to four people to work a non-traditional schedule (the job-share position is shared between two people). The purpose of this policy was to retain qualified career prosecutors who might otherwise leave county employment due to unmet family needs.  Part-time and job-share positions are available to help prosecutors balance the needs of family and their desire to continue long term employment.   The reality is that these part-time roles have traditionally been requested by female DA's in the office, often due to their obligations as primary care providers to their families.  Almost every female who has children in the office has opted to work one of these part-time positions at some point.

vi. Defendants and Ms. Becton's discriminatory and retaliatory actions towards Ms. Blumberg as detailed above have humiliated Ms. Blumberg and caused her to be miserable, worried, nervous, and anxious as her like situated male colleagues

leapfrog over her in career advancement as a result of Defendants and Ms. Becton's discriminatory treatment.

**e.  Plaintiff Jill Henderson**

i.   Ms. Henderson has repeatedly complained about being treated differently based upon her age and gender and she has complained about the lack of female leaders. In retaliation, she has not been promoted, she has been treated with disrespect and she has been given more work without any pay increase.

ii.  Ms. Henderson complained to both Ms. Becton and Ms. Johnson that more senior female representation was needed.  Mr. Walpole was suddenly promoted by Ms. Becton to a Level 5 position in or around the end of 2018.  In January 2019, after five successful years as the Elder Abuse Unit Supervisor, Ms. Henderson approached Ms. Becton and Ms. Johnson and explained her desire to take on a more senior (not a lateral role).  After that request, Ms. Becton transferred Ms. Henderson's only subordinate away from the Unit.  While Ms. Henderson was on vacation, they transferred Ryan Wagner out and left Ms. Henderson with over 30 unassigned elder abuse cases to deal with.  Ms. Henderson was not consulted about the move or even advised that it was being contemplated.  When Ms. Henderson was asked to provide a case list, she asked Ms. Johnson if downsizing the Elder Unit was being contemplated and was specifically assured that it was not. The number of attorneys in the Elder Unit was then cut in half during her vacation with no prior notice.  Ms. Henderson had been told "just wait, they have a plan to promote you."  Instead, she has been isolated in the office with no voice given her experience, success and expertise.  Ms. Henderson came up with a plan to help run an office and help with the chronic backlog of cases, but her plans

1    were ignored.

2    iii.  Ms. Henderson has repeatedly complained about being treated differently based

3         upon her age and gender and she has complained about the lack of female leaders.

4         In retaliation, she has not been promoted, she has been treated with disrespect and

5         she has been given more work without any pay increase.

6    iv.  In June 2019, Ms. Henderson was told by Ms. Becton that in addition to her Elder

7         Abuse role, she was now head of the Domestic Violence Unit. This gave her

8         seven (7) subordinates and was a lateral move, not a more senior role.  It is

9         extremely unusual for such a major role to be assigned without consultation.  No

10        male has been giving such a major role without being consulted first.  Ms.

11        Henderson confirmed with Venus Johnson that Ms. Henderson had been clear in

12        prior communications that she wanted a promotion and not greater responsibility

13        without compensation or a promotion.

14   v.   Ms. Becton then announced that Mr. Walpole, a Senior DA with less than eight

15        months of experience in his new position as a Level 5 (to which he was promoted

16        without any process), would be designated the Acting Assistant District Attorney.

17        This meant that this junior, less experienced male attorney was now Ms.

18        Henderson's direct supervisor. Mr. Walpole has never worked in either the

19        Domestic Violence Unit or the Elder Abuse Unit.

20   vi.  It became increasingly clear that Ms. Henderson's supervisory role was meant to

21        placate the growing cries of gender discrimination echoing through the DA's

22        office. Ms. Henderson has been reduced to merely a placeholder, a figurehead. It

23        was a significant increase in responsibility with no increase in pay.

24   vii. Mr. Walpole, with far inferior experience, made offers on Domestic Violence

*SECOND* AMENDED COMPLAINT

cases without consulting Ms. Henderson or even asking her for all the facts of the case. He has micromanaged units run by women and not the men.  He usurped Ms. Henderson's authority by bypassing her and going directly to her subordinates, often giving contradictory advice. He has tried to silence Ms. Henderson, admonishing her for disagreeing with him.  Ms. Henderson raised her concern with Ms. Becton that Mr. Walpole was not permitting her to disagree with him.  Ms. Becton told Ms. Henderson that she had authority to have different opinions than Mr. Walpole but she took no action in response to Ms. Henderson's comments and Mr. Walpole made negative comments in Ms. Henderson's performance review as a result.

     viii.   Defendants and Ms. Becton's discriminatory and retaliatory actions towards Ms. Henderson as detailed above have humiliated Ms. Henderson and caused her to be embarrassed, mortified, and extremely anxious for which she has sought therapy sessions to cope.

119.     Defendants subjected Plaintiffs to unjust employment actions, continue to deny Plaintiffs opportunities for growth, promotion, and overlook their accomplishments and contributions, in retaliation for their protected complaints.

120.     As a proximate result of Defendants' actions, Plaintiffs have suffered and continue to suffer severe embarrassment, humiliation, and mental anguish, all to their damage in an amount according to proof.

121.     Plaintiffs have retained counsel to prosecute their FEHA claims.  Therefore, they are entitled to attorneys' fees pursuant to Cal. Gov. Code §12965(b).

## **FIFTH CAUSE OF ACTION**

**Gender Discrimination in Violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-et seq.**

*SECOND* AMENDED COMPLAINT

77

(All PLAINTIFFS Against all DEFENDANTS and DOES 1-20)

122.   Plaintiffs reincorporate herein all preceding paragraphs of this complaint as though fully set out below.

123.   Defendants discriminated against Plaintiffs by demoting them and/or denying them opportunities for growth, promotion, and overlooking their accomplishments and contributions, constituting disparate treatment in that it was based on the fact that Plaintiffs are experienced women as alleged herein.

124.   Defendants have a culture of disparaging women with demeaning, sexualized comments.

125.   Since 2017, Defendants have reversed gains made by women in the office.

126.   Defendants have established an environment where women need to gain more experience than men to get high profile assignments, including needing to work for up to 6 years more than men to be assigned to the homicide unit.

127.   In multiple instances, male prosecutors with less tenure and experience than female prosecutors have been selected for career-advancing assignments and given supervisory positions and dictatorships.

128.   Stacey Grassini, a male, was promoted to a Level 5 executive management position without any prior supervisory assignments within the office. Plaintiffs are more qualified.

129.   Chris Walpole, an attorney with very limited junior supervisory experience, was promoted without process to Level 5 executive management to supervise the largest vertical prosecution unit in the office, the Sexual Assault, Domestic Violence and Elder Abuse Unit.  Chris Walpole was again promoted to "Acting Assistant District Attorney" to supervise Homicide, Gangs, CVRU, Sexual Assault, Domestic Violence, Special Operations and Elder Abuse (over 75% of the office.)  Nancy Georgiou, the most senior Level 5 and the only remaining female Level 5, had formerly supervised the significant Sexual Assault, Domestic Violence and Elder Abuse Unit yet the supervisory responsibilities for the unit were assigned to a male attorney with less supervisory and sexual assault experience and despite her experience in these fields, Ms. Georgiou was moved to oversee the smallest prosecution unit. Plaintiffs are also more qualified than the male promoted.

130.    Simon O'Connell, an attorney with less than six months of junior management experience, was promoted to a Level 5 executive management position instead of a number of female applicants for the position (including three of the Plaintiffs) with multiple years of executive management and unit supervisory experience.

131.    Caleb Webster, with only five years of experience as an attorney was promoted to the position of Misdemeanor Team Leader replacing one of the more qualified Plaintiffs.

132.    Male Level 3 attorneys were moved to supervise Level 4 female attorneys and subsequently promoted.

133.    Symbolically, junior male attorneys and investigators were given larger window offices while more qualified female attorneys were forced to take smaller offices without windows.

134.    Newly promoted Level 5 manager, Chris Walpole was selected to fill the role of Acting Assistant District Attorney instead of the more experienced, and most senior Level 5, who happens to be a woman.

135.    Under Ms. Becton's administration, less experienced male prosecutors are now supervising higher ranking, advanced level female prosecutors.  Notably, no less experienced female prosecutors are supervising higher ranking, advanced level male prosecutors.  Also, the only senior-supervising female prosecutor supervises the smallest DA branch office in Richmond supervising only two advanced-level attorneys. Even where female prosecutors hold a supervisory position, often they are supervisory in name only as the female prosecutor does not actually have anyone beneath her to supervise. Male prosecutors with less tenure and experience than female prosecutors have also been selected by Ms. Becton for career-advancing assignments and given supervisory positions and directorships.

136.    Under Ms. Becton's administration, female prosecutors with significant prosecutorial experience have been excluded from committee membership and training positions which they previously held.  Ms. Becton's exclusion of the senior female prosecutors from these positions of significance within the office has sent the very clear message to prosecutors within the office, and to law enforcement in general, that the senior female prosecutors are not valued by Ms. Becton.

