1   Sarah R. Nichols (SBN 233099)
    Meeta Dama (SBN 250277)
2   **NICHOLS LAW, P.C.**
    75 Broadway, Ste. 202
3   San Francisco California 94111
    Telephone: (415) 710-9116
4   Email: sarah@nicholslawyer.com
            meeta@nicholslawyer.com
5

6   David S. Ratner (SBN 316267)
    Shelley A. Molineaux (SBN 277884)
7   **RATNER MOLINEAUX, LLP**
    1990 N. California Blvd., Suite 20
8   Walnut Creek, CA 94596
    Telephone: (925) 239-0899
9   Email: david@ratnermolineaux.com
            shelley@ratnermolineaux.com

10  Attorneys for Plaintiffs
11  MARY ELIZABETH KNOX; RACHEL PIERSIG; ALISON
    CHANDLER; MARY BLUMBERG; JILL HENDERSON

12              **UNITED STATES DISTRICT COURT**
13             **NORTHERN DISTRICT OF CALIFORNIA**
                   **SAN FRANCISCO DIVISION**
14

15
16  MARY ELIZABETH KNOX; RACHEL       Case No.: 3:20-cv-01449-JCS
    PIERSIG; ALISON CHANDLER; MARY
    BLUMBERG; JILL HENDERSON,         **PLAINTIFFS' OPPOSITION TO**
17                                    **DEFENDANTS' MOTION FOR**
                                      **SUMMARY JUDGMENT**
18          Plaintiffs,
                                      Date: May 20, 2022
19  v.                                Time: 9:30 a.m.
                                      Judge: Hon. Joseph C. Spero
20  THE COUNTY OF CONTRA COSTA; THE   Courtroom: F – Floor 15
    CONTRA COSTA COUNTY DISTRICT      Location: 450 Golden Gate Avenue
21  ATTORNEY'S OFFICE; and does 1 through 10,        San Francisco, CA 94102
    inclusive.
22          Defendants.              Complaint Filed: February 26, 2020
23                                   FAC Filed: August 24, 2020
                                     SAC Filed: March 21, 2021
24
                                     Trial Date: October 3, 2022
25

26

27

28

NICHOLS LAW, P.C.
75 BROADWAY, SUITE 202
SAN FRANCISCO, CALIFORNIA 94111

i

1

**TABLE OF CONTENTS**

2                                                                                                   **Page**

3   I.    INTRODUCTION…………………………………………………………………..1

4   II.   STATEMENT OF FACTS……………………………………………………....…1

5         A.    DA Becton Acknowledged the Historically Discriminatory Practices

6               in the Office…………………………………………………………………1

7         B.    Each Plaintiff Suffered Numerous Adverse Employment Actions……………....2

8               1.    Becton Demoted Plaintiff Knox, and Replaced Her with A Less
                      Qualified Male……………………………………………………....2

9

10              2.    Defendants Promoted a Less Experienced Male Prosecutor,

11                    Chris Walpole………………………………………………………...2

12              3.    In June 2019, Becton Promoted Two More Males to Level 5 Roles,

13                    This Time Using an Application and Interview Process to Give the

14                    Illusion of Using Objective Criteria…………………………………..3

15              4.    Becton Prematurely Transferred Blumberg from

16                    Misdemeanor Supervisor to a Non-Supervisory Position………………4

17              5.    Chandler and Piersig were Required to Take "Mental Health Breaks"

18                    Between Trial Assignments……………………………………………4

19              6.    Plaintiffs Requested Roles and Assignments that Traditionally Lead

20                    to Career Advancement But Were Passed Over in Favor of Men…………..5

21              7.    Defendants Denied Plaintiffs Resources Given to Similarly Situated Men……7

22        C.    Defendants' Basis for The Adverse Actions are Pretextual and Not Credible………8

23              1.    Evidence Establishes No Issues Existed Concerning Mary Knox's
                      Performance and That Knox Was a Well-Respected Supervisor………………8

24              a)   Merit Board Testimony Concerning Knox's Demotion……………………8

25

26              b)   Several Witnesses Discredit and Contradict DA

                      Becton's Stated Basis for Demoting Knox……………………………………9

27

28

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'**                          Sarah R. Nichols, Esq.
**MOTION FOR SUMMARY JUDGMENT**                                    David S. Ratner, Esq.
*Knox, et. al v. County of Contra Costa et. al*                    Shelley A, Molineaux, Esq.
3:20-cv-01449

NICHOLS LAW, P.C.
75 BROADWAY, SUITE 202
SAN FRANCISCO, CALIFORNIA 94111

1

**TABLE OF CONTENTS**
(continued)

c)   Male Supervisors Escaped Discipline Despite Documented

Complaints……………………………………………………..…..10

D.  DA Becton Has a Clear Discriminatory Preference for Younger Attorneys………12

E.  Each Plaintiff Reported Discrimination and Engaged in Other Protected

Activities…………………………………………………………………...13

F.  Plaintiffs Suffered Retaliation Because of Their Protected Activities…………..13

III.    SUMMARY JUDGMENT STANDARD…………………………………………15

IV.    ARGUMENT……………………………………………………………………15

A.    Defendants Waived the Defense of Failure to Exhaust Administrative Remedies

Because They Did Not Assert the Defense Timely………………………………..15

1.  Defendants Waived the Exhaustion Requirement By Waiting 2 Years

To Raise It…………………………………………………………………...16

2.  Even If The Court Finds Defendants' Have Not Waived  Their

Objection, Plaintiffs Timely Filed A Charge With The DFEH Making Their

Gender and Age Discrimination Claims Timely Filed Under the Work Sharing

Agreement…………………………………………………………………...16

3.  If The Court Finds the Failure to File EEOC Charges Prior To Filing Suit Fatal

to Plaintiffs Claims, It Should Exercise Supplemental Jurisdiction Over

Plaintiffs' Causes of Action………………………………………………17

4.  Under Title VII An Administrative Charge is Timely as to a Pattern

and Practice of Discrimination, So Long as One Actionable Act Occurred

During the Look Back Period……………………………………………17

B.    Plaintiffs Established a Prima Facie Case for Gender and Age Discrimination..…19

NICHOLS LAW, P.C.
75 BROADWAY, SUITE 202
SAN FRANCISCO, CALIFORNIA 94111

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**
*Knox, et. al v. County of Contra Costa et. al*
3:20-cv-01449

Sarah R. Nichols, Esq.
David S. Ratner, Esq.
Shelley A, Molineaux, Esq.

**TABLE OF CONTENTS**
(continued)

1.  Each Plaintiff Was Qualified to Be Promoted, To Perform Supervisory Duties and Assigned to Committees That Would Lead to Further Career Advancement……………………………………………………………………..19

2.  Each Plaintiff Suffered Significant Adverse Employment Actions…………….. 19

3.  Plaintiffs Were Treated Less Favorably as A Result of Their Protected Characteristics and Activities………………………………………………….21

4.  Plaintiffs Alleged Multiple Examples of Similarly Situated Individuals Being Treated More Favorably……………………………………….....................22

5.  Defendants Cannot Look To How Other Women Were Treated To Prove That Plaintiffs Were Not Treated Less Favorably………………………………..23

C.  Defendants' Justification for Adverse Actions Are Pretext and Not Credible…….23

D.  Defendants Failed to Prevent Discrimination………………………...………...25

E.  Plaintiffs Faced an Avalanche of Retaliation After They Attempted to Improve the Conditions of the Office By Reporting Incidents of Discrimination……………………………………………………..28

F.  Even If the Court Finds That Ms. Becton Did Not Act with A Discriminatory Animus, Defendants Are Still Liable Under A Cat's Paw Theory Because Ms. Becton's Decision-Making Was Influenced By Men Who Benefitted From The Discrimination…………………………………………………….…….29

V.  CONCLUSION……………………………………………………………………….30

NICHOLS LAW, P.C.
75 BROADWAY, SUITE 202
SAN FRANCISCO, CALIFORNIA 94111

iv

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**
*Knox, et. al v. County of Contra Costa et. al*
3:20-cv-01449

Sarah R. Nichols, Esq.
David S. Ratner, Esq.
Shelley A, Molineaux, Esq.

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**                                                                                                    **Page(s)**

3

*Achal v. Gate Gourmet*,

4

    114 F. Supp. 3d 781, 801, 804 (N.D. Cal. July 14, 2015)……………………………….23, 26

5

*Arbaugh v. Y & H Corp.*,

6

    546 U.S. 500, 510 (2006)………………………………………………………....…16

7

*Arroyo v. Rosas*,

8

    19 F.4th 1202, 1214 (9th Cir. 2021)………………………………………………..17

9

*Ayala v. Frito Lay, Inc.*,

10

    263 F.Supp.3d 891, 905 (E.D. Cal. 2017)……………………………………………20

11

*Banks v. Chesapeake & Potomac Tel. Co.*,

12

    802 F.2d 1416, 1427 (D.C. Cir. 1986)………………………………………………16

13

*Bush v. Commonwealth Edison Co.*,

14

    990 F.2d 928, 931……………………………………………………………………23

15

*Chuang v. University of California Davis, Bd. of Trustees*,

16

    225 F.3d 1115, 1129 (9th Cir. 2000)………………………………………………..23

17

*Diaz v. AT&T*,

18

    752 F.2d 1356, 1359, 1361 (9th Cir. 1985)…………………………………………21

19

*Eberhart v. United States*,

20

    546 U. S. 12, 19 (2005) (per curiam)………………………………………………… 16

21

*Ered Wu v. Pacifica Hotel Col.*,

22

    2001 U.S. Dist. LEXIS 6048……………………………………………………..20

23

*Flait v. North American Watch Corp.*,

24

    3 Cal. App. 4th 467, 476 (1992)…………………………………………………28

25

*Fort Bend Cty. v. Davis*,

26

    139 S. Ct. 1843 (2019)………………………………………………………15, 16

27

28

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**
*Knox, et. al v. County of Contra Costa et. al*
3:20-cv-01449

Sarah R. Nichols, Esq.
David S. Ratner, Esq.
Shelley A, Molineaux, Esq.

NICHOLS LAW, P.C.
75 BROADWAY, SUITE 202
SAN FRANCISCO, CALIFORNIA 94111

NICHOLS LAW, P.C.
75 BROADWAY, SUITE 202
SAN FRANCISCO, CALIFORNIA 94111

*Godwin v. Hunt Wesson, Inc.,*

    150 F.3d 1217, 1221-22 (9th Cir. 1998)…………………………………………....19, 23

*Guessous v. Fairnew Prop. Invs., LLC,*

    828 F.3d 208, 216 (4th Cir. 2016)……………………………………………..15

*Hunt v. Cromartie,*

    526 U.S. 541 (1999)…………………………………………………………...15, 19, 23

*Knox v. Indiana,*

    93 F.3d 1327, 1334 (7th Cir. 1996)……………………………………………20

*Kohler v. Inter-Tel Techs.,*

    244 F.3d 1167, 1172 (9th Cir. 2001)……………………………………………17

*Leland v. City & Cnty. of San Francisco,*

    576 F. Supp. 2d 1079, 1103 (N.D. Cal. 2008)…………………………………………26

*Lewis v. United Parcel Serv., Inc.,*

    No. 05-cv-02820 WHA, 2005 U.S. Dist. LEXIS 23488, 2005 WL 2596448, at *2 (N.D. Cal.

