UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Case No.  20-cv-01449-JCS

MARY ELIZABETH KNOX, et al.,

Plaintiffs,

v.

CONTRA COSTA COUNTY, et al.,

Defendants.

**ORDER RE:**

1) **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT**
2) **DEFENDANTS' MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF PLAINTIFFS' EXPERT DR. PETER GLICK**
3) **PLAINTIFFS' MOTION FOR SANCTIONS FOR VIOLATION OF THE PROTECTIVE ORDER**

Re: Dkt. Nos. 95, 96, 101

## I.    INTRODUCTION

Plaintiffs Mary Elizabeth Knox, Rachel Piersig, Alison Chandler, Mary Blumberg and Jill Henderson, who are or were deputy district attorneys in the Contra Costa County District Attorney's Office ("DA's Office" or "Office"), bring this action against Contra Costa County and the DA's Office asserting claims of gender and age discrimination.  Presently before the Court are: 1) Defendants' Motion For Summary Judgment Or, Alternatively, Partial Summary Judgment ("Summary Judgment Motion"); 2) Defendants' Motion To Exclude Opinions And Testimony Of Plaintiffs' Expert Dr. Peter Glick ("Motion to Exclude"); and 3) Plaintiffs' Motion For Sanctions For Violation Of The Protective Order ("Sanctions Motion").  A hearing on the motions was held on June 10, 2022 at 9:30 a.m.

As described in more detail below, the parties' briefing on these motions was

disappointing.  At times, Defendants have made arguments that are clearly contrary to established law or the facts in the case.  On the other hand, Plaintiffs made almost no attempt in their briefing to define for the Court the parameters of their case – including the specific adverse employment actions on which they base their claims.  Indeed, at the hearing, the Court was forced to use the valuable time of counsel in this case, counsel in the other cases on calendar who were waiting for their matters to be called, and the Court, to list out and confirm the specific adverse employment actions at stake in this case.  Finally, it is clear from the briefing that many (but not all) of the adverse employment actions extracted by the court at oral argument may be subject to dismissal on summary judgment based on the look-back periods under FEHA or Title VII.  Unfortunately, neither party grappled with that issue on an adverse employment action by adverse employment action basis.  The Court, as described below, will order further briefing on that issue.  However, the parties should know that, in the future, the failure to raise an issue in sufficient detail may result the court holding that the argument has been waived.  The Court's rulings are set forth below.[1]

## II.      BACKGROUND

This action was initiated on February 26, 2020. Plaintiffs filed the Second Amended Complaint ("SAC"), which is the operative complaint, on March 22, 2021.   In the SAC, Plaintiffs assert the following claims: 1) gender discrimination in violation of California's Fair Employment and Housing Act, Cal. Gov't Code §12940 ("FEHA") (asserted by all Plaintiffs against all Defendants); 2) age discrimination in violation of FEHA (asserted by Plaintiffs Knox, Piersig, Chandler and Henderson against all Defendants); 3) failure to take action to prevent discrimination and retaliation based on gender in violation of FEHA (asserted by all Plaintiffs against all Defendants); 4) retaliation for protected activity involving complaints about gender discrimination in violation of FEHA (asserted by all Plaintiffs against all Defendants); 5) gender discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. (asserted by all Plaintiffs against all Defendants); 6) age discrimination in violation of the Age

---

[1] The parties have consented to the jurisdiction of a United States magistrate judge pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

1    Discrimination in Employment Act of 1967 (as amended, 29 U.S.C. §§ 621-634) ("ADEA")

2    (asserted by Plaintiffs Knox, Piersig, Chandler and Henderson against all Defendants); and 7)

3    retaliation for protected activity involving complaints about gender discrimination in violation of

4    Title VII (asserted by all Plaintiffs against all Defendants).

5          The SAC alleges that all five Plaintiffs exhausted their administrative remedies by filing

6    complaints with the California Department of Fair Employment and Housing ("DFEH") and

7    receiving right-to-sue letters.  SAC ¶¶ 13 (alleging Knox filed a complaint with DFEH on

8    September 4, 2019 and received a right to sue notice on the same date); 14 (alleging Piersig filed a

9    complaint with DFEH on August 23, 2019 and received a right-to-sue notice on the same date); 15

10   (alleging Chandler filed a complaint with DFEH on September 11, 2019 and received a right-to-

11   sue notice on the same date); 16 (alleging Blumberg filed a complaint with DFEH on November

12   21, 2019 and received a right-to-sue notice on the same date); 17 (alleging Henderson filed a

13   complaint with DFEH on May 14, 2020 and received a right-to-sue notice on the same date).  It is

14   undisputed that in her complaint to the DFEH, Chandler alleged discrimination on the basis of sex

15   and retaliation but did not allege she was discriminated against on the basis of her age. *See*

16   Declaration of John Fish in Support of Defendants' Motion for Summary Judgment or,

17   Alternatively, Partial Summary Judgment ("Fish MSJ Decl.") ¶ 2 & Ex. A.

18         It is also undisputed that Plaintiffs did not file complaints with the Equal Opportunity

19   Employment Commission ("EEOC") until November 2021, more than seven months after the

20   operative complaint in this case was filed and twenty-one months after the action was initiated.

21   *See* Fish MSJ Decl. ¶ 5 & Ex. C. In particular, Plaintiffs filed complaints with the EEOC as

22   follows: 1) Blumberg filed a complaint for age and sex discrimination and retaliation with the

23   EEOC on November 29, 2021; 2) Chandler filed a complaint for age and sex discrimination with

24   the EEOC on November 23, 2021; 3) Henderson filed a complaint for age and sex discrimination

25   and retaliation with the EEOC on November 23, 2021; 4) Knox filed a complaint for age and sex

26   discrimination with the EEOC on November 18, 2021; and 5) Piersig filed a complaint for age and

27   sex discrimination and retaliation with the EEOC on November 29, 2021.  *Id.*

28

United States District Court
Northern District of California

3

United States District Court
Northern District of California

### III.   SUMMARY JUDGMENT MOTION

#### A.   The Parties' Contentions

##### 1.   The Motion

In their Summary Judgment Motion, Defendants contend Plaintiffs' Title VII[2] claims must be dismissed as untimely as to most of the conduct alleged in the SAC because it falls outside of the 300-day limitations period under 42 U.S.C. § 2000e-5(e)(1), which applies to EEOC charges that were filed with the appropriate state enforcement agency.  Summary Judgment Motion at 15-17.  According to Defendants, because Plaintiffs filed their EEOC complaints in late November 2021, their federal claims must be based on conduct that occurred on or after late January 2021 to be timely.  *Id.* at 16.  In addition, they assert, any allegations of discriminatory conduct that occurred after the SAC was filed, in March 2021, cannot be considered because Plaintiffs did not amend their complaint to include allegations related to that conduct.  *Id.*  Thus, for example, even though Knox included allegations in her EEOC complaint about a failure to promote in the summer of 2021, that conduct is not included in the SAC and therefore cannot be considered, Defendants contend.  *Id.* at 16 n. 11.

Defendants also assert that the Court should dismiss Chandler's FEHA claims to the extent they are based on age discrimination or retaliation for protected activity related to age discrimination because they fall outside of the scope of her FEHA complaint (which alleged only age discrimination) and therefore were not properly exhausted.  *Id.*  at 17.

Defendants argue further that they are entitled to summary judgment on Plaintiffs' claims because Plaintiffs cannot demonstrate any genuine dispute of fact as to discriminatory intent under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  *Id.* at 17.  In particular, Defendants contend Plaintiffs cannot produce enough evidence to

---

[2] Although Defendants assert generally in the introduction of the Motion that Plaintiffs' ADEA claims are also time-barred, they did not brief this argument in their Summary Judgment Motion except as to Chandler, who did not include age discrimination in her DFEH charge.  *See* Motion at 2 (stating that ADEA claims are time-barred), 15-17 (addressing timeliness of Title VII claims and Chandler's age discrimination claim).  Therefore, except for Chandler's age discrimination claims, the Court does not address whether its conclusions relating to the timeliness of Plaintiffs' Title VII claims also apply to Plaintiffs' ADEA claims.

1    make a prima facie case of discriminatory intent and that even if they could, they cannot point to

2    "significant, substantial evidence" that Defendants' legitimate and non-discriminatory reasons for

3    their conduct were pretextual. *Id.* at 18.

4        According to Defendants, Plaintiffs' claims are based on four categories of conduct: "(1)

5    complaints about lateral assignments (Level 4 to Level 4); (2) alleged exclusion from committee

6    membership and training positions; (3) Knox's demotion from Level 5 to Level 4 ; and (4) an

7    alleged failure to promote Knox, Piersig and Henderson from Level 4 to Level 5." *Id.*  They argue

8    that Plaintiffs' claims fail as a matter of law as to the lateral assignments and exclusions from

9    committee memberships and training positions because they "did not involve a demotion,

10   reduction in pay, loss of benefits, a less distinguished title or a notable change in hours

11   worked" and therefore, were not adverse employment actions under federal or California law,

12   which is a required element for making a prima facie case of discrimination. *Id.* at 18-19.

13       Defendants further contend Plaintiffs' discrimination claims fail even as to the adverse

14   employment actions that remain because there is no dispute that Defendants had legitimate, non-

15   discriminatory reasons for their actions and Plaintiffs cannot point to specific and substantial

16   evidence that these reasons are pretext. *Id.* at 19-23. In particular, Defendants concede that

17   Knox's demotion in 2018 is an adverse employment action but argue the discrimination claims

18   asserted on the basis of that demotion nonetheless fail as a matter of law because Defendants had a

19   legitimate, non-discriminatory reason for the demotion, namely, that "Knox had a poor reputation

20   when it came to trust and chain of command" and "DA Becton had been notified about several

21   complaints by attorneys who feared retaliation by Knox and she [therefore] had reasons to

22   conclude Knox was not trustworthy." *Id.* at 23.  Further, Defendants assert, the "evidence

23   overwhelmingly shows that the demotion was justified because she was not qualified to be a part

24   of DA Becton's executive management team."  *Id.* Defendants note that "DA Becton has made at

25   least four demotion decisions since she became DA, and three of the four were men."  *Id.*

26   Therefore, Defendants contend, there is no evidence that Knox's demotion was a result of gender

27   bias.  *Id.* Likewise, Defendants contend, Plaintiffs cannot establish that Knox's demotion was a

28   result of age discrimination because "DA Becton's entire leadership team (with the exception of

United States District Court
Northern District of California

one 38 year-old) has always consisted of individuals over 40 years old." *Id.* at 23-24 (citing Chan Decl., Ex. K). According to Defendants, Knox's "suggestion that DA Becton harbors a bias based on age and gender is baseless, particularly considering DA Becton is also a woman (and age 70) who has been a champion for diversity throughout her career." *Id.* at 24.

Defendants also assert that Chandler and Blumberg did not apply for the Level 5 promotion in April 2019, and therefore they cannot claim that they were denied this promotion based on their age and gender. *Id.* Moreover, they contend, although Knox, Henderson, and Piersig *did* apply for Level 5 promotion in April 2019, their claims for failure to promote fail as a matter of law because there were legitimate nondiscriminatory reasons they were not promoted. *Id.* In particular, Defendants assert, DA Becton chose to promote Simon O'Connell and Stacey Grassini (both male) instead because those candidates demonstrated a willingness to implement her vision and policies for the Office and Becton listened to group discussions where it was found that Knox, Henderson and Piersig were not as qualified as O'Connell and Grassini. *Id.* at 24-25. Defendants argue further that Knox, Henderson and Piersig cannot point to any evidence that the reasons offered by Defendants are pretext and contend the use of subjective criteria is not sufficient to demonstrate pretext where, as here, the criteria related to legitimate business reasons. *Id.* at 25.

Next, Defendants argue that Plaintiffs' retaliation claims fail because there is no evidence that they engaged in protected activity, or that a causal link exists between any alleged protected activity and an adverse action. *Id.* at 26. As to Knox, Defendants note that she alleges Becton discriminated against her for supporting Becton's political adversary but contend "supporting an adversary in an election is not protected activity under Title VII or FEHA, and is irrelevant to her gender or age discrimination concerns." *Id.* Further, Defendants assert, Knox's only "protected activity" was the filing of her DFEH charge, this lawsuit, and her EEOC charge but all of these occurred after she was demoted and reassigned to the Level 4 Felony Filer position. *Id.* Therefore, Defendants assert, Knox cannot establish a causal connection between those protected activities and her demotion and reassignment. *Id.* As to Knox's transfer to the Elder Abuse Unit in 2021, Defendants argue this cannot provide a basis for her retaliation claims because that is not an

1   adverse employment action.  *Id.*

2        As to Piersig and Chandler, although they allege that they complained to Assistant DA

3   Johnson in 2018, these allegations are not sufficient to support their retaliation claims, Defendants

4   assert, because their complaints were only general complaints about mismanagement and did not

5   specifically raise mistreatment on the basis of gender, age, or any other protected status.  *Id.* at 27

6   (citing SAC ¶ 118(b)(i)).  Defendants also reject Piersig's allegation that after filing the Complaint

7   in this case she received a "retaliatory" performance review from her supervisor, arguing that there

8   "is no evidence showing why it was retaliatory or that her supervisor even had knowledge of her

9   Charge or Complaint."  *Id.*

10       Defendants contend Henderson's retaliation claim also fails, asserting that in deposition

11  Henderson testified only "that she spoke to DA Becton and Chief Johnson about wanting a

12  promotion and about promoting diversity in the Office in general, but did not make any formal

13  complaint or otherwise put either DA Becton or Chief Johnson on notice of alleged

14  discrimination."  *Id.* at 28 (citing Fish MSJ Decl., Ex. L (Henderson Dep.) at 61:02-63:14).

15       Defendants argue that Blumberg's retaliation claim fails because the only protected

16  activity she engaged in was the filing of her DFEH and EEOC charges and this lawsuit and the

17  "only adverse action that Plaintiff Blumberg alleges took place since that time was her

18  lateral transfer from one Level 4 position to another Level 4 position (she did not apply for a

19  promotion to Level 5)."  *Id.*  But again, Defendants assert, a lateral transfer is not an adverse

20  employment action and therefore cannot support a retaliation claim.  *Id.*

21       Finally, Defendants argue that Plaintiffs' FEHA claims for failure to prevent

22  discrimination are derivative of their discrimination claims and therefore fail for the same reasons

23  their underlying discrimination claims fail.  *Id.* at 29.  Further, they assert, the undisputed facts

24  establish that they took "reasonable steps to prevent discrimination by conducting a prompt

25  investigation of Plaintiffs' claims."  *Id.* at 29-30.  They also point to evidence that they "maintain

26  anti-discrimination policies and educate employees on the County's anti-discrimination policies

27  and how to report any instances of discrimination."  *Id.*  at 30 (citing Chan Decl., Exs. L-M).

28

United States District Court
Northern District of California

### 2. Opposition

In their Opposition, Plaintiffs reject Defendants' exhaustion argument, arguing that Defendants waived the defense by failing to timely assert it. Opposition at 15-16. Alternatively, they contend the DFEH charges are sufficient because of the worksharing agreement that exists between the DFEH and the EEOC. *Id.* at 16-17 (citing 29 CFR §1601.1301; Nichols Decl. ¶7, Ex. F at section II, subsection A). Even if their Title VII and ADEA claims fail for lack of exhaustion, Plaintiffs argue that the Court should exercise supplemental jurisdiction over their state law claim. *Id.* at 17. Plaintiffs also argue that because their claims are based on a "pattern and practice" of conduct, they are timely so long as one act occurred within the "look-back period." *Id.* at 17-19. According to Plaintiffs, their claims are timely even as to the conduct that occurred before the look-back period because they have alleged multiple adverse employment actions in 2021 and these are part of an ongoing hostile work environment. *Id.* at 18 (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002); *Harris v Forklift Sys, Inc*. 510 U.S. 17, 21 (1993)).

Plaintiffs further assert that they have established a prima facie case of age and gender discrimination because the evidence shows that each plaintiff: 1) was qualified to be promoted, to perform supervisory duties and assigned to committees that would lead to further career advancement; and 2) suffered significant adverse employment actions. *Id.* at 19-20. They argue that "[a]dverse employment actions have been held to come in different shapes and sizes depending on the circumstances of the case" and that where, as here, the plaintiffs are employed by a civil service merit system that can offer only limited rewards for a job well done, "[p]ay cuts or demotion . . . should not be the only parameters by which the court judges the occurrence of an adverse employment action." *Id.* at 20. According to Plaintiffs, adverse employment actions can include "warning letters, transfers of job duties, undeserved performance ratings . . . , lateral transfers . . . , disadvantageous transfers or assignments, refusals to promote, . . . moving a person from a spacious, brightly lit office to a dingy closet, depriving the person of previously available support services [and] cutting off challenging assignments[.]" *Id.* at 20 (citations omitted).

There is no bright-line rule for defining what constitutes an adverse employment action, Plaintiffs contend. *Id.* at 21. Instead, "any 'adverse treatment that is reasonably likely to impair a

1   reasonable employee's job performance or prospects for advancement or promotion falls within

2   the reach of the antidiscrimination provisions of sections 12940(a) and 12940(h).' "  *Id.* (quoting

3   *Yanowitz v. L'Oreal USA, Inc*, 36 Cal. 4th 1028, 1052 (2005)).  According to Plaintiffs, the

4   transfers in this case involved moves to jobs that diminished Plaintiffs' opportunities and

5   therefore, there were multiple adverse employment actions taken against them.  *Id.*  They further

6   assert that they have offered evidence of multiple examples in which similarly situated individuals

7   outside of the protected classes were treated more favorably than Plaintiffs.  *Id.* at 22-23.

8   Moreover, they contend, Defendants cannot rely on evidence of other women being treated more

9   favorably than Plaintiffs as such evidence does not meet Defendants' burden.  *Id.* at 23 (citing

10  *Bush v. Commonwealth Edison Co*., 990 F.2d 928, 931 (1993)).  Plaintiffs argue further that the

11  evidence is sufficient to show that Defendants' proffered reasons for their conduct are not credible

12  and are pretextual.  *Id.* at 23-25.

13       Plaintiffs reject Defendants' assertion that their failure to prevent discrimination claims fail

14  because Defendants' response to Plaintiffs' complaints was sufficient. *Id.*  at 25-27.  Instead, they

15  contend the "Office's purported complaint and investigation process was pro forma and [it]

16  conducted no meaningful investigations."  *Id.* at 27.  According to Plaintiffs, "[t]his was true to

17  such an extreme level that there was no documentation of the 15 alleged complaints about Knox

18  and even DA Becton testified that she did not know if the office had a complaint procedure for

19  workplace complaints."  *Id.* (citing Nichols Decl. ¶2, Ex. A at 455:18).