137.     The promotion process in Ms. Becton's administration for male prosecutors has been discriminatorily different than the promotion process for female prosecutors.  The change has been dramatic.  Junior male prosecutors are systemically promoted sooner than their more experienced female counterparts, resulting in higher pay that compounds with every year of employment.  Male prosecutors now have direct supervision of at least 75% of the prosecuting attorneys.

xvi.  **Plaintiff Mary Elizabeth Knox**

    i.   DA Becton overrode the approval of two supervisors for Plaintiff Knox to take over a homicide case for a colleague on leave, and a less qualified male attorney was put on the case.

    ii.   DA Becton transferred Plaintiff Knox from Ms. Knox's position as supervisor of the Community Violence Reduction Unit (the unit Ms. Knox created) to Felony Filing, a position usually filled by attorneys with twenty years less experience than Ms. Knox, in a satellite office with limited contact to other attorneys.

    iii.   Since the filing of Plaintiffs' original complaint, after two and a half years in the felony filer position, DA Becton transferred Ms. Knox to the Elder Abuse unit in a non-supervisory role, another position typically held by attorney's with less than fifteen years of experience.

    iv.   At the same time as Ms. Knox's most recent transfer, DA Becton transferred Satish Jallepalli, a male attorney with significantly less years in the office than Ms. Knox, to the CVRU. A position and unit Ms. Knox stated she would like, and is, qualified for.

    v.   Tellingly, the attorney moved into Ms. Knox's felony filer role is a fourteen-year attorney, supporting Ms. Knox's claim that the role she was performing for the last two and a half years is traditionally done by an attorney with less than fifteen years' experience.

    vi.   A male attorney (Jason Peck) who had no prior experience as a unit supervisor or misdemeanor team supervisor replaced Plaintiff Knox as supervisor of the CVRU.

*SECOND* AMENDED COMPLAINT

80

vii.  DA Becton passed over Ms. Knox for a Level 5 Senior Deputy District Attorney position in May 2019. Instead, DA Becton promoted Simon O'Connell, a male attorney with less than six months of junior management experience, and Stacey Grassini, a male attorney with no experience supervising attorneys, to Level 5, Senior Management, roles .

viii.  DA Becton assigns Ms. Knox rolls beneath her level of experience, expertise, and skill, which has the effect of killing the career that Ms. Knox has spent decades building. In direct contrast, DA Becton assigns younger, male attorneys, such as Simon O'Connell, Stacey Grassini, Chris Walpole, and Jason Peck, to name just a few, to roles beyond their individual levels of experience giving them an opportunity to rise to the challenge and stretch their professional growth and accomplishments. DA Becton does not give the same opportunity to the women in the office.

ix.  Defendants and Ms. Becton's discriminatory actions towards Ms. Knox as detailed above have humiliated Ms. Knox and caused her to be depressed, disheartened, and extremely upset as she watches the 35-year career she has built dissipate.

xvii.  **Plaintiff Rachel Piersig**

i.  The DA's office consistently denied Plaintiff Piersig opportunities for growth, and promotion, overlooking Ms. Piersig's accomplishments and contributions and placed Ms. Piersig in a role beneath her experience and skill set.

ii.  Plaintiff Piersig was passed over for a Level 5 promotion in 2018 and again passed over for a Level 5 Senior Deputy District Attorney position in May 2019.

iii.  In her performance review, Ms. Piersig was accused of being "too mean" to police officers - a charge that Ms. Piersig has never heard leveled at any male prosecutor. This language is gendered, not leveled at males, and exemplifies the bias Ms. Piersig has had to endure.

iv.  LevelLevelIn June 2018, both Ms. Piersig and Ms. Chandler went to Ms. Johnson to voice their frustration and concerns regarding their treatment and management within

the Homicide Unit. Specifically, they both raised the times when they voiced issues or concerns on their cases and their experience and concerns were ignored, demeaned and discounted. Ms. Johnson indicated that "things would change for the better soon" but nothing favorable occurred.

v.   Instead, the female Homicide Unit members were "given" "mental health breaks" while the male attorney Chris Walpole continued to receive the better assignments, was promoted and given a pay raise associated with a Level 5.

vi.   In October 2018, Ms. Piersig was transferred from the Homicide Unit to her current position as a Felony Expeditor, a position typically reserved for prosecutors with less experience.  Ms. Johnson told Ms. Piersig that the transfer "would be good for her mental health."  Mr. Walpole was promoted to a Level 5 and currently supervises the Family Violence Division, the Elder Abuse Unit, the Domestic Violence Unit, and the Human Trafficking Unit.  He was later promoted again to "Acting Assistant District Attorney."  The other complaining party, Ms. Chandler, was moved to the felony filer position in Richmond as "a mental health break."  This "time out" response exemplifies the discriminatory practice within the DA's office; women who complain about disparate treatment are moved to positions to give them "mental health breaks." This treatment has a disparate impact on female prosecutors, contributing to pauses in their career and a slower rise through the ranks of the DA's office. Mr. Butts still supervises the Homicide Unit.

vii.   Ms. Piersig has extensive supervisory experience.  As the supervising attorney of the Domestic Violence and Elder Abuse Units for over four years, she directly supervised fourteen attorneys at various times, of various levels of experience, from brand-new felony attorneys to far more senior prosecutors.  Since October 2018, Ms. Piersig has supervised the entire Preliminary Hearing unit, teaching less-experienced attorneys the fundamentals of felony prosecution to prepare them for felony trials.  She now directly supervises three attorneys.

*SECOND* AMENDED COMPLAINT

82

viii. While supervising the preliminary hearing team, Ms. Piersig's authority was repeatedly usurped by a junior male supervisor, Simon O'Connell.  Without speaking to Ms. Piersig, Mr. O'Connell would assign trials to Ms. Piersig's team.  Mr. O'Connell had no supervisory authority over Ms. Piersig's team.  One week, Mr. O'Connell assigned trials to the attorneys on Ms. Piersig's team leaving her without any attorneys to handle the preliminary hearings for the week.  Ms. Piersig had to repeatedly ask Mr. O'Connell to not assign work to her team without speaking to her. He persisted and told attorneys they were transferred off her team and told another attorney that she was now assigned to Ms. Piersig's team.  All these actions were outside of Mr. O'Connell's authority.

ix. During this time a junior female attorney was assigned a very serious felony case. Mr. O'Connell inserted himself and contacted Mr. Cabral and stated that the case should not be assigned to the young female attorney because, without any evidence, Mr. O'Connell was concerned that the defendant would "become focused" on the young attorney.  Ms. Piersig was informed that that the case would be reassigned to a male attorney.  The male attorney selected was not as talented as the young female. Ms. Piersig pointed out that this was unfair and was denying a female attorney an opportunity based solely on her gender, and while, ultimately, the case remained with that attorney, Ms. Piersig was seen to be complaining on behalf of other female prosecutors and Mr. O'Connell was promoted to a Level 5 by Ms. Becton.

x. As a supervisor, Ms. Piersig regularly trained new attorneys. Ms. Piersig held formal trainings on domestic violence for the new attorneys. She also held trainings for attorneys on opening statements, and all aspects of trial, voir dire through closing statements.  She trained Contra Costa County Sheriff Dispatchers regarding elder abuse issues and provided training to all county law enforcement on procedures for handling domestic violence situations.  Ms. Piersig has contributed immensely to the Contra Costa District Attorney's Office through these internal trainings and external

trainings that build bridges and are preventative measures used to reduce violence. Since Ms. Becton's election, Ms. Piersig has not been asked to participate in any trainings.

xi.  Mr. Walpole was suddenly promoted by Becton to a Level 5 position in or around the end of 2018.  Mr. Walpole was promoted without an application process and hurdled ahead of many qualified female prosecutors with far more experience including Ms. Piersig.  Historically, in order to be considered for a Level 5 promotion, attorneys had prosecuted in nearly every unit in the office and had significant supervisory experience.  Ms. Piersig has been with the DA's Office four years longer than Mr. Walpole.  She also has significantly more supervisory experience, including her four years supervising the Domestic Violence and Elder Abuse Units. In contrast, before his sudden promotion to Level 5, Mr. Walpole had only a year of junior level supervisory experience, back in 2012.  That position was limited to supervising three attorneys in court while the attorneys file and negotiate the misdemeanor cases themselves.  Supervising misdemeanors is considered an entry level supervisory position and does not invoke the level of responsibilities and duties that heading the Felony Domestic Violence Unit does, as Ms. Piersig did successfully for four years. Nevertheless, these qualifications and experience were overlooked and ignored on account of Ms. Piersig's gender.  Mr. Walpole's gender trumped Ms. Piersig's experience.

xii.  In April 2019, Becton announced that promotions into vacant Senior Deputy District Attorney positions would be made following applications and interviews. Ms. Piersig submitted her application highlighting her extensive experience and accomplishments in the office.  This included her successful and effective leadership of the Domestic Violence and Elder Abuse Units and the several initiatives she had put in place to increase efficiencies and conviction rates in those units, detailed above.

xiii.   Ms. Piersig's interview was scheduled at 1:00 p.m. on a Tuesday, Ms. Piersig's heaviest court day.  When Ms. Piersig arrived at the interview, she was surprised to find that Ms. Becton, the sole decision maker on advanced level promotions, was not in attendance. The interview lasted barely 20 minutes and contained odd questions such as Ms. Piersig's thoughts on the chain of command in the office. The interview questions were very generic and did not have anything to do with the Level 5 position which entails supervising multiple teams of attorneys.  The interview, and whole process, on its face was a sham put in place to support decisions that had already been made regarding the promotions and to placate those that complained about Mr. Walpole's sudden promotion.

xiv.   In an email from Ms. Becton on May 15, 2019, it was announced that Stacey Grassini, a male, and Simon O'Connell, a male, were promoted to the Senior Deputy District Attorney positions. Ms. Piersig, and many other well qualified female attorneys, were passed over in favor of younger or less qualified males.