    Oct. 13, 2005), aff'd, 252 Fed. Appx. 806 (9th Cir. 2007)…………………………………20

*McDonnell Douglas v. Green,*

    411 U.S. 792, (1973) at 802…………………………………………………...21

*M.F. v. Pacific Pearl Hotel Mgmt,*

    (2017) 16 Cal.App.5th 693, 701…………………………………………………27

*Nat'l R.R. Passenger Corp. v. Morgan,*

    536 U.S. 101, 117 (2002)………………………………………………………18

*Northrop Grumman Corp. v. Workers' Comp. Appeals Bd.,*

    103 Cal. App. 4th 1021, 1035 (2002)…………………………………………26

*Reeves v. Sanderson Plumbing Products, Inc,*

    530 U.S. 133, 147 (U.S. 2000)………………………………………………...23

*Strother v. Southern Cal. Permanente Med. Grp.,*

    79 F.3d 859, 868, 869 (9th Cir. 1996)…………………………………………20, 28

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'**          Sarah R. Nichols, Esq.
**MOTION FOR SUMMARY JUDGMENT**          David S. Ratner, Esq.
*Knox, et. al v. County of Contra Costa et. al*      Shelley A, Molineaux, Esq.
3:20-cv-01449

1

*Staub v. Proctor Hospital*.

2
     562 U.S. 411, 417-18 (2011)…..……………………………………………...29

3
*Tolan v. Cotton*,

4
     572 U.S. 650, 658–59 (2014) (per curiam)……………………………………15

5
*Trujillo v. N. Cty.*

6
     *Transit Dist.*, 63 Cal. App. 4th 280, 289 (1998)………………………………26

7
*Wallis v. J.R. Simplot Co.*,

8
     26 F.3d 885, 889 (9th Cir.1994)………………………………………………19

9
*Wyatt v. City of Boston*,

10
     35 F.3d 13, 15-16 (1st Cir. 1994)……………………………………………...20

11
*Yanowitz v. L'Oreal USA, Inc.*,

12
     36 Cal. 4th 1028, 1052 (2005)………………………………………………...21

13
*Yartzoff v. Thomas*,

14
     809 F.2d 1371, 1376 (9th Cir. 1987)…………………………………………...20

15
**Statutes**

16
29 CFR §1601.13 (2018)……………………………………………………………16

17
Cal. Gov't Code § 12940(k)…………………………………………………………25

18

19

20

21

22

23

24

25

26

27

28

NICHOLS LAW, P.C.
75 BROADWAY, SUITE 202
SAN FRANCISCO, CALIFORNIA 94111

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**
*Knox, et. al v. County of Contra Costa et. al*
3:20-cv-01449

Sarah R. Nichols, Esq.
David S. Ratner, Esq.
Shelley A, Molineaux, Esq.

## I.   INTRODUCTION

Plaintiffs, five accomplished and dedicated career prosecutors commenced this case to correct ongoing gender and age discrimination by the Contra Costa District Attorney's Office.   This brief and the declarations accompanying it will demonstrate that Plaintiffs are all members of two protected classes – women and workers over 40 years old; that each Plaintiff suffered adverse employment actions; that each Plaintiff was qualified for a promotion to a Level 5 or Senior Deputy District Attorney position; and that Defendants proffered reasons for each adverse employment action is pretext and an attempt to justify Defendants' illegal discrimination. This Brief will also show that Defendants met Plaintiffs' internal complaints concerning discrimination with retaliation rather than remediation.  Moreover, this Memorandum will show the reasons DA Becton proffers for the adverse employment actions she either instituted or sanctioned not only do not hold up to scrutiny but are belied by independent witnesses not involved in this lawsuit.

## II.   STATEMENT OF FACTS

This Statement of Facts, constrained by the 30-page limit of this brief, can only highlight some of the salient facts. The declarations and exhibits set out in minute detail facts proving that each Plaintiff was a victim of both age and gender discrimination and suffered acts of retaliation.

### A.   DA Becton Acknowledged the Historically Discriminatory Practices in the Office.

In her early days as the DA, women in senior leadership positions in the District Attorney's office – Level 5 attorneys and Unit supervisors – met with DA Becton to welcome her to the office and discuss the troubling history of less experienced white men consistently promoted over more experienced and qualified women in the office.  (Becton Decl. ¶12; Nichols Decl. Ex. B at 77:2-20; Redmond Decl. ¶¶10-11; Knox Decl. ¶12; Henderson Decl. ¶26). The women met with Becton because they were witness to and victims of gender discrimination in the form of pay inequity, hostility towards female supervisors, bias against women's ability to take on "tough" cases, gendered and demeaning language to describe women, and discriminatory treatment of pregnant women. (*E.g.,* Piersig Decl. ¶¶ 10-15, 18, 31-33; Henderson Decl. ¶¶ 5-8, 10, 25; Chandler Decl. ¶¶ 11-13; Blumberg Decl. ¶¶ 16-9, 28, 30, 91-92). Becton and Chief Assistant District Attorney Venus Johnson both acknowledged that gender discrimination existed for years in the office.  Johnson testified that

**PLTFS' OPP TO DEF'S MSJ**
*Knox, et. al v. County of Contra Costa et.*

the office had "predominantly been for years led by men in supervisory roles and white males." (Nichols Decl. Ex. G at 59:11-16, 62:10-17).  Although Becton promoted some women, Becton's knowledge of the office's history of discrimination failed to prevent her from continuing to run an office where the "boy's club" thrives, and women are illegally demoted; passed over for supervisory roles and promotion in favor of less qualified men; subject to bias and punishment for their failure to conform to gendered stereotypes; and removed from case assignments, committees, and career-advancing positions of visibility in the office.  (Redmond Decl. ¶52-53; Piersig Decl. ¶¶64, 67-68, 70; Henderson Decl. ¶¶27, 38-39, 48; Knox Decl. ¶¶34-40; Chandler Decl. ¶¶12-19; Blumberg Decl. ¶¶16-19, 28, 30, 33-35, 42; Smith Decl. ¶¶ 7-8).

**B.     Each Plaintiff Suffered Numerous Adverse Employment Actions**

      1.     <u>Becton Demoted Plaintiff Knox, and Replaced Her with A Less Qualified Male</u>

In October 2018, Becton demoted Mary Knox from a Level 5 supervisor overseeing the Community Violence Reduction Unit to a Level 4 Felony Filer Role with no supervisory authority. (Becton Decl. ¶16; Knox Decl. ¶¶34-40). Knox suffered loss of pay, loss of all supervisory duties, and rotated to a smaller office away from the main office at 900 Ward Street. This drastically reduced Knox's visibility within the office both with decision makers for future assignments, promotions, and opportunities and to new and less experienced attorneys who would not view her as a mentor in the office.  (Knox Decl. ¶¶34-40). Becton refused to provide Knox with an explanation for the demotion. (*Id*. ¶¶34-35).  Traditionally, the Felony Filing role is about a one-year rotation. (Nichols. Decl. ¶2, Ex. A at 682:16-23). Becton kept Knox in this role for two and half years, a retaliatory duration for filing this lawsuit. (Knox Decl. ¶¶34-40) The role was also far beneath Knox's skill set. (*Id*. at ¶38; Nichols. Decl. ¶2, Ex. A at 607:14-24, 619:16-19, 671, 675:3-21, ¶6, Ex. E at 142:9-23). In 2021, Becton denied Knox's requests to move to a role with cases to try but instead, without any input from Knox, was moved to the Elder Abuse Unit. (Knox Decl. ¶¶49-51). Typically, an experienced attorney who is not being retaliated against has some input on their assignment. (*Id*.).

      2.     <u>Defendants Promoted a Less Experienced Male Prosecutor, Chris Walpole.</u>

Becton replaced Knox on the Executive Management Team with the promotion of Walpole to a Level 5. Becton promoted Walpole to a Level 5 without any application, interview process, or

NICHOLS LAW, P.C.
75 BROADWAY, SUITE 202
SAN FRANCISCO, CALIFORNIA 94111

consideration of other applicants.  Defendants have not articulated the criteria used to select Walpole. DA Becton hand-picked him for the role and informed him of her selection during a private conversation in her office.  (Nichols. Decl. ¶10, Ex. I at 53:8-57:6; 68:1-69:16).  Walpole is 46 years old. (*Id*. at 8:15-16).  Walpole's supervisory experience consisted of leading a small team of two to three misdemeanor deputies at the low volume Richmond branch for one year. (*Id*. at 62:3-6; Henderson Decl. ¶31).  Walpole's promotion "surprised" members of DA Becton's management team who were not consulted about the decision and believed senior women in the office were more qualified. (Nichols. Decl. ¶ 6, Ex. E at 40:4-6, 45:2-6, 164:18-20; Redmond Decl. ¶ 42-44). Johnson testified that Walpole was promoted because he was "respected" and that his promotion was DA Becton's decision. (Nichols. Decl. ¶ 8, Ex. G at 80:13-15, 146:3-7).

Plaintiffs were more qualified based on their experience within the office.  Knox worked in every criminal division of the office, was the first, and only, female Homicide Unit Supervisor, the first female prosecutor to be given the responsibility of New Prosecutor Training, the first female prosecutor to design, and implement, a new unit in the District Attorney's Office and the first female prosecutor in the office to receive the state-wide "Prosecutor of the Year" award.  She had more experience supervising, managing and trying cases. Knox successfully prosecuted some of the most notorious criminals in the County's history. (Knox Decl. ¶¶4-5). In her application for District Attorney, Becton cited a case prosecuted by Knox as one of the most significant and complex legal matters Becton had handled. (*Id*. ¶17, Ex. A at 9). Plaintiffs had more tenure in the office, possess more significant: trial, supervisory, teaching, and grant application writing experience, are subject matter experts, active on committees, hold leadership roles, trained and recruited lawyers, and served the local community. (Piersig Decl. ¶¶4-8, 35, 49, 54; Henderson Decl. ¶¶12-15, 23; Blumberg Decl. ¶¶4-11, ¶59; Chandler Decl. ¶¶2-10, ¶20). Walpole, on the other hand, recently moved to the East Coast and announced he will retire after his last case. (Piersig Decl. ¶89, Blumberg Decl. ¶55).

3.  In June 2019, Becton Promoted Two More Males to Level 5 Roles, This Time Using an Application and Interview Process to Give the Illusion of Using Objective Criteria

In Spring 2019, Becton announced via email that she would make two more Level 5 promotions. (Piersig Decl. ¶¶50-51).  Becton accepted applications for these promotions and while she set up interview panels and drafted a slate of interview questions, the team deciding the

3

promotions did not use any objective criteria in evaluating written applications, ranking candidates, or otherwise evaluating candidates for promotion. (Nichols. Decl. ¶ 3, Ex. B at 242:22-243:5, 247:8-10, 252:5-12, 297:16-17, 319:25; Nichols. Decl. ¶ 5, Ex. D at. at 141:20-142:18; Piersig Decl. ¶55). The decision-making process boiled down to "Diana makes the choices" even though Becton was not present at every interview, including Piersig's. (Nichols. Decl. ¶3, Ex. B at 268:16-17; *Id*. ¶6, Ex. E at 50:2-8; *Id.* 104:2-3, 197:7-10; *Id*. ¶ 8, Ex. G at 79:18-80:4, 86:17-21; *Id*. ¶ 10, Ex. I at 109:6; Becton Decl. ¶6; Piersig Decl. ¶55).  At the end of this process, two men, Simon O'Connell and Stacey Grassini "rose to the top" based on their "diversity of thought".  (Becton Decl. ¶¶20, 23; Nichols Decl. ¶3, Ex. B at 186:20-187:11, 273:8-16; ¶5, Ex. D at 147:1; ¶9).  However, the job description for the position focused on supervisory, trial, and negotiation experience, not "diversity of thought".  (Piersig Decl. ¶52, Ex. E).  Defendant's 30(b)(6) witness, Jason Chan could not articulate any reason why Henderson, Chandler, Piersig, and Blumberg were not promoted, nor could he identify any issues with their competency or performance. (Nichols. Decl. ¶5, Ex. D at 156:1-157:9; 159:8-161:9; 161:20-164:18).  Plaintiffs possessed significantly more trial and supervisory experience than these two males. (Knox Decl. ¶51; Piersig Decl. ¶¶4-8, 35, 49, 54; Henderson Decl. ¶¶12-15, 23; Chandler Decl. ¶27-29; Blumberg Decl. ¶49).