20       Finally, Plaintiffs contend they faced "an avalanche of retaliation" after they reported

21  incidents of discrimination and therefore summary judgment should be denied as to their

22  retaliation claims.  *Id.* at 29.  Moreover, they assert, even if DA Becton herself was not motivated

23  by discriminatory animus, Defendants are nonetheless liable for discrimination under a "cat's

24  paw" theory.[3] *Id.* (citing *Staub v. Proctor Hospital*, 562 U.S. 411, 417-18 (2011)).  In particular,

25

26  ───────────────

27  [3]Under a "cat's paw" theory, an employer may be held liable for discriminatory conduct "if a
    supervisor performs an act motivated by [discriminatory] animus that is intended by the supervisor
    to cause an adverse employment action, and if that act is a proximate cause of the ultimate
28  employment action" even if the supervisor was not the ultimate decision-maker with respect to the
    discriminatory act.   562 U.S. at 422.

United States District Court
Northern District of California

1    according to Plaintiffs, Becton "admitted that the DA's office was an old boy's network prior to

2    her arrival and . . . used tools from that old boy's network to make employment decisions." *Id.*

3    (citing Nichols Decl. ¶2, Ex. B at 303:10-20, 305:13- 306:6).

4                **3. Reply[4]**

5        In their Reply, Defendants reject Plaintiffs' arguments contending their claims are not

6    time-barred and reiterate their assertion that to the extent Plaintiffs' claims survive, they fail as a

7    matter of law because the undisputed material facts show that they cannot establish discrimination,

8    retaliation, or failure to prevent discrimination.  Reply at 1.

9        First, Defendants challenge Plaintiffs' argument that they have waived the defense that

10   Plaintiffs' claims are time-barred to the extent they are based on conduct that occurred before

11   January 2021.  *Id.* at 2.  Defendants argue that they asserted the defense promptly, pointing out

12   that in their Answer, their Seventh Affirmative Defense alleges that "the Complaint and each

13   cause of action set forth therein cannot be maintained to the extent that Plaintiffs failed to timely

14   invoke and/or exhaust their administrative remedies." *Id.* (quoting dkt. nos. 61 (Defendants'

15   Answer to Plaintiffs' Second Amended Complaint), 90 (First Amended Answer to Plaintiffs'

16   Second Amended Complaint)). Defendants further assert that their failure to raise the affirmative

17   defense in their motions to dismiss did not waive the defense.  *Id.* (citing *United States v. Valdez*,

18   195 F.3d 544, 548 (9th Cir. 1999); *Parker v. United States*, 110 F.3d 678, 682 (9th Cir. 1997)).

19   According to Defendants, at the time they filed the motions to dismiss, "they were not aware that

20   Plaintiffs had failed to timely file their EEOC Charges because no discovery had been conducted."

21   *Id.*

22       Defendants argue that Plaintiffs' reliance on a worksharing agreement between DFEH and

23   the EEOC to argue that they sufficiently exhausted their Title VII claims is misplaced. *Id.* at 3.

24   They point out that Plaintiffs' right-to-sue letter from the DFEH expressly stated that "[t]o obtain a

25

26   _____

27   [4] Defendants have filed a separate document containing evidentiary objections to evidence
     submitted by Plaintiffs in support of their opposition brief.  Dkt. no. 103-2.  Because that
     document is in violation of Civil Local Rule 7-3(c) ("Any evidentiary and procedural objections to
28   the opposition must be contained within the reply brief or memorandum"), that document is
     STRICKEN.

United States District Court
Northern District of California

10

United States District Court
Northern District of California

federal Right to Sue notice, you must contact the U.S. Equal Employment Opportunity Commission (EEOC) to file a complaint within 30 days of receipt of this DFEH Notice of Case Closure or within 300 days of the alleged discriminatory act, whichever is earlier." *Id.* (quoting Fish MSJ Decl., Ex. A). They also assert that the worksharing agreement Plaintiffs offered as an exhibit in support of their opposition brief was for the wrong EEOC office (Los Angeles rather than San Francisco, where Plaintiffs filed their DFEH complaints) and that even if that agreement applied, they did not use the form specified in the agreement for dual-filing of charges with DFEH and the EEOC. *Id.* at 3 n. 2.

Defendants contend Plaintiffs "muddy the waters" by relying on hostile work environment cases to argue "that they are entitled to look back past the statute of limitations as long as one act occurred within the appropriate 300 days." *Id.* at 3. According to Defendants, it is improper to conflate a "pattern and practice" with a hostile work environment in this manner because Plaintiffs do not assert any claims for a hostile work environment and therefore, the continuing violation doctrine that may apply to such claims does not apply to Plaintiffs' claims. *Id.* at 3-4. Instead, Defendants assert, Plaintiffs' claims involve discrete acts, which cannot be combined to create a single act for the purposes of timeliness. *Id.* Therefore, Plaintiffs' Title VII claims are time-barred, Defendants contend. *Id.* at 4.

With respect to Plaintiffs' remaining claims, Defendants reiterate their assertion that Plaintiffs have not alleged adverse employment actions within the relevant time period, that is, within 300 days of the date they filed their EEOC charges, arguing that Plaintiffs' assertions to the contrary are vague and do not explain how the specific facts support their contention. *Id.* at 4. They reject Plaintiffs' argument that the lateral transfers in this case were adverse employment actions, arguing that while "Plaintiffs claim their lateral assignments had a material impact on their employment because not all lateral assignments are equal, [they] do not cite any evidence in support of this statement." *Id.* at 5. Instead, they argue, the undisputed evidence establishes that Plaintiffs were given "important roles" within the office:

> Knox was a Felony Filer until she was moved to oversee the Elder Unit at the suggestion of co-Plaintiff Henderson; Blumberg was moved to the "plum" assignment in Homicide until she requested a

1
2
3
4
5

> transfer; Henderson became the Domestic Violence Supervisor in addition to the Elder Abuse Supervisor and with the increased responsibilities supervised six attorneys, not just one; Piersig went from Homicide to her first supervisorial role as Felony Expeditor until she was offered—and accepted—becoming the Domestic Violence Supervisor upon Henderson's extended leave; and Chandler was transferred (at her request) out of Homicide to Felony Filer, and then to Felony Expeditor, the supervisorial role (her first) she expressly asked for just two years earlier.

6
7
8

*Id.* According to Defendants, "Plaintiffs do not dispute that these assignments did not result in 'substantial or tangible' harm to them, and have not made any showing that these assignments impaired their job performance or prospects for advancement." *Id.* at 5.

9
10
11
12
13
14
15

Defendants further contend there is no evidence that similarly situated individuals outside of Plaintiffs' protected class were treated more favorably and that Plaintiffs improperly ignore evidence that "throughout DA Becton's tenure, women received the majority of promotions to executive management positions and men received the majority of demotions" and that "with the exception of one 38 year-old, [Becton's] executive management has always consisted of individuals over 40 years old." *Id.* at 6-7. Similarly, Defendants argue that Plaintiffs fail to present specific and substantial evidence of pretext. *Id.* at 8-12.

16
17
18
19
20
21
22
23

Defendants reiterate their arguments that Plaintiffs' claims for failure to prevent discrimination and retaliation fail as a matter of law. *Id.* at 12-14. They also reject Plaintiffs' "cat's paw" theory, which they contend is typically applied where a supervisor rubber-stamped a subordinate's discriminatory act. *Id.* at 14-15. According to Defendants, "[m]erely alleging that the Office was 'an old boy's network' is not sufficient to show that DA Becton's decisions were actually motived by other's discriminatory animus, and without such proof, Plaintiffs cannot succeed on their 'cat's paw' theory." *Id.* at 15 (citing *Acosta v. Brain*, 910 F.3d 502, 514-15 (9th Cir. 2018)).

24

**B.    Legal Standards Under Rule 56 of the Federal Rules of Civil Procedure**

25
26
27
28

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-

United States District Court
Northern District of California

1    moving party's claim, or to a defense on which the non-moving party will bear the burden of

2    persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

3         Once the movant has made this showing, the burden shifts to the party opposing summary

4    judgment to designate "'specific facts showing there is a genuine issue for trial.'" *Id.* (citation

5    omitted); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely disputed

6    must support the assertion by . . . citing to particular parts of materials in the record . . . ."). "[T]he

7    inquiry involved in a ruling on a motion for summary judgment . . . implicates the substantive

8    evidentiary standard of proof that would apply at the trial on the merits." *Anderson v. Liberty*

9    *Lobby Inc.*, 477 U.S. 242, 252 (1986). Under Rule 56, this burden can be satisfied by either:

10        (A)  citing to particular parts of materials in the record, including
11             depositions, documents, electronically stored information,
             affidavits or declarations, stipulations (including those made for
12             purposes of the motion only), admissions, interrogatory answers,
             or other materials; or

13
14        (B)  showing that the materials cited do not establish the absence or
             presence of a genuine dispute, or that an adverse party cannot
15             produce admissible evidence to support the fact.

16   Fed. R. Civ. P. 56(c)(1).

17        The non-moving party has the burden of identifying, with reasonable particularity, the

18   evidence that precludes summary judgment. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).

19   A party need not present evidence to support or oppose a motion for summary judgment in a *form*

20   that would be admissible at trial, but the *contents* of the parties' evidence must be amenable to

21   presentation in an admissible form. *See Fraser v. Goodale*, 342 F.3d 1032, 1036−37 (9th Cir.

22   2003). Neither conclusory, speculative testimony in affidavits nor arguments in moving papers

23   are sufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co.,*

24   *Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir. 1979).[5]

25   _____

26   [5] On the other hand, the Ninth Circuit has expressly rejected Defendants' assertion at the motion
     hearing that a declaration by the plaintiff must be supported by corroborating evidence to establish
27   a genuine dispute of material fact. *See Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497 (9th Cir.
     2015) (holding that the district court had erred in finding that the plaintiff's declaration was not
28   sufficient to establish genuine dispute of fact because the declaration was self-serving and

1    On summary judgment, the court draws all reasonable factual inferences in favor of the

2    non-movant, *Scott v. Harris*, 550 U.S. 372, 378 (2007), but where a rational trier of fact could not

3    find for the non-moving party based on the record as a whole, there is no "genuine issue for trial"

4    and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574,

5    587 (1986).

6

7    ### C.    Timeliness of Title VII Claims

8    #### 1.    Legal Standards Governing Exhaustion of Administrative Remedies and Timeliness

9    Pursuant to 42 U.S.C. § 2000e-5(e)(1), a Title VII plaintiff must file a charge with the

10   EEOC within 300 days "after the alleged unlawful employment practice occurred" if it occurred in

11   a State that has an entity with the authority to grant or seek relief with respect to the alleged

12   unlawful practice and the employee initially filed a grievance with that agency. *Nat'l R.R.*

13   *Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002). A claim is time-barred if it is not filed

14   within this time limit. *Id.* In *Morgan*, the Court explained that the application of this rule varies

15   depending on whether a claim is based on discrete discriminatory acts or a hostile work

16   environment. *Id.* at 110.

17   Where a claim is based on discrete acts, "[a] discrete retaliatory or discriminatory act

18   'occurred' on the day that it 'happened[ ]' " and therefore, a party "must file a charge within . . .

19   300 days of the date of the act or lose the ability to recover for it." *Id.* The *Morgan* Court

20   rejected the proposition that the use of the word "practice" in Section 2000e-5(e)(1) "converts

21   related discrete acts into a single unlawful practice for the purposes of timely filing." *Id.* at 111.

22   Thus, "discrete acts that fall within the statutory time period do not make timely acts that fall

23

24   _____

explaining that "[a]lthough the source of the evidence may have some bearing on its credibility
25   and on the weight it may be given by a trier of fact, the district court may not disregard a piece of
evidence at the summary judgment stage solely based on its self-serving nature"); *see also*
26   *M'Wanza v. Foster*, No. 314CV00331MMDWGC, 2017 WL 4172414, at *6 (D. Nev. Sept. 19,
2017), report and recommendation adopted, No. 3:14-CV-331-MMD-WGC, 2017 WL 6626310
27   (D. Nev. Dec. 28, 2017) (rejecting defendant's argument on summary judgment that the plaintiff's
declaration was insufficient to demonstrate a genuine dispute of material fact because it was not
28   corroborated by other evidence and finding that under *Nigro*, "[t]he weight to be assigned to [the
plaintiff's] statements [was] a function reserved for the jury at the time of trial.").

United States District Court
Northern District of California

outside the time period[,]" even if they are related.  *Id.* at 112-113.

In contrast, claims for a hostile work environment "are different in kind from discrete acts" because "[t]heir very nature involves repeated conduct."  *Id.*  at 115 (citations omitted).  Thus, where a plaintiff asserts a hostile work environment claim, the "unlawful employment practice" "cannot be said to occur on any particular day[,]" instead "occur[ing] over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own."  *Id.*  Because the "entire hostile work environment encompasses a single unlawful employment practice[,]" so long as "an act contributing to the claim occur[ed] within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability" under Section 2000e-5(e)(1).  *Id.*

### 2.  Discussion

Plaintiffs ask the Court to reject Defendants' timeliness defense on the basis that it is waived and argue that even if it is not, their Title VII claims are timely because their claims are based on a pattern and practice of discriminatory conduct.  Plaintiffs assert in the alternative that their Title VII claims are timely because there is a worksharing agreement between DFEH and EEOC and therefore, they exhausted their Title VII claims when they filed their complaints with DFEH and obtained right-to-sue letters, almost two years before they filed their complaints with the EEOC. The Court finds the first two arguments unpersuasive but agrees with Plaintiffs as to the third.

#### a.  Waiver

Plaintiffs have offered no authority that suggests that where, as here, a defense was timely asserted in a defendant's answer the defendant waives the defense by filing a motion to dismiss that does not raise the issue.   To the contrary, failure to raise an affirmative defense in a motion to dismiss generally does not waive the defense. *See United States v. Valdez*, 195 F.3d 544, 548 (9th Cir. 1999)  Further, while Defendants could have raised this issue on the pleadings, they nonetheless were diligent in pursuing discovery on the exhaustion question, propounding a request for production at the outset of discovery on the subject.  *See* Fish Supp. Decl. ¶ 2 & Ex. A. According to Defendants' counsel, Plaintiffs promised they would produce all responsive

1   documents but "failed to actually produce any documents" and it was "not until December

2   2021 . . . that Plaintiffs finally filed their EEOC Charges, which alerted the County that that they

3   were untimely." *Id.*

4        These circumstances are in marked contrast to the facts of *Fort Bend Cty. v. Davis*, 139 S.

5   Ct. 1843 (2019), the single case cited by Plaintiffs in support of their waiver argument.  In that

6   case, the plaintiff had asserted a religion-based discrimination claim but the defendant did not

7   raise the defense that she had not adequately exhausted that claim in her EEOC charge until years

8   later, after "an entire round of appeals all the way to the Supreme Court."  139 S. Ct. at 1848

9   (quoting 893 F. 3d 300, 307-308 (2018)). The Court affirmed the Fifth Circuit's holding that the

10  defense was waived, concluding that the charge-filing requirement was not jurisdictional and

11  therefore subject to forfeiture.  *Id.* at 1851.

12       Therefore, the Court concludes Defendants have not waived their defense based on

13  timeliness of Plaintiffs' EEOC charges.

14                    b.  Pattern and Practice

15       Plaintiffs assert that their Title VII claims are timely as to conduct that occurred more than

16  300 days before they filed their EEOC charges because conduct within that period was part of a

17  pattern and practice of discriminatory conduct.  This argument fails, however, because Plaintiffs'

18  complaint does not assert any claims based on a theory of hostile work environment, instead

19  asserting discrimination on the basis of discrete adverse employment actions.  As discussed above,

20  the Supreme Court made clear in *Nat'l R.R. Passenger Corp. v. Morgan* that in the case of such

21  claims, "discrete acts that fall within the statutory time period do not make timely acts that fall

22  outside the time period[,]" even if they are related.  536 U.S. at 112-113.

23                    c.  Worksharing Agreement

24       Plaintiffs contend they were excused from the statutory requirement that they file a charge

25  with the EEOC in accordance with 42 U.S.C.A. § 2000e-5(e)(1) because there is a worksharing

26  agreement between California's DFEH and EEOC under which each designates "the other as its

27  agent for the purpose of receiving and drafting charges, including those that are not jurisdictional

28  with the agency that initially receives the charges." Opposition at 16 (citing 29 CFR §1601.13

United States District Court
Northern District of California

16

United States District Court
Northern District of California

1   (2018); Nichols Decl. ¶7, Ex. F (2019 Worksharing Agreement), Section II.A). The Court agrees.

2          As a preliminary matter, although Defendants contend the worksharing agreement

3   provided by Plaintiffs is inapplicable because it is only between DFEH and the Los Angeles

4   District office of the EEOC, *see* Reply at 3 n. 2, the agreement is not so limited.  In particular,

5   though the caption of the agreement refers to the Los Angeles District Office and it is signed by

6   the director of the EEOC's Los Angeles District Office, the agreement itself refers generally to the

7   EEOC, stating at the outset:

8              In recognition of, and to the extent of the common jurisdiction and
9              goals of the two (2) Agencies, and in consideration of the mutual
              promises and covenants contained herein, the [DFEH]  and the EEOC
              hereby agree to the terms of this Worksharing Agreement, which is
10             designed to provide individuals with an efficient procedure for
              obtaining redress for their grievances under appropriate California
11             and Federal laws.

12  Nichols Decl., Ex. F, Section I.B. Moreover, the same agreement can be found on the DFEH

13  website, which includes a tab entitled "Work Share Agreements" that takes the user to a list of

14  links of what purport to be the worksharing agreements between the EEOC and the DFEH for each

15  year from 2008 through 2020, s*ee*  https://www.dfeh.ca.gov/ legalrecords/#workShareBody, and

16  includes a link entitled "EEOC Contract 2019" that takes the user to a pdf of the same document

17  provided by Plaintiffs in support of their Opposition brief.  The site also contains a link to a

18  document entitled "EEOC Contract FY 2020 Extension" that extends the 2019 agreement through

19  2020. [6]  Therefore, the Court concludes that Plaintiffs are correct that the 2019 Worksharing

20  Agreement cited in their Opposition is an agreement between the EEOC and DFEH generally and

21  applies to their DFEH charges.

22

23  ───────────────

24  [6]The Court takes judicial notice of the 2019 Worksharing Agreement and the 2020 extension of
    that agreement (which is relevant to Chandler's DFEH charge, filed May 14, 2020), because they
    are posted on the DFEH official website and thus are public records not subject to reasonable
25  dispute.  *See* Fed. R. Evid. 201(b); *see also Kennedy v. Columbus Mfg., Inc.*, No. 17-CV-03379-
    EMC, 2017 WL 4680079, at *4 (N.D. Cal. Oct. 18, 2017) (taking judicial notice of 2016
26  worksharing agreement between DFEH and EEOC posted on DFEH website); *LaNier v. United
    States*, No. 15-cv-00360-BAS-BLM, 2017 WL 4244621, at *3 n.2 (S.D. Cal. Sept. 25, 2017)
27  (taking judicial notice of the EEOC-DFEH workshare agreement from various years); *Saling v.
    Royal*, No. 2:13–cv–1039–TLN–EFB PS, 2015 WL 5255367, at *9 n.5 (E.D. Cal. Sept. 9, 2015)
28  (same); *Hause v. The Salvation Army*, No. CV 07-5249 CAS (CWx), 2007 WL 4219450, at *1 n.2
    (C.D. Cal. Nov. 27, 2007) (same).