xv.   Ms. Piersig has more than six years of additional experience compared to Simon O'Connell who was promoted. At the time of his promotion, Mr. O'Connell had just six months of experience as a supervisor, as the felony trial team leader.  This position supervises less experienced attorneys, is really an assistant supervisory role without independence and is limited to assigning trials, making offers, and supervising the subordinate attorney, which is significantly less supervisory experience than Ms. Piersig holds.  Ms. Piersig also has an additional six months of experience as the felony expeditor, has worked in more units in the office and prosecuted more homicides than Mr. O'Connell.

xvi.   Ms. Piersig has prosecuted more trials and has significantly more supervisory experience than Stacy Grassini.  In fact, prior to his promotion to the Level 5 position, Mr. Grassini had never held a supervisory role in the office.  He had not tried a case in ten years and, on information and belief, has never prosecuted a homicide.

xvii.   When Ms. Becton took office in June 2018, two males and three females occupied the advanced level Attorney 5 positions. Now, there is only one female at that level, and she supervises only two attorneys in the smallest DA branch office in Richmond.  The DA's office is in turmoil and is losing experienced prosecutors at an unprecedented rated.  Since January 2019, fifteen prosecutors have resigned their position with the County.

xviii.   Shortly after the promotions of Mr. O'Connell and Mr. Grassini, in June 2019, Ms. Becton doubled down on her discrimination and announced that Mr. Walpole, a Senior DA with less than eight months of experience in his new position as a Level 5 (to which he was promoted without any process bypassing many more qualified females), would be designated the Acting Assistant District Attorney.

xix.   Defendants and Ms. Becton's discriminatory actions towards Ms. Piersig as detailed above have humiliated Ms. Piersig and caused her to be miserable, unhappy, embarrassed, and anxious as her career grows stagnate due to Defendants and Ms. Becton's actions.

xviii.   **Plaintiff Allison Chandler**

i.   In Spring of 2019, Plaintiff Chandler was promised a supervisory role in Felony Filer while still having to manage her homicide trial caseload, but ultimately was not given the supervisory role.

ii.   Since 2019, Plaintiff Chandler has been forced to do one and a half times the work by taking on "non-negotiable" extra responsibilities in Felony Filer by Filing Domestic Violence Misdemeanors. She was even stripped of a capital murder case assignment to do Filing Domestic Violence Misdemeanors.

iii.   Ms. Chandler has been told she is "too emotional" and "excitable" and "her temperament" is problematic. These are all gendered terms only leveled at females and used against them to prove that they are not equipped to supervise. Men are

*SECOND* AMENDED COMPLAINT

passionate and zealous; women are emotional and excitable. One is considered an asset: the other, a liability.

iv. Ms. Chandler has consistently sought out opportunities for growth and advancement in her career. She has explicitly requested supervisory roles from her superiors. Despite career success, her willingness to take on extra work and roles in addition to her assigned role, Ms. Chandler is consistently passed over for supervisory roles she is qualified for, with those roles going to less qualified, more junior males. The effect of this has been a stagnation in her career growth and inability to arc her career ascension at the same rate as her male counterparts and as a result Ms. Becton has failed to provide Ms. Chandler with equal employment opportunities based on her gender.  Despite her qualifications and experience, Ms. Chandler has been put in a role beneath her experience and skill set. She has been overlooked for supervisory positions that she is immensely qualified for and those have gone to younger, less qualified males.

v. In June 2018, prior to their individual transfers, both Ms. Piersig and Ms. Chandler went to Ms. Johnson to voice their frustration and concerns regarding their treatment and management within the Homicide Unit. Specifically, they both raised the times when they voiced issues or concerns on their cases and their experience and concerns were ignored, demeaned and discounted. Ms. Johnson indicated that "things would change for the better soon" but nothing favorable occurred.

vi. Instead, in retaliation, the female Homicide Unit members were "given" a "mental health break" while the male attorneys continued to receive the better assignments and were promoted.  Mr. Walpole was promoted to a "Level 5" and currently supervises the Family Violence Division, the Elder Abuse Unit, the Domestic Violence Unit, and the Human Trafficking Unit, and also has been promoted to "acting Assistant District Attorney." Ms. Chandler, was moved to her current felony filer position in Richmond as "a mental health break."  She was removed from emails

and committees, and members of executive management started to ignore her.  This "time out" response exemplifies the discriminatory practice within the DA's office, and it effects women in the office by sending a message that the senior women will be ignored.  Junior women have ceased seeking guidance from senior women and are being redirected to junior male attorneys endorsed by management.  Women who complain about disparate treatment are moved to positions to give them "mental health breaks" and effectively pushed aside.  Their reputations in the office are forever tainted.  This treatment has a disparate impact on female prosecutors, contributing to pauses in their career and a slower rise through the ranks of the DA's office.  Ms. Becton is aware of this because senior women have told her.  Despite this, she participates in the disparate treatment and does nothing to stop it.

vii.   In March 2019, Ms. Chandler was informed she would be rotated to Richmond to be the Felony Filer and share in the Felony Expeditor duties, a supervisory position. Ms. Chandler was told she would be assisting Steve Bolen, the then head of the Richmond office with the expeditor duties. Ms. Chandler had previously completed Felony Filer rotation in Martinez, and the role was beneath her experience and skill set. However, she was willing to take on the role since it came with the promise of a shared supervisory role, Felony Expeditor.  Ms. Chandler had requested a supervisory role. She was also informed that in addition to her Felony Filer and shared Expeditor role, Ms. Chandler was to continue prosecuting her over a dozen murder cases "until a prosecutor could replace her in homicide."

viii.   At the end of March 2019, Ms. Chandler was cleaning out her office planning to begin her new role in Richmond upon her return from a scheduled vacation when her supervisor, Derek Butts, questioned why she was cleaning out her office. Ms. Chandler informed him she was rotating to Richmond to be Felony Filer and share the Expeditor role. Mr. Butts showed her an email from Ms. Johnson informing him that Ms. Chandler was simply "filling in for a moment in Richmond as Felony Filer and

'still in homicide.'" There was no mention of the promised supervisory role.  Ms. Chandler left for her vacation with half her belongings in Richmond and the rest in Martinez, unsure of her role or even what office to return to after her vacation.

ix.  While on vacation, Chris Walpole, called Ms. Chandler and asked her to "help out" the office by being the Felony Filer in Richmond.  She agreed to do it for one week because she was expected to continue carrying and managing a very heavy homicide caseload. Since Becton was elected, there has been a significant number of employee departures, so more was being required of the remaining attorneys. Ms. Chandler fulfilled her commitment and completed the week and returned to homicide as she was instructed.

x.  In April 2019, Ms. Becton announced that promotions into vacant Senior Deputy District Attorney positions would be made following applications and interviews. Attorneys with one year of experience in a Level 4 position were eligible to apply. Although, Ms. Chandler was qualified for the position, she wanted to gain fundamental supervisory experience before taking on an executive management role as she understood this was historically a requirement.  She also understood there were many more senior qualified and experienced contenders like Mary Knox and Rachel Piersig who were applying for the role. Regardless, Ms. Chandler went through the process of putting together a resume similar to the application with the intent of highlighting her experience and contributions so Ms. Becton would understand her qualifications and move her into a supervisory role.  This is another example of Ms. Chandler being proactive.  She gave her completed application to Ms. Becton, asking that it be put in her file and informing Ms. Becton that she wanted a supervisory role with the goal of one day heading the Sexual Assault Unit. Becton asked Ms. Chandler if being Felony Filer and Expeditor as previously planned in Richmond would be a supervisory role that she would be interested in. Ms. Chandler said yes.

xi.   Ms. Chandler also sent her resume to Ms. Johnson asking her to review it prior to finalizing transfers. Ms. Chandler also let Ms. Johnson know that she wanted to be a supervisor.  Sometime later, Ms. Johnson approached Ms. Chandler to inform her that she was being transferred to a non-supervisory role as Felony Filer in Richmond and that she would not be Felony Expeditor.  This was a step back in Ms. Chandler's career trajectory as she had already held this role prior to being on the Homicide team and it was not a supervisory role which she had explicitly requested.

xii.  Ms. Johnson told Ms. Chandler that she wanted to speak to her "woman to woman," that although Ms. Chandler had exceptional trial skills and "checked all the boxes" typically required to be moved into a supervisory role, Ms. Becton was looking for other intangible attributes, reputation in the office, as in, "what others think of you and how well you get along with others." Basically, Ms. Becton was conducting a popularity contest and not basing decisions on experience and abilities. Ms. Becton had provided many junior level male prosecutors opportunities to manage.  Even with their many mistakes and problems, Ms. Becton continued to allow them to stay in their position.  Ms. Chandler has not had any negative evaluations nor is anything in her personnel file that would support Ms. Becton's decision to deny her a supervisory role.

xiii. In June 2019, a younger lesser qualified and less experienced male (twelve years her junior with five years of experience) was promoted into the position of Misdemeanor Team Leader in Richmond, a supervisory position in the office in which Ms. Chandler currently works. Ms. Chandler had requested this role when she was told she needed supervisory experience in order to move to the Sexual Assault Unit. Even though the role was beneath her experience level, she was willing to do it to get the experience.  It was given to a less experienced male.

xiv.  In the meantime, Stacey Grassini and Jason Peck were promoted to supervisory roles, and Stacey Grassini was given a Level5 role without any supervisory experience. The

reasons used for blocking Ms. Chandler's career advancement did not apply for less experienced males.