    4.   <u>Becton Prematurely Transferred Blumberg to a Non-Supervisory Position</u>

In October 2018, Becton removed Blumberg from her supervisory role overseeing misdemeanor attorneys without any explanation, despite Blumberg's request to stay in the traditionally two-year role. (Becton Decl. ¶21; Blumberg Decl. ¶¶16-18). Becton transferred Blumberg to homicide without warning. In contrast, the two men rotating to homicide at the same time as Blumberg, had known they were moving for weeks and had also known about Blumberg's transfer.  This premature transfer into a non-supervisory position in the Homicide Unit without her input or knowledge, had a significant impact on Blumberg's health.  (*Id*.).  Removing Plaintiff Blumberg from her supervisory role as Misdemeanor Supervisor has negatively impacted her ability to receive other promotions and career advancement.  (Blumberg Decl. ¶14-17).  When Blumberg asked about a part-time role she was discouraged, and she saw that the last female part-time attorney was treated poorly.  (*Id*. at ¶20).

4

5. <u>Chandler and Piersig were Required to Take "Mental Health Breaks" Between Trial Assignments.</u>

Unlike their male counterparts, Plaintiffs Chandler and Piersig were required to take "mental health breaks" after heavy trial assignment rotations. The "need" for these breaks results from gender stereotypes that suggest that women could not handle the male-dominated atmosphere of the Homicide Unit for an extended period of time. The Homicide Unit is a bastion of toxic masculinity where people such as Chief Deputy Tom Kensok, who was assigned as a supervisor by Becton, told junior female attorneys he would assign them cases that would cause them to "cream in their panties," told a pregnant woman what to drink to help with "lubrication" in delivery, and sent around a video in the workplace titled "Jizz in my pants." (Chandler Decl. ¶¶13, 18, 24; Piersig Decl. ¶21).

In 2019, Plaintiff Chandler was side-lined and forced to "take a break" to a Felony Filer position in Richmond, after completing a rotation in the Homicide Unit. By contrast, no one required Chris Walpole, a male attorney with a lower level of achievement to take a break after working in Homicide. Walpole's next assignment was in the Interpersonal Violence Unit. Becton required Chandler and Piersig to take breaks after they complained about being treated differently than Walpole based upon their gender by Derek Butts (male) the Unit's supervisor. (Chandler Decl. ¶¶18, 20; Piersig Decl. ¶¶9-23). Becton permitted Butts to stay in his role. (*Id.* ¶¶20-22).

6. <u>Plaintiffs Requested Roles and Assignments that Traditionally Lead to Career Advancement But Were Passed Over in Favor of Men</u>

Assignments, staffing resources, training and committee participation all impact an attorney's visibility in the office, success and career advancement both inside and outside of the DAs Office. (Henderson Decl. ¶¶ 23, 27; Piersig Decl. ¶¶ 22, 32-33, 43, 67, 71-74). Certain units charged with "women's work" (*e.g.*, the Domestic Violence, Sexual Assault, Human Trafficking, and Elder Abuse Units) are undervalued since the cases involve primarily women victims. Supervising roles in these units are not seen as a Level 5 roles. "Plum" career-advancing units such as Homicide and

**PLTFS' OPP TO DEF'S MSJ**
*Knox, et. al v. County of Contra Costa et.*

CVRU provide more visibility and opportunity for advancement. Since Knox's demotion Becton placed only males leading those units.  (*Id.*; Redmond Decl. ¶ 52).[1]

Becton drastically changed the new attorney training program and swearing in. Becton invited only male prosecutors to the swearing in. She told the new attorneys that these men would be the ones to welcome and train them, reinforcing the male-dominated power structure in the office. (Henderson Decl. ¶¶34-35, 68; Piersig Decl. ¶¶72-74; Knox Decl. ¶40). Loss of the training opportunity impacted Plaintiffs because training is one of the few means afforded prosecutors to demonstrate mastery in the office and ensure the new attorneys coming into the office see women in visible roles. (Henderson Decl. ¶35).  When Piersig asked Stephanie Kang, a younger attorney who had taken over the new prosecutor training, why older women were being removed from their training roles, she responded that Chief Assistant Johnson thought that the misdemeanor attorneys would "relate better" to people who were closer to their experience and age.  (Piersig Decl. ¶ 73-74). Johnson, who only had eight years of experience as a prosecutor before joining the office, did not possess enough trial experience to understand the value of attorneys with significant experience doing the training. (*Id.*). There were no objective criteria or guidelines in place regarding the addition or removal of prosecutors from training positions. (Nichols. Decl. ¶ 5, Ex. D at 61:8-62:25). Eliminating older women from training roles demonstrated lack of respect causing the Plaintiffs to lose prominence in the office.  (*Id.*; Henderson Decl. ¶35).  The invisibility of Plaintiffs was driven home in the 2021 office training on trial strategy when the male trainer listed only male prosecutors as sources to whom the young attorneys should look to for advice and trial skills. (Piersig Decl. ¶74). Compounding this slight, Dan Cabral announced that it was an "excellent presentation" without adding that skilled female attorneys worked in the office.  (*Id.*).

Becton removed Knox who has tried more cold case murders than anyone in the office from her position managing the new prosecutor training and denied Knox's request to serve on the Death Penalty Committee based on a new "standard" even though Knox had served on the committee when

[1] "While positions may be lateral on the organizational chart, all positions in the DA's office do not have the same prestige and are not lateral in terms of giving a Prosecutor the opportunity to advance and the opportunity to be regarded in the office, and in the community, as a leader…When women are excluded from assignments and special opportunities their careers are stifled and their rate of advancement is slowed."  (Redmond Decl. ¶ 56).

6

NICHOLS LAW, P.C.
75 BROADWAY, SUITE 202
SAN FRANCISCO, CALIFORNIA 94111

1  she was both a Level 4 and a Level 5 attorney. (Knox Decl. ¶¶37, 40).  Participation as a member of

2  the Death Penalty Review Committee, one of the Office's most important committees carries

3  prestige.  (*Id*.).  The Committee should be composed of the most experienced homicide prosecutors.

4  Henderson also asked to be on the Death Review Committee but was ignored and placed on

5  the Evaluations Committee where she worked to develop attorney evaluation criteria. (Henderson

6  Decl. ¶61).  A member of executive leadership disbanded this committee once it completed the

7  evaluation drafts; thereafter, a younger male attorney who was not on the committee presented the

8  evaluation forms at an executive management meeting and took credit for the work.  (*Id.*).

9  In another instance, after Henderson reported to DA Becton about discriminatory recruitment

10  efforts against racially diverse and LGBTQ candidates, in favor of heterosexual white males, and

11  explicit instructions to favor a white male candidate who played sports, DA Becton created a new

12  position with the title "Director of Retention and Recruiting" for Ryan Wagner, a young white male

13  who has done nothing to change the status quo, and did not allow Henderson to participate in

14  recruiting in 2019.  (Henderson Decl. ¶¶32-33, 37, 55).  Similarly, in October 2018, Becton removed

15  Blumberg from the Recruitment and Retention Committee after years of service without explanation

16  and without the courtesy to tell Blumberg.  (Blumberg Decl. ¶¶10-13).  In February 2021 Becton

17  denied five qualified senior women the opportunity to run the FBI Safe Streets Task Force. Instead,

18  she appointed a younger male.  (Blumberg Decl. ¶38).

19  7.  Defendants Denied Plaintiffs Resources Given to Similarly Situated Men

20  Many women prosecutors failed to receive the resources and support provided to male

21  attorneys. (Piersig Decl.¶¶42-45; Henderson Decl. ¶67). In 2018, Henderson's subordinate was

22  transferred out from her Unit without her knowledge and not replaced. (*Id*. ¶36). Becton maintained

23  a policy that attorneys could not be assigned trials without the knowledge of the Unit Supervisor.

24  However, O'Connell assigned trials regularly to the attorneys in the Unit supervised by Piersig

25  without speaking to her, including once assigning trials to multiple attorneys in her unit leaving her

26  without sufficient coverage for the unit's work. (Piersig Decl. ¶39). This was part of a larger pattern

27  to call female attorneys "supervisors" or allow them to serve as the head of a unit in the office

28  without any actual attorneys to supervise or mentor, and fail to provide them with similar resources

7

NICHOLS LAW, P.C.
75 BROADWAY, SUITE 202
SAN FRANCISCO, CALIFORNIA 94111

as males, which greatly impacted their ability to succeed in their roles and get tapped for promotion and other advancement in the office.  (Henderson Decl. ¶¶35-37).

**C.    Defendants' Basis for The Adverse Actions are Pretextual and Not Credible.**

1.    Evidence Establishes No Issues Existed Concerning Mary Knox's Performance and That Knox Was a Well-Respected Supervisor

**a)  Merit Board Testimony Concerning Knox's Demotion**

Lynn Uilkema, a former Level 5 Supervisor who retired in 2019 testified that Knox was a good supervisor, someone with whom she consulted on issues, never demeaning or disrespectful, and not untrustworthy or someone she would characterize as untrustworthy.  (Nichols. Decl. ¶2, Ex. A at 654:15-655:8).  Molly Manoukian, who Knox supervised in the Homicide Unit for two and a half years testified that Knox was an excellent supervisor with a tremendous amount of experience, accessible to members of the team, good at moving roadblocks for the team and providing support without hovering and allowed attorneys in the Unit to do their jobs.  (*Id*. at 671, 674:20-22-678:15). Manoukian also testified that Knox followed the chain of command to get approval for investigative assistance on homicides in a timely manner.  (*Id*. at 678:8-15).

Phyllis Redmond testified at the hearing that, "Mary is a very strong prosecutor, a strong trial attorney, that she has very high standards for the people on her teams, which makes sense considering the teams she supervised" and worked "very, very hard with an incredibly hard work ethic and really needed to have those same qualities in her lawyers: high standards, strong work ethic." (Nichols. Decl. ¶2, Ex. A at 607:14-609:7). As the Chief Deputy, Redmond oversaw personnel complaints and Redmond never heard of anyone who was scared to approach Knox or worried about being retaliated against if they voiced a concern about a case, and never received any complaints about Knox. (*Id*. at 617:5-619:15; Redmond Decl.¶ 33).