The 2019 Worksharing Agreement provides that the EEOC and the DFEH may accept charges on behalf of each other, stating that "the EEOC and the [DFEH] each designate the other as its agent for the purpose of receiving and drafting charges . . ." *Id.* at p. 3, Section II.A. Further, Section II.B of the Worksharing Agreement provides:

> The FEPA[7] shall take all charges alleging a violation of Title VII, the ADEA, the EPA, GINA or the ADA where both the FEPA and the EEOC have mutual jurisdiction, or where the EEOC only has jurisdiction, so long as the allegations meet the minimum requirements of those Acts, and for charges specified in Section III. A. 1. below, refer them to the EEOC for initial processing.

*Id.*, Section II.B. Section III.A., in turn, covers charges under Title VII and the ADEA, as relevant here. *Id.,* Section III.A.

The Ninth Circuit has held that because of the worksharing agreements between the EEOC and DFEH,[8] plaintiffs who have filed a timely charge with DFEH may sue for discrimination under federal law, including Title VII, even where they did not file a charge with the EEOC or receive a right-to-sue letter from the EEOC and where the right-to-sue letter they received from the DFEH explicitly instructed them that they were required to file a charge with the EEOC. *Surrell v. California Water Serv. Co.*, 518 F.3d 1097, 1104 (9th Cir. 2008); *Stiefel v. Bechtel Corp.*, 624 F.3d 1240, 1245 (9th Cir. 2010).

In *Surrell*, the plaintiff (Surrell) filed a charge alleging race discrimination by her employer with the DFEH and received a right-to-sue letter stating that "[i]f a federal notice of Right–To–Sue is wanted, the [EEOC] must be visited to file a complaint within 30 days of this [notice] or within

---

[7] "FEPA" stands for Fair Employment Practices Agency and means "a State or local agency which the [EEOC] has determined satisfies the criteria stated in section 706(c) of title VII [42 U.S.C. § 2000e–5(c) ]." 29 C.F.R. § 1601.3(a); *see also* 29 C.F.R. § 1601.74 (listing designated FEP Agencies, including California's DFEH). As relevant here, it refers to the California DFEH.

[8] According to the State of California, the California DFEH and EEOC have had a worksharing agreement every year since 1981. *See State of California v. Dhillon,* No. C-20-7664 EMC, Northern District of California, Complaint ¶ 26. In the *Dhillon* case, the State of California attached as exhibits to the Complaint the 2019 Worksharing Agreement supplied by Plaintiffs in this action and the 2020 extension of that agreement that is also found on the DFEH website, representing in the Complaint that they were "[t]rue and correct copies of the Fiscal Year 2019 EEOC-DFEH Worksharing Agreement and 2020 contract extension." The Court takes judicial notice of these representations. *See* F.R. Evid. 201(b)(2); *Phillips 66 Co. v. Sacks*, 409 F. Supp. 3d 972, 982 (W.D. Wash. 2019) (holding that under Fed.R.Evid. 201(b), "courts may take judicial notice of federal and state court proceedings.).

United States District Court
Northern District of California

1  300 days of the alleged discriminatory act, whichever is earlier."  518 F.3d at 1104.  Surrell never

2  filed an EEOC charge, but later she sued her employer for race discrimination under Title VII.  *Id.*

3  The defendant argued Surrell's Title VII claim was barred because she had not exhausted her

4  administrative remedies under Title VII, but the Ninth Circuit disagreed.  *Id.* First, it found that

5  "[f]ailure to obtain a federal right-to-sue letter does not preclude federal jurisdiction."  Second, it

6  concluded that the plaintiff had sufficiently exhausted her Title VII claim by filing the DFEH

7  charge because of the worksharing agreement between DFEH and the EEOC, reasoning that "once

8  a plaintiff is entitled to receive a right-to-sue letter . . . it makes no difference whether the plaintiff

9  actually obtained it."  *Id.* (citations omitted).

10      In *Stiefel*, which addressed whether a claim for disability discrimination under the

11  Americans with Disabilities Act ("ADA") had been exhausted, the court explained:

12  > As with the DFEH charge in *Surrell*, by filing a charge with the
   > California department, Stiefel was entitled to a federal right-to-sue
13  > letter because of the Worksharing Agreement between the state
   > agency and the EEOC. As in the present case, Surrell received a right-
14  > to-sue letter warning that "[i]f a federal notice of Right–To–Sue is
   > wanted, the [EEOC] must be visited to file a complaint within 30 days
15  > of this [notice] or within 300 days of the alleged discriminatory act,
   > whichever is earlier." *Surrell*, 518 F.3d at 1104. Surrell never filed a
16  > separate charge with the EEOC nor received a right-to-sue letter from
   > that agency. Nevertheless, we held in *Surrell* that "once a plaintiff is
17  > entitled to receive a right-to-sue letter (as Surrell was once the EEOC
   > did not timely act on her properly filed charge), it makes no difference
18  > whether the plaintiff actually obtained it." *Id.* at 1105. The same is
   > true for an ADA plaintiff.

19

20  *Stiefel v. Bechtel Corp.*, 624 F.3d 1240, 1245 (9th Cir. 2010); *see also Reed v. UBS Sec., LLC*, No.

21  C 09-5237 MHP, 2010 WL 3119200, at *2–3 (N.D. Cal. Aug. 3, 2010) ("Numerous cases have

22  found that filing with the DFEH is sufficient to notify the EEOC") (citing *Surrell*, 518 F.3d at

23  1104;  *Iniguez v. Boyd Corp.*, No. 1:08–CV–1758–AWI–DLB, 2009 WL 2058529, at *4 (E.D.Cal.

24  July 14, 2009)); *Pierotti v. Bd. of Regents of Univ. of California*, No. 16-CV-02936-HSG, 2018

25  WL 2183271, at *8 (N.D. Cal. May 11, 2018) ("In California, because the EEOC and DFEH have

26  a work-sharing agreement, a filing with one agency is considered to be constructively filed with

27  the other.") (internal quotation and citation omitted); *Gamble v. Kaiser Found. Health Plan, Inc.*,

28  348 F. Supp. 3d 1003, 1013 (N.D. Cal. 2018) ("Where federal and state law overlap, there is a

United States District Court
Northern District of California

work-sharing agreement under which employment discrimination charges may be filed either with the federal Equal Employment Opportunity Commission (EEOC) or the state anti-discrimination agency, which in California is the Department of Fair Employment and Housing (DFEH). See 42 U.S.C. § 2000e-8(b). Charges filed with either the EEOC or the DFEH are deemed filed with both agencies.") (citation omitted).

Because it is undisputed that all five Plaintiffs filed charges with the DFEH and obtained right-to-sue letters from DFEH, those charges are also considered to have been filed with the EEOC because of the Worksharing Agreement between the DFEH and the EEOC.  Although Defendants assert that the Worksharing Agreement does not apply because Plaintiffs did not use the form specified at Section II.D of the 2019 Worksharing Agreement for dual filing of charges, they mischaracterize that section to the extent that they omit the part of the section that states that in lieu of EEOC Form 5, dual-filed charges may be made using "an employment discrimination charge form which within statutory limitations, is acceptable in form and content to the EEOC and the [DFEH]."  Nichols Decl., Ex. F (2019 Worksharing Agreement), Section II.D.  Defendants have not argued or presented evidence that the form Plaintiffs used was unacceptable under this provision.  Nor have they cited any authority that supports their contention that failure to use the specified form excuses the DFEH from its obligations under the Worksharing Agreement to refer discrimination claims covered by Title VII to the EEOC.  To the contrary, Section II.B of the Worksharing Agreement, quoted above, indicates that under that agreement the DFEH is to refer to the EEOC "all charges" "so long as the allegations meet the minimum requirements" of the federal discrimination laws at issue.  Therefore, the Court rejects Defendants' argument that Plaintiffs' DFEH charges do not exhaust their federal claims because they did not use the correct form for dual filing.  *See Negus v. Abbott Critical Care*, No. C 94-20112 RMW, 1994 WL 721597, at *5 (N.D. Cal. Dec. 21, 1994) (denying summary judgment based on failure to exhaust administrative remedies as to FEHA discrimination claim where plaintiff had filed charge with EEOC but not DFEH, even though the plaintiff failed to check the box indicating he wanted the charge filed with both the EEOC and the state agency, citing worksharing agreement).

For the reasons stated above, the Court concludes that Plaintiffs' DFEH charges satisfied

their obligation to exhaust as to their Title VII claims and rejects Defendants' argument that they are entitled to summary judgment on those claims to the extent they are based on conduct that occurred more than 300 days before they filed their EEOC complaints.[9]  The Court finds, however, that Chandler's FEHA claim is barred to the extent that she did not allege age discrimination in her DFEH charge, *see* Fish MSJ Decl., Ex. A, and Plaintiffs did not respond to this argument in their Opposition brief.

**D.  Whether Defendants are Entitled to Summary Judgment Under *McDonnell Douglas***

**1.  *McDonnell Douglas* Framework**

Under both FEHA and Title VII, where a plaintiff seeks to establish discrimination on the basis of circumstantial rather than direct evidence, their claims are analyzed using the burden-

---

[9]At oral argument, the Court asked Defendants if the 300-day lookback period (counted backwards from the date each Plaintiff filed her DFEH charge) would apply to Plaintiffs' Title VII claims if the Court were to find that the DFEH charges were sufficient to exhaust Plaintiffs' Title VII claims by virtue of the worksharing agreement between DFEH and the EEOC.  Defendants provided no clear response to that question and counsel appeared to be unfamiliar with the Ninth Circuit case law addressing the legal implications of the worksharing agreement that has existed between the EEOC and DFEH for decades, discussed above. Similarly, Plaintiffs' counsel did not cite a single case in their Opposition brief in support of their argument that their Title VII claims were exhausted by filing their DFEH complaints, relying exclusively on the terms of the Worksharing Agreement and the regulation that allows such agreements. Plaintiffs also failed to address the legal implications of their position with respect to the lookback period that would apply to each of their Title VII claims.  The Court tentatively concludes (but does not hold) that because the 2019 Worksharing Agreement waives the statutory provision giving the DFEH exclusive jurisdiction to investigate the charges for 60 days, *see* Section III.A.(1), the 300-day lookback period likely applies to Plaintiffs' Title VII claims.  *See Kennedy v. Columbus Mfg., Inc.,* No. 17-CV-03379-EMC, 2017 WL 4680079, at *4 n. 4 (N.D. Cal. Oct. 18, 2017) ("A further argument might be made that, because the EEOC may not process a charge filed with a state agency until 60 days after that filing, *see* 42 U.S.C. § 2000e-5(c); 29 C.F.R. § 1601.13(a)(3)(ii), the EEOC charge period is actually 240 days. *See id*. at § 1601.13(b)(1). *See generally Mohasco Corp. v. Silver*, 447 U.S. 807 (1980). However, the workshare agreement waives the DFEH's 60-day exclusive jurisdiction. *See* Workshare Agreement, supra note 2, at 3; see also 29 C.F.R. § 1601.13(a)(3)(iii) ('A FEP agency may waive its right to the period of exclusive processing of charges.... '). This restores the 300-day charge period. *See id*. at § 1601.13(a)(4)(ii)(A).").  As the parties did not address this question the Court does not decide at this time whether each of the adverse employment actions upon which Plaintiffs base their federal claims is timely.  The Court notes, however, that a number of the adverse employment actions discussed below appear to have occurred more than 300 days before the corresponding DFEH charge was filed and therefore may be untimely with respect to Plaintiffs' federal claims.  The Court also does not address whether these employment actions are timely with respect to Plaintiffs' FEHA claims because Defendants did not raise this issue in their Summary Judgment Motion.  Again, though, it appears that some of the adverse employment actions upon which Plaintiffs rely occurred more than a year before the corresponding DFEH charges and therefore may not fall within the FEHA look-back period.

shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Hawn v. Exec. Jet Mgmt., Inc*., 615 F.3d 1151, 1155 (9th Cir. 2010) (Title VII); *Guz v. Bechtel Nat'l, Inc*., 24 Cal. 4th 317, 354–55 (2000) (FEHA). Under this framework, the plaintiff must first establish a prima facie case of employment discrimination. *Hawn v. Exec. Jet Mgmt., Inc*., 615 F.3d at 1155–56 (9th Cir. 2010) (citing *Noyes v. Kelly Servs*., 488 F.3d 1163, 1168 (9th Cir. 2007)). If the plaintiff establishes a prima facie case, "[t]he burden of production, but not persuasion, then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action." *Id.* (quoting *Chuang v. Univ. of Cal. Davis, Bd. of Trs*., 225 F.3d 1115, 1123–24 (9th Cir. 2000)). If the defendant meets this burden, plaintiffs must then raise a triable issue of material fact as to whether the defendant's proffered reasons for the adverse employment action are mere pretext for unlawful discrimination. *Id.* (citing *Noyes*, 488 F.3d at 1168).

To establish a prima facie case, a plaintiff "must offer evidence that 'give[s] rise to an inference of unlawful discrimination.' " *Id.* (quoting *Godwin v. Hunt Wesson, Inc*., 150 F.3d 1217, 1220 (9th Cir.1998) (alteration in original), citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). A prima facie case may be made "by showing: (1) that [the plaintiffs] are members of a protected class; (2) that they were qualified for their positions and performing their jobs satisfactorily; (3) that they experienced adverse employment actions; and (4) that 'similarly situated individuals outside [their] protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination.' " *Id.* (quoting *Peterson v. Hewlett–Packard Co*., 358 F.3d 599, 603 (9th Cir. 2004); and citing *Wallis v. J.R. Simplot Co*., 26 F.3d 885, 889 (9th Cir. 1994)). The Supreme Court has "explained that a prima facie case will vary according to the unique factual circumstances presented in every action." *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. at 802 n. 13). Further, [t]he requisite degree of proof necessary to establish a prima facie case for Title VII and ADEA claims on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis v. J.R. Simplot Co*., 26 F.3d 885, 889 (9th Cir. 1994), as amended on denial of reh'g (July 14, 1994).

There are no "bright-line rules" as to what constitutes an adverse employment action for

the purposes of making a prima facie case of discrimination, so "courts must pore over each case to determine whether the challenged employment action reaches the level of 'adverse.' " *Wanamaker v. Columbian Rope Co*., 108 F.3d 462, 466 (2d Cir. 1997). Under Title VII, it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e–2(a)(1).  "The Supreme Court has held that 'this not only covers "terms" and "conditions" in the narrow sense, but "evinces a congressional intent to strike at the entire spectrum of disparate treatment . . . in employment." ' " *Chuang v. Univ. of California Davis, Bd. of Trustees*, 225 F.3d 1115, 1125 (9th Cir. 2000) (quoting *Oncale v. Sundowner Offshore Servs., Inc*., 523 U.S. 75, 78 (1998) (internal quotation omitted);  *see also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (holding that under Title VII, "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.");  *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000) (observing that a "wide array of disadvantageous changes in the workplace constitute adverse employment actions.").

        Where a transfer is "*purely* lateral[,]" that is, where there is "no change in title, rank, wages, or benefits of employment[,]" it is not an adverse employment action.  *Posin v. Cnty. of Orange*, No. SACV150120AGJCGX, 2016 WL 5858706, at *5 (C.D. Cal. Jan. 18, 2016) (citing *Stutler v. Illinois Dep't of Corr*., 263 F.3d 698, 702 (7th Cir. 2001) ("a lateral transfer without a loss in benefits does not constitute an adverse employment action."). "A transfer is not an adverse action simply because the plaintiff finds it to be 'personally humiliating.' " *McRae v. Dep't of Corr. & Rehab*., 142 Cal. App. 4th 377, 393 (2006) (citation omitted).  On the other hand, "[a] transfer can be an adverse employment action when it results in substantial and tangible harm." *Id.*  In *McCrae,* the court adopted the following standard set forth by the D.C. Circuit in *Brown v. Brody* for determining whether a transfer is an adverse employment action:  "[A] plaintiff who is made to undertake or who is denied a lateral transfer—that is, one in which she suffers no diminution in pay or benefits—does not suffer an actionable injury unless there are some other materially adverse consequences . . . such that a reasonable trier of fact could conclude that the

plaintiff has suffered objectively tangible harm. Mere idiosyncrasies of personal preference are not sufficient to state an injury." *Id.* (quoting 199 F.3d 446, 457 (D.C. Cir. 1999)). "A reduction in an employee's potential for career advancement may constitute an adverse employment action." *Woodson v. Int'l Bus. Machines, Inc.*, No. C 05-3387 JF, 2006 WL 1195453, at *5 (N.D. Cal. May 2, 2006) (citation omitted).

To survive summary judgment on a Title VII claim where the plaintiff has made a prima facie case and the defendant has articulated a legitimate, non-discriminatory reason for the alleged adverse employment action, a plaintiff must offer direct evidence or specific and substantial circumstantial evidence that the proffered reason is pretextual. *Manatt v. Bank of Am., NA*, 339 F.3d 792, 801 (9th Cir. 2003); *see also Horn v. Cushman & Wakefield W., Inc.*, 72 Cal. App. 4th 798, 805 (1999) (applying same standard under California law).

### 2. Discussion[10]

#### a. Knox

Plaintiffs point to the following employment actions against Knox they contend satisfy the

---

[10]In their Opposition, Plaintiffs argued that they had presented evidence that they had been subjected to adverse employment actions sufficient to survive summary judgment but did not clearly identify the adverse employment actions upon which each plaintiff's claims are based or address Defendants' arguments as applied to specific adverse employment actions. Instead, Plaintiffs simply cited to various subsections in the factual background section of their brief to show that each plaintiff was subjected to adverse employment actions, leaving the Court to guess as to the theory and specific conduct underlying each plaintiff's discrimination and retaliation claims. At the motion hearing, the Court asked Plaintiffs to identify every adverse employment action they contend supports their claims, not only to assist the Court in deciding the Summary Judgment Motion but also to ensure that the parties have a clear understanding of the scope of each claim as they prepare for trial. The adverse employment actions listed at the hearing are set forth below. At trial, Plaintiffs will not be permitted to base their claims on any adverse employment actions that are not set forth below. Further, Plaintiffs will not be permitted to rely on any conduct that is not contained in the SAC, including conduct that occurred after March 22, 2021, when the SAC was filed, to establish an adverse employment action. Under Rule 8 of the Federal Rules of Civil Procedure, the allegations in the complaint must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (quotation omitted). As Plaintiffs' claims are based on discrete adverse employment actions, allowing them to base their claims on conduct that is not alleged in the operative complaint would not meet that requirement. *See Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 969 (9th Cir. 2006) (holding in a disability access case that plaintiff could not avoid summary judgment based on new facts relating to architectural barriers that were not listed in the complaint). The Court notes that in their Opposition brief, Plaintiffs did not challenge Defendants' argument that Plaintiffs cannot rely upon conduct that post-dates the filing of the SAC to avoid summary judgment.