xv. DA Becton assigns younger, male attorneys, such as Simon O'Connell, Stacey Grassini, Chris Walpole, and Jason Peck, to name just a few, to roles beyond their individual levels of experience giving them an opportunity to rise to the challenge and stretch their professional growth and accomplishments. Meanwhile, Ms. Chandler has to "prove" herself over and over again, and yet DA Becton still denies Ms. Chandler the opportunities that less qualified males are given.

xvi. Defendants and Ms. Becton's discriminatory actions towards Ms. Chandler as detailed above have humiliated Ms. Chandler and caused her to be miserable, unhappy, feel hopeless, and anxious as her career fails to progress due to Defendants and Ms. Becton's discriminatory treatment.

xix. **Plaintiff Mary Blumberg**

i. Plaintiff Blumberg was stripped of the supervisory role of Central and Eastern Operation(s) Misdemeanors Trial Team, which traditionally is a two-year period, roughly one year prematurely. She was also forced to the Homicide Unit without consultation.

ii. Plaintiff Blumberg experienced consistent denials of opportunities for growth, promotion, and overlooked accomplishments and contributions.

iii. Despite all her accomplishments, Ms. Blumberg has been discriminated against by Diana Becton based on gender.  In September 2017, Ms. Blumberg was assigned to supervise the Central and Eastern Operation(s) Misdemeanor Trial Team. This was a good career move for her as it would build her supervisory experience as she would be supervising twelve to fourteen new attorneys. Supervising misdemeanor trial attorneys is usually a two-year assignment. However, in October 2018, without any discussion, Ms. Blumberg was unceremoniously removed from the supervisor

position despite telling her then supervisor, many times that she wanted to remain supervising misdemeanors for the traditional two-year period.

iv. In October 2018, merely a year into her assignment, Ms. Blumberg was unexpectedly transferred from her supervisory position to the Homicide Unit. She was told the morning the transfer memorandum was sent that she was being moved. This move was unusual for two reasons: (1) it was done without input from Ms. Blumberg and (2) the two males who were assigned at the same time as her to Homicide Unit had known about their move for weeks and one was also aware that Ms. Blumberg would be moved. Given the emotionally taxing and demanding mental and physical load of the Homicide Unit, and the significant investment of time it requires, attorneys are historically consulted before being moved to the Homicide Unit. The office has a vested interest in ensuring that the attorneys rotated to the Homicide Unit are ready, mentally and emotionally, and prepared for the impact the time commitment will have on their family and personal life. However, Ms. Blumberg was not allowed to consider this. She was never consulted. Unlike Ms. Blumberg, the male prosecutors who were moved to the Homicide Unit were granted weeks of advanced notice of the upcoming transfer and could mentally prepare for the new assignment.

v. The stressful move to the Homicide Unit has had a significant impact on Ms. Blumberg's health and her family.  Her children are young and go days without seeing their mother.  Recently, a trial demanded she work 90 plus hour weeks for several weeks, causing her to downplay several health symptoms that ultimately landed her in the hospital with emergency surgery. Ms. Blumberg spent a month recovering from surgery but continued to be stressed given other homicide cases were scheduled for trial in her absence.  She asked for assistance to manage her caseload in her absence, and Plaintiff Mary Knox offered to try the double homicide case during Ms. Blumberg's recovery. True to form, Becton ignored Mary Knox and assigned the double homicide trial to a junior male prosecutor.

*SECOND* AMENDED COMPLAINT

vi. Upon return to work, Ms. Blumberg's repeatedly requested accommodations, and was met with silence and laughter. After asking for a stand-up desk, the Office Manager told Ms. Blumberg to "just stack" books on her desk.  Ms. Blumberg was only accommodated after a sympathetic colleague offered to disassemble her own standing desk and reassemble it in Ms. Blumberg's office. Shortly thereafter, she filed a DFEH complaint, and in retaliation, the executive management began to harass her for a doctor's note in order for her to return to work.  Her attorneys were forced to intervene.  Other similarly situated prosecutors have not been required to provide a doctor's note and even her supervisor thought the request for a doctor's note was unusual.

vii. At the same time Ms. Becton assigned Ms. Blumberg to the Homicide Unit, Ms. Blumberg was removed from the Recruitment and Retention Committee. She emailed the Assistant Deputy District Attorney in charge of the recruitment and retention committee, asking for an explanation, and has never received an explanation.

viii. At the end of 2018, a junior attorney, became the first male to request to work one of the part-time positions. At the time that he made the request, there was only one experienced prosecutor working part-time, a female attorney. This means that there should have been three spots still available, one part-time and job-share position. His request could easily have been accommodated without affecting the female's position. Instead, though Ms. Becton granted his request, as was appropriate, and at the same time demanded that the female attorney return to full-time status, which was not appropriate. Given the availability of multiple part-time positions, both attorneys should have been allowed to remain in their part-time positions. This was odd because no request for part-time has ever been denied, and Ms. Becton has spoken at length about how she was going to make the office better for women.

ix. However, consistent with Ms. Becton's policy and practice, a female was asked to sacrifice, presumably "for the good of the office," ignoring her own personal and

career goals.  Ms. Becton had no interest in accommodating the female's desire to balance the needs of her family with her desire to continue long-term employment. This is a consistent theme with Ms. Becton. Ms. Becton replaced a longer tenured female attorney with a junior male attorney.  The female attorney was ordered to return to full-time employment by March 2019. As a result, a seasoned, talented prosecutor moved to another County.  She accepted a part-time position with the Alameda County DA's Office. Ms. Becton's actions violated the office policy and directly caused a qualified career prosecutor to leave county employment to meet family needs.  This is yet another example of Ms. Becton pushing out, silencing, and punishing female prosecutors.

x. In June of 2019 for personal reasons, Ms. Blumberg considered asking for a part-time position but was hesitant given what had occurred with last female part-time attorney. She asked an Assistant District Attorney the procedure for requesting a part-time position. He said he did not know and needed to research the issue. After obtaining some information, he asked Ms. Blumberg if her request for part-time was based upon a medical issue.  This surprised Ms. Blumberg, as obtaining a part-time position had never been based on a medical need.  Moreover, this Assistant District Attorney indicated that if it was not medical, she needed to list all of her reasons for requesting the position as it is a discretionary decision made by the DA. According to his information, Ms. Blumberg would need to elaborate on her reasons for her request, including if it was medical. Ms. Blumberg pointed out that never in the history of the office was an attorney required to make such a showing.  Ms. Blumberg further explained that she should be allowed to work part-time if she desired regardless of whether it was due to a medical need or not. He basically shrugged his shoulders and said, "good luck getting this approved." Given the recent message Ms. Becton had sent by effectively forcing an experienced female attorney to return to

full-time employment or resign, and seeking private medical information, Ms. Blumberg never requested the part-time position.

xi. The treatment of the last female part-time attorney and the perceived unwillingness of Ms. Becton to allow female prosecutors to utilize the part time positions has had a chilling effect on women asking for these positions. Female prosecutors fear they will be further marginalized and discriminated against if they request a part-time position. Ms. Becton's policies and practices have a demonstrable disparate impact on females in the office.

xii. Defendants and Ms. Becton's discriminatory actions towards Ms. Blumberg as detailed above have humiliated Ms. Blumberg and caused her to be miserable, worried, nervous, and anxious as her like situated male colleagues leapfrog over her in career advancement as a result of Defendants and Ms. Becton's discriminatory treatment.

xx. **Plaintiff Jill Henderson**

i. Plaintiff Henderson experienced a reduction of her supervision role and her unit was cut.

ii. However, Plaintiff Henderson was given additional responsibilities and also became the head of the DV Unit without a promotion or compensation.

iii. Mr. Walpole, a younger and less qualified male, is now Ms. Henderson's direct supervisor and has never done a rotation in the Elder Abuse or Domestic Violence Units he now manages.  He undermines Ms. Henderson's authority by inserting himself into daily supervisory issues often without notifying Ms. Henderson.  When working through the conflict, Mr. Walpole told Ms. Henderson that he thought she was "smart" in a condescending manner for a younger man. When Ms. Henderson complained to Ms. Johnson, no action was taken.

iv. When Ms. Becton announced that promotions into vacant Senior Deputy District Attorney positions would be made following applications and interviews in April

2019, Ms. Henderson submitted her application highlighting her extensive experience and accomplishments in the office.  This included her successful and effective leadership of the Elder Abuse Unit. During the interview, Ms. Henderson specifically noted that she wanted to be a role model for women in the office and the women were under-represented in management. She also separately complained about the lack of representation of women in leadership to Ms. Becton, Ms. Johnson, and Mr. Cabral, and they all acknowledged the need.

v.   Sometime after the interview, Ms. Becton called Ms. Henderson into her office and informed her that someone else was getting the Senior Deputy position.  When Ms. Henderson inquired about the second Level 5 position in special operations, Ms. Becton told Ms. Henderson that she had no hope of being promoted in the future despite the fact that she, Becton, believed Ms. Henderson to be "great."  Ms. Henderson asked what she could do to be eligible to improve and Ms. Becton said, "nothing."

vi.  The interview and whole process on its face was a sham put in place to support decisions that had already been made regarding the promotions.  This sham process had been put in place after employees had protested when Chris Walpole was promoted without any process.  Indeed, Ms. Becton, the ultimate decision maker, failed to attend many of the female interviews of senior female candidates.