Becton testified at the Hearing that between January and October 2018, Johnson told her that fifteen attorneys complained to Johnson that they were afraid of Knox. However, Becton could not identify anyone who complained and could not substantiate any of the alleged complaints with any documentation. (Nichols. Decl. ¶2, Ex. A at 430:22-431:6; 431:22-432:2, 434:3-24; Redmond Decl. ¶33).  Knox's written performance review for the same period contains no complaints about Knox and praised Knox for her supervisory skills.  (Knox Decl. Ex. F).  For example, for the period July

8

– October 2018, Johnson's review of Knox cited to no complaints (other than from defense attorneys regarding plea offers), stated Knox "satisfied her responsibilities" and was "available to her team whenever the need arose." (*Id*. at Ex. F at 2). Nancy Georgiou's review of Knox (October 2018-July 2019) complimented "[h]er breadth of experience in the office," stated Knox's "legal acumen is legendary[,]" that she "is a trusted legal advisor to law enforcement officers[,]" "has long been regarded as a trusted mentor for attorneys and community partners[,]" and "respected by judges, attorneys, criminal justice partners, and the community."  (*Id*. at Ex. F at 2-3).

The sole witness DA Becton called at the Merit Board hearing was Stephanie Kang. (Nichols. Decl. ¶ 2, Ex. A at 580). Kang, a junior attorney in the office who oversaw the Central and East Misdemeanor Operations team testified that "…[Knox] is well respected." (*Id*. at 694:9-13; 695:2-4; 699:9-10; 699:20-24.)  Kang testified Knox was someone she sent the new attorneys to for advice and input. (*Id*. at 699:25-700:2). Kang noted that anytime the office is considering charging a felony, she tells them to be prepared to talk to Ms. Knox about it "because it's a really good learning experience for them to talk to a person with that much experience in the office, go prepared and have that experience to talk out legal issues with her." (*Id*. at 700:3-17).

### b) Several Witnesses Discredit and Contradict DA Becton's Stated Basis for Demoting Knox

Becton made the decision to demote Knox alone.  (Nichols Decl. ¶2, Ex. A at 602: 12-16; Nichols Decl. ¶8, Ex. G at 113:18-114:3, 114:22-115:5; Redmond Decl. ¶5-8, 20-28).  Becton said she received "no objections" from her "management team," (Becton Decl. ¶16), Becton previously testified that she never even discussed Knox's demotion or sought an opinion on it from Redmond and Nancy Georgiou, two of the women on her executive management team at the time who had previously expressed concerns about gender discrimination in the office. (Redmond ¶26; Nichols Decl. ¶3, Ex. B at 45:2-10; 45:19-22).  Uilkema and Georgiou testified that they did not agree with Knox's demotion and did not have input into the decision to move Knox to felony filing. (Nichols Decl. ¶ 2, Ex A at 646:21-648:7; Nichols Decl. ¶ 6, Ex. E at 25: 10-19, 54: 4-13, 57:7-21, 60:1-4, 104: 2-3, 111:6-8, 114:1-7, 116:8-117:6, 197:7-10).

Redmond, a Level 5 (2012-2017) and Becton's Chief Assistant (2017-2019) disputes Becton's stated reasons for demoting Knox.  (Redmond Decl. ¶¶ 3-5, 7-8, 19-33, 38-41, 46).

9

Redmond stated that she knew of no complaints against Knox, even though she was part of the prior DA's executive management team and there was no mention or hint of an intent to demote Plaintiff Knox, and that attorneys in the office wanted to work under Knox. (*Id*. at ¶¶ 6-8, 17-18, 26, 29, 30-33. 39). In addition, during the time numerous complaints were said to have been made about Knox, Redmond and Becton removed a highly sensitive, high-profile homicide case that demanded an attorney who could be trusted from Simon O'Connell and assigned it to Knox as an implicit acknowledgment of Becton's trust in Knox. (*Id*. at ¶¶ 34-37).

Judge Anita Santos, one of DA Becton's former colleagues at the Contra Costa County Superior Court disputes the accuracy of Becton's statement that Knox misrepresented statements Judge Santos made. (Becton Decl. ¶17; Redmond Decl. ¶41; Santos Decl. ¶¶ 4-7; Nichols Decl. Ex. A at 557:19-559:19). Judge Santos also noted that Knox "has a reputation in the Contra Costa County judicial community for honesty, trustworthiness, and integrity." (Santos Decl. ¶7). Regarding the allegation that Knox told Johnson she had an independent witness in a case when in fact she did not, Johnson testified that she was the one that relayed information that there was an independent witness to defense counsel and did not follow up on how the situation was resolved. (Nichols Decl. Ex. G at 15:1-22, 16:4-17:22, 18:14-19:19). Evidence also undermines the notion that Knox failed to follow the chain of command. Women who protest their treatment are often accused in this way. Similarly, Walpole complained that Henderson did not act with a "unified front" when Henderson supported Smith's discrimination complaint. (Henderson Decl. ¶58). Redmond, too, faced such complaints. (Nichols Decl. ¶4, Ex. C at 51:17-54:25; Redmond Decl. ¶46).

c) **Male Supervisors Escaped Discipline Despite Documented Complaints**

Prosecutors lodged numerous valid documented complaints about Dan Cabral, a current Assistant to the DA, concerning anger management issues, and public outbursts of aggression. (Redmond Decl. ¶¶9, 11-16). Cabral remains a supervisor. Piersig and Chandler filed complaints against their male homicide supervisor, Derek Butts, for being ineffective, but he remains a supervisor. (Nichols Decl. ¶8, Ex. G at 134:18-135:4, 174:19-176:1; Piersig Decl. ¶16-21; Chandler Decl. ¶34). Uilkema spoke at an office-wide meeting of the unit supervisors called for the removal of Cabral, Kensok, and MacMaster, who are all male. (Nichols Decl. ¶4, Ex. C at 141:13-142:11;

10

144:19-146:7). Cabral admitted that the unit heads wanted them removed because nobody trusted them, they were not good managers, and morale would be improved if the three of them were removed. (*Id.* at Ex. C at 146:8-19.) The Felony Trial Team requested that Cabral be removed from his position supervising the team. Cabral confronted the Felony Trial Team leading to at least two complaints against Cabral for his confrontational behavior, one from Lovena Henry (Nichols Decl. ¶4, Ex. C at 147:6-12) and the other from Saron Tesfai, who a year later asked that Cabral not be on his interview panel because he found Cabral threatening. (Redmond Dec ¶14).

On October 9, 2017, a group of unit supervisors told DA Becton that Cabral needed to be removed from the executive management team and his supervisory role. (Redmond Decl. ¶ 12; Henderson Decl. ¶30). After the meeting, Redmond told DA Becton that the office did not respect Cabral. (Redmond Dec. ¶13). In contrast, DA Becton admitted nobody made any complaints about Knox at the office wide meeting and she had no written records of any complaints about Knox. (Nichols Decl. ¶2, Ex. A. at 438:10-17, 536:7-14).

Despite Henderson's qualifications, Becton told Henderson that she could do nothing to improve her chances of promotion and she will never be promoted. (Henderson Decl. ¶ 44). However, Henderson interviewed well, exhibited excitement, and was qualified for the promotion. (Nichols Decl. ¶8, Ex. G at 85:12-22, 181:1-8).  When Henderson also solicited feedback from Johnson about what she could do to receive a promotion, she was instructed to ask Becton.  (*Id.* at 178:18-22).  No one had ever complained about Henderson's performance at the time of the promotions and reassignments. (Henderson Decl. ¶69; Nichols Decl. ¶5, Ex. D at 156:1-157:9). There were no complaints about Chandler or Piersig's performance in the office at the time of the promotions and reassignments.  (Chandler Decl. ¶34; Nichols Decl. ¶ 5, Ex. D at 159:8-161:10-163:17).  Also, no one had complained about Blumberg when Becton instituted promotions and reassignments. Blumberg received a glowing 360-degree feedback from her team and her supervisor said Blumberg should be a supervisor. (Blumberg Decl. ¶31; Nichols Decl. ¶5, Ex. D at 163:18-164:18).  Yet, Becton did not allow Blumberg to supervise because Blumberg asked her team to help clean up the office because County did not provide janitorial services. (Redmond ¶¶ 54-55 Blumberg Decl. ¶47). Ironically, Becton now requires all attorneys to clean the common areas.  (*Id.*)

NICHOLS LAW, P.C.
75 BROADWAY, SUITE 202
SAN FRANCISCO, CALIFORNIA 94111

11

1

**D.    DA Becton Has a Clear Discriminatory Preference for Younger Attorneys.**

2        As shown above, Becton favors the young over the old and the men over women. For

3  example, the Director of Recruiting (younger male), ignored and maligned an older woman legal

4  intern literally put her in a closet to work and denied her opportunities given to younger male interns.

5  DA Becton ignored her complaints. (Ocodhain Decl. ¶¶1-11).

6        DA Becton's promotion and assignment process for older female prosecutors is

7  discriminatorily different than the promotion and assignment process for male prosecutors and junior

8  prosecutors.   This illegal and discriminatory behavior resulted in extraordinarily high levels of

9  turnover, with approximately half the attorneys in the office resigning. (Piersig Decl. ¶¶65-66). For

10  example, Johnson with merely eight years of experience as a junior prosecutor in the Alameda

11  County District Attorney's Office and only one murder trial was hired as Becton's Assistant DA and

12  then promoted to Chief. (Nichols Decl. ¶ 2, Ex. A at 487:1-3).  Becton did not provide the training

13  or recruitment committees or other committees in the office with specific selection guidelines to

14  avoid gender, age or any other form of discrimination.  (Nichols Decl. ¶5, Ex. D at 62:21).  After

15  less than one year of supervisory experience Walpole was put in a supervisory role over most of the

16  office then left to work remotely and announced his retirement. (Piersig Decl. ¶89, Blumberg Decl.

17  ¶55; Henderson Decl. ¶31). To conceal the discriminatory motives behind these employment

18  decisions, Defendants point to misleading numbers regarding the percentage of woman that fill

19  supervisory positions under Becton's tenure (Henderson Decl. ¶¶ 47-51; Piersig Decl. ¶¶ 64-67) and

20  have concocted several reasons for their actions, after the fact.

21        Becton reassigned the training program from Knox to Kang, a lawyer in her 30s, while

22  removing the former instructors, all over the age of 40.   One of the younger trainers asked to use

23  Henderson's PowerPoint presentation.  (Henderson Decl. ¶34).  Johnson testified that the younger

24  trainers were more relatable and that new "younger" attorneys, or "more junior" attorneys were

25  invited to be part of the training.  (Nichols Decl. ¶8, Ex. G at 97:1-14, 101:18-21).  This change was

26  motivated by the desire to have "fresh faces," in other words, young faces, for training.  (Henderson

27  Decl. ¶34; Piersig Decl. ¶73; Nichols Decl. ¶11, Ex. J at 58:10-59:22).   Loss of the training

28

NICHOLS LAW, P.C.
75 BROADWAY, SUITE 202
SAN FRANCISCO, CALIFORNIA 94111

**PLTFS' OPP TO DEF'S MSJ**
*Knox, et. al v. County of Contra Costa et.*

1   opportunity impacted Plaintiffs because training is one of the few means afforded prosecutors to

2   demonstrate mastery to the office.  (Henderson Decl. ¶35).

**E.    Each Plaintiff Reported Discrimination and Engaged in Other Protected Activitie**s

4          Henderson repeatedly reported discrimination of older women to Becton and Johnson.

5   (Henderson Decl. ¶¶ 33, 59; Knox Decl. ¶ 27; Redmond Decl. ¶¶ 10-11, 13, 53-55; Nichols Decl.