United States District Court
Northern District of California

adverse employment action requirement: 1) Knox's demotion from a Level 5 to a Level 4 and her transfer from her position as supervisor in the Community Violence Reduction Unit ("CVRU") to the Felony Filer position in 2018;[11]  2) removal from the Death Penalty Review Committee in late 2018, when Knox was dropped from the email list for that committee, and failure to reappoint Knox in 2019 when new committee assignments were announced;[12]  3) exclusion from the New Prosecutor Training that Knox previously had been in charge of and replacement by Stephanie Kang, in late 2018 or early 2019;  4) failure to promote Knox to Level 5 in December 2018 when Chris Walpole was promoted to a Level 5 without an application process and Knox was passed over;  5) failure to promote Knox in June 2019 to a Level 5 position for which she applied; and 6) her transfer without consultation to the Elder Unit in  February 2021. *See* Opposition at 19 (citing Fact section of brief, subsections 1, 3, and 6); Knox Decl. ¶¶ 34-40 (2018 demotion); 37 (removal from Death Penalty Review Committee;  40 (exclusion from New Prosecutor Training); 41 (2019 denial of promotion).[13]

Defendants do not dispute that Knox's 2018 demotion to Level 4 was an adverse

---

[11] Plaintiffs contend the demotion to Level 4 and the transfer to Felony Filer were two separate adverse actions and there is some evidence to support that theory.  In particular, Knox states in her declaration that she was told by Becton that her position in CVRU would no longer be considered a Level 5 *and* that she was going to be transferred out of CVRU to the Felony Filer position.  *See* Knox Decl. ¶¶ 34-35.  Although Knox's account of how and when she learned that she was being demoted to a Level 4 appears to contradict the allegation in the SAC (and the representation of counsel at the motion hearing) that she did not learn of her demotion to Level 4 until she received her paycheck, in November 2018, *see* SAC ¶ 118.xv,  the Court nonetheless assumes for the purposes of the Summary Judgment Motion that Plaintiffs are correct in treating the demotion and transfer as separate actions.  It does not decide at this time whether either action falls within the look-back period for her Title VII claims because, as noted above, the applicable look-back period for Plaintiffs' Title VII claims to the extent those claims were exhausted by their DFEH charges was not briefed.

[12] Defendants state in a footnote that "DA Becton never removed or excluded Mary Knox, Mary Blumberg or Alison Chandler from any committees. Nor have Knox, Blumberg or Chandler ever been removed from any trainings of new hires."  Motion at 20 n. 15 (citing Becton Decl., ¶ 9).  Becton's statement appears to be contradicted, however, by Knox's statement that she was removed from the Death Penalty Review Committee when she was demoted, even though she had been on that committee previously as a Level 4 and several other committee members were Level 4s.  Knox Decl., ¶ 37.  Further, Knox stated that she was "excluded" from training of new prosecutors after being put in charge of that training in previous years by former DA Mark Peterson.  *Id.*  ¶¶ 4, 15, 30, 40.  Therefore, the facts are in dispute on these questions.

[13] At oral argument, Plaintiffs also cited the failure to give Knox one of the open Level 5 positions in the summer of 2021, but that conduct is not alleged in the SAC and therefore Plaintiffs may not rely upon it in support of their claims.

employment action.  Further, there is sufficient evidence in the record to establish a genuine issue of material fact as to whether her transfer to the Felony Filer position in 2018 and to the Elder Unit in 2021 were adverse employment actions and were not "purely" lateral transfers as Defendants contend. As to the former, there is evidence that the Felony Filer position was non-supervisorial and that Knox was sent to an office in a remote location where she was isolated from other attorneys and didn't appear in court.  *See* Knox Decl. ¶¶ 34-40. As to the 2021 transfer to the Elder Abuse Unit, there is evidence that this position represented a further loss of prestige and opportunity for advancement as the Elder Abuse position was an entry level position typically held by someone with only six years experience whereas the Felony Filer position was usually held by attorneys with eight to ten years experience. *Id.*  ¶¶ 38, 50.

The Court also rejects Defendants' argument that Knox's removal from the Death Penalty Review Committee and exclusion from New Prosecutor Training after Becton became DA are not adverse employment actions as a matter of law.  Defendants have cited no authority in which a court has announced a bright-line rule that such conduct cannot constitute an adverse employment action and the Court has found none.  Further, exclusions from committees and training programs may be akin to reassignments of job duties, which the Supreme Court has recognized may constitute adverse employment actions under some circumstances. *See Burlington Indus., Inc. v. Ellerth*, at 761; *see also Bryson v. Chicago State Univ*., 96 F.3d 912, 916 (7th Cir. 1996) (holding that where plaintiff came forward with evidence that committee work conferred prestige and was important to further professional advancement, "[a] sudden loss of all committee responsibilities. . . , if proven at trial, would be a loss of tangible employment benefits just as serious as moving an office to an undesirable location, relocating someone's personal files, or isolating the employee from others—all actions courts have held to qualify under Title VII in other cases.").

Here, Plaintiffs present evidence from which a jury could reasonably conclude that Knox's stature in the office, and the associated opportunities for her career advancement, were materially diminished by removing her from the Death Penalty Review Committee and depriving her of the leadership position she had previously held training new attorneys.  In particular, Plaintiffs present evidence that Knox was put in charge of the New Prosecutor Training by the previous DA and was

26

the first woman to be given that responsibility.  Knox Decl. ¶¶ 4, 40.  Plaintiffs have also offered evidence that after Becton became DA, Knox was excluded from this training and replaced by a woman 30 years her junior because it was thought that the new attorneys would relate better to younger attorneys, and that removal of older women from this training program caused them to lose visibility and prominence in the office. *Id.*  ¶ 40; Piersig Decl. ¶ 73.  Similarly, Plaintiffs have presented evidence that Knox had previously been a member of the Death Penalty Review Committee – a committee that "carries prestige in the District Attorney's Office and it is one of the most important committees in the office" -- before she was removed from it by Becton.  Knox Decl. ¶ 37.

Finally, Plaintiffs have presented evidence that Knox was passed over for promotion when Chris Walpole was promoted in 2018 and was denied a promotion to Level 5 in 2019 when she submitted an application for such a promotion.  *See* Knox Decl. ¶¶  41.  In the context of Title VII, a "failure to promote is a classic example of an adverse employment action." *Hardin v. Wal-Mart Stores, Inc.*, 604 F. App'x 545, 547 (9th Cir. 2015).  Further, a plaintiff can make a prima facie case of discrimination based on failure to promote even where she did not apply for a position where an employer does not use formal procedures for posting or accepting applications for a promotion opportunity or for determining who will be offered the position. *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1133 (11th Cir.1984).

In *Carmichael*, the plaintiff asserted a Title VII discrimination claim based, in part, on failure to promote him to positions for which he had not applied where there had been no notice that the positions were available or application process.  *Id.*  at 1132-33.  The district court found no discrimination as to those jobs because the plaintiff had not applied for them or expressed an interest in them, but the Court of Appeals found that the district court had erred, finding that "the plaintiff was not required to ask specifically for [those jobs] when he did not know about [them] and where there was no formal mechanism for expressing his interest."  *Id*. at 1132-1133.  The court reasoned as follows:

> To require this plaintiff to demonstrate an explicit expression of interest in specific jobs would also be at odds with the purposes of the prima facie case in analyzing evidence. The prima facie case raises a

presumption of discrimination because it eliminates the most common reasons for rejecting a job applicant: a lack of qualifications and a lack of an available job. *Teamsters*, 431 U.S. at 358 n. 44, 97 S.Ct. at 1866 n. 44. The paradigmatic prima facie case, described in *McDonnell Douglas*, requires the plaintiff to prove that he "applied for" a job to eliminate another obvious nondiscriminatory reason: that the plaintiff was not offered the job because the company did not know he was interested. *McDonnell Douglas* "align[s] closely the prima facie case with proof of elements within the plaintiff's own objective knowledge." Note, *Relative Qualifications and the Prima Facie Case in Title VII Litigation*, 82 Colum.L.Rev. 553, 556 (1982); see also Méndez, 32 Stan.L.Rev. at 1141–42, 1142 n. 68, 1158. By showing that he applied, the plaintiff shows that the employer knew he was interested in the job. But when there is no formal notice of the job's availability, the plaintiff may have no means, within his own knowledge, of showing whether the employer considered him or not. Furthermore, when an employer uses such informal methods it has a duty to consider all those who might reasonably be interested, as well as those who have learned of the job opening and expressed an interest.

Accordingly, a plaintiff makes out a prima facie case—that is, he creates a presumption of discrimination and forces the employer to articulate legitimate reasons for his rejection—as long as he establishes that the company had some reason or duty to consider him for the post. The employer cannot avoid a Title VII violation by showing that it incorrectly assumed that the plaintiff was uninterested in the job. When the plaintiff had no notice of or opportunity to apply for the job, such a reason for rejection is "legally insufficient and illegitimate". *Harris*, 712 F.2d at 1383–84.

*Id.* at 1133-1134.

The *Carmichael* rule has been expressly approved by the Third Circuit in *Fowle v. C & C Cola, a Div. of ITT-Cont'l Baking Co*., 868 F.2d 59, 68 (3d Cir. 1989); the Fifth Circuit in *Bernard v. Gulf Oil Corp*., 841 F.2d 547, 570 (5th Cir. 1988); the Sixth Circuit in *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1017 (6th Cir.2001); and the Eighth Circuit in *Kehoe v. Anheuser–Busch, Inc.*, 96 F.3d 1095, 1105 n. 13 (8th Cir.1996).  In *Dews*, the Sixth Circuit emphasized the importance of the *Carmichael* rule:

This exception to the application requirement is significant because in many cases where discriminatory animus truly is at issue, an employer may simply avoid advertising a particular opening so as to avoid controversy among affected employees. If the plaintiff is not required to show that he applied for the position under these circumstances (a part of prong two), then it also stands to reason that the plaintiff should not be required to show that he was considered for the position (prong three). Rather, in these circumstances, it is sufficient that the plaintiff was passed over despite being qualified for the job.

231 F.3d at 1022.

28

United States District Court
Northern District of California

1         Although the Court has found no Ninth Circuit case that expressly adopts the *Carmichael*

2   rule, it also has found no authority in this Circuit (or in any other Circuit for that matter) applying

3   a rigid requirement that a plaintiff must have applied for a position to make a prima facie case

4   based on failure to promote under *McDonnell Douglas*.  Rather, the Ninth Circuit's formulation of

5   the *McDonnell Douglas* framework has dropped the "applied for" requirement found in

6   *McDonnell Douglas* itself.  *See Hawn v. Exec. Jet Mgmt., Inc*., 615 F.3d at 1155–56; *McDonnell*

7   *Douglas*, 411 U.S. at 802;  *see also Fulton v. State, Dep't of Soc. & Health Servs*., 169 Wash. App.

8   137, 153 (2012) ("Federal courts have eliminated the *McDonnell Douglas* "applied for"

9   requirement in individual disparate treatment cases . . . where an employer does not use formal

10   procedures for posting or accepting applications for a promotion opportunity or for determining

11   who will be offered the position.").  Therefore, the Court concludes that where, as here, a position

12   was filled without alerting potential applicants or offering an opportunity to apply for the position,

13   a defendant's failure to promote a qualified applicant is sufficient to make a prima facie case based

14   on failure to promote.[14]

15         For these reasons, the Court concludes that Defendants are not entitled to summary

16   judgment as to any of Knox's claims based on her failure to establish that she was subjected to any

17   adverse employment action.  The Court also rejects Defendants' contention that they are entitled

18   to summary judgment on the basis that they have offered legitimate, non-discriminatory reasons

19   for demoting and transferring Knox in 2018 and for rejecting her application for a Level 5

20

21   _____

22   [14] In the Summary Judgment Motion, Defendants assert that where a plaintiff does not apply for a
     particular position she cannot make a prima facie case based on failure to promote her to that position,

23   citing a single case, *Steckle v. Motorola Inc.*, 703 F.2d 392, 393 (9th Cir. 1983).  Summary
     Judgment Motion at 24.  That case does not address whether a prima facie case can be made where

24   the plaintiff did not apply for the promotion that is alleged to have been denied for discriminatory
     reasons.  Instead, it involved a plaintiff who *had* applied for the promotion that was denied and

25   was found to have made a prima facie case of discrimination.  Thus, *Steckle* sheds no light on this
     question and offers no support for Defendants' position.  Defendants did not address the extensive

26   case law discussed above that contradicts their characterization of the law. Likewise, Plaintiffs did
     not offer any response whatsoever to Defendants' assertion in the motion, even though a number

27   of Plaintiffs' claims are based on the theory that they were passed over for promotions for which
     they did not actually apply.  The failure of counsel on both sides to identify the relevant legal

28   authority in support of their positions has imposed a significant and unnecessary burden on the
     Court in connection with deciding the pending motions.

United States District Court
Northern District of California

1    promotion in 2019,[15] citing her "poor reputation when it came to trust and chain of command,"

2    "multiple complaints by attorneys Knox supervised, a lack of trust based on misrepresentations

3    made by Knox on two occasions, a history of not following the directives of the prior DA, friction

4    with her supervisor, and concerns raised by defense attorneys." Motion at 3.

5         As to the failure to promote Knox in 2019, Defendants contend that Knox was denied the

6    promotion based not only on her qualifications but because DA Becton also factored in the

7    candidates' "willingness to implement her vision and policies for the office" and because there

8    was consensus among the panel that interviewed the candidates that the two candidates who were

9    given the promotions, O'Connell and Grassini (who are both male), were more qualified.  *Id.* at

10   24-25. The Court concludes that Plaintiffs have offered specific and substantial evidence of pretext

11   as to Knox's demotion and transfer in 2018 and the failure to promote her in 2019.

12        First, Plaintiffs offer specific and substantial evidence contradicting the explanation

13   offered by Becton for demoting and failing to promote Knox.  *See* Becton Decl. ¶ 17 (listing

14   reasons for Knox's demotion).  For example, Becton states in her declaration that one of the

15   reasons she demoted Knox was that when she was appointed as Interim DA in 2017, existing

16   Chief Doug McMaster, and existing Assistants Tom Kensok and Dan Cabral told her that Knox

17   did not follow the chain of command, had been the subject of complaints and did not get along

18   with her supervisor; and that former DA Mark Peterson had decided to demote Knox from Level 5

19   to Level 4 "but had gotten distracted with his own legal issues and did not carry out the decision."

20   *Id.*  Yet Phyllis Redmond, who was a senior Deputy in the Office as of 2012 and was promoted to

21   Chief Assistant District Attorney, submitted a declaration stating that she was on Peterson's

22   management team and that he never "said or even hinted that he intended to demote Knox" and

23   instead "relied on [her] to oversee high profile cases [and] tasks."  Redmond Dec. ¶¶ 6-7.  Rather,

24

25   _____

26   [15] Defendants do not articulate non-discriminatory reasons for the other adverse employment
     actions discussed above, such as Knox's removal from the Death Penalty Review Committee,  her
     exclusion from the New Prosecutor Training or the failure to promote her to the position given to
27   Chris Walpole in December 2018.  As to Knox's claims based on those actions, the prima facie
     case of discrimination is sufficient to meet her burden on summary judgment because Defendants
28   articulated no legitimate, non-discriminatory reason that shifts the burden back to Knox to show
     pretext.

1    Redmond states, Knox had a reputation for having "a very high work ethic" and Redmond never

2    heard Peterson "mention he was dissatisfied with how Knox ran her department or oversaw the

3    programs he tasked her with." *Id.*  ¶ 8.

4         Redmond also states in her declaration that Becton mischaracterizes the facts when she

5    states in her declaration that she eliminated Mary Knox's Level 5 position as head of CVRU after

6    consulting with her executive management team (including Redmond) and receiving feedback

7    from them that "CVRU did not warrant or need its own Level 5 supervisor."  Becton Decl. ¶ 15.

8    According to Redmond, DA Becton did not consult with her or the management team about

9    eliminating Knox's Level 5 position and if she had, Redmond would have counseled against it.

10   Redmond Decl. ¶¶ 20-22, 26.  Likewise, Redmond contradicts Becton's statement that no one

11   objected to her decision to reassign Knox to the nonsupervisorial Felony Filer position, Becton

12   Decl. ¶ 16, stating that this was not discussed and that the decision was made by Becton alone,

13   who announced to Redmond, "I am reassigning Paul Graves and Mary Knox.  They are not my

14   people."  Redmond Dec. ¶ 21.

15        Redmond also offers testimony that casts doubt on Becton's statement that she demoted

16   Knox in part because Assistant DA Venus Johnson had reported to her complaints by attorneys

17   who worked under Knox.  *See* Becton Decl. ¶ 17; Redmond Decl. ¶¶ 31-37.  Among other things,

18   Redmond states that in 2018 she was filling the role of Chief of Administrative Services, which is

19   "essentially HR" and in that capacity she received and handled complaints from attorneys about

20   their supervisors but received no complaints about Knox; that she worked closely with Johnson

21   during this period and regularly discussed personnel matters but Johnson never mentioned any

22   complaints about Knox; and that she spent several weeks during this period meeting with Becton

23   to discuss who should handle a very high profile homicide case and Becton ultimately decided to

24   assign it to Knox without expressing any concerns about complaints about Knox or a lack of

25   trustworthiness.  *Id.*

26        In addition to Redmond's testimony, Plaintiffs also offer testimony that Knox was a good

27   supervisor.  For example, Lynn Uilkema, a former Level 5 Supervisor who retired in 2019

28   testified at the administrative proceeding that Knox was a good supervisor, someone with whom

she consulted on issues, never demeaning or disrespectful, and not untrustworthy or someone she would characterize as untrustworthy. Nichols. Decl. ¶2, Ex. A at 654:15-655:8. Similarly, Molly Manoukian, who worked under Knox in the Homicide Unit for two and a half years testified that Knox was an excellent supervisor with a tremendous amount of experience, that she was accessible to members of the team, good at moving roadblocks for the team and providing support without hovering and allowed attorneys in the Unit to do their jobs. *Id*. at 671, 674:20-22-678:15. Manoukian testified further that Knox followed the chain of command to get approval for investigative assistance on homicides in a timely manner. *Id*. at 678:8-15.