vii. In an email from Ms. Becton on May 15, 2019, it was announced that Stacey Grassini, a male, and Simon O'Connell, a male, were promoted to the Senior Deputy District Attorney positions.  Ms. Henderson, and many other well qualified female attorneys, were passed over in favor of these younger and less qualified males.  Mr. O'Connell, for example, has eight years less experience than Ms. Henderson.

viii. In addition to her traditional prosecutorial experience, Ms. Henderson has demonstrated a dedicated passion to proactively helping communities reduce crime. She developed a community prosecution program that was so popular, the City of

*SECOND* AMENDED COMPLAINT

Concord paid her full salary and benefits for four years. Ms. Henderson brainstormed novel techniques to address poverty-based crimes with incarceration as a last resort. When Ms. Becton was appointed the DA, Ms. Henderson shared her excitement and willingness to institute such programs. Ms. Becton declined her offer. When Ms. Becton formed a variety of committees to improve various office functions, Ms. Henderson asked Ms. Becton where she could be the most useful. Ms. Becton declined to use Ms. Henderson as a resource on any committee. Shortly after Ms. Becton's appointment Ms. Henderson shared her concerns about diversity in the office and wanted to discuss new methods of recruiting. Ms. Becton did not consult with Ms. Henderson over any of her ideas or rectify any of her concerns. Ms. Henderson specifically stated that she had recommended several qualified candidates with diverse backgrounds that she had interviewed and were rejected.

ix.  Ms. Henderson's role may be supervisory on paper, but she has been stripped of actual authority, respect and the opportunity to lead the department.  Instead, lesser qualified and less experienced male attorneys are being given this power and are not reprimanded for breaching long standing protocols showing respect to the employee's supervisor. For example, men are permitted to use subordinates without letting female supervisors know.

x.  In addition, after being involved in in-house trainings for years, Ms. Henderson has been excluded from the ability to lead trainings and was told that the DA wanted younger attorneys to do the training.

xi.  The power in the office is being redistributed to the younger males in the office at an alarmingly fast rate, while equally or more qualified female prosecutors are being stripped of their roles, their presence, and their voice in the office.  Ms. Henderson went to Ms. Becton with her complaints over a course of more than a year, believing Ms. Becton would take action, but Ms. Henderson only experienced worse treatment as a result in retaliation after making her complaints.

xii.  Defendants and Ms. Becton's discriminatory actions towards Ms. Henderson as detailed above have humiliated Ms. Henderson and caused her to be embarrassed, mortified, and extremely anxious for which she has sought therapy sessions to cope.

138.   Further, Defendants and Ms. Becton has hired and protected men with a history of demeaning women.  The following are some examples:

vii.  Ms. Becton assigned a male to the Felony Expeditor position in the Richmond branch office.  In that position, he was the senior supervisor of junior female DAs despite numerous complaints about his sexist behavior.  In the past he sent videos to junior DAs under his supervision entitled "Jizz in my pants." He sent an email calling a female Deputy Attorney General a "pussy" and told junior female DAs that he would assign them cases that would cause them to "cream in their panties."  He told a woman that she was "swinging with the biggest dick on the fourth floor" and asked a nursing mother to not lift anything because it may make her "leak breast milk."  He told a pregnant attorney that she should order a mocha Frappuccino at Starbucks because it would help with "lubrication" in delivery.  Despite all of this and more, Ms. Becton assigned him to supervise women, and allowed him to continue as a supervisor as the Richmond Expeditor while deeming more senior women without such complaints unsuitable for managerial roles.

viii.  Ms. Becton hired Roy Smalley as an Investigator Assistant.  Mr. Smalley was accused in a civil lawsuit of requiring one of his female employees at a group home in Solano County to have sex with him as a condition of her employment.  Mr. Smalley's hiring is alleged to have occurred outside of Contra Costa County's HR regulations and without a completed background check.  Following news reports of the hiring, Mr. Smalley abruptly quit his employment with the DA's Office.

ix.  Ms. Becton hired Larry Wallace who resigned from his last position over allegations of gender harassment.  The claims settled for $400,000. The settlement became public, and

*SECOND* AMENDED COMPLAINT
98

was widely reported, following an investigation by the Sacramento Bee.  Ms. Becton

admitted that she was aware of the allegations and settlement when she hired Wallace.

139.    The empowerment and endorsement of these men shows Ms. Becton is not interested in ensuring a workplace free of discrimination for women.

140.    Defendants' actions, as described above constitute gender discrimination, in violation of the Fair Employment and Housing act, California Government Code Section 12940.

141.    Defendants' consistently denied Plaintiffs opportunities for growth, promotion, and overlooked their accomplishments and contributions, constituting disparate treatment in that it was based on the fact that Plaintiffs are experienced women as alleged herein.

142.    As a proximate result of Defendants' actions, Plaintiffs have suffered and continue to suffer severe embarrassment, humiliation, and mental anguish, all to their damage in an amount according to proof.

143.    Plaintiffs' gender was the determining factor and/or motivating factor in Defendants' adverse employment action.

144.    As a direct, legal and proximate result of the discrimination, Plaintiffs have sustained economic and emotional injuries, resulting in damages in an amount to be proven at trial.

145.    Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiffs' right to be free from discrimination based on gender.

146.    Plaintiffs are entitled to their reasonable attorneys' fees and costs of suit.

## <u>SIXTH CAUSE OF ACTION</u>

**Age Discrimination in Violation of Employment Act of 1967, as amended, 29 U.S.C. § § 621 to 634.**

(PLAINTIFFS Knox, Piersig, Chandler and Henderson

Against all DEFENDANTS and DOES 1-20)

147.     Plaintiffs Knox, Piersig, Chandler and Henderson repeat and reincorporate herein all preceding paragraphs of this Complaint as though set forth in full herein.

148.    Defendants discriminated against Plaintiffs by demoting them and/or denying them opportunities for growth, promotion, and overlooking their accomplishments and contributions, constituting disparate treatment in that it was based on Plaintiffs' age.

149.    Plaintiffs allege that much younger employees lacking the experience, expertise, and historical knowledge attributable to Plaintiffs Knox, Piersig, Chandler and Henderson filled roles and positions that should have gone to Plaintiffs.

150.    Defendants' consistently denied Plaintiffs opportunities for growth, promotion, and overlooked their accomplishments and contributions, constituting disparate treatment in that it was based on the fact that Plaintiffs are women over the age of forty as alleged hereinabove.

151.    Under Ms. Becton's administration, less experienced male prosecutors are now supervising higher ranking, advanced level female prosecutors.  Notably, no less experienced female prosecutors are supervising higher ranking, advanced level male prosecutors.  Also, the only senior-supervising female prosecutor supervises the smallest DA branch office in Richmond supervising only two advanced-level attorneys. Even where female prosecutors hold a supervisory position, often they are supervisory in name only as the female prosecutor does not actually have anyone beneath her to supervise. Male prosecutors with less tenure and experience than female prosecutors have also been selected by Ms. Becton for career-advancing assignments and given supervisory positions and directorships.

152.    Under Ms. Becton's administration, female prosecutors with significant prosecutorial experience have been excluded from committee membership and training positions which they previously held.  Ms. Becton's exclusion of the senior female prosecutors from these positions of significance within the office has sent the very clear message to prosecutors within the office, and to law enforcement in general, that the senior female prosecutors are not valued by Ms. Becton.

xxi.  **Plaintiff Mary Elizabeth Knox**

i.   At the time she was subjected to Defendants' adverse actions, Plaintiff Knox was over the age of forty.)

ii. Defendants continued to subject Plaintiff Knox to a demeaning assignment for over a year, despite the office tradition to limit an assignment to Felony Filing to one year and notwithstanding Plaintiff Knox's requests to DA Becton to be reassigned to a position commensurate with her experience.

iii. Since the filing of Plaintiffs' original complaint, after two and a half years in the felony filer position, DA Becton transferred Ms. Knox to the Elder Abuse unit in a non-supervisory role, another position typically held by attorney's with less than fifteen years of experience.

iv. At the same time as Ms. Knox's most recent transfer, DA Becton transferred Satish Jallepalli, a younger, male attorney with significantly less years in the office than Ms. Knox, to the CVRU. A position and unit Ms. Knox has stated she would like, and is, qualified for.

v. DA Becton demoted Plaintiff Knox from her position in executive management as a Senior Deputy District Attorney. In her place, DA Becton promoted three younger, male attorneys to Senior Deputy District Attorney, Simon O'Connell, Stacey Grassini, and Chris Walpole.

vi. In addition, DA Becton replaced Ms. Knox as head of CVRU with a younger male, Jason Peck.

vii. Defendants and Ms. Becton's discriminatory actions towards Ms. Knox as detailed above have humiliated Ms. Knox and caused her to be depressed, disheartened, and extremely upset as she watches the 35-year career she has built dissipate.

xxii. **Plaintiff Rachel Piersig**

i. At the time she was subjected to Defendants' adverse actions, Plaintiff Piersig was over the age of forty.

ii. Junior male prosecutors are systematically promoted sooner than their more experienced female counterparts; male prosecutors now have direct supervision of at least 75% of the prosecuting attorneys.