6   ¶8, Ex. G at 187:21-188:13). In 2019 Henderson concurred with Melissa Smiths allegations of

7   gender and disability discrimination.[2] (Henderson Decl. ¶ 56). Henderson also complained to Becton

8   about Walpole's discrimination and retaliation against Smith. Becton failed to correct the illegal

9   behavior or investigate it.  (Henderson Decl. ¶ 59; Smith Decl. ¶ 22).  In June 2018, Chandler and

10  Piersig complained to Johnson about the gender bias and discriminatory treatment they faced in the

11  Homicide Unit. (Chandler Decl. ¶ 18, 26; Piersig Decl. ¶¶ 17-19).

12         In addition, Plaintiffs gave notice they were represented by attorneys in August 2019 when

13  their counsel requested their personnel files, then filed DFEH Charges and this lawsuit.  In July

14  2021, Plaintiffs filed a settlement conference brief; in it, Plaintiffs asked to be placed in the open

15  executive management positions.  (Piersig Decl. ¶ 76).  Plaintiffs also filed charges with the EEOC

16  at the end of 2021.

**F.    Plaintiffs Suffered Retaliation Because of Their Protected Activities.**

18         Each Plaintiff has been kept in unsuitable roles based on their experience for more than three

19  years and deprived of opportunities to serve in their desired units and committees.  The day after

20  Plaintiffs asked to be placed in executive management positions, Becton reduced Piersig's role by

21  reducing her staff and shifted her to a joint supervisory position. (Piersig Decl. ¶¶ 77-80).

22  Additionally, Piersig received an unwarranted negative performance review in 2020 after this action

23  commenced. However, the review related to something she had allegedly done wrong in 2018.

---

[2] The retaliatory treatment of Melissa Smith after she complained of gender discrimination is illustrative of the DA Office's pattern and practice of retaliating against women who make claims of discrimination.  (Henderson Decl. ¶¶ 56-60; Smith Decl. ¶¶ 12-23).  Smith was a Level 4 who made complaints of gender discrimination in 2019 and was retaliated against and humiliated by Chris Walpole, who stepped out of the chain of command and above Smith's supervisor, Plaintiff Henderson, to seek out complaints from a judge and inspector about Smith without first approaching or counseling her; and notified Smith after the fact with the clear message not to complain about discrimination again or face further retaliation.  (Smith Decl. Decl. ¶¶ 12-21).  These actions by Walpole were taken in direct retaliation for Smith's complaints.  (Henderson Decl. ¶¶ 57-58).

**PLTFS' OPP TO DEF'S MSJ**
*Knox, et. al v. County of Contra Costa et.*

NICHOLS LAW, P.C.
75 BROADWAY, SUITE 202
SAN FRANCISCO, CALIFORNIA 94111

(Piersig Decl. ¶23, Ex. B). Also, Piersig was not allowed to work from home for the full 20 hours of remote work authorized each week. On the other hand, Walpole not only was allowed to work from home, but from his home in North Carolina. Michael Gressett, a male Level 4 prosecutor, also worked from home full-time. (Piersig Decl. ¶¶ 89-91; Nichols Decl. ¶10, Ex. I at 22:1-6).

As outlined above, after complaining about the discrimination, Knox has been demoted and put in roles beneath her skills and experience. She has been transferred without discussion and denied roles requested and passed over for promotion. Becton denied Blumberg supervisory roles and promotions after she filed her DFEH complaint. Blumberg was also denied a standing desk and required her to supply medical proof to work part-time in contradiction to long-standing office policy. (Blumberg Decl. ¶ 26). After protesting discrimination and supporting Ms. Smith's claim of discrimination and retaliation, Becton marginalized Henderson and refused to speak directly to her. (Henderson Decl. ¶ 56). Walpole then documented unspecific and non-sensical "issues" with Henderson's performance dating back years that suspiciously had gone unaddressed until the lawsuit was filed. (*Id.* ¶¶ 69-71). Walpole interfered with and undermined Henderson's authority as the head of the Domestic Violence Unit, including in personnel matters and case recommendations after this lawsuit was filed, a protected activity. (*Id.* ¶¶ 62-64).

Plaintiffs were all passed over for the Level 5 promotions in 2021, which were given to Colleen Gleason and Devon Bell. (Piersig Decl. ¶¶ 81-85). In July 2021, a settlement conference brief was filed in connection with this matter; in it, Plaintiffs asked to be placed in the open executive management positions, for which they are all qualified. (Piersig Decl. ¶66). In making these promotions, Becton abandoned the ruse of a promotion "process", and a day before the settlement conference in this case, promoted two women to Level 5 roles. (Nichols Decl. ¶ 5, Ex. D at 149:12-150:25) Colleen Gleason (Level 5 Attorney Walpole's wife was a bridesmaid in Gleason's wedding, and Gleason is godmother to one of Walpole's children) and Devon Bell (wife of Kevin Bell) who did not submit an application for promotion in 2019 or thereafter. (Piersig Decl. ¶70-75; Nichols Decl. ¶10, Ex. I at 156:4-8, 157:3-15; 172:15-16).

Crystalizing the retaliation that permeated the office and was condoned by Becton, when Chandler was finally given the opportunity to supervise, she received an email from Jun Fernandez

14

NICHOLS LAW, P.C.
75 BROADWAY, SUITE 202
SAN FRANCISCO, CALIFORNIA 94111

to her entire team that demeaned her. To top it all off Fernandez quoted, Doug MacMaster and boasted about his golfing skills: "*I cannot say that I approve of Alison swapping with you.*" *You, my friend, are the quintessential Felony Expeditor. Knowledgeable, intelligent, insightful, scrupulously fair, and a pleasure to deal with. It's been my honor and privilege to work with you – during my tenure in your office, and afterwards. In addition, you possess an ability to crush a drive off the tee that I deeply envy....*" This email did not reference any of the documented discrimination that women, including Chandler, had suffered at the hands of Mr. MacMaster. Chandler reported the email and was ignored and further demeaned this forcing Chandler's constructive termination. (Chandler Decl. ¶¶49-57).

### III.    SUMMARY JUDGMENT STANDARD

The trial court cannot resolve issues of credibility to determine that a fact is not genuinely disputed; to do so is to improperly weigh the evidence. *Tolan v. Cotton*, 572 U.S. 650, 658–59 (2014). If a dispute as to a material fact cannot be resolved without observing the witness's demeanor to evaluate credibility, the fact is genuinely in dispute. *Guessous v. Fairnew Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Even when a fact itself is undisputed, that fact may support several reasonable inferences. In resolving the summary judgment motion, the trial judge must resolve those differing inferences in favor of the nonmoving party. *Hunt v. Cromartie*, 526 U.S. 541 (1999).

### IV.    ARGUMENT

#### A.    Defendants Waived the Defense of Failure to Exhaust Administrative Remedies Because They Did Not Assert the Defense Timely.

Plaintiffs timely commenced their Title VII and ADEA causes of action. Defendants argue that because Plaintiffs did not obtain a right to sue from the EEOC until December 2021, all claims arising more than 300 days before that are time barred. Defendants are wrong. Plaintiffs timely commenced this action on February 26, 2020 (Dckt #1). The fact that the Complaint does not allege that Plaintiffs exhausted their administrative remedies with the EEOC does not constitute a failure to timely file suit. (Dckt #1, 21, and 26.) Defendants did not cite any case law to support their argument because no case or statute so holds. Glaring by its omission, Defendants' fail to cite *Fort Bend Cty. v. Davis*, 139 S. Ct. 1843 (2019), in which the Supreme Court unequivocally held that Title VII's charge-filing requirement is not jurisdictional, and that the requirement is a claim-

15

NICHOLS LAW, P.C.
75 BROADWAY, SUITE 202
SAN FRANCISCO, CALIFORNIA 94111

processing rule. *Id.* at 1846. A Defendant who fails to timely raise the absence of a filed charge with the EEOC waives the procedural requirement. (*Id*.)

1. Defendants Waived the Exhaustion Requirement By Waiting 2 Years To Raise It

To the extent that Defendants could have asserted a defense of failure to exhaust administrative remedies, they waived it. A claim processing rule is only mandatory if a party "properly raises it" and may be "forfeited if the party asserting the rule waits too long to raise the point." *Eberhart v. United States*, 546 U. S. 12, 19 (2005) (per curiam); *Fort Bend Cty*., 139 S. Ct. at 1849.  Defendants did not raise this objection despite moving to dismiss Plaintiffs' Complaint twice. (Dckt #26 and # 49.) *See Arbaugh v. Y & H Corp*., 546 U.S. 500, 510 (2006) (holding that Defendant raised Title VII's statutory limitation of covered employers too late.)

As the Supreme Court noted in *Fort Bend*, "Defendants...have good reason promptly to raise an objection that may rid them of the lawsuit filed against them." 139 S. Ct. at 1851-52. The failure to raise such a defense suggests that Defendants did not want to take advantage of the objection for strategic reasons. *See Banks v. Chesapeake & Potomac Tel. Co*., 802 F.2d 1416, 1427 (D.C. Cir. 1986) ("reliance on a statute of limitations is an affirmative defense and is waived if a party does not raise it in a timely fashion.") Defendants' boilerplate affirmative defense for failure to exhaust should not save it from failing to timely raise an objection when it had the chance and could have been cured by Plaintiffs.

2. Even If The Court Finds Defendants' Have Not Waived Their Objection, Plaintiffs Timely Filed A Charge With The DFEH Making Their Gender and Age Discrimination Claims Timely Filed Under the Work Sharing Agreement.

Defendants do not dispute that Plaintiffs timely filed charges with California's Department of Fair Employment and Housing ("DFEH") (Defendants' MSJ 3:26-27; 4:1-3; 16:5-6.). Pursuant to the EEOC and DFEH work sharing agreement, each designates "the other as its agent for the purpose of receiving and drafting charges, including those that are not jurisdictional with the agency that initially receives the charges." 29 CFR §1601.13 (2018); (Nichols Decl. ¶7, Ex. F at section II, subsection A). The work-sharing agreement goes on to note: "The FEPA ("The California Department of Fair Employment and Housing") shall take all charges alleging a violation of Title VII…where both the FEPA and the EEOC have mutual jurisdiction, or where only the EEOC has

16

jurisdiction, so long as the allegations meet the minimum requirements of those Acts." (*Id*. at section II, subsection B.) Defendants do not dispute that Plaintiffs' DFEH charges were timely and Defendants concede they were filed with an appropriate state agency. (MSJ 16:5.)  Based on the work-sharing agreement, the DFEH charges are sufficient for purposes of the claims processing procedure to file the instant Title VII and ADEA claims.

   3. <u>If The Court Finds the Failure to File EEOC Charges Prior To Filing Suit Fatal to Plaintiffs Claims, It Should Exercise Supplemental Jurisdiction Over Plaintiffs' State Causes of Action.</u>

If the Court finds the failure to allege the EEOC charges as fatal to Plaintiffs' Title VII and ADEA claims, and Defendants' waiver not fatal to their exhaustion argument, the Court may still assert supplemental jurisdiction over Plaintiffs' state law claims. The Ninth Circuit recently opined that a District Court should strongly consider retaining supplemental jurisdiction over related state-law claims after a case has proceeded through summary adjudication of the federal claims. *Arroyo v. Rosas*, 19 F.4th 1202, 1214 (9th Cir. 2021) (finding the values of judicial economy, convenience, fairness to litigants, and comity "overwhelmingly favored" the district court retaining jurisdiction over related state law claims at "the very late stage" of the case).