Moreover, although Becton testified at the administrative proceeding that Johnson told her that fifteen attorneys complained to Johnson that they were afraid of Knox, she was unable to remember any details about when she received that information or whether there was any written record of the complaints. Nichols Decl., Ex. A at 430-434. There was no mention of such complaints in Knox's written performance review for this period. Knox Dec., Ex. F. Instead, it was noted that Knox had "long been regarded as a trusted mentor for attorneys and community partners." *Id.*

Another reason Becton offered for demoting Knox was that she believed Knox had misrepresented statements made by Judge Santos when Knox claimed that Judge Santos had appointed her to be the legal advisor to the civil grand jury. Becton Decl. ¶ 17. But Judge Santos has submitted a declaration in this case explaining that she did, in fact, contact Knox and refer the civil grand jury to her to serve as the legal advisor, not realizing that the grand jury foreman had been redirected to Lynn Uillkema. Santos Decl. ¶¶ 5-6. Judge Santo states that she subsequently spoke on the telephone with Uilkema, who clarified the situation, and apologized in open court to Chief Assistant DA Redmond for any confusion she had caused. *Id.* ¶ 6. Santos states in her declaration that Knox "has a reputation in the Contra Costa judicial community for honesty, trustworthiness and integrity." *Id.* ¶ 7.

The evidence discussed above is only a sampling of the evidence that contradicts Defendants' proffered reasons for demoting and failing to promote Knox. Further, while Defendants contend there is no evidence that Knox's demotion was based on age or gender, citing

the fact that Becton has also demoted three men since she became DA,[16] Plaintiffs have presented evidence that younger males were treated more favorably than older and female attorneys when there were complaints about or problems with their performance.  For example, Redmond states in her declaration that older women attorneys are demoted and deemed unfit to supervise "almost immediately" if there are complaints without any coaching mentoring or second chances provided. *Id.*  ¶ 53.  In contrast, when complaints are received about male supervisors, they are either dismissed or the attorney is "coached, mentored, and allowed an opportunity to correct."  *Id.*

Redmond points to Cabral and another supervisor, Derek Butts, who were the subject of complaints and even calls for removal but were not removed as supervisors.  *Id.*  She also notes that at least one attorney has left under the supervision of the current (male) supervisor of CVRU but that he remains in that position, in contrast to Knox, whose demotion was justified, in part, because "one attorney resign[ed] because of [Knox]." Becton Decl. ¶ 17; Redmond Decl.  ¶ 55. Plaintiffs offer similar testimony from Piersig, Henderson, Chandler and Uilkema about the response to complaints about Cabral and Butts. *See* Nichols Decl. ¶8, Ex. G at 134:18-135:4, 174:19-176:1; Ex. C at 141:13-142:11, 144:19-146:7;  Piersig Decl. ¶¶16-21; Chandler Decl. ¶ 34; Henderson Decl. ¶¶ 28-30.

Similarly, Chandler states in her declaration that DA Becton assigned Doug MacMaster the Richmond Felony Expeditor position, a supervisorial position, even though she was aware that he had sexually harassed female attorneys by 1) sending female attorneys, including Chandler,  an email that attached a sexually harassing video titled "Jizz in my pants"; 2) joking with  "male peers about inappropriate topics in the office and allow[ing] men in the office to engage in stereotypical gendered behavior";  3) organizing a weekly "guys lunch" from which female attorneys were excluded; 4) sending an email in which he called a female Deputy Attorney

---

[16] According to Becton, in addition to demoting Knox, she demoted Doug McMaster, who was Chief, to a Level 4 and promoted Phyllis Redmond to that position in December 2017; in February 2018, Assistant DA Tom Kensok  elected to retire rather than be demoted and Venus Johnson was hired to fill his position; and in October 2018, Becton demoted Paul Graves from a Level 5 to a Level 4 and promoted Chris Walpole "a couple of months later" to fill Graves's role.  Becton Decl. ¶¶ 13, 14, 20;  *see also* Chan Decl. Exs. A-J (organization charts for the Contra Costa DA's Office from August 2017 through January 2022).

General a "pussy" and told junior females that he would assign them cases that would cause them to "cream in their panties";  5) telling a woman "that she was 'swinging with the biggest dick on the fourth floor' and asked a nursing mother to not lift anything because it 'may make her leak breast milk' "; and 6) telling Blumberg, while pregnant, that she should order a mocha frappuccino at Starbucks because it would help with 'lubrication' in delivery."  Chandler Decl. ¶ 13. According to Chandler, "[d]espite being told about the documented complaints of sexual harassment, Ms. Becton allowed Mr. MacMaster to remain a supervisor and manage women." *Id.*

In addition, to counter Defendants' assertion that the numbers do not support discriminatory intent on the part of DA Becton, Plaintiffs have offered other numbers suggesting that younger and male attorneys have been given promotions and leadership positions under DA Becton at the expense of older and female attorneys with more experience and that the worsening situation for older female attorneys has led many to leave the Office.  *See* Chandler Decl. ¶ 26 ("Since DA Becton started, at least 9 senior women, 45% of the senior women attorneys, with over one hundred-and fifty-years collective experience departed the District Attorney's Office."); Piersig Decl. ¶¶ 64-66 (describing pattern of promoting younger and less experienced male attorneys under Becton and listing specific examples of senior and older women who were more qualified being passed over).  Thus, there is a genuine issue of material fact as to whether DA Becton's record with respect promotions and demotions is consistent with discriminatory intent.

Finally, to the extent Defendants rely on Becton's consideration of applicants' "diversity of thought" and willingness to implement her "vision and policies" when making promotion and demotion decisions to show that she had a legitimate, non-discriminatory reason for failing to promote Knox, *see* Becton Decl. ¶¶ 20, 23, the Court finds that Plaintiffs have demonstrated genuine disputes of material fact relating to pretext based on the evidence discussed above – especially in light of the Ninth Circuit's admonition that "subjective practices are particularly susceptible to discriminatory abuse and should be closely scrutinized." *See Jauregui v. City of Glendale*, 852 F.2d 1128, 1136 (9th Cir. 1988).

      b.  Piersig

In their Opposition brief, Plaintiffs cite Defendants' failure to promote Piersig to a Level 5

1    position for which she applied in April 2019 to show that she was subjected to an adverse

2    employment action. Opposition at 19 (citing to Fact section of brief, subsection 3); *see also* Piersig

3    Decl. ¶¶ 50-63.  In addition, at oral argument, Plaintiffs identified the following conduct that they

4    contend constituted adverse employment actions as to Piersig:  1) her transfer to the Felony

5    Expeditor role around September 2018; 2) failure to promote her to a Level 5 in December 2018,

6    when Chris Walpole was promoted to a Level 5 without an application process (discussed above);

7    3)  failure to provide equal resources between 2018 and 2020 as compared to males who held

8    comparable positions, including short-staffing resulting from transfers of  Piersig's superivisees to

9    other units, assigning her a smaller office and declining her request for a parking space;   4) failure

10   to offer Piersig the position of Felony  Trial Team Supervisor and instead giving the position to

11   Simon O'Connell even though he had less supervisory experience than Piersig; and 5) a negative

12   performance review from Derek Butts that covered a period of time when he supervised Piersig

13   that was earlier than the period the review was supposed to cover.[17]

14          As discussed above, it is well-established that failure to promote is an adverse employment

15   action. Thus, as it is undisputed that Piersig applied for a Level 5 position and was denied that

16   promotion in June of 2019, the denial of this promotion constitutes an adverse employment action.

17   Further, the evidence is sufficient to establish a genuine dispute that the failure to give Piersig the

18   Felony Trial Team Supervisor position, which was instead given to a male attorney, constituted

19   the denial of a promotion and therefore was an adverse employment action.  *See* Piersig Decl. ¶

20   35.  At the hearing, Plaintiffs represented that the promotion was awarded to O'Connell with a

21   "tap on the shoulder" and without any announcement of the position or application process, which

22   Defendants did not dispute.  As discussed above, under such circumstances a prima facie case may

23   be made even though the plaintiff did not apply for the position at issue, as is the case here.

24          The performance evaluation from Derek Butts also is sufficient on summary judgment to

25   show an adverse employment action as Plaintiffs have offered evidence that the criticisms of

26

27   _____

     [17] Plaintiffs also point to the failure to promote Piersig to a Level 5 in July 2021 and the denial of
     her request to work remotely after Contra Costa County adopted a remote work policy in August
28   2021.  This conduct occurred after the SAC was filed, however, and therefore the Court does not
     consider it.

1    Piersig were undeserved and the evaluation improperly addressed a period of time that fell outside

2    the period covered by the performance review period.  *See* Piersig Decl. ¶¶ 23-30.  *See Yartzoff v.*

3    *Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) ("undeserved performance ratings, if proven, would

4    constitute [an] 'adverse employment decision[ ]' cognizable under [Title VII]").

5             The Court also concludes there is sufficient evidence that Piersig's transfer from Homicide

6    to the Felony Expeditor position was an adverse employment action to survive summary

7    judgment.  While it appears to be undisputed that both positions were Level 4 positions and the

8    Felony Expeditor position involved supervision of other attorneys (which Piersig's position in

9    Homicide did not), Defendants do not dispute that an assignment in Homicide is a "plum" career

10   advancing position and there is evidence that Piersig was transferred out of Homicide for her

11   "mental health" after she repeatedly complained over the course of many months that she and

12   other women in the unit were being subjected to a hostile work environment by supervisor Derek

13   Butts without any corrective action being taken by management.  Piersig Decl. ¶¶ 9-21. Drawing

14   all reasonable inferences in favor of Plaintiffs, the Court finds that there is sufficient evidence that

15   this transfer was not a purely lateral transfer to establish a material dispute of fact that the transfer

16   was an adverse employment action.

17            Finally, the Court questions whether the alleged failure to provide Piersig with adequate

18   resources rises to the level of an adverse employment action but does not decide that question.

19   "Scarce resources and increased workloads are familiar complaints in virtually every workplace

20   and every industry, but [generally] they do not give rise to a discrimination claim under Title VII."

21   *Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 73 (D.D.C. 2007) (holding that failure to provide

22   sufficient resources (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275,

23   141 L.Ed.2d 662 (1998)). Thus, in *Rattigan*, the court found that the plaintiff, an attorney who was

24   African-American, failed to state a claim under Title VII based on the allegation that the FBI

25   office where he served as the legal attaché, in Riyadh, Saudi Arabia, was not given additional

26   resources after September 11 whereas offices in other locations headed by White legal attachés

27   were given additional resources.  *Id.*  On the other hand, some courts have found that a failure to

28   provide equal resources based on a plaintiff's membership in a protected class may be sufficient to

United States District Court
Northern District of California

36

1    establish an adverse employment action in the Title VII context.  *See Asante-Addae v. Sodexo,*

2    *Inc.*, No. 3:13-CV-00489 VLB, 2015 WL 1471927, at *13 n. 11 (D. Conn. Mar. 31, 2015), aff'd,

3    631 F. App'x 68 (2d Cir. 2016) (citing *Malcom v. Honeoye FallsLima Educ. Ass'n,* 678 F.Supp.2d

4    100, 105–06 (W.D.N.Y.2010) with the parenthetical "finding plaintiff stated a Title VII

5    discrimination claim where [the plaintiff] alleged that 'she made defendants aware of alleged

6    discriminatory conduct' by third-party school district and the defendants subsequently provided

7    her with fewer resources and less support than they did or would have done for non-minority

8    members").  As the parties have not briefed this issue and the answer is not obvious, the Court

9    does not decide this question on summary judgment.

10          Defendants have offered a non-discriminatory reason only as to one of the adverse

11   employment actions discussed above, the failure to promote Piersig in June 2019.  The Court finds

12   that Piersig has offered sufficient evidence of pretext to survive summary judgment as to that

13   conduct.  According to Defendants, Piersig, like Knox, was not promoted because the men who

14   were selected were found by Becton to show "diversity of thought" and have a willingness to

15   implement her vision and the panel found them to be more qualified.  Motion at 24-25. But

16   Plaintiffs have presented evidence that the factors Becton allegedly considered were not listed in

17   the job description or the job announcement and were not addressed at Piersig's interview.  Piersig

18   Decl. ¶¶ 51, 52, 55.  Moreover, Becton did not attend Piersig's interview and Piersig states she

19   was not given the opportunity to reschedule.[18]  *Id.*  ¶ 55. Piersig's declaration also describes both

20   of the male candidates who were promoted as being younger and less experienced than she was

21   and states that she was later told that Becton was the sole decision-maker as to these promotions.

22   *Id.* ¶¶ 58-63.   This evidence is sufficient to meet Plaintiffs' burden as to pretext with respect to

23   failure to promote Piersig in June 2019.

24

25

26   _____

27   [18] According to Becton, she was required unexpectedly to attend a Board of Supervisors meeting
     during the interviewing process and that candidates – including Piersig – were "given the option to
     reschedule" at another time when she could attend. Becton Decl. ¶ 23.  Becton states that she

28   "understand[s]" that Piersig "elected to proceed with the interview" rather than rescheduling but
     does not state the basis for her understanding.  Clearly, there is a dispute of fact on this question.

United States District Court
Northern District of California

c. Henderson

In their Opposition brief, Plaintiffs cite the following employment actions against Henderson to establish that she was subjected to adverse employment actions: 1) failure to promote Henderson to a Level 5 position for which she applied in 2019, when she was denied a promotion and told she would never be promoted;  2) exclusion from New Prosecutor Training; 3) denial of requests to be on Death Penalty Review Committee and part of the contract system assessment working group and placement instead on the evaluation committee; 4) exclusion from recruiting activities and creation of a recruitment and retention position that was given to a younger white male instead of Henderson after Henderson reported to DA Becton about discriminatory recruitment efforts against racially diverse and LGBTQ candidates in prior recruiting in which she had been involved; and 5) failure to provide adequate resources, including transfer of a subordinate out of her unit in 2019, making her a "supervisor" with no actual subordinates to supervise.  Opposition at 19 (citing to Fact section of brief, subsections 3, 6 & 7); *see also* Henderson Decl., ¶¶ 36 (transfer of only subordinate to another unit);  40-46 (2019 denial of promotion), 34-35 (exclusion from New Prosecutor Training); 61 (committee assignments).

At oral argument Plaintiffs identified the following additional employment actions as adverse actions: 1) in June 2019, when Ms. Johnson went on maternity leave, the assignment to Henderson of supervision of the Domestic Violence and Elder Abuse Units, without consulting Henderson or increasing her pay despite increased responsibility and work load,  *see* Henderson Decl. ¶ 53;  2) failure to give Henderson the supervisory position on the Trial Team left open by O'Connell's June 2019 promotion, despite Henderson's request that she be assigned that position, which was instead assigned to a younger male attorney, Kevin Bell, *see id.*  ¶¶ 21, 46; 3) failure to promote her to Level 5 in December 2018, when Walpole was promoted to Level 5 without an announcement or application process; *id.* ¶ 31, and 4) negative comments in a performance evaluation by Chris Walpole after Henderson expressed support for the gender and disability discrimination claims made by Melissa Smith, *see id.*  ¶¶ 59-60 & Ex. G (January 20, 2021

1    counseling memorandum).[19]

2         As discussed above, denial of a promotion is a "classic example" of an adverse

3    employment action.  Furthermore, where there is no job announcement or application process for a

4    position, a prima facie case of discrimination can be made even if the plaintiff did not apply for

5    the position at issue. As there is evidence in the record that Henderson was either denied a

6    promotion for which she applied (the Level 5 promotion she was denied in June 2019 and failure

7    to give her the supervisory position on the Trial Team left open by O'Connell's promotion) or

8    passed over for a  promotion for which there was no announcement or formal application process

9    (failure to promote in 2018 when Walpole was made a Level 5), these are sufficient to

10   demonstrate that Henderson was subject to adverse employment actions.  Likewise, Henderson

11   has offered evidence that she was excluded from various committees and activities that negatively

12   affected her reputation in the Office and opportunities for promotion and given an underserved

13   negative performance review by Walpole.  Based on the authority discussed above, and drawing

14   all reasonable inferences in Henderson's favor, these actions also constitute adverse employment

15   actions.

16        The Court does not decide whether the assignment of additional responsibilities to

17   Henderson in 2019 without a promotion or pay raise or the alleged failure to provide her with

18   equal resources rise to the level of adverse employment actions.  As discussed above, the authority

19   is mixed as to whether such actions constitute adverse employment actions and the issue was not

20   briefed by the parties.

21        Defendants offered what they contend is a legitimate reason for only one of the

22   employment actions discussed above, namely, the failure to offer Henderson the promotion to

23   Level 5 for which she applied in April 2019. Motion at 25.  According to Defendants, they

24   declined to promote Henderson based on non-discriminatory (though admittedly subjective)

25   criteria used by Becton focusing on applicants' willingness to advance her "vision" for the Office

26   and "diversity of thinking."  As discussed above, however, there is evidence in the record that

27   _____

28   [19] Plaintiffs also point to the failure to promote Henderson to a Level 5 in the summer of 2021 but
     that occurred after the SAC was filed and therefore the Court does not consider that conduct.

United States District Court
Northern District of California

1  neither the job description nor the questions the selection panel asked of applicants addressed

2  these criteria.   Further, it is undisputed that only two of the four Level 5 openings were filled and

3  both went to younger men.   This evidence is sufficient to demonstrate a genuine dispute of

4  material fact as to whether the reason offered by Defendants was pretext for discrimination.

5  Therefore, Defendants are not entitled to summary judgment as to Henderson's discrimination

6  claims under Title VII and FEHA.

7          d.   Chandler

8          Plaintiffs point to the following actions they contend were adverse employment actions

9  against Chandler: 1) failure to promote Chandler to a Level 5 in June 2019 after discouraging her

10 from applying for that promotion; *see* Chandler Decl. ¶¶ 27-29, 2) failure to give Chandler the

11 Felony Expeditor position after it was initially promised to her in the Spring of 2019 and instead

12 giving that position to a male attorney with less experience while assigning Chandler the non-

13 supervisorial Felony Filer position; *id.*  ¶¶ 30-38, 3) the assignment to Chandler of the non-

14 supervisorial filing duties of Domestic Violence Misdemeanors on top of her duties as Felony

15 Filer, which amounted to an additional half-time job, without any additional compensation, even

16 though the male who had held the position for the previous seven years had not been asked to

17 perform those duties; *id*. ¶¶ 35-37, 4) passing over Chandler for a series of supervisory positions,

18 including the Richmond Misdemeanor Team Leader position in 2019; *id*. ¶ 38.[20]

19         With respect to the failure to promote Chandler to a Level 5 in June 2019, Defendants

20 contend Chandler cannot make a prima facie case based on this conduct because she did not

21 submit an application for that promotion.   They do not dispute, however, that Chandler expressed

22

23 ──────────────────

24 [20] Plaintiffs also point to an email that was sent by Jun Fernandez on September 28, 2021, after
Chandler was offered the Felony Expeditor position that had been given to Fernandez two years
25 before, asserting that the email was an adverse employment action. The email stated that former
Chief MacMaster had told Fernandez, "I cannot say that I approve of Alison swapping in for you.
26 You, my friend, are the quintessential Felony Expeditor." Chan Decl. ¶ 14.  According to
Defendants, Chandler complained and it was determined that the email "should not have been
27 sent."  *Id.*  ¶ 16.  Because the Fernandez email was not included in the SAC, Plaintiffs may not
rely upon it as an adverse employment action in support of Chandler's claims.  The Court does not
28 preclude the possibility that evidence relating to this conduct may be admissible at trial for other
purposes, however.