*SECOND* AMENDED COMPLAINT

iii.   Despite, applying for, and being qualified for, the Senior Deputy District Attorney position, DA Becton failed to promote Ms. Piersig. In her place, DA Becton promoted three younger, male attorneys to Senior Deputy District Attorney, Simon O'Connell, Stacey Grassini, and Chris Walpole.

iv.   Defendants and Ms. Becton's discriminatory actions towards Ms. Piersig as detailed above have humiliated Ms. Piersig and caused her to be miserable, unhappy, embarrassed, and anxious as her career grows stagnate due to Defendants and Ms. Becton's actions.

xxiii.   **Plaintiff Allison Chandler**

i.   At the time she was subjected to Defendants' adverse actions, Plaintiff Chandler was over the age of forty.

ii.   DA Becton has engaged in a pattern and course of age discrimination by systematically demoting and failing to advance, promote and assign supervisory roles to qualified and accomplished female prosecutors, particularly those with prosecutorial experience and tenure.

iii.   DA Becton assigns younger, male attorneys, such as Simon O'Connell, Stacey Grassini, Chris Walpole, and Jason Peck, to name just a few, to roles beyond their individual levels of experience giving them an opportunity to rise to the challenge and stretch their professional growth and accomplishments. Meanwhile, Ms. Chandler has to "prove" herself over and over again, and yet DA Becton still denies Ms. Chandler the opportunities that less qualified males are given.

iv.   Ms. Chandler has consistently sought out opportunities for growth and advancement in her career. She has explicitly requested supervisory roles from her superiors. Despite career success, her willingness to take on extra work and roles in addition to her assigned role, Ms. Chandler is consistently passed over for supervisory roles she is qualified for, with those roles going to less qualified, more junior males. The effect of this has been a stagnation in her career growth and inability to arc her career

ascension at the same rate as her male counterparts and as a result Ms. Becton has

failed to provide Ms. Chandler with equal employment opportunities based on her

gender.  Despite her qualifications and experience, Ms. Chandler has been put in a

role beneath her experience and skill set. She has been overlooked for supervisory

positions that she is immensely qualified for and those have gone to younger, less

qualified males.

v.    In June 2019, a younger lesser qualified and less experienced male (twelve years her

junior with five years of experience) was promoted into the position of Misdemeanor

Team Leader in Richmond, a supervisory position in the office in which Ms.

Chandler currently works. Ms. Chandler had requested this role when she was told

she needed supervisory experience in order to move to the Sexual Assault Unit. Even

though the role was beneath her experience level, she was willing to do it to get the

experience.  It was given to a less experienced male.

vi.   Defendants and Ms. Becton's discriminatory actions towards Ms. Chandler as

detailed above have humiliated Ms. Chandler and caused her to be miserable,

unhappy, feel hopeless, and anxious as her career fails to progress due to Defendants

and Ms. Becton's discriminatory treatment.

xxiv.  **Plaintiff Jill Henderson**

i.    At the time she was subjected to Defendants' adverse actions, Plaintiff Henderson was

over the age of forty.

ii.   After being involved in in-house trainings for years, Ms. Henderson has been

excluded from the ability to lead trainings and was told that DA Becton wanted

younger attorneys to do the training. The DA's assistant stated that the DA wanted to

see more "fresh faces."

iii.  Mr. Walpole, a younger and less qualified male, is now Ms. Henderson's direct

supervisor and has never done a rotation in the Elder Abuse or Domestic Violence

Units he now manages.  He undermines Ms. Henderson's authority by inserting

himself into daily supervisory issues often without notifying Ms. Henderson.  When working through the conflict, Mr. Walpole told Ms. Henderson that he thought she was "smart" in a condescending manner for a younger man. When Ms. Henderson complained to Ms. Johnson, no action was taken.

iv.   When Ms. Becton announced that promotions into vacant Senior Deputy District Attorney positions would be made following applications and interviews in April 2019, Ms. Henderson submitted her application highlighting her extensive experience and accomplishments in the office.  This included her successful and effective leadership of the Elder Abuse Unit. During the interview, Ms. Henderson specifically noted that she wanted to be a role model for women in the office and the women were under-represented in management. She also separately complained about the lack of representation of women in leadership to Ms. Becton, Ms. Johnson, and Mr. Cabral, and they all acknowledged the need.

v.   Sometime after the interview, Ms. Becton called Ms. Henderson into her office and informed her that someone else was getting the Senior Deputy position.  When Ms. Henderson inquired about the second Level 5 position in special operations, Ms. Becton told Ms. Henderson that she had no hope of being promoted in the future despite the fact that she, Becton, believed Ms. Henderson to be "great."  Ms. Henderson asked what she could do to be eligible to improve and Ms. Becton said, "nothing."

vi.   The interview and whole process on its face was a sham put in place to support decisions that had already been made regarding the promotions.  This sham process had been put in place after employees had protested when Chris Walpole was promoted without any process.  Indeed, Ms. Becton, the ultimate decision maker, failed to attend many of the female interviews of senior female candidates.

vii.   In an email from Ms. Becton on May 15, 2019, it was announced that Stacey Grassini, a male, and Simon O'Connell, a male, were promoted to the Senior Deputy

District Attorney positions.  Ms. Henderson, and many other well qualified female attorneys, were passed over in favor of these younger and less qualified males.  Mr. O'Connell, for example, has eight years less experience than Ms. Henderson.

viii.   Ms. Henderson's role may be supervisory on paper, but she has been stripped of actual authority, respect and the opportunity to lead the department.  Instead, lesser qualified and less experienced male attorneys are being given this power and are not reprimanded for breaching long standing protocols showing respect to the employee's supervisor. For example, men are permitted to use subordinates without letting female supervisors know.

ix.   The power in the office is being redistributed to the younger males in the office at an alarmingly fast rate, while equally or more qualified female prosecutors are being stripped of their roles, their presence, and their voice in the office.  Ms. Henderson went to Ms. Becton with her complaints over a course of more than a year, believing Ms. Becton would take action, but Ms. Henderson only experienced worse treatment as a result in retaliation after making her complaints.

x.   Defendants and Ms. Becton's discriminatory actions towards Ms. Henderson as detailed above have humiliated Ms. Henderson and caused her to be embarrassed, mortified, and extremely anxious for which she has sought therapy sessions to cope.

153.   Defendants' policy, practice, routine and pervasive discrimination against Plaintiffs and women over the age of forty causes individuals who are similarly situated as Plaintiffs to be demonstrably disadvantaged by depriving said individuals from continuing gainful employment with Defendants, despite superior qualifications and job performance.  Furthermore, Defendants' policy and practice is not justified by any business necessity and in fact is harmful to its stated purpose to protect the citizens of Contra Costa County.

154.   As a proximate result of Defendants' actions, Plaintiffs have suffered and continue to suffer severe embarrassment, humiliation, and mental anguish, all to their damage in an amount according to proof.

*SECOND* AMENDED COMPLAINT

155.   Plaintiffs' age was the determining factor and/or motivating factor in Defendants' adverse employment action.

156.   As a direct, legal and proximate result of the discrimination, Plaintiffs have sustained economic and emotional injuries, resulting in damages in an amount to be proven at trial.

157.   Defendants' unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiffs' right to be free from discrimination based on gender. Plaintiffs are entitled to their reasonable attorneys' fees and costs of suit.

**SEVENTH CAUSE OF ACTION**

**Retaliation in Violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-et seq.**

(All PLAINTIFFS against all DEFENDANTS and DOES 1-20)

158.   Plaintiffs reincorporate herein all preceding paragraphs of this complaint as though fully set out below.

159.   Section 704(a) of Title VII of the Civil Rights Act of 1964, as amended, prohibits employers from discriminating against an employee "because [she] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a).

160.   Defendants retaliated against Plaintiffs because they complained about improper conduct and unlawful acts by persons, as described above and filed charges alleging such unlawful conduct with the Department of Fair Employment & Housing.

161.   These complaints by Plaintiffs were protected activity under the law.

xxv.   **Plaintiff Mary Elizabeth Knox**

i.   Since her demotion, and in contrast to Ms. Becton's treatment of the male prosecutors who supported Paul Graves in the election, Ms. Knox has been stripped of all management and training responsibilities and has been physically isolated from day-to-day contact with the vast majority of prosecutors in the office. As a female, Ms. Knox is the only supporter of Mr. Graves' campaign who has been so publicly retaliated against by Ms. Becton.

*SECOND* AMENDED COMPLAINT

ii. This retaliation is unlike anything Ms. Knox has ever experienced.  She was a very visible supporter of former DA Mark Peterson's opponent, Dan O'Malley, in a prior election.  Post-election, Peterson retaliated and moved Ms. Knox from the Homicide Unit to the Richmond office to handle preliminary hearings.  However, after a few months, Ms. Knox was moved back to the Homicide Unit, promoted to Homicide Unit supervisor, promoted into executive management as a Senior Deputy District Attorney and her ideas and opinions, such as creating the CVRU and developing the Freeway Security Network, were respected and valued by Mark Peterson.

iii. Ms. Knox was one of many of Graves' supporters in the DA's office, yet she is the only supporter who Ms. Becton has targeted, demoted, and banished even though Ms. Knox has never disobeyed a policy or procedure put in place by Ms. Becton. Ms. Becton has lashed out at Ms. Knox because of her gender and age, stripping her of her many years of successful and important prosecutorial work.

iv. The only other DA to experience such a public demotion and banishment was Ms. Becton's actual political opponent, Paul Graves. To add insult to injury, in an interview with the Mercury News in late 2018, Ms. Becton stated publicly that the demotion of Mr. Graves and Ms. Knox gave "some attorneys in our office new opportunities for growth and development." This is in keeping with a later statement made by Ms. Becton's assistant, Venus Johnson, that the DA wants to see more "fresh faces." In contrast, young white males who supported Paul Graves have been forgiven by the DA and moved into the roles that older females are more qualified for.