Here, in light of the extensive party and judicial resources expended in this litigation over the past two years, and the well-accepted principal that "California courts consistently look to Title VII for guidance in interpreting FEHA [,]" *Kohler v. Inter-Tel Techs.*, 244 F.3d 1167, 1172 (9th Cir. 2001), the values of judicial economy, convenience, fairness to litigants, and comity strongly favor the exercise of supplemental jurisdiction.  If the Court declines to exercise supplemental jurisdiction and Plaintiffs are forced to refile their case in state court, the result would be a waste of state and federal judicial resources, effort of all litigants, inconvenience for all involved, including the state court, and prejudice to the Plaintiffs that would result from the delay in resolution of their claims.

   4. <u>Under Title VII An Administrative Charge is Timely as to a Pattern and Practice of Discrimination, So Long as One Actionable Act Occurred During the Look Back Period.</u>

Defendants ignore Plaintiffs properly filed DFEH charges in order to argue that it is not liable for any of its illegal acts prior to January 2021. (Def. MSJ 16:4-8.) Defendants acknowledge in their brief that Plaintiffs properly filed DFEH charges in 2019, except Henderson who filed in 2020. (Defendants MSJ 3:26-4.) Defendants do not dispute that Plaintiffs DFEH charges, which provide a

17

NICHOLS LAW, P.C.
75 BROADWAY, SUITE 202
SAN FRANCISCO, CALIFORNIA 94111

one year look back and are timely as to Plaintiffs' Fair Employment and Housing ("FEHA") causes of action. Defendants further acknowledge that filing a charge with the DFEH extends Plaintiffs' Title VII look back period to 300 days from the date of filing.  (Def. MSJ 3:26-4.) As outlined above, DFEH and EEOC's Work Sharing Agreement allows each agency to accept charges on behalf of the other. Thus, the timely filed DFEH supplies the applicable look-back window for the federal claims. If the Court finds that the timely filed DFEH charges are not sufficient to support the federal claims, nonetheless, the filed EEOC charges provide evidence of a pattern and practice of a discriminatory environment and are timely so long as one act contributing to the claim occurred within the look back period. Plaintiffs' EEOC Charges allege that: "Contra Costa County District Attorney Diana Becton has engaged in a pattern and course of gender and age discrimination by demoting and failing to advance, promote and assign supervisory roles to qualified and accomplished prosecutors who are women, particularly if those women are over 40 and have significant prosecutorial experience and tenure." Plaintiffs allege multiple adverse employment actions that occurred in 2021, including the promotion of Devon Bell.

Plaintiffs' Charges, along with their Complaints, allege that Plaintiffs, through much of their careers in the DA's Office suffered a spectrum of disparate discriminatory treatment because of their gender resulting in a hostile work environment which is not comprised of only one unlawful employment practice. The timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened. It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002).  Although some of the discrete discriminatory acts alleged by Plaintiffs occurred outside of the limitations period, those acts, taken as a whole constitute Defendants' hostile work environment. "The [Defendants'] 'unlawful employment practice', therefore cannot be said to occur on any particular day. It occurs over a series of days, perhaps years, and, in direct contrast to discrete acts..." *Harris v Forklift Sys, Inc.* 510 U.S. 17, 21 (1993). Because Plaintiffs allege an ongoing pattern and practice

NICHOLS LAW, P.C.
75 BROADWAY, SUITE 202
SAN FRANCISCO, CALIFORNIA 94111

18

of a discriminatory hostile work environment and numerous discriminatory acts occurred within 300 days of the filing of Plaintiffs' EEOC Charges, Plaintiffs are able to introduce evidence concerning all acts constituting Defendants' hostile work environment.

**B.      Plaintiffs Established a Prima Facie Case for Gender and Age Discrimination.**

To state a prima facie case of discrimination under either Title IV or FEHA, a plaintiff must allege and ultimately show that: (i) she was a member of a protected class; (ii) she was qualified for the position she sought or was performing competently in the position she held; (iii) she suffered an adverse employment action; and (iv) that other persons with qualifications similar to her own were treated more favorably. *Godwin v. Hunt Wesson, Inc.,* 150 F.3d 1217 (9th Cir. 1998). "The requisite degree of proof necessary to establish a prima facie case for Title VII . . . claims on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir.1994).

1.      Each Plaintiff Was Qualified to Be Promoted, To Perform Supervisory Duties and Assigned to Committees That Would Lead to Further Career Advancement.

At the time DA Becton promoted Walpole (2018), O'Connell and Grassini (April 2019), Gleeson and Bell (2021) to Level 5 roles, Plaintiffs were experienced Level 4 prosecutors and Becton admits each met the minimum qualifications for the promotion. (Becton Decl. ¶ 20; Chan Decl. ¶4). Level 4 is the highest level an attorney can achieve without promotion to the DA's Executive Management Team. Level 4s, therefore, meet the qualifications for any position, assignment, committee, or task in the DA's office. The DA, as Becton stated, has discretion to organize the units and assign the attorney as she wants. (Becton Decl. ¶7).  Defendants do not argue, because they cannot, that Plaintiffs did not meet the minimum qualifications for the roles and positions they were denied. Instead, Defendants only offer their pretextual justifications for why Plaintiffs were not given promotions, prestigious roles, opportunities, and supervisory roles.

2.      Each Plaintiff Suffered Significant Adverse Employment Actions

The evidence supports that each Plaintiff has suffered the following adverse employment actions. Knox: *See* Fact §§ 1, 3, 6 *supra;* Piersig: *See* Fact § 3 *supra;* Henderson: *See* Fact §§ 3, 6, 7 *supra*; Chandler: *See* Fact § 3 *supra;* Blumberg: *See* Fact Se §§ 3, 4, 6 *supra*.  Adverse employment actions have been held to come in different shapes and sizes depending on the circumstances of the

19

NICHOLS LAW, P.C.
75 BROADWAY, SUITE 202
SAN FRANCISCO, CALIFORNIA 94111

1   case. Because Plaintiffs are Civil Servants the Defendants' ability to reward them is limited.  Even

2   Becton admitted that the "rewards" she can dispense for a job well done are minimal.[3] (Nichols.

3   Decl. ¶2, Ex. B at 324:4-24). Pay cuts or demotion therefore should not be the only parameters by

4   which the court judges the occurrence of an adverse employment action in light of the County's

5   merit-based system. *See Wu v. Pacifica Hotel Col.,* No. C 00-2059 SI, 2001 U.S. Dist. LEXIS 6048

6   (N.D. Cal. Apr. 24, 2001) (Demotion with change in duties or prestige, may be an adverse

7   employment action.)

8           Courts have held the following to be adverse employment actions: warning letters, transfers

9   of job duties, undeserved performance ratings (*Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th  Cir.

10  1987)), lateral transfers (*Strother v. Southern Cal. Permanente Med. Grp.*, 79 F.3d 859, 869 (9th

11  Cir. 1996)), disadvantageous transfers or assignments, refusals to promote, (*Wyatt v. City of Boston*,

12  35 F.3d 13, 15-16 (1st Cir. 1994)), moving a person from a spacious, brightly lit office to a dingy

13  closet, depriving the person of previously available support services, cutting off challenging

14  assignments, (*Knox v. Ind.*, 93 F.3d 1327, 1334 (7th Cir. 1996)); *see also Ayala v. Frito Lay, Inc*.,

15  263 F.Supp.3d 891, 905 (E.D. Cal. 2017) ("Adverse employment actions can include termination,

16  demotion, failing to promote, denial of an available job, adverse job assignments, official discipline,

17  and significant changes in compensation or benefits."); *Lewis v. United Parcel Serv., Inc*., No. 05-

18  cv-02820 WHA, 2005 U.S. Dist. LEXIS 23488, 2005 WL 2596448, at *2 (N.D. Cal. Oct. 13, 2005),

19  aff'd, 252 Fed. Appx. 806 (9th Cir. 2007) ("Under California law, an adverse employment action

20  may be...anything else that is reasonably likely to adversely and materially affect an employee's [sic]

21  job performance or opportunity for advancement in his or her career."); *Strother*, 79 F.3d at 869

22  (plaintiff was replaced as the Coordinator for the "Personal Physician Program," and excluded from

23  educational seminars, meetings, and positions involving quality assurance which may have put her

24  in position for merit increases.)

25

26

27  [3] Becton acknowledged congratulatory emails as a way of rewarding an attorney, yet, when giving a statement to the
    press related to a high-profile case, Becton failed to even acknowledge the prosecutor on the case, Knox. (Knox Decl. ¶

28  28). This was the same case Redmond and Becton had spent several weeks choosing who to assign it to. (Knox Decl.
    ¶¶34-36).

                                                    20

NICHOLS LAW, P.C.
75 BROADWAY, SUITE 202
SAN FRANCISCO, CALIFORNIA 94111

No bright line rule exists defining what constitutes an adverse employment action. As the California Supreme Court held in *Yanowitz v. L'Oreal USA, Inc*, "adverse treatment that is reasonably likely to impair a reasonable employee's job performance or prospects for advancement or promotion falls within the reach of the antidiscrimination provisions of sections 12940(a) and 12940(h)." 36 Cal. 4th 1028, 1052 (2005). Defendants admit that lateral transfers that affect promotional opportunities, prestige, reassignment into a more inconvenient job, or are accompanied by hostile environments meet the definition of an adverse employment action. Lateral roles have different duties leading to different opportunities. (Def. MSJ 19:24-26.) Some of the factors that elevate one assignment from another are: whether it is a supervisory role; how many attorneys are supervised; whether the role is located at the main office or one of the small offices; and the visibility to decision makers, opportunities, and partner agencies; whether the assignment is on the Misdemeanor team or the pinnacle Homicide team; CVRU or Elder. All of these are "lateral" but they are not equal. Accordingly, Plaintiffs have alleged multiple adverse employment actions.

3. <u>Plaintiffs Were Treated Less Favorably Due to Their Protected Characteristics and Activities</u>

Defendants argue that the fourth element requires that Plaintiff show that "persons outside her protected class...were given more favorable treatment." (Defendants' MSJ 18:5-6.) However, that is narrower than what the law requires. The Supreme Court has never expressly required a similarly situated person to be outside the protected class for purposes of establishing a prime facie case. *See McDonnell Douglas v. Green,* 411 U.S. 792, 802 (1973) (failure-to-hire case, stating that fourth prong was, "after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications"); *see also Diaz v. AT&T,* 752 F.2d 1356, 1359, 1361 (9th Cir. 1985)(failure-to-promote case, reversing district court's holding that fourth prong could not be met unless position was filled by someone outside the protected class).[4]

---

[4] "The imposition of the inflexible rule advocated by Defendants [*i.e.,* that the terminated plaintiff must be replaced by someone outside the protected class] is untenable because it could result in the dismissal of meritorious claims. Defendant's rule would preclude suits against employers who replace a terminated employee with an individual who shares her protected attribute only in an attempt to avert a lawsuit. It would preclude suits by employers who hire and fire minority employees in an attempt to prevent them from vesting in employment benefits or developing a track record to qualify for promotion. It would also preclude a suit against an employer who terminates a woman it

**PLTFS' OPP TO DEF'S MSJ**
*Knox, et. al v. County of Contra Costa et.*

NICHOLS LAW, P.C.
75 BROADWAY, SUITE 202
SAN FRANCISCO, CALIFORNIA 94111

4.  <u>Plaintiffs Allege Multiple Examples of Similarly Situated Individuals Treated More Favorably.</u>

Each Plaintiff was qualified to be Level 5s but were passed over in favor of three, younger males, Walpole, O'Connell, and Grassini establishing a prime facie case of discrimination. *See Fact §§ 2 & 3 supra.* In 2021, each Plaintiff was also passed over in favor of two younger, females, Gleason and Bell. (Piersig Decl. ¶¶83-84).