United States District Court
Northern District of California

1    interest in applying and was told by her supervisor, Dan Cabral, that she did not have sufficient

2    supervisorial experience for the Level 5 and would not be awarded the promotion if she applied.

3    *See id.* ¶ 29.  Nor do they point to any evidence that controverts Chandler's statements in her

4    declaration that she prepared a resume that she personally delivered to Becton with the request that

5    she be given a supervisorial position so that she could become qualified for a Level 5 position.  *Id.*

6    Defendants also have cited no authority suggesting that an individual who has expressed interest

7    in being promoted to a position but has been told by her supervisor not to bother to apply cannot

8    establish that she has been subjected to an adverse employment action simply because she

9    followed that advice and therefore did not obtain the promotion.  Indeed, the Supreme Court has

10   expressly rejected that proposition.  *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324,

11   366-367 (1977) (holding that failure to submit an application does not bar discrimination claim

12   under Title VII where the plaintiff was deterred from applying by an employer's discriminatory

13   practices). Therefore, the failure to promote Chandler to a Level 5 in June 2019 is sufficient to

14   demonstrate that she was subjected to an adverse employment action for the purposes of making a

15   prima facie case of discrimination.

16        Further, there is evidence that in April or May of 2019, Chandler requested the Richmond

17   Felony Expeditor position, which would have been a promotion for her to the extent it would have

18   provide the supervisorial experience she had been told she would need to eventually be promoted

19   to a Level 5, but that after the position was initially promised to her it was instead given to a male,

20   Jun Fernandez.  Becton Decl., ¶ 24; Chandler Decl. ¶¶ 30-39.   Instead, she was assigned the non-

21   supervisorial position of Felony Filer.  Chandler Decl. ¶ 18.  Similarly, although she made

22   repeated requests for a position that would allow her to gain supervisorial experience, Chandler

23   was passed over for such positions, including the position of Misdemeanor Team Leader, which

24   was given to a male with less experience than Chandler.  *Id.* ¶ 39.  This evidence also is sufficient

25   to show that Chandler was subjected to an adverse employment action in the form of denial of

26   promotions.

27        The Court does not decide whether the additional work assigned to Chandler when she was

28   asked to take on the supervisorial filing duties of Domestic Violence Misdemeanors constituted an

adverse employment action.  As discussed above, the case authority is mixed as to when the imposition of additional work is an adverse employment action and the issue was not briefed by the parties.

Of the employment actions listed above, Defendants have come forward with a non-discriminatory reason as to only one employment decision, the decision to assign Chandler to the Felony Filer position instead of the Felony Expeditor position she had requested.  In particular, Defendants point to Becton's statement in her declaration that DDA Georgiou had supervised Chandler and said Chandler "would be better in the Felony Filer role."  Becton Decl. ¶ 24. Assuming that this vague statement is a legitimate, non-discriminatory reason for Defendants' conduct sufficient to shift the burden to Plaintiffs to show pretext, Plaintiffs have met that burden. Among other things, Chandler states Dan Cabral told her that she was "emotional" and that Georgiou had labeled her "excitable", terms that are not used to describe men in the office and which have been used to prevent Chandler from supervising and have affected her reputation and career advancement.  Chandler Decl. ¶ 44.  She also states in her declaration that around this time several junior males with less experience than Chandler were given supervisorial positions, while Chandler was passed over.  Chandler Decl. ¶ 22.

Nor have Defendants established that the failure to assign Chandler the Felony Expeditor position in 2019 was not discriminatory because they offered her the position more than two years later, in September 2021.  *See* Reply at 5; Becton Decl. ¶ 24.  Defendants have cited no authority suggesting that because they ultimately offered that position to Chandler the earlier failure to assign that position to her is not actionable.  Chandler alleges that during the interim period her career stagnated.  Chandler Decl. ¶ 33. Even assuming Defendants' subsequent offer to assign Chandler this position sheds any light on their intent in connection with the decision to deny Chandler's earlier request for the position, this evidence does not establish as a matter of law that they are entitled to summary judgment on this ground.

e.  Blumberg

Plaintiffs cite to the following employment actions against Blumberg that they contend constitute adverse employment actions: 1) transfer from her position as a misdemeanor supervisor

42

1    to a non-supervisorial position in the Homicide unit in October 2018; 2) removal in October 2018

2    from the Recruitment and Retention Committee after "years of service without explanation and

3    without the courtesy to tell Blumberg" and exclusion from other activities in which she had

4    formerly participated, including the diversion/community courts committee and on-campus

5    interviews, which has stifled her opportunities for advancement in the office; and 3) failure to

6    promote Blumberg to a Level 5 position in the Spring of 2019.  Opposition at 19 (citing to Fact

7    section of brief, subsections 3, 4 & 6); *see also* Blumberg Decl. Decl. ¶¶ 48-49 (failure to

8    promote), 16-18 (transfer to homicide unit), 12, 54 (removal from Recruitment and Retention

9    Committee).

10          The Court concludes Blumberg's claim fails as to the last of these.  As discussed above,

11   denial of a promotion is an adverse employment action under FEHA and Title VII, and while a

12   plaintiff generally must have applied for the position to rely on the denial of the promotion in

13   support of such a claim, there are exceptions when: 1) the position was not announced and there

14   was no formal application process; or 2) the plaintiff was deterred from applying by the

15   defendants' discriminatory practices, making it futile to apply.  Plaintiffs have not demonstrated a

16   genuine dispute of fact as to the failure to promote her to Level 5 in 2019 because there is no

17   evidence in the record that she applied for the position, even though there was a formal application

18   process, and there also is no evidence Blumberg was deterred from applying by Defendants'

19   discriminatory practices.  Blumberg implicitly concedes in her declaration that she did not submit

20   an application for the promotion because she "understood [she]was not suitable [for the promotion

21   to Level 5] because despite what [she] had accomplished at that point in [her] career, those limited

22   positions were typically reserved for attorneys with decades of experience."  Blumberg Decl. ¶ 48.

23   Unlike Chandler, though, there is no evidence in the record that Blumberg talked to her supervisor

24   or to Becton about the possibility of applying for the promotion or that she was discouraged from

25   applying.  Nor have Plaintiffs cited authority establishing that Blumberg's assumption that she

26   was not sufficiently qualified for the Level 5 position is enough to excuse her from the general

27   rule that to demonstrate an adverse employment action based on failure to promote where there is

28   a formal application process, the plaintiff must apply for the position.

United States District Court
Northern District of California

1       On the other hand, the Court concludes that there is sufficient evidence to create a genuine

2   dispute of material fact as to whether Blumberg's transfer to the Homicide Unit in October 2018

3   was an adverse employment action.[21] It appears to be undisputed that while a position in the

4   Homicide Unit is considered to be desirable it is also extremely demanding and stressful, often

5   involving long hours.  Blumberg Decl. ¶¶ 16, 21;  *see also* Becton Decl. ¶ 8 (recognizing that

6   assignments like Homicide – although considered by many to be the pinnacle assignment in the

7   Office – can be very demanding and stressful and lead to "burn-out.").  There is also evidence that

8   Defendants recognize that this position involves special challenges and therefore typically give

9   attorneys advance notice before moving them into this position but did not provide Blumberg with

10  any advance notice of the transfer.  Blumberg Decl. ¶¶ 17-18.  In contrast, two men who were

11  transferred to the unit at the same time were given "weeks" of advance notice.  *Id.* ¶ 18.

12  Furthermore, Blumberg had made a specific request to her supervisor that she remain in her

13  position as misdemeanor supervisor for the full two years that is typical for that position.  *Id.* ¶ 16.

14  Drawing all reasonable inferences in Blumberg's favor, the Court concludes Plaintiffs have

15  demonstrated that Blumberg's transfer was an adverse employment action for the purposes of

16  making a prima facie case of discrimination.[22] *See Patten v. Grant Joint Union High Sch. Dist.*,

17  134 Cal. App. 4th 1378, 1390 (2005) (finding that transfer of plaintiff school principal from one

18  school to another was an adverse employment action even though "at first glance" the transfer did

19  not appear adverse, based on, *inter alia*, the fact that the plaintiff's previous school was

20  underperforming and therefore presented "administrative challenges an up-and-coming principal

21  wanting to make her mark would relish" and also where new school ran on a year-round schedule,

22  which presented difficulties for plaintiff because of her own school-aged children's schedules),

23  disapproved of on other grounds by *Lawson v. PPG Architectural Finishes, Inc.*, 12 Cal. 5th 703

24  (2022);  *Williams v. Regus Mgmt. Grp., LLC*, 836 F. Supp. 2d 159, 177 (S.D.N.Y. 2011)("holding

25

26  [21] For the purposes of the instant motion the Court assumes that Blumberg's claims based on the
    October 2018 transfer are timely but notes that this transfer occurred more than a year before she
27  filed her DFEH charge, on November 21, 2019.
    [22] Because Defendants did not argue in the Motion that they had a legitimate nondiscriminatory
28  reason for transferring Blumberg to Homicide in 2018 the Court does not address whether there is
    evidence of pretext.

United States District Court
Northern District of California

1    that requiring that an employee permanently relocate from New York to Dallas, after he has

2    specifically insisted on a transfer to New York for important personal reasons, constitutes a

3    change in the terms and conditions of his employment sufficient to satisfy the [New York City

4    Human Rights Law].").

5         The Court also finds that Blumberg's exclusion from several committees and other

6    opportunities constituted adverse employment actions where Blumberg offers testimony that she is

7    "no longer included in leading any office wide training"; "no longer invited to instruct in the

8    Prosecutor's Academy"; "no longer assigned to the Recruitment and Retention Committee"; no

9    longer included in the diversion/community courts committee "[d]espite [her] work on the initial"

10   committee; "no longer invited to participate in the on-campus interview process"; and has been

11   "blatantly ignored by male Assistant District Attorneys and has been "iced out," to the detriment

12   of her career advancement. *Id.* ¶ 54.  While Becton states that she has never removed or excluded

13   Blumberg from any committees or training of new hires, Becton Decl., ¶ 9, this evidence only

14   shows that there is a material dispute of fact on this question.

15        Defendants did not address the reasons for the actions discussed above and therefore the

16   Court need not address pretext as to Blumberg's discrimination claims.

17

18       **E.**   **Whether Defendants are Entitled to Summary Judgment on Plaintiffs' Retaliation Claims**

19        A claim for retaliation under FEHA and Title VII requires that Plaintiffs show that: (1)

20   they engaged in a protected activity; (2) they were subjected to an adverse employment action, and

21   (3) there was a causal link between the two. *Miller v. Dep't of Corr.*, 36 Cal. 4th 446, 472 (2004);

22   *Villiarimo v. Aloha Island Air, Inc*., 281 F.3d 1054, 1064 (9th Cir. 2002). "Causation sufficient to

23   establish the third element of the prima facie case may be inferred from circumstantial evidence,

24   such as the employer's knowledge that the plaintiff engaged in protected activities and the

25   proximity in time between the protected action and the allegedly retaliatory employment

26   decision." *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) (citation omitted).

27       **1.   Knox**

28        Defendants contend Knox's retaliation claim fails to the extent it is based on her 2018

United States District Court
Northern District of California

1    demotion because the only protected activity she has engaged in was filing the DFEH and EEOC

2    charges and initiating this action, all of which occurred after her demotion; therefore, they assert,

3    the demotion does not satisfy the causation requirement for Knox's retaliation claim.  Motion at

4    26 (citing *James v. Tempur Sealy Int'l, Inc*., 2019 U.S. Dist. LEXIS 64280, *13 (N.D. Cal. April

5    15, 2019)).  Defendants assert that Knox's transfer to the Elder Abuse Unit in 2021 cannot support

6    her retaliation claim because it was a lateral transfer and not an adverse employment action, as

7    discussed above.  *Id.*

8            As a preliminary matter, Plaintiffs contend that all of them engaged in protected activities

9    that resulted in retaliation, Opposition at 13, but do not point to any protected activities by Knox

10   other than the ones identified by Defendants. The earliest of those occurred on September 4, 2019,

11   when Knox filed her DFEH charge.[23]  Knox was demoted almost a year earlier, *see* Knox Decl. ¶

12   34, and excluded from the Death Penalty Review Committee and New Prosecutor Training in late

13   2018 or early 2019, while the hiring decisions for the Level 5 promotion Knox was denied

14   occurred in June 2019, Becton Decl. ¶ 23.  As all of these actions pre-date Knox's DFEH

15   complaint, none can satisfy the causation requirement for her retaliation claims. On the other hand,

16   Knox's transfer to the Elder Abuse Unit occurred *after* she filed the DFEH charge and the original

17   complaint in this action (filed February 26, 2020).  Therefore, Defendants' argument that there is

18   no causation, as a matter of law, does not apply to that conduct.   Further, as discussed above, the

19   Court finds that Defendants have not established, as a matter of law, that that transfer was a purely

20   lateral transfer and therefore not an adverse employment action.   Therefore, Defendants are not

21   entitled to summary judgment on Knox's retaliation claims except as to the conduct that occurred

22   before September 2019.

23                    **2.  Piersig and Chandler**

24           Defendants challenge Piersig's and Chandler's retaliation claims on the grounds that their

25   _____

26   [23] In their brief, Plaintiffs contend Defendants were put on notice of Plaintiffs' protected activities
     a month earlier, when Plaintiffs' counsel requested their personnel files from Defendants in
27   August 2019.  Opposition at 13.  Assuming this assertion is supported by the evidence (Plaintiffs
     do not cite any evidence in support of this representation), it makes no difference to the Court's
28   conclusion because both the demotion and the failure to promote Knox to the Level 5 position
     occurred before that.

United States District Court
Northern District of California

1    alleged complaints to Venus Johnson were merely generalized complaints about mismanagement

2    and therefore were not protected activity.  Motion at 27 (citing SAC, ¶¶ 118(b)(i); *Yanowitz v.*

3    *L'Oreal USA, Inc*., 36 Cal. 4th 1028, 1047 (2005)).  Defendants further assert that to the extent

4    Piersig contends she received a negative performance review after the complaint was filed in this

5    case, "there is no evidence showing why it was retaliatory or that her supervisor even had

6    knowledge of her Charge or Complaint."  *Id.* (citing *Flores v. City of Westminster,* 873 F.3d 739,

7    748 (9th Cir. 2017)).  Both arguments are unpersuasive.

8         As to the June 2018 meeting Chandler and Piersig had with Venus Johnson, the declaration

9    supplied by Piersig is explicit that they complained about gender discrimination to Johnson and

10   that their complaints were not simply generalized complaints about mismanagement.  Piersig

11   Decl. ¶¶ 17-19. Therefore, there is a genuine dispute of fact as to whether this constituted

12   protected activity by Piersig and Chandler. Further, Defendants' argument that there is no

13   evidence that Piersig's March 2020 negative performance review (given less than a month after

14   the Complaint in this action was filed) was retaliatory or that her supervisors had knowledge that

15   the Complaint in this case had been filed is also contradicted by Piersig's declaration.  Piersig

16   states that the evaluation contained untrue and defamatory statements from Derek Butts about her

17   performance in 2018, outside of the 3 month period the review was to cover, which were quoted

18   by Dan Cabral, who performed the review, and that both Butts and Cabral were aware of

19   Plaintiffs' lawsuit as it had been covered in the media and discussed in the office.  Piersig Decl. ¶

20   23.

21         Therefore, Defendants have not established that Piersig's and Chandler's retaliation claims

22   fail as a matter of law.

23              ### 3.  Henderson

24         Defendants contend Henderson's retaliation claims fail because the protected activity she

25   cites were not explicitly aimed at age and gender discrimination but instead, were only generalized

26   discussions of the need to promote diversity.  Motion at 28. The single snippet of Henderson's

27   deposition testimony Defendants cite, however, includes testimony by Henderson that she had a

28   meeting with Becton and Johnson where she raised the "pathetic lack of diversity" in the office,

United States District Court
Northern District of California

47

the "inequality" of women and the need to get women into executive management positions.  Fish Decl., Ex. L (Henderson Dep.) at p. 61.  Drawing all reasonable inferences in Henderson's favor, as is required on summary judgment, this evidence is sufficient to establish a material dispute of fact that Henderson engaged in protected activity by complaining about gender discrimination.

### 4.  Blumberg

Defendants argue that Blumberg's retaliation claims fail because the only employment action that Defendants took against her that followed any protected activity was her transfer to the Homicide unit, which Defendants contend was a purely lateral transfer and thus was not an adverse employment action.  Motion at 28-29.  As discussed above, the Court rejects Defendants argument that they are entitled to summary judgment that Blumberg's transfer to Homicide was a purely lateral transfer and therefore also rejects that argument in connection with Blumberg's retaliation claims.

### F.  Whether Defendants are Entitled to Summary Judgment on Plaintiffs' Failure to Prevent Discrimination Claim Under FEHA

Under FEHA, it is unlawful for an employer "to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring."  Cal. Gov't Code section 12940(k).  To prevail on a claim asserted under this section, a plaintiff must establish three essential elements: 1) the plaintiff was subjected to discrimination, harassment or retaliation;  2) the defendant failed to take all reasonable steps to prevent discrimination, harassment or retaliation; and 3) the defendant's failure caused plaintiff to suffer injury, damage, loss or harm.  *Leliand v. City and County of San Francisco* 576 F. Supp.2d 1079, 1103 (N.D. Cal. 2008).

As discussed above, Plaintiffs have come forward with sufficient evidence to demonstrate that there is a material dispute of fact with respect to the first element.  The Court further finds that the facts are disputed as to whether Defendants took all reasonable steps to prevent discrimination and retaliation.  The record is replete with evidence from which a jury could reasonably conclude that Defendants ignored complaints of discrimination or failed to take sufficient remedial action.  *See, e.g.,* Piersig Decl., ¶¶ 23-28 (no action taken in response to complaints from female attorneys Piersig and Chandler about discriminatory and harassing conduct by supervisor, Derek Butts;

1   Chandler Decl. ¶ 23 (same); Henderson Decl. ¶ 39 (complaints to Cabral that office needed more

2   female leadership were ignored); Smith Decl. ¶ 11 (complaints about gender discrimination

3   ignored and resulted in retaliation).  There is also evidence sufficient to create a material dispute

4   of fact that all five Plaintiffs were injured by Defendants' alleged discrimination and retaliation

5   by, among other things, being demoted or passed over for advancement.  Therefore, Defendants

6   are not entitled to summary judgment on Plaintiffs' claim for failure to prevent discrimination.

7       **G.    CONCLUSION**

8           For the reasons set forth above, Defendants' Summary Judgment Motion is GRANTED as

9   to: 1) claims asserted by Blumberg under FEHA and Title VII based on Defendants' failure to

10  promote her to a Level 5 in June 2019; 2) Chandler's FEHA claim for age discrimination (Claim

11  Two);  and 3) Knox's retaliation claims to the extent they are based on conduct that occurred

12  before September 4, 2019.  The Summary Judgment Motion is DENIED in all other respects.  In

13  addition, the Court STRIKES Defendants' evidentiary objections (dkt. no. 103-2).