v. In April 2019, Ms. Knox participated in the promotion process to be returned to her former position as a Level 5.  Despite 5 years of experience as a Level 5, Ms. Knox was not promoted. Stacey Grassini (male) and Simon O'Connell, who had decades

1   less prosecutorial experience and no assigned supervisory experience, were

2   promoted to the Level 5 positions.

    vi.  Despite an office tradition that limited an assignment to Felony Filing to one year,

4   Ms. Knox continues in that position notwithstanding requests to Ms. Becton to be

5   reassigned to a position commensurate with her experience. These complaints by

6   Plaintiffs were protected activity under California law.

    vii.  When Ms. Becton was appointed the District Attorney of Contra Costa County in

8   September 2017, upon the mid-term resignation of former DA, Mark Peterson, Ms.

9   Becton recognized Ms. Knox's skills and experience in numerous ways.  Shortly

10   after her appointment, Ms. Becton approached Ms. Knox and asked about her

11   interest in serving as Ms. Becton's Chief Deputy, the number two position of

12   authority in the office. Ms. Knox told Ms. Becton that she would support her in

13   every way to ensure her success and the success of the mission of the District

14   Attorney's Office. At this time, Ms. Becton had not yet announced her intent to run

15   for election in 2018, yet, in the interest of full disclosure, Ms. Knox told Ms. Becton

16   that she had already pledged her support to Senior Deputy District Attorney Paul

17   Graves in the upcoming election.

    viii.  A month later, in October 2017, Ms. Becton authorized Ms. Knox to continue in her

19   role as an expert witness in federal court regarding 4th Amendment Search and

20   Seizure issues, commenting that this recognition of Ms. Knox's expertise brought

21   distinction to the District Attorney's Office.

    ix.  In the Spring of 2018, prior to the election, Ms. Becton asked Ms. Knox to accept

23   the assignment of a death penalty prosecution that involved the murder and sexual

24   assault of a fourteen-year-old in 1980. The defendant in that case had prior and

25   subsequent convictions for sadistic sexual assaults. Becton told Ms. Knox that no

26   attorney in the office was more qualified to try the case than her.  Ms. Becton

*SECOND* AMENDED COMPLAINT

approved Ms. Knox's request to attend the Capitol Litigation Symposium in May 2018.

x.   At Ms. Knox's request, Ms. Becton moved the Gang Unit into the Community Violence Reduction Unit under Ms. Knox's supervision.

xi.   After the election, on October 5, 2018, Ms. Becton told Ms. Knox that Ms. Becton was transferring her from her position as supervisor of the Community Violence Reduction Unit (the unit Ms. Knox created) to Felony Filing, a position usually filled by attorneys with twenty years less experience than Ms. Knox in a satellite office with limited contact to other attorneys. This transfer was far beneath Ms. Knox's skill set and experience. Ms. Becton did not inform Ms. Knox that she was being demoted from her position in executive management as a Senior Deputy District Attorney, a position that is held by the employee and not specific to a job assignment.  Ms. Knox learned that she had been demoted when she received her next paycheck and her pay decreased.  Ms. Becton replaced Ms. Knox as supervisor of the CVRU with Jason Peck, who had no prior experience as a unit supervisor or as a misdemeanor team supervisor.

xii.   Defendants and Ms. Becton's discriminatory and retaliatory actions towards Ms. Knox as detailed above have humiliated Ms. Knox and caused her to be depressed, disheartened, and extremely upset as she watches the 35-year career she has built dissipate.

**f.  Plaintiff Rachel Piersig**

i.   In June 2018, both Ms. Piersig and Ms. Chandler went to Ms. Johnson to voice their frustration and concerns regarding their treatment and management within the Homicide Unit. Specifically, they both raised the times when they voiced issues or concerns on their cases and their experience and concerns were ignored, demeaned and discounted. Ms. Johnson indicated that "things would change for the better soon" but nothing favorable occurred.

*SECOND* AMENDED COMPLAINT

ii.   Instead, the female Homicide Unit members were "given" "mental health breaks" while the male attorney Chris Walpole continued to receive the better assignments, was promoted and given a pay raise associated with a Level 5.

iii.   In October 2018, Ms. Piersig was transferred from the Homicide Unit to her current position as a Felony Expeditor, a position typically reserved for prosecutors with less experience.  Ms. Johnson told Ms. Piersig that the transfer "would be good for her mental health."  Mr. Walpole was promoted to a Level 5 and currently supervises the Family Violence Division, the Elder Abuse Unit, the Domestic Violence Unit, and the Human Trafficking Unit.  He was later promoted again to "Acting Assistant District Attorney."  The other complaining party, Ms. Chandler, was moved to the felony filer position in Richmond as "a mental health break."  This "time out" response exemplifies the discriminatory practice within the DA's office; women who complain about disparate treatment are moved to positions to give them "mental health breaks." This treatment has a disparate impact on female prosecutors, contributing to pauses in their career and a slower rise through the ranks of the DA's office. Mr. Butts still supervises the Homicide Unit.

iv.   After filing the Complaint in this case, Ms. Piersig has received a retaliatory performance review from her supervisor.  Ms. Piersig lodged a formal complaint internally in April 2020.  When she inquired about the status of her complaint in June 2020, she was told there were no updates and it had "been referred to Jason Chan."  There has been no response since.  In comparison, since that time, a male has filed an informal complaint and Chris Walpole has had repeated meetings to address the male attorney's concerns.

v.   Ms. Piersig has been assigned to over a dozen criminal units in the office, tried nearly 60 jury trials, and supervised two felony units.  Her experience, management skills and knowledge far surpass those of all three men (Walpole,

*SECOND* AMENDED COMPLAINT

110

1    Grassini, and O'Connell) recently promoted.  Her credentials, qualifications and

2    achievements surpass the men who were promoted ahead of her. The Defendants

3    discriminated against her because she is a woman over 40 years old and have

4    retaliated against her because of her complaints.

5    vi.   Defendants and Ms. Becton's discriminatory and retaliatory actions towards Ms.

6    Piersig as detailed above have humiliated Ms. Piersig and caused her to be

7    miserable, unhappy, embarrassed, and anxious as her career grows stagnate due to

8    Defendants and Ms. Becton's actions.

9    **g.   Plaintiff Allison Chandler**

10   i.   In June 2018, prior to their individual transfers, both Ms. Piersig and Ms.

11   Chandler went to Ms. Johnson to voice their frustration and concerns regarding

12   their treatment and management within the Homicide Unit. Specifically, they both

13   raised the times when they voiced issues or concerns on their cases and their

14   experience and concerns were ignored, demeaned and discounted. Ms. Johnson

15   indicated that "things would change for the better soon" but nothing favorable

16   occurred.

17   ii.   Instead, in retaliation, the female Homicide Unit members were "given" a "mental

18   health break" while the male attorneys continued to receive the better assignments

19   and were promoted.  Mr. Walpole was promoted to a "Level 5" and currently

20   supervises the Family Violence Division, the Elder Abuse Unit, the Domestic

21   Violence Unit, and the Human Trafficking Unit, and also has been promoted to

22   "acting Assistant District Attorney." Ms. Chandler, was moved to her current

23   felony filer position in Richmond as "a mental health break."  She was removed

24   from emails and committees, and members of executive management started to

25   ignore her.  This "time out" response exemplifies the discriminatory practice

26   within the DA's office, and it effects women in the office by sending a message

27

28

that the senior women will be ignored.  Junior women have ceased seeking guidance from senior women and are being redirected to junior male attorneys endorsed by management.  Women who complain about disparate treatment are moved to positions to give them "mental health breaks" and effectively pushed aside.  Their reputations in the office are forever tainted.  This treatment has a disparate impact on female prosecutors, contributing to pauses in their career and a slower rise through the ranks of the DA's office.  Ms. Becton is aware of this because senior women have told her.  Despite this, she participates in the disparate treatment and does nothing to stop it.

iii.    When Ms. Chandler was rotated to Richmond Felony Filer, police agency detectives began to ask Ms. Chandler, "What did you do?"  The move suggested to outsiders that she had been demoted.  This was very upsetting and has impacted her reputation with detectives in the law enforcement community.  The failure to promote Ms. Chandler will have a lasting effect on her ability to rebuild her reputation within the law enforcement community, and it will further set her behind junior male prosecutors in the office.

iv.    After the transfer memorandum was distributed in 2019, Ms. Chandler was informed she would be given additional responsibilities but still not any supervisory duties.  Ms. Chandler was told that not only would she be doing the non-supervisory position of Felony Filer, but she was also expected to take on Filing Domestic Violence Misdemeanors, historically a separate role from Felony Filer, and the non-supervisory part of the misdemeanor team leader job in Richmond. She was told these additional duties were "not negotiable." For the past seven years, a male has held the position of Felony Filer in Richmond and

was never asked to absorb filing Domestic Violence Misdemeanors as well. Ms. Chandler was forced to do one and half times the work, for the same pay, neither of which is a supervisory position.

    v.   Ms. Chandler pushed back on the expectation that she take on the filing of Domestic Violence Misdemeanors. She reminded her supervisors that she would be taking a handful of homicide cases with her to Richmond, one of which was a capital murder case, a very prestigious and once in a lifetime opportunity for prosecutors. Ms. Chandler was committed to seeing these cases to their end. Having these cases, in addition to her Felony Filer position would make also filing Domestic Violence Misdemeanors nearly impossible. Instead of filling the Domestic Violence Misdemeanor role, Ms. Chandler was stripped of her capital murder case.  Not only was Ms. Chandler expected to take on another job in addition to her own, but to add insult to injury, in order to give her the time to do it, she was further maltreated by having a prestigious and important case taken from her docket. Similar to the other Plaintiffs, Ms. Chandler has been discriminated against based upon her gender and age and retaliated against for protesting her treatment.

    vi.   Defendants and Ms. Becton's discriminatory and retaliatory actions towards Ms. Chandler as detailed above have humiliated Ms. Chandler and caused her to be miserable, unhappy, feel hopeless, and anxious as her career fails to progress due to Defendants and Ms. Becton's discriminatory treatment.