In addition to the above five attorney promotions, the following examples establish a pattern and practice of discrimination against females. Blumberg: *See Fact § 4 supra.* Piersig: *See Fact § 5 supra.* When a capital case came into the office, rather than assign it to Chandler, who had worked on it in the SAU or Piersig, Butts assigned it to a male attorney who had never been in the homicide department. (Piersig Decl. at ¶12.) Butts praised male attorneys and their skill after trial via email. The emails announcing the results of cases tried by females were less complimentary and often credited others. (*Id.* ¶14.)  Chandler: *See Fact § 5 supra.* Chandler was denied supervisory roles that she was qualified for in favor of junior attorneys and males. (Chandler Decl. ¶¶18, 38.) When Chandler was assigned Felony filer in Richmond, she was asked to take on half the duties of another role. The men who had filled the Felony filer position for the past 7 years had never been asked to do that. (*Id.* ¶¶35, 36.)  Becton admits that she promoted Bell to a Level 5 because Bell had been the "second in command to O'Connell at the 10 Douglas office" thereby confirming Plaintiffs' allegations that not being given a supervisory role, even if a lateral transfer on the organization chart, hurts an attorney's chances of future promotion.[5] (Becton Decl. ¶ 29.) Defendants often used this "right time right place" logic in why someone was promoted as opposed to Plaintiffs. Being denied more prestigious roles and assignments hurt Plaintiffs' opportunities for advancement, which constitutes an adverse employment action.

---

negatively perceives as a "feminist" and replaces her with a woman who is willing to be subordinate to her male co-workers or replaces an African-American with an African-American who is perceived to "know his place." Although each of these situations involves wrongfully-motivated terminations, under the rule advocated by the Defendants, the terminated employee would be unable to meet the prima facie burden. Such a result is unacceptable." *Perry v. Woodward,* 199 F.3d 1126 (10th Cir. 1999).

[5] See Chan Decl., Ex. G, that at the time of her promotion, Devon Bell was in the same role, in a different office, as Jun Fernandez, the role that Chandler was promised and then denied. (Chandler Decl. ¶¶18, 38.)

**PLTFS' OPP TO DEF'S MSJ**
*Knox, et. al v. County of Contra Costa et.*

NICHOLS LAW, P.C.
75 BROADWAY, SUITE 202
SAN FRANCISCO, CALIFORNIA 94111

Henderson was told she might be considered for promotion if she were not too close to retirement. After she was interviewed in relation to a discrimination complaint, however, even the potential of promotion was off the table in retaliation for engaging in protected activity. (Henderson Decl. ¶52). Cabral has a history of anger management issues and public, and private complaints against him, yet he has been allowed to remain in his role. Cabral's complaints were public and made to Becton. Yet, Becton used complaints allegedly brought to Cabral, prior to Becton coming to the office, and by attorneys who were no longer in the office, as justification for declaring Knox unfit to supervise. (Nichols. Decl. ¶4, Ex. C at 115:13-124:1). Complaints against Supervisor Butts have similarly not warranted his removal. (*See* Facts Section B.(c) at p. 12). Yet, Knox, Blumberg, and Henderson have each been labelled unfit to supervise for alleged minor complaints, none of which rise to the level of being publicly lambasted for poor management, as is the case with Cabral.

     5.  <u>Defendants Cannot Look To How Other Women Were Treated To Prove That Plaintiffs Were Not Treated Less Favorably</u>

Defendants cannot rely on their promotions of Gleason and Bell after this case was filed to establish that each Plaintiff was not discriminated against. The issue in a disparate treatment case is whether the individual party was treated less favorably than similarly situated persons. That other individuals in the same protected class were not treated less favorably does not satisfy Defendants' burden. *See Bush v. Commonwealth Edison Co.,* 990 F.2d 928, 931 (1993).

## C.   **Defendants' Justification for Adverse Actions Are Pretext and Not Credible.**

A Plaintiff can demonstrate an employer's discriminatory motive through "circumstantial evidence of discrimination that tends to show that the employer's proffered motives were not the actual motives because they are inconsistent or otherwise not believable." *Achal v. Gate Gourmet*, 114 F. Supp. 3d 781, 801 (N.D. Cal. July 14, 2015); *see also Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221-22 (9th Cir. 1998). Evidence as to pretext is considered cumulatively. *Chuang v. Univ. of Cal. Davis, Bd. of Trustees*, 225 F.3d 1115, 1129 (9th Cir. 2000). "The trier of fact can infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Reeves v. Sanderson Plumbing Prod., Inc,* 530 U.S. 133, 147 (U.S. 2000).

**Knox:** More than any other Plaintiff, Defendants produce a long list of reasons they claim justify their adverse actions. (Def. MSJ 7:9-10). For example**,** Becton claims that Knox was not

NICHOLS LAW, P.C.
75 BROADWAY, SUITE 202
SAN FRANCISCO, CALIFORNIA 94111

trustworthy. However, Georgiou, Redmond, Uilkema, Judge Santos, and many others dispute these claims. (Nichols. Decl. ¶2, Ex. A at 655:5-8, ¶6, Ex. E at 25:23-26:9; Redmond Decl. ¶30-37; Santos Decl. ¶7). In addition, Becton possessed first-hand knowledge of Knox's integrity. Knox tried a homicide case before Becton that Becton, in her written application for District Attorney, described as her most complex case. Not only had Becton overruled several Defense objections to Knox's handling of the case, but more importantly every ruling was upheld on appeal. (Knox Decl. ¶17, Ex. A at 9). Becton claims that Cabral, McMaster, and Kensok provided Becton with a laundry list of complaints: that former DA Peterson intended to demote Knox; Redmond disputes that (Redmond Decl. ¶¶6-9); that Knox fails to follow the chain of command, but can provide no example (Nichols. Decl. ¶2, Ex. A at 376:13-377:21; 380:17-382:18); that Knox was not a team player, but fellow managers disagreed (Nichols. Decl. ¶2, Ex. A at 654:15-655:8; 676:18-677:2).

Becton alleges that she had been given numerous complaints concerning Knox's (poor) ability to supervise. Johnson and Becton contradict each other on key elements of these undocumented complaints while Redmond disputes their existence. (Nichols Decl.¶2, Ex.A at 434:3-438:17; 525:7-536:14; Redmond Dec.¶¶31,32,36). Georgiou also testified she never heard any complaints about Knox as a supervisor (Nichols. Decl. ¶6, Ex. E at 25:23-26:9). During the relevant period, Knox received a glowing review from Johnson, the same person who claims to have fielded 15 complaints about Knox. (Knox Decl. ¶43). Uilkema also testified Knox was an excellent manager. (Nichols Decl.¶6, Ex. A 675:2-21). Becton claims Knox lied that Judge Santos appointed Knox to advise the civil grand jury. Judge Santos makes clear that she made a mistake and Redmond confirmed that at the time Judge Santos apologized. (Redmond Dec. ¶41; Santos Dec. ¶¶5-6). Becton claims Knox inappropriately charged cases in CVRU. However, Becton assigned Knox the "gatekeeper" role for charging cases. (Def. MSJ 7:22, 8:1-3; Becton Dec. 6:11; Becton Dep. ¶17).

**Henderson:** The only reason Defendants provide for failing to promote Henderson is a counseling memo issued in January 2021 after the discriminatory promotions of 2019 and after Henderson filed this lawsuit. (Def. MSJ 13:1:5). Becton provides no rationale for why Henderson was not promoted thus there is no pretext to rebut. (Becton Dec. ¶23). Additionally, the counseling memo is further evidence that complaints against female supervisors are considered irrefutable

24

NICHOLS LAW, P.C.
75 BROADWAY, SUITE 202
SAN FRANCISCO, CALIFORNIA 94111

evidence of a bad supervisor while complaints against male supervisors are either ignored or brushed off. (Redmond Dec. ¶53). Because Defendants have failed to offer a legitimate reason for their actions against Henderson, or any reason at all, they fail to shift the burden back to Henderson to prove pretext.

**Piersig**: Defendants offer no justification for why Piersig was not selected for a level 5 role thus there is no pretext to rebut. Despite her superior qualifications, Becton did not even attend her interview and she was passed over. (Def. MSJ 13:10-17.) Similar to Henderson, Defendants have failed to offer a legitimate reason for Piersig's adverse employment actions and thus failed to shift the burden back to her to prove pretext.

**Chandler**: Defendants offer no explanation for why Chandler was not given one of the myriad supervisory roles other junior male attorneys were or why she was not promoted to a Level 5 thus, once again, there is no pretext to rebut. (Def. MSJ 13:19-14:12; Chandler ¶¶18, 38).

**Blumberg:** Defendants are unable to explain why asking attorneys to clean an office that has limited janitorial service is so offensive that Blumberg is unfit to supervise, especially in light of the fact that Becton requires attorneys to clean the common areas. (Redmond Decl. ¶54, Blumberg ¶¶31 47). Blumberg was not put on notice of any such complaints and such reasons appear to be contradicted by the positive praise Blumberg received on her 360 evaluation. It is another example of the types of complaints that disqualify female supervisors, but worse complaints do not disqualify male supervisors. (*Id.* ¶53). Defendants failed to shift the burden to Plaintiffs Henderson, Chandler, and Piersig by offering legitimate rationales for their adverse employment actions. Given that each established a prime face case of discrimination, summary judgment is not appropriate. Plaintiffs Knox and Blumberg have provided numerous examples of why Defendants' justifications are not credible considering the factual evidence establishing pretext, thereby defeating Defendants' motion.

### D. Defendants Failed to Prevent Discrimination.

The FEHA makes liable an employer that fails to take all reasonable steps necessary to prevent discrimination and harassment from occurring in the workplace. Cal. Gov't Code § 12940(k). To state a prima facie case of failure to prevent discrimination or harassment, a plaintiff must show that (i) plaintiff was subjected to discrimination, harassment or retaliation, (ii) which

defendant failed to take all reasonable steps to prevent the discrimination, harassment or retaliation, and (iii) which caused plaintiff harm. *See Leland v. City & Cnty. of San Francisco*, 576 F. Supp. 2d 1079, 1103 (N.D. Cal. 2008); *see also Achal*, 114 F. Supp. 3d 781, 804 (N.D. Cal. 2015) (citing *Trujillo v. N. Cty. Transit Dist.*, 63 Cal. App. 4th 280, 289 (1998)).