14          In view of the many unanswered questions relating to the timeliness of Plaintiffs' claims

15  and the sprawling nature of Plaintiffs' case, **the parties are also ordered to meet and confer and**

16  **file a joint submission no later than July 29, 2022 as follows**:

17      •   The parties shall supply a chart that lists each Plaintiff and identifies, on a claim-

18          by-claim basis: 1) the cut-off date for the look-back period that applies to that claim

19          based on the date each individual Plaintiff filed her DFEH charge and the

20          applicable laws and regulations that apply to that claim; 2) for each Plaintiff, the

21          specific adverse actions each claim is based upon, consistent with this Opinion, and

22          the date the conduct occurred, with citations to supporting evidence.  The parties ar

23          cautioned that, as discussed above, no adverse actions may be included in this case

24          unless they are listed above by the court as potential adverse actions.  The parties

25          should supply a single chart but if they are unable to agree on the cut-off dates that

26          apply to particular claims or there are disputes as to when certain conduct occurred

27          they should indicate their disagreements and provide evidence and/or authority in

28          support of their positions.

United States District Court
Northern District of California

- Simultaneous briefs, not to exceed ten (10) pages, addressing why each of Plaintiffs' claims is (or is not) timely as to each individual plaintiff and each of the adverse employment actions her claim is based upon.

To the extent the parties conclude, through meeting and conferring, that some of Plaintiffs' claims are untimely as to certain adverse employment actions, they shall file a stipulation listing those claims. The parties are hereby given notice that the Court may rule on the timeliness of portions of or all of Plaintiffs' claims prior to trial based on the summary judgment briefing to date, and on the joint and separate submissions required by this Order, to the extent the parties' disputes do not turn on disputed facts that must be decided by the jury.

## IV.   MOTION TO EXCLUDE

### A.   Background

Plaintiffs have retained as an expert Dr. Peter Glick and seek to offer opinions by Dr. Glick contained in his expert report addressing the science of stereotyping, bias, and discrimination. Fish Decl., Ex. A (Plaintiffs' Expert Witness Disclosures). In his report ("Glick Report"), Dr. Glick states that he has "coedited two books on prejudice, co-authored a book on the social psychology of gender and sexism, and authored or co-authored more than 80 professional papers (peer-reviewed journal articles and chapters in edited books) on prejudice, stereotypes, and discrimination, including comprehensive reviews of sex discrimination in the workplace." Glick Report at 3.  Dr. Glick has been recognized as an expert in the field of social psychology and his report contains a lengthy list of honors and awards he has received.  *Id.* at 3-4.

In his report, Dr. Glick offers "social framework" testimony intended to inform the Court and jury "about empirically validated principles revealing when and how stereotypes and bias can lead to workplace discrimination toward women." *Id.* at 6.  His report also addresses stereotypes and bias related to age.  *Id.* at 52-53.  His opinions relate to general principles that will allow the jury and the Court to "go[ ] beyond common assumptions about how stereotypes and biases operate." *Id.* As an example, he explains that "research reveals how bias depends on situational context (e.g., role expectations for a job), targets specific judgment dimensions (e.g., perceived warmth), and involves both prescriptive and descriptive stereotypes." *Id.*  According to Dr. Glick,

"[c]ompared to common-sense knowledge, scientific research presents a much more nuanced picture of how stereotypes and bias work, including in what circumstances and toward whom they tend to occur."  *Id.*

In his Report, Dr. Glick states that he reviewed the Second Amended Complaint and a handful of documents (three evaluations of Knox, the September 21, 2021 email from Jun Fernandez relating to Chandler's promotion to Felony Expeditor and Chandler's complaint about that email, and an "Investigation Report").  *Id.* at 8. At his deposition, Dr. Glick testified that he had not actually received the Investigation Report and had not reviewed it.  Fish Decl., Ex. B (Glick Dep.) at 145.

**B.    Contentions of the Parties**

In the Motion to Exclude, Defendants argue that the opinions of Dr. Glick should be excluded, in their entirety, because they do not satisfy the requirements of Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  In particular, they contend Dr. Glick's opinions fall short because: 1) they are not based on sufficient facts or data, as his report relies only on "selected documents and information provided by Plaintiffs" and he did not "review the County's policies or conduct any independent assessment of the County's promotion and demographic data in this case"; 2) they do not address "the application of his principles and methods to the facts of this case, and [do not] rule out other possible non-discriminatory reasons for Plaintiffs' job assignments";  and 3) they will "lead to prejudice and jury confusion, and they will not assist the trier of fact in determining whether Defendants intentionally discriminated against Plaintiffs because of their age or gender."   Motion to Exclude at 5.

Defendants contend many courts have excluded this type of social framework opinion testimony, citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 355 n.8 (2011), *White v. BNSF Ry. Co.*, 726 F. App'x 603 (9th Cir. 2018), *Mullenix v. The Univ. of Tex. at Austin*, 2021 WL 4304815, at *1 (W.D. Tex. Sept. 21, 2021) and *Nikolova v. The Univ. of Tex. at Austin*, 2022 WL 443783, at *1 (W.D. Tex. Feb. 14, 2022).  *Id.* at 5-6.  Defendants assert that in *Mullenix* and *Nikolova*, the court excluded opinions of Dr. Glick that are similar to those Plaintiffs seek to introduce in this

1    case. *Id*. at 6. They also offer a rebuttal expert report of Dr. Greg Mitchell, who like Dr. Glick is a

2    social psychologist and expert on bias and discrimination. *See* Fish Decl., Ex. C. (Defendants'

3    Expert Witness Disclosure).

4            Plaintiffs respond that Defendants have not challenged Dr. Glick's qualifications or the

5    reasoning supporting his opinions. Opposition at 3-4. Instead, they assert, Defendants criticize

6    Dr. Glick's report because it does not express opinions as to the ultimate legal issues in this case,

7    namely, whether Defendants discriminated or retaliated against Plaintiffs. *Id.* at 2. But such

8    opinions are not properly the subject of expert opinion, Plaintiffs contend. *Id.* (citing *Hangarter v.*

9    *Provident Life & Acc. Ins. Co*., 373 F.3d 998, 1016 (9th Cir. 2004)). They further assert that

10   *Mullenix* and *Nilolova* are distinguishable because in those cases Dr. Glick *did* opine on whether

11   discrimination occurred in the specific circumstances of those cases. *Id.* Plaintiffs point to

12   another case where Dr. Glick's opinions were found to be admissible, *Tuli v. Brigham & Women's*

13   *Hosp., Inc.*, 592 F. Supp. 2d 208 (D. Mass. 2009). *Id.* In that case, they assert, the judge found

14   that Dr. Glick's opinions satisfied the requirements of Rule 702 and *Daubert* because Dr. Glick

15   opined only as to general principles to provide "context" and did not provide a "roadmap to a

16   particular outcome" for the jury. *Id.* (quoting 592 F. Supp. 2d at 215-216). The same is true here,

17   according to Plaintiffs, and therefore Dr. Glick's opinions in this case are also admissible.

18           Plaintiffs further assert that even Defendants' expert, Dr. Mitchell, concedes that expert

19   testimony may be necessary "for a lay jury to fully comprehend the complexities of age and

20   gender biases." *Id.* at 9-10 (citing Nichols Decl. at ¶3, Ex. B (Mitchell Dep.) at 71). They point

21   out that Dr. Mitchell's report does not opine that the social science of discrimination is not an

22   appropriate subject of expert opinion but instead, that the jury should be told about the

23   countervailing research findings that "even under conditions ripe for discrimination of the kind

24   that Dr. Glick emphasizes, many people do not act on their biases and the observed differences in

25   outcomes for women and men as a group (or for younger versus older employees as a group) tend

26   to be small when they are observed at all." *Id.* at 10 (quoting Nicholas Decl., Ex. C (Mitchell

27   Report) at 22).

28

United States District Court
Northern District of California

**C.    Analysis**

**1.  Legal Standards Under Rule 702 and *Daubert***

Under Rule 702 of the Federal Rules of Evidence, a witness may offer expert testimony if the following requirements are met:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  In determining whether expert testimony meets the requirements of Rule 702, courts follow the approach set forth in *Daubert v. Merrell Dow Pharms., Inc.*, in which the Supreme Court described the relevant inquiry as follows:

> Faced with a proffer of expert scientific testimony, then, the trial judge must determine . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.  This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

509 U.S. 579, 590 (1993).

With respect to the first requirement, that an expert must testify to "scientific knowledge," the Court in *Daubert* explained that "[t]he adjective 'scientific' implies a grounding in the methods and procedures of science . . . [while] the word 'knowledge' connotes more than subjective belief or unsupported speculation  . . . [and] 'applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds.'"  *Id.* (quoting Webster's Third New International Dictionary 1252 (1986)).  The Court declined to set forth a definitive test but offered some "general observations" about the types of factors that might be considered in determining whether this requirement is met.  *Id.* at 593.  These include: 1) whether the methodology can be or has been tested; 2) whether the theory and technique has been subjected to peer review; 3) if a "particular scientific technique" is involved, the known or

United States District Court
Northern District of California

1   potential rate of error; and 4) the degree of acceptance in the relevant scientific community.

2   *Daubert*, 509 U.S. at 592-94.

3           The Ninth Circuit has noted that the "scientific knowledge" requirement is usually met by

4   "[e]stablishing that an expert's proffered testimony grows out of pre-litigation research or that the

5   expert's research has been subjected to peer review." *Daubert v. Merrell Dow Pharmaceuticals,*

6   *Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995) ("*Daubert II*").  However, when such evidence is not

7   available, the proponent's experts may satisfy this requirement by "explain[ing] precisely how

8   they went about reaching their conclusions and point[ing] to some objective source – a learned

9   treatise, the policy statement of a professional association, a published article in a reputable

10  scientific journal or the like – to show that they have followed the scientific method, as it is

11  practiced by (at least) a recognized minority of scientists in their field."  *Id.* at 1319.

12          The second requirement under Rule 702, that expert testimony must "assist the trier of fact

13  to understand the evidence or to determine a fact in issue," "goes primarily to relevance."  *Id.* at

14  591.  This is a question of "fit," and "is not always obvious."  *Daubert*, 509 U.S. at 591.  The

15  Court cautioned that "scientific validity for one purpose is not necessarily scientific validity for

16  other, unrelated purposes."  *Id.*  To meet this requirement there must be "a valid scientific

17  connection to the pertinent inquiry."  *Id.*  In other words, the expert testimony must "logically

18  advance[ ] a material aspect of the proposing party's case."  *Daubert II*, 43 F.3d at 1315.  This

19  requirement is more stringent than the relevancy requirement of Rule 402 of the Federal Rules of

20  Evidence, "reflecting the special dangers inherent in scientific expert testimony."  *Jones v. U.S.*,

21  933 F. Supp. 894, 900 (N.D. Cal. 1996) (citing *Daubert*, 509 U.S. at 591; *Daubert II*, 43 F.3d at

22  1321 n. 17).  In particular, expert testimony " 'can be both powerful and quite misleading because

23  of the difficulty in evaluating it.' "  *Id.* (quoting *Daubert*, 509 U.S. at 595 (citation omitted)).

24  Therefore, federal judges should exclude scientific expert testimony under the second prong of the

25  *Daubert* standard unless they are "convinced that it speaks clearly and directly to an issue in

26  dispute in the case."  *Id.* (quoting *Daubert II*, 43 F.3d at 1321 n. 17).

27          "[A] major principle underlying the *Daubert* gatekeeping function is that the trier of fact

28  should not be unduly prejudiced by testimony that is based on foreign concepts."  *Volk v. United*

United States District Court
Northern District of California

54

*States*, 57 F. Supp. 2d 888, 896 (N.D. Cal. 1999); *see also Stilwell v. Smith & Nephew, Inc*., 482 F.3d 1187, 1192 (9th Cir. 2007) ("In *Daubert* and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Supreme Court described the district court's 'gatekeeping role,' and required that 'all forms of expert testimony, not just scientific testimony' survive scrutiny under Rule 702.") (quoting *White v. Ford Motor Co*., 312 F.3d 998, 1007 (9th Cir. 2002)).

### 2. Discussion

In determining whether Dr. Glick's opinions are admissible, the Court considers whether they meet the scientific knowledge requirement and whether they will be helpful to the jury. The Court finds that the first requirement is satisfied. Whether the second requirement is met presents a closer call.

As Judge Gertner observes in *Tuli*, Dr. Glick "is an expert in social framework analysis" and his opinions on that subject are "based not simply on experience, but also social psychological testing of stereotyping and discrimination over the past thirty or forty years . . . in both the laboratory and field settings." 592 F. Supp. 2d at 214. Further, in this case, as in *Tuli*, Dr. Glick does not offer opinions as to whether or not the general principles he describes point to discrimination and bias under the specific circumstances of this case. It was that sort of expert opinion testimony that the Supreme Court disapproved in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 355 n. 8 (2011) (citing Monahan, Walker, & Mitchell, Contextual Evidence of Gender Discrimination: The Ascendance of "Social Frameworks," 94 VA. L. REV. 1715 (2008) ("Monahan, Walker & Mitchell")). In particular, in dicta the Supreme Court suggested that the testimony of a social framework expert, Dr. William Bielby, might not satisfy *Daubert* to the extent he opined that Wal-Mart had a "strong corporate culture," that makes it "vulnerable" to "gender bias[,]" pointing to criticism by Monahan, Walker & Mitchell that Dr. Bielby's application of social framework analysis specifically to Wal-Mart did not meet the standards expected of social scientific research into stereotyping and discrimination. 564 U.S. at 355 n. 8.[24]

---

[24] Defendants quote the Supreme Court's conclusion that Dr. Bielby's opinions could be "safely

1        Similarly, in *Mullenix* and *Nikalova*, Judge Hightower concluded that opinions offered by

2    Dr. Glick applying the principles of social framework analysis to the specific facts of those cases

3    were not supported by scientific principles and methodology.  *See Mullenix v. Univ. of Texas at*

4    *Austin,* 2021 WL 4304815, at *6; *Nikolova,* 2022 WL 443783, at *5.  Judge Hightower points to

5    the same experts whose criticisms were cited in *Wal-Mart*, who originated the field of social

6    framework analysis, and who explain the problems with applying its principles to specific cases as

7    follows:

> The very idea of a social framework is to supply fact-finders with
> information about general social science research to provide a context
> or "framework" for the fact-finder to use when evaluating the
> evidence in a particular case. Thus, a social framework necessarily
> contains only general statements about reliable patterns of relations
> among variables as discovered within social scientific research,
> whether communicated via jury instructions or testimony of a
> qualified expert, and goes no further. . . .
>
> There is little doubt that those experts who purport to link findings
> from academic studies to behaviors in particular cases do not apply
> the same level of intellectual rigor used to produce the empirical
> studies from which they extrapolate. Any attempt to link basic
> research findings to specific organizational settings and outcomes
> requires that many assessments be made about the presence and
> operation within the organization of variables that have been found to
> be important within the basic research settings. To make these
> assessments in a scientifically reliable way, the variables must be
> clearly defined, measured, and their relationships systematically
> tested, with the definitions, measurements, and tests reported in a
> transparent way so that another researcher could attempt to replicate
> the assessments. To qualify as scientific, a system of measurement or
> testing cannot be a private system that only one researcher (or expert)
> can apply. A scientific paper that contained only a series of
> descriptive conclusions and did not disclose the particular methods
> used and measurements taken to reach those conclusions would be
> promptly rejected by a scientific journal. Unfortunately, some courts
> have allowed experts to link social frameworks to the facts of
> particular cases despite the experts' failure to meet these scientific
> requirements.

23    *Mullenix*, 2021 WL 4304815, at *5 (quoting Monahan, Walker & Mitchell at 1736, 1738-39,

24    1745);  *see also Nikolova,* 2022 WL 443783, at *5 (same).

25

26    _____

27    disregard[ed]" as "unhelpful[,]" Motion to Exclude at 5 (erroneously citing 564 U.S. at 355 n.8),
      but that statement was not made in connection with whether Dr. Bielby's opinions were
      admissible under *Daubert*.  Instead, the Court found that Dr. Bielby's testimony could be "safely
      disregarded" "*even if properly considered*" because Bielby's opinions did not shed light on the
28    commonality question that was before the Court. 564 U.S. at 354 (emphasis added).

United States District Court
Northern District of California

United States District Court
Northern District of California

Judge Hightower recognized that social framework analysis that is applied to the specific case could, in theory, satisfy *Daubert* but pointed to the opinion of Monahan, Walker & Mitchell that "[i]f testimony about a specific case is to be offered by an expert, that testimony should be based on valid 'social fact' research that involves the parties before the court, rather than on subjective, unscientific extrapolation from general research conducted outside the case." *Mullenix*, 2021 WL 4304815, at *5 (quoting Monahan, Walker & Mitchell at 1749); *Nikolova,* 2022 WL 443783, at *6 (same).  In that context, Judge Hightower found that Dr. Glick's opinions fell short for the further reason that he had not relied on representative data in drawing his conclusions about the specific discrimination alleged in those cases, instead relying only on the materials supplied by the plaintiffs, rendering his opinions unreliable. *Mullenix*, 2021 WL 4304815, at *6; *Nikolova,* 2022 WL 443783, at *7.  That conclusion does not apply here, however, because Dr. Glick does not attempt to apply social framework analysis to the specific facts of this case, in contrast to the opinions offered in *Mullenix* and *Nikolova* by Dr. Glick.  Therefore, Defendants' reliance on those cases to argue that Dr. Glick's opinions in this case must be excluded for failure to consider representative data is misplaced.  For these reasons, the Court concludes the scientific knowledge requirement is satisfied as to Dr. Glick's opinions.[25]

A more difficult question is whether Dr. Glick's opinions will be helpful to the jury, a question that turns on both relevance of the opinion and the possibility that the jury will be confused rather than enlightened by an expert's opinion.  On this question, Judges Hightower and Gertner reached opposite conclusions. Judge Hightower found that even as to Dr. Glick's opinions about the general principles of social framework analysis, the jury was likely to be confused and misled because "the majority of Glick's expert report focuses on gender stereotyping and bias throughout society" and "the jury may assume that such stereotyping and bias existed at UT Austin." *Nikolova*, 2022 WL 443783, at *8.  Judge Hightower reasoned that "[t]he burden is on Plaintiff to prove that she was discriminated against because of her sex, not just that gender

---

[25] In reaching this opinion, the Court decides only that Dr. Glick's opinions meet the minimum threshold for admissibility with respect to this requirement. Defendants' expert may nonetheless offer rebuttal opinions challenging the opinions of Dr. Glick with respect to his characterization of the general principles of social framework analysis.

1   stereotyping or bias exists throughout society." *Id.* (citation omitted).  Therefore, she excluded Dr.

2   Glick's entire report on the basis that it was likely to lead to prejudice and jury confusion.  *Id.*; *see*

3   *also Mullenix,* 2021 WL 4304815, at *7 (reaching same conclusion).