**h.  Plaintiff Mary Blumberg**

    i.   At the same time Ms. Becton assigned Ms. Blumberg to the Homicide Unit, Ms. Blumberg was removed from the Recruitment and Retention Committee. She

emailed the Assistant Deputy District Attorney in charge of the recruitment and retention committee, asking for an explanation, and has never received an explanation.

ii. Ms. Johnson has said that Ms. Becton prefers younger, newer attorneys to do the training and recruitment as they can relate more to law students. However, this "younger attorney" attitude only applies to the females with experience; male prosecutors have been left in their training and recruitment roles while all of the experienced female prosecutors have been pushed out. For example, a male, Assistant Deputy District Attorney, with 18 years more experience than Ms. Blumberg, still heads the recruitment and retention committee. He and a male Senior Deputy District Attorney, one-year Ms. Blumberg's senior, along with Ms. Johnson and a junior female attorney, (who has only six years in the office) conducted the new hire interviews.  The recently appointed male, Director of Recruitment, one year behind Ms. Blumberg, is also in charge of recruitment and retention. This is another example of experienced female prosecutors losing visibility and influence in the office but not the male prosecutors.

iii. Ms. Blumberg's move from her role as the Misdemeanor Supervisor to the Homicide Unit appears to have been done to curtail her access and visibility to new hires and trainings as it coincided with her removal from the recruitment and retention committee.

iv. Ms. Blumberg's move from her role as the Misdemeanor Supervisor to the Homicide Unit appears to have been done to curtail her access and visibility to new hires and trainings as it coincided with her removal from the recruitment and retention committee.

v.   This sort of punitive shifting of women's roles has also been seen in relation to part-time roles. Traditionally, the DA's office offered two part-time positions and one job share position to people to work less than full time. This allowed for up to four people to work a non-traditional schedule (the job-share position is shared between two people). The purpose of this policy was to retain qualified career prosecutors who might otherwise leave county employment due to unmet family needs. Part-time and job-share positions are available to help prosecutors balance the needs of family and their desire to continue long term employment. The reality is that these part-time roles have traditionally been requested by female DA's in the office, often due to their obligations as primary care providers to their families. Almost every female who has children in the office has opted to work one of these part-time positions at some point.

vi.   Defendants and Ms. Becton's discriminatory and retaliatory actions towards Ms. Blumberg as detailed above have humiliated Ms. Blumberg and caused her to be miserable, worried, nervous, and anxious as her like situated male colleagues leapfrog over her in career advancement as a result of Defendants and Ms. Becton's discriminatory treatment.

**i.   Plaintiff Jill Henderson**

i.   Ms. Henderson has repeatedly complained about being treated differently based upon her age and gender and she has complained about the lack of female leaders. In retaliation, she has not been promoted, she has been treated with disrespect and she has been given more work without any pay increase.

ii.   It became increasingly clear that Ms. Henderson's supervisory role was meant to placate the growing cries of gender discrimination echoing through the DA's

office. Ms. Henderson has been reduced to merely a placeholder, a figurehead. It was a significant increase in responsibility with no increase in pay.

iii.  Ms. Henderson complained to both Ms. Becton and Ms. Johnson that more senior female representation was needed.  Mr. Walpole was suddenly promoted by Ms. Becton to a Level 5 position in or around the end of 2018.  In January 2019, after five successful years as the Elder Abuse Unit Supervisor, Ms. Henderson approached Ms. Becton and Ms. Johnson and explained her desire to take on a more senior (not a lateral role).  After that request, Ms. Becton transferred Ms. Henderson's only subordinate away from the Unit.  While Ms. Henderson was on vacation, they transferred Ryan Wagner out and left Ms. Henderson with over 30 unassigned elder abuse cases to deal with.  Ms. Henderson was not consulted about the move or even advised that it was being contemplated.  When Ms. Henderson was asked to provide a case list, she asked Ms. Johnson if downsizing the Elder Unit was being contemplated and was specifically assured that it was not. The number of attorneys in the Elder Unit was then cut in half during her vacation with no prior notice.  Ms. Henderson had been told "just wait, they have a plan to promote you."  Instead, she has been isolated in the office with no voice given her experience, success and expertise.  Ms. Henderson came up with a plan to help run an office and help with the chronic backlog of cases, but her plans were ignored.

iv.  Ms. Henderson has repeatedly complained about being treated differently based upon her age and gender and she has complained about the lack of female leaders. In retaliation, she has not been promoted, she has been treated with disrespect and she has been given more work without any pay increase.

*SECOND* AMENDED COMPLAINT

116

v.   In June 2019, Ms. Henderson was told by Ms. Becton that in addition to her Elder Abuse role, she was now head of the Domestic Violence Unit. This gave her seven (7) subordinates and was a lateral move, not a more senior role.  It is extremely unusual for such a major role to be assigned without consultation.  No male has been giving such a major role without being consulted first.  Ms. Henderson confirmed with Venus Johnson that Ms. Henderson had been clear in prior communications that she wanted a promotion and not greater responsibility without compensation or a promotion.

vi.   Ms. Becton then announced that Mr. Walpole, a Senior DA with less than 8 months of experience in his new position as a Level 5 (to which he was promoted without any process), would be designated the Acting Assistant District Attorney. This meant that this junior, less experienced male attorney was now Ms. Henderson's direct supervisor. Mr. Walpole has never worked in either the Domestic Violence Unit or the Elder Abuse Unit.

vii.   It became increasingly clear that Ms. Henderson's supervisory role was meant to placate the growing cries of gender discrimination echoing through the DA's office. Ms. Henderson has been reduced to merely a placeholder, a figurehead. It was a significant increase in responsibility with no increase in pay.

viii.   Mr. Walpole, with far inferior experience, made offers on Domestic Violence cases without consulting Ms. Henderson or even asking her for all the facts of the case. He has micromanaged units run by women and not the men.  He usurped Ms. Henderson's authority by bypassing her and going directly to her subordinates, often giving contradictory advice. He has tried to silence Ms. Henderson, admonishing her for disagreeing with him.  Ms. Henderson raised her

concern with Ms. Becton that Mr. Walpole was not permitting her to disagree with him.  Ms. Becton told Ms. Henderson that she had authority to have different opinions than Mr. Walpole but she took no action in response to Ms. Henderson's comments and Mr. Walpole made negative comments in Ms. Henderson's performance review as a result.

ix.  Defendants and Ms. Becton's discriminatory and retaliatory actions towards Ms. Henderson as detailed above have humiliated Ms. Henderson and caused her to be embarrassed, mortified, and extremely anxious for which she has sought therapy sessions to cope.

162.    Defendants subjected Plaintiffs to unjust employment actions, continue to deny Plaintiffs opportunities for growth, promotion, and overlook their accomplishments and contributions, in retaliation for their protected complaints.

163.    As a proximate result of Defendants' actions, Plaintiffs have suffered and continue to suffer severe embarrassment, humiliation, and mental anguish, all to their damage in an amount according to proof.

164.    Plaintiffs are entitled to their reasonable attorneys' fees and costs of suit.

## **PRAYER FOR RELIEF**

WHEREFORE, PLAINTIFFS pray for judgment against the DEFENDANTS, and each of them, as follows:

1.    A preliminary and permanent injunction ordering Defendants to immediately cease their discriminatory and illegal practices with regard to gender and age discrimination and retaliation and to take all reasonably necessary steps to ensure that such practices do not take place in the future;

2.    Rescission of each demotion and promotion effective October 2018 to date and the appointment of an outside panel of experienced prosecutors to be selected by Plaintiffs to

*SECOND* AMENDED COMPLAINT

conduct a hiring process and recommendation of the appointment of candidates to every Executive Management position;

3. For any role that comes with a pay increase, for the pay increase to be retroactive to January 1, 2019, and as to Ms. Knox, to November 2018.

4. Reinstatement of each Plaintiff to committees and training positions commensurate with their particular experience and expertise.

5. Compensatory damages including emotional distress damages and lost wages, benefits and interest in a sum according to proof;

6. Interest on judgment, including prejudgment interest, at the legal rate;

7. Attorney's fees and costs;

8. For the costs of this action; and

9. For any further legal and equitable relief the Court deems proper.

Dated: March 22, 2021                    **NICHOLS LAW, P.C.**

By: _____/s/_____
        Sarah R. Nichols

Dated: March 22, 2021                    **RATNER MOLINEAUX, LLP**

By: _____/s/_____
        David S. Ratner
        Shelley A. Molineaux
        *Attorneys for Plaintiffs*

*SECOND* AMENDED COMPLAINT

## JURY DEMAND

Plaintiffs hereby demand a jury trial.

Dated: March 22, 2021        **NICHOLS LAW, P.C.**


By:_____/s/_____
        Sarah R. Nichols

Dated: March 22, 2021        **RATNER MOLINEAUX, LLP**

By: _____/s/_____
        David S. Ratner
        Shelley A. Molineaux
        *Attorneys for Plaintiffs*