Defendants argue that after the Plaintiffs filed their DFEH charges they took immediate action. (Def. MSJ 29:25-30:2). The filing of a DFEH does not initiate Defendants' obligation to investigate and remediate discrimination; that obligation is triggered when the Defendant first learns of a claim of discrimination, which it did through the numerous complaints of discrimination Plaintiffs made to Becton, Johnson, and other senior leaders in the office, and it was acknowledged by Becton that the office had a history of gender discrimination. An employer cannot wait for a formal charge to be filed to investigate claims of discrimination. Rather, "[t]he employer's duty to prevent harassment and discrimination is affirmative and mandatory." *Northrop Grumman Corp. v. Workers' Comp. Appeals Bd.*, 103 Cal. App. 4th 1021, 1035 (2002).

Defendants acknowledge that all the Plaintiffs filed DFEH charges, but then admitted that they only investigated Knox's claims. While Piersig complained about discrimination and harassment by her former supervisor Derek Butts almost four years ago, no investigation was initiated, and no other action was taken by Defendants. Piersig asked Defendants multiple times for resolution regarding these complaints, has never received any response, and Derek Butts continues to supervise not only her, but others. (Piersig Dec., ¶¶23-28). Chandler also complained about Butts, (Chandler ¶23); however, two women, complaining of the same gendered and discriminatory behavior from the same man never warranted an investigation, much less removing this man from his supervisory role.  As further evidence that Defendants did not meet their obligation to prevent discrimination, in September 2021, Jun Fernandez, a male Deputy District Attorney sent a discriminatory and retaliatory email disparaging Chandler to multiple people, including Chandler's supervisor.[6] Chandler complained and Defendants did not acknowledge Chandler's complaint for three months. When they finally did, Chandler asked to be transferred away from the perpetrator and

---

[6] Defendants claim to have investigated but provide zero details of how it was investigated, what was done, and prevention measures that were put in place. Defendants fail to even identify dates related to the "investigation." (Chan Decl. ¶14-16).

**PLTFS' OPP TO DEF'S MSJ**
*Knox, et. al v. County of Contra Costa et.*

NICHOLS LAW, P.C.
75 BROADWAY, SUITE 202
SAN FRANCISCO, CALIFORNIA 94111

1    back to the Martinez office. Defendants refused, claiming no open positions existed. Days later,

2    however, Defendants issued a transfer memo moving a similarly situated male to a role in Martinez

3    that Chandler was qualified for. Defendants' failure to take her complaint seriously, remedy the

4    discriminatory environment, or transfer her to a unit free of discrimination forced Chandler to resign

5    and amounts to effective termination. (Chandler Decl. ¶¶49-57.)

6         Henderson raised concerns about lack of female leadership. Cabral claimed it had been noted.

7    (Henderson Decl. ¶39). Carla Ocodhain, a former Contra Costa County intern, also complained of

8    age discrimination. (Ocodhain Decl. ¶¶1-11). Melissa Smith, a former fifteen-year Contra Costa

9    County Prosecutor, complained of gender discrimination and was ignored and retaliated against.

10   (Smith Decl. ¶11). Phyllis Redmond, a former 30-year Contra Costa County Prosecutor, and Chief

11   Assistant at the time of her early retirement complained of unfair treatment and retaliation. (Redmond

12   Decl. ¶¶2, 47-52.)   Despite having widespread knowledge of a long and pervasive history of

13   discrimination, the Office had few policies, objective criteria, or established and known procedures

14   to safeguard against discrimination.  In addition, the Office's purported complaint and investigation

15   process was pro forma and conducted no meaningful investigations.  This was true to such an extreme

16   level that there was no documentation of the 15 alleged complaints about Knox and even DA Becton

17   testified that she did not know if the office had a complaint procedure for workplace complaints.

18   (Nichols Decl. ¶2, Ex. A at 455:18).

19        "[W]hether an employer sufficiently complied with its mandate to 'take immediate and

20   appropriate corrective action' is a question of fact." *M.F. v. Pacific Pearl Hotel Mgmt,* (2017) 16

21   Cal.App.5th 693, 701 (internal citation omitted.)  Plaintiffs' discrimination claims survive summary

22   judgment and Defendants' failure to investigate discrimination and retaliation claims, despite

23   multiple complaints from multiple sources, are similarly not appropriate for summary judgment.

24   Whether the investigation Defendants claim to have engaged in and whether Defendants took

25   immediate and corrective action are questions of fact. As such Defendants' motion for summary

26   judgment on Plaintiffs' failure to prevent discrimination claims must be denied.

27        //

28        //

NICHOLS LAW, P.C.
75 BROADWAY, SUITE 202
SAN FRANCISCO, CALIFORNIA 94111

27

**E. Plaintiffs Faced an Avalanche of Retaliation After They Attempted to Improve the Conditions of the Office By Reporting Incidents of Discrimination**

"To assert a prima facie retaliation claim under FEHA, 'the plaintiff must show that he engaged in a protected activity, his employer subjected him to adverse employment action, and there is a causal link between the protected activity and the employer's action.'" *Strother v. S. Cal. Permanente Med. Grp.*, 79 F.3d 859, 868 (9th Cir. 1996) (quoting *Flait v. N. Am. Watch Corp.*, 3 Cal. App. 4th 467, 476 (1992)). Even if Plaintiffs' discrimination allegations fail, their retaliation claims can still survive.

Defendants retaliated against Knox for complaining of discrimination, harassment and filing this lawsuit by: 1) failing to promote her, 2) failing to assign her a prestigious role in the office, 3) keeping her in an assignment beneath her experience level for longer than normal, 4) refusing to give her a supervisory role.  (Knox Decl., ¶¶35, 38, 40, 49, 51).

Defendants retaliated against Piersig for complaining of discrimination, harassment, and filing this lawsuit by: 1) transferring her out of homicide instead of transferring her harasser, Derek Butts and allowing him to continue supervising her, 2) allowing her harasser, Derek Butts to give her a poor performance review after her complaint, 3) using the poor performance review in this case to justify its actions towards her, and 4) failing to promote her in summer of 2021 to a level 5 even though she met the qualifications. (Piersig Decl., ¶¶23-28).

Defendants retaliated against Chandler for complaining of discrimination and filing this lawsuit by: 1) moving her to an office with less visibility under the pretext that she would be allowed to supervise, not allowing her to supervise but making her move anyway; 2) giving the supervisory role she had been promised to a male and for years refusing to give her a different supervisor role; 3) requiring her to work one and a half assignments, no male in that role has ever been asked to do that, 4) stripping her of a very prestigious, career altering, and once in a lifetime capital murder case after she complained of a discriminatory assignment, 5) failing to promote her in summer of 2021 to a level 5 even though she met the qualifications, 6) allowing a male to publicly disparage her in an email without suffering any retribution or even acknowledgement from management, the ongoing

NICHOLS LAW, P.C.
75 BROADWAY, SUITE 202
SAN FRANCISCO, CALIFORNIA 94111

28

NICHOLS LAW, P.C.
75 BROADWAY, SUITE 202
SAN FRANCISCO, CALIFORNIA 94111

1   discrimination and retaliation forced Chandler to resign in February 2022. (Chandler Decl. ¶¶23, 30-
2   33, 36-38, 46, 48-57.)

3          Defendants retaliated against Henderson for complaining of discrimination, harassment,
4   filing this lawsuit and speaking honestly during an investigation into discrimination by 1) failing to
5   promote her in summer of 2021 to a level 5 even though she met the qualifications, and 2) refusing
6   to give her the Sexual Assault Unit supervisory role, a gateway to a Level 5 position.[7] (Henderson
7   Decl. ¶¶52, 53).

8          Defendants retaliated against Blumberg for complaining of discrimination and filing this
9   lawsuit by 1) failing to allow her to be on the Recruitment Committee; 2) refused to give her part-
10  time position; 3) failing to promote her in summer of 2021 to a Level 5 even though she met the
11  qualifications, 4) failing to move her to a supervisory role.  (Blumberg Decl., ¶¶12, 20, 41, 42, 54).

12  **F.     Even If the Court Finds That Ms. Becton Did Not Act with A Discriminatory Animus,
        Defendants Are Still Liable Under A Cat's Paw Theory Because Ms. Becton's Decision-
13      Making Was Influenced By Men Who Benefitted From The Discrimination.**

14         In *Staub v. Proctor Hospital*, Justice Antonin Scalia wrote, "[w]hen the company official
15  who makes the decision to take an adverse employment action is personally acting out of hostility
16  to the employee's membership in or obligation to a uniformed service, a motivating factor obviously
17  exists. The problem we confront arises when that official has no discriminatory animus but is
18  influenced by previous company action that is the product of a like animus in someone else." 562
19  U.S. 411, 417-18 (2011). Since a supervisor is an agent of the employer, when he causes an adverse
20  employment action the employer causes it; and when discrimination is a motivating factor in his
21  doing so, it is a "motivating factor in the employer's action," precisely as the text requires.

22         Here, Becton admitted that the DA's office was an old boy's network prior to her arrival
23  (Nichols Decl. ¶2, Ex. B at 303:10-20, 305:13- 306:6). Becton then used tools from that old boy's
24  network to make employment decisions. Johnson also testified that the office had a history of being
25  predominately white and male. Becton then promoted individuals who "had the respect of the office"
26  allowing the same gender discrimination that previously existed to influence her opinion in
27  promoting.  Further, Cabral who was admittedly part of the old boy's network, remained in his

28

[7] Graves, Walpole, and Gleason have each been promoted from Sexual Assault to a Level 5.

**PLTFS' OPP TO DEF'S MSJ**
*Knox, et. al v. County of Contra Costa et.*

position with an outsized influence on the decision-making process and who Becton considered to have the respect of the office, despite a very public and humiliating verbal lashing by the unit supervisors and the team he supervised. Cabral used complaints made by attorneys who were no longer in the office, before Becton's arrival as justification for declaring Knox unfit to supervise. (Nichols. Decl. ¶4, Ex .C at 115:13-124:1). At his deposition, Cabral could not keep the disdain he felt toward who Becton called the "self-described" senior women. (*Id*. at 51:17-57:8, 142:5-146:23, 233:6-236:15). It was the subjective criteria of someone who benefitted from the longstanding discriminatory behavior of the office that influenced decisions at all levels. Of note, only two out of the eight senior women remain at the DA's office, Knox and Georgiou.

Cabral claims Knox received "several complaints" and named two. (Def. MSJ 10:25-11:11.) Redmond explained that any criticism Knox had of Lopez's work performance was justified. (Redmond Decl. ¶38). Defendants also cite Knox's performance review from 2015[8], done by Kensok and MacMaster; all three men were the top decision makers in the previous administration, continuing the historically discriminatory office practices. Walpole stated he was keeping a list of complaints regarding a female attorney to discredit her, revealing his inner motivation to influence Becton and he did this to both Smith and Henderson. (Henderson Decl. at ¶69).

## V.    CONCLUSION

Each of the Plaintiffs have suffered numerous adverse actions and Defendants' justifications for those actions and why similarly situated individuals were treated more favorably have significant issues of credibility and believability. There are clearly issues of disputed material facts and therefore Defendants' Motion for Summary Judgment should be denied.

Dated: March 31, 2022          By: _____*/s/ David S. Ratner*_____

David S. Ratner
Shelley A. Molineaux
**Ratner Molineaux, LLP**

Sarah R. Nichols
Meeta T. Dama
**Nichols Law, P.C.**
*Attorney for Plaintiffs*

---

[8] However, there is no evidence that Becton relied on this in coming to any decisions.

30

NICHOLS LAW, P.C.
75 BROADWAY, SUITE 202
SAN FRANCISCO, CALIFORNIA 94111