4         In contrast, Judge Gertner found that all of the opinions offered by Dr. Glick in his report

5   were admissible, rejecting the defendant's argument that they would not assist the jury. *Tuli*, 592

6   F. Supp. 2d at 215.    She reasoned:

> Professor Glick brings the insights of established scientific inquiry
> and social framework analysis, as to which he is an expert, to bear on
> the facts of this case. It is an area that the jury may well not have
> common knowledge. But Professor Glick does so in a way that has
> scientific validity: he cannot say whether a  given act or word was
> discriminatory; he can only show the settings in which discrimination
> typically occurs and opine on whether the allegations in the case at
> bar are consistent with the observed patterns. He allows the jury to
> make the final decision and expressly disclaims the capacity to draw
> any conclusion in this particular case. His testimony is admissible.

13  *Id.* at 215-216. Judge Gertner also noted that gender stereotyping expert testimony has been

14  permitted by the Supreme court, citing *Price Waterhouse v. Hopkins*, in which "social

15  psychologist Dr. Susan Fiske, Professor Glick's colleague, testified about gender stereotyping

16  patterns in the accounting firm partner selection process, the significance of the fact that the

17  plaintiff was the only woman in the pool of candidates, and the subjectivity of the evaluations

18  without indicating whether any particular comment was the result of stereotyping." *Id.* at 2014

19  (citing 490 U.S. 228 (2009)).

20        The Court here finds that this question will be better addressed in the context of trial, when

21  the evidence unfolds and the relevance of particular opinions will be clearer. *See Sumotext Corp.*

22  *v. Zoove, Inc.*, No. 16-CV-01370-BLF, 2020 WL 533006, at *1 (N.D. Cal. Feb. 3, 2020) ("In

23  many instances . . . rulings 'should be deferred until trial, so that questions of foundation,

24  relevancy, and potential prejudice may be resolved in proper context.'") (quoting *United States v.*

25  *Pac. Gas & Elec. Co.*, 178 F. Supp. 3d 927, 941 (N.D. Cal. 2016)). Though the Court shares Judge

26  Hightower's concerns that Dr. Glick's opinions have the potential to confuse or prejudice the jury,

27  it also places significant weight on the fact that both parties' experts appear to agree that some

28  aspects of how gender stereotyping and discrimination occurs are not well understood by a

layperson and therefore, that there may be specific circumstances where expert testimony on that subject will be helpful to the jury. For example, to the extent Defendants repeat at trial their argument that DA Becton could not have intended to discriminate with respect to certain conduct because she is female and over 70, it may be helpful to the jury to hear testimony by Dr. Glick (and potentially, Dr. Mitchell as well) describing scientific research and findings with respect to discriminatory conduct by members of a protected group against other members of that group. Therefore, the Court denies Defendants' Motion to Exclude without prejudice to objecting at trial to Dr. Glick's opinions. Plaintiffs, in turn, will be required to make a proffer showing that any opinion they seek to introduce by Dr. Glick is directly relevant to issues raised in the case and will not mislead or confuse the jury.

## V.       MOTION FOR SANCTIONS

### A.    The Protective Order

The parties in this case entered into a stipulated protective order governing the exchange of confidential material that was approved by the Court. Dkt. No. 71 ("Protective Order"). The parties recognized that the Protective Order "does not confer blanket protections on all disclosures or responses to discovery and that the protection it affords from public disclosure and use extends only to the limited information or items that are entitled to confidential treatment under the applicable legal principles." Protective Order § 1. Further, the parties agreed to detailed rules governing the designation of material as confidential. *See generally* Protective Order § 5.

Section 5.1 of the Protective Order is entitled "Exercise of Restraint and Care in Designating Material for Protection" and provides as follows:

> Each Party or Non-Party that designates information or items for protection under this Order must take care to limit any such designation to specific material that qualifies under the appropriate standards. The Designating Party must designate for protection only those parts of material, documents, items, or oral or written communications that qualify – so that other portions of the material, documents, items, or communications for which protection is not warranted are not swept unjustifiably within the ambit of this Order.
>
> Mass, indiscriminate, or routinized designations are prohibited. Designations that are shown to be clearly unjustified or that have been made for an improper purpose (e.g., to unnecessarily encumber or retard the case development process or to impose unnecessary

59

1    expenses and burdens on other parties) expose the Designating Party
     to sanctions. If it comes to a Designating Party's attention that
2    information or items that it designated for protection do not qualify
     for protection, that Designating Party must promptly notify all other
3    Parties that it is withdrawing the mistaken designation.

4    Protective Order § 5.1.  The Protective Order requires that material must be designated as

5    confidential "before the material is disclosed or produced" "[e]xcept as otherwise provided in [the

6    Protective Order] . . . or as otherwise stipulated or ordered."  Protective Order § 5.2.  As to

7    depositions, the Protective Order requires that "the Designating Party identify on the record,

8    before the close of the deposition . . . all protected testimony."  Protective Order § 5.2(b).

9         The Protective Order also contains a section addressing challenges to confidentiality

10   designations.  Protective Order § 6.  That section provides that "a Party does not waive its right to

11   challenge a confidentiality designation by electing not to mount a challenge promptly after the

12   original designation is disclosed."  Protective Order § 6.1.  It also contains the following Meet and

13   Confer provision:

14        The Challenging Party shall initiate the dispute resolution process by
          providing written notice of each designation it is challenging and
15        describing the basis for each challenge. To avoid ambiguity as to
          whether a challenge has been made, the written notice must recite that
16        the challenge to confidentiality is being made in accordance with this
          specific paragraph of the Protective Order. The parties shall attempt
17        to resolve each challenge in good faith and must begin the process by
          conferring directly (in voice to voice dialogue; other forms of
18        communication are not sufficient) within 14 days of the date of
          service of notice. In conferring, the Challenging Party must explain
19        the basis for its belief that the confidentiality designation was not
          proper and must give the Designating Party an opportunity to review
20        the designated material, to reconsider the circumstances, and, if no
          change in designation is offered, to explain the basis for the chosen
21        designation. A Challenging Party may proceed to the next stage of the
          challenge process only if it has engaged in this meet and confer
22        process first or establishes that the Designating Party is unwilling to
          participate in the meet and confer process in a timely manner.

23   Protective Order § 6.2.  Where meet-and-confer efforts fail, the parties may seek judicial

24   intervention as follows:

25        If the Parties cannot resolve a challenge without court intervention,
          the Designating Party shall file and serve a motion to retain
26        confidentiality under Civil Local Rule 7 (and in compliance with Civil
          Local Rule 79-5, if applicable) within 21 days of the initial notice of
27        challenge or within 14 days of the parties agreeing that the meet and
          confer process will not resolve their dispute, whichever is earlier.
28        Each such motion must be accompanied by a competent declaration

United States District Court
Northern District of California

60

1

2

3

4

5

6

> affirming that the movant has complied with the meet and confer requirements imposed in the preceding paragraph. Failure by the Designating Party to make such a motion including the required declaration within 21 days (or 14 days, if applicable) shall automatically waive the confidentiality designation for each challenged designation. In addition, the Challenging Party may file a motion challenging a confidentiality designation at any time if there is good cause for doing so, including a challenge to the designation of a deposition transcript or any portions thereof. Any motion brought pursuant to this provision must be accompanied by a competent declaration affirming that the movant has complied with the meet and confer requirements imposed by the preceding paragraph.

7   Protective Order § 6.3.

8       **B.   Contentions of the Parties**

9       Plaintiffs seek sanctions against Defendants for violating the Protective Order by making

10  blanket and indiscriminate confidentiality designations in connection with the depositions of

11  Plaintiffs' witnesses.  Sanctions Motion at 1. They present evidence that Defendants' counsel

12  designated the deposition transcripts as confidential at the outset of the deposition as to the

13  following witnesses: Chris Walpole, Danney Cabral, Diana Becton, Eli Makus, Jason Chan, Mary

14  Blumber, Mary Knox, Nancy Georgiou, Rachel Piersig, Simon O'Connell, Stacey Grassini, Venus

15  Johnson, Jill Henderson and Alison Chandler.  Molineaux Decl., Exs. A-O (deposition excerpts).

16  They also point out that when Defendants filed the Summary Judgment Motion, their counsel

17  acknowledged in a supporting declaration that the deposition excerpts they filed in support of that

18  motion were not, in fact, confidential even though they had previously designated the entirety of

19  the deposition transcripts as confidential. Sanctions Motion at 3 (citing dkt. no. 95-1, Fish Dec. ¶¶

20  3 (Makus Dep.), 7 (Georgiou Dep.), 8 (Cabral Dep.), 9 (Johnson Dep.), 10 (O'Connell Dep.), 11

21  (Walpole Dep.), 14 (Knox Dep.), 15 (Henderson Dep.), 17 (Piersig Dep.), 18 (Blumberg Dep.), 19

22  (Chandler Dep.)).

23      Plaintiffs contend Defendants have acted in bad faith, indiscriminately designating material

24  as confidential and failing to promptly notify Plaintiffs of mistaken designations, violating both

25  the Protective Order and the law that protects the public's interest in having access to such

26  materials.  *Id.* at 3-4.  They ask the Court to order that all the Confidential designations asserted by

27  Defendants in this case be de-designated and that Defendants be required to redesignate only those

28  documents that fit within the Protective Order.  *Id.*  at 4. Plaintiffs further request monetary

United States District Court
Northern District of California

61

1    sanctions in the amount of $10,000, "both for the additional time spent on the Opposition to the

2    MSJ, the making of this motion, and to deter future behavior."  *Id.*

3        Defendants respond that the Sanctions Motion is unnecessary and could have been avoided

4    if Plaintiffs had adequately met and conferred with them on the designations, as required under the

5    Protective Order.  Opposition at 1-2.  They offer a declaration of attorney John Fish stating that

6    Defendants designated the depositions of both parties' witnesses as confidential "as a

7    precautionary matter in the event discussions about specific cases or legal matters arose[,]" that

8    they "understood Plaintiffs' [sic] agreed with this approach" and that "[t]here was never an

9    objection or any questions about the designations."  Fish Decl. ¶ 2.  They also point to an email

10   exchange in which Defendants, in response to a request by Plaintiffs' counsel to meet and confer

11   about the designations, told Plaintiffs: "As things turned out, and as expected, portions of the

12   depos are confidential and portions are not. If Plaintiffs have a specific portion(s) of a deposition

13   you propose Defendants de-designate, please let us know. We will of course be reasonable."  Fish

14   Decl., Ex. A.  According to Fish, Plaintiffs' counsel did not respond "or otherwise

15   reach[ ] out to Defendants to identify the specific testimony they wanted to de-designate as

16   confidential before filing this instant motion for sanctions." Fish Decl. ¶ 3.

17       In their Reply, Plaintiffs contend they adequately met and conferred with Defendants

18   before bringing the Motion, providing the formal meet-and-confer letter that led to the email

19   exchange referenced by Fish and pointing out that they made several attempts to meet and confer

20   and that ultimately, Defendants improperly placed the burden on Plaintiffs to identify material that

21   was not confidential despite their use of indiscriminate designations as to the deposition

22   transcripts.  *Id.*  at 4.

23   **C.    Discussion**

24       Courts are authorized to issue protective orders under Rule 26(c)(1) of the Federal Rules of

25   Civil Procedure, which permits a federal court to issue an order "to protect a party or person from

26   annoyance, embarrassment, oppression, or undue burden or expense." Among other things, a

27   protective order may "forbid disclosure or discovery, specify the terms for disclosure or discovery,

28   prescribe a discovery method other than the one selected by the party seeking discovery, prohibit

inquiry into certain matters, and otherwise limit the scope of disclosure or discovery limit the scope of disclosure of materials produced in discovery." *Edwards Vacuum, LLC v. Hoffman Instrumentation Supply, Inc*., No. 3:20-CV-1681-AC, 2021 WL 186932, at *1 (D. Or. Jan. 19, 2021) (citing Fed.R.Civ. P. 26(c)(1)(D)).  However, it is "well-established that the fruits of pretrial discovery are, in the absence of a court order to the contrary, presumptively public." *San Jose Mercury News, Inc. v. U.S. Dist. Ct.--N. Dist. (San Jose)*, 187 F.3d 1096, 1103 (9th Cir. 1999). Further, the court may enter an order overriding this presumption only where there is a particularized showing of good cause. *Id.* Likewise, "a party's confidentiality designations must be reasonably and narrowly tailored to protect the confidential information the party seeks to shield from further disclosure." *Edwards Vacuum, LLC v. Hoffman Instrumentation Supply, Inc*., No. 3:20-CV-1681-AC, 2021 WL 186932, at *2 (D. Or. Jan. 19, 2021) (explaining that :an 'across-the-board' designation is improper, even if some confidential information may be found within the broader designation" and that "a party misuses a protective order when it over-designates discovery materials in that way.").

Defendants do not dispute that their practice of designating all depositions at the outset of the deposition constituted "blanket" designations of confidentiality – a practice that it improper under the case law and violates Section 5.1 of the Protective Order, which expressly prohibits such conduct.  They contend the practice was intended to be a "precautionary measure in the event discussions about specific cases or legal matters arose" in the depositions but do not explain why the same result could not have been achieved by identifying confidential material at the end of each deposition, as required under the Protective Order.  Nor do they cite any authority that suggests this explanation excuses their obligations to designate material as confidential only in a manner that is narrowly tailored.  Defendants' assertion that Plaintiffs "never" objected to the blanket designations, even if true (Plaintiffs clearly did object in their formal meet-and-confer letter dated March 9, 2022, *see* Molineaux Reply Decl., Ex. D) also is of no moment as the Protective Order specifically provides that such objections are not waived due to delayed assertion of the objection.  Protective Order § 6.1.

The Court also rejects Defendants' assertion that Plaintiffs did not adequately meet and

United States District Court
Northern District of California

confer before bringing the Sanctions Motion and therefore, that the Motion is not ripe.  Plaintiffs sent Defendants a formal meet-and-confer letter on March 9, 2022 clearly stating that they were giving "written notice that Plaintiffs [were] challenging Defendants' practice of designating the transcript of each deposition taken in this civil action as confidential under the Protective Order in this civil action."  Molineaux Reply Decl., Ex. D.  The letter goes on to list each of the depositions in which Defendants had made such a blanket designation, to cite the provision of the Protective Order governing designations and to point to the heightened interest of the public in the information contained in these transcripts given that they involved the functioning of a government office.  *Id.* It ended by asking Defendants to provide their designations by March 11, 2022 and offering two possible times on March 10 and 11th for the parties to meet and confer.  *Id.*

The email exchange that was supplied by Fish shows that on March 11, 2022, Plaintiffs' counsel followed up, stating she had received no response and offering to meet and confer the following Monday or Tuesday.  Fish Decl., Ex. A. Fish then responded (on March 11, 2022) stating that he had been in a deposition and that he would "be in touch after [he] review[ed] with [his] client."  *Id.* By Tuesday, March 15, 2022, Defendants' counsel had not gotten back to Plaintiffs' counsel, who sent another email inquiring about the designations and asking for times when counsel could meet and confer on Wednesday, Thursday and Friday of that week.  *Id.* The next day, Fish responded as follows:

> Defendants designated certain depositions (not all of them) confidential at the outset of the depos rather than interrupting to have the court reporter designate specific sections. This was done for Plaintiffs' depos as well as Defendants' depos since September and as recently as last week. I understood your three co-counsel agreed with this approach and even referenced the confidential designations as a basis for witnesses to respond to certain lines of questioning. There was never an objection or any question. As things turned out, and as expected, portions of the depos are confidential and portions are not. If Plaintiffs have a specific portion(s) of a deposition you propose Defendants de-designate, please let us know. We will of course be reasonable.

*Id.*

The Court finds that Plaintiffs made multiple attempts to meet and confer and that Defendants' counsel was largely unresponsive, delaying in responding to Plaintiffs' communications and refusing to provide times when the parties could meet and confer.

64

United States District Court
Northern District of California

1  Defendants then told Plaintiffs to identify the portions of the transcripts that should be de-

2  designated, shifting the obligations established under the Protective Order for designations and in

3  flagrant disregard of the presumption of public access to the deposition transcripts.  Defendants

4  did not offer any justification for this approach, which appears to have been an improper delay

5  tactic.[26]  The Protective Order provides that a party satisfies its obligation to meet and confer if it

6  "establishes that the Designating Party is unwilling to participate in the meet and confer process in

7  a timely manner."  Protective Order § 6.2.  Plaintiffs have made that showing here.

8          Given that Defendants have offered no justification for their blanket designations and the

9  rule against blanket designations is well-established, the Court finds that Defendants have acted in

10  bad faith.  This conclusion finds further support in the fact that Defendants have not given notice

11  of any de-designations other than by their non-opposition to one of Plaintiffs' administrative

12  motion to seal, *see* dkt. no. 104, and failed to respond at all to another administrative motion to

13  seal based on Defendants' blanket designations of the deposition transcripts. See dkt. no. 125.

14  Therefore, the Court finds that sanctions are warranted.  An appropriate measure of sanctions is

15  the cost of the extra work necessitated by Defendants' conduct.  In particular, Plaintiffs are

16  entitled to the following amounts: 1) reasonable fees and costs incurred in connection with the

17  three administrative motions to seal they were required to file in connection with the deposition

18  transcripts, dkt. nos. 99, 121 and 125, which are DENIED on the basis that no showing has been

19  made that the material sought to be sealed warrants protection; 2) reasonable fees and costs

20  incurred in connection with filing in the public record the exhibits that were the subject of the

21  motions to seal the Court denies herein; 3) reasonable fees and costs incurred in connection with

22  the briefing of the Sanctions Motion; 4) reasonable fees and costs incurred in connection with

23  preparing supporting declarations documenting the costs listed above so that the Court can

24  determine the amount of sanctions.

25

26

27  _____

[26] It is also possible that this tactic was aimed at keeping potentially inflammatory deposition

28  testimony from the public during a hotly contested election battle between Becton and Knox.  Of
course, it that were the purpose of Defendants' conduct it would fly in the face of the principle that
the public has an important right to this information.

**D.      Conclusion**

The Sanctions Motion is GRANTED. The Court DENIES Plaintiffs' administrative motions to seal (dkt. Nos. 99, 121 and 125).  Plaintiffs shall file evidence establishing the fees and costs incurred in performing the work described above within fourteen (14) days.[27] Within the same time period, Plaintiffs shall also file the documents that are the subject of the motions to seal (dkt. nos. 99, 121 and 125) in the public record.   In addition, Defendants shall supply Plaintiffs with narrowly tailored confidentiality designations as to all of the depositions they have designated as confidential within seven (7) days of the date of this order.

**IT IS SO ORDERED.**

Dated:  June 24, 2022

_____
JOSEPH C. SPERO
Chief Magistrate Judge

United States District Court
Northern District of California

---

[27] Alternatively, the parties may meet and confer and stipulate to the amount of sanctions.  Should they agree to the amount of the sanctions award, they should submit a joint stipulation to the Court within fourteen days of the date of this